Slip Op. 20-8

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| ASOCIACIÓN DE EXPORTADORES E INDUSTRIALES DE ACEITUNAS DE MESA, ACEITUNAS GUADALQUIVIR, S.L.U., AGRO SEVILLA ACEITUNAS S. COOP. AND., and ANGEL CAMACHO ALIMENTACIÓN, S.L., | |
| Plaintiff, | |
| v. | Before: Gary S. Katzmann, Judge |
| UNITED STATES, | Court No. 18-00195 |
| Defendant, | |
| and | |
| COALITION FOR FAIR TRADE IN RIPE OLIVES, | |
| Defendant-Intervenor. | |

## OPINION

[Plaintiffs' motion for judgment on the agency record is granted in part and Commerce's <u>Final Determination</u> is remanded consistent with this opinion.]

Dated: January 17, 2020

<u>Matthew P. McCullough</u>, Curtis Mallet-Prevost, Colt & Mosle LLP, of Washington, DC, argued for plaintiff. With him on the joint brief were <u>Christopher A. Dunn</u> and <u>Tung Nguyen</u>.

<u>Tara K. Hogan</u>, Assistant Director, and <u>Sonia W. Murphy</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant. With them on the brief were <u>Joseph H. Hunt</u>, Assistant Attorney General, and <u>Jeanne E. Davidson</u>, Director. Of counsel was <u>Saad Y. Chalchal</u>, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

<u>David J. Levine</u> and <u>Raymond Paretzky</u>, McDermott Will & Emery LLP, of Washington, DC, argued for defendant-intervenor.

Katzmann, Judge:  This case presents two issues of first impression under Sections 771 and

771B of the Tariff Act of 1930,[1] respectively: (1) the interpretation and application of the term

"expressly limits" in the countervailable domestic subsidy provision, 19 U.S.C. § 1677(5A)(D)(i)

("Section 1677(5A)"); and (2) the interpretation and application of the term "substantially

dependent" in the agricultural countervailable subsidies provision, 19 U.S.C. § 1677-2 ("Section

1677-2").[2]  The case involves a claim from the U.S. domestic olive industry that the governments

of the European Union ("EU") and Spain unfairly subsidized Spanish olives that were then

imported into the U.S. to the detriment of the U.S. industry.  See Petition for Imposition of AD

and CVD Duties, Vol. I (June 21, 2017), P.R. 7 ("Pet. Vol. I").  Based on a petition filed by the

Coalition for Fair Trade in Ripe Olives ("Coalition" or "Defendant-Intervenor"), the Department

of Commerce ("Commerce") initiated an investigation into subsidies received by the Spanish olive

industry.  Commerce's investigation resulted in a determination that subsidies given to growers of

raw olives were de jure specific to olive growers under Section 1677(5A) and those subsidies were

attributable to downstream processors of those raw olives into ripe olives under Section 1677-2.

Therefore, using information collected from interested parties during its investigation, Commerce

calculated countervailing duties ("CVDs") for imports of ripe olives from Spain.  See Ripe Olives

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provision of Title 19 of the U.S. Code, 2012 edition. Citations to 19 U.S.C. § 1677e, however, are not to the U.S. Code 2012 edition, but to the unofficial U.S. Code Annotated 2018 edition.  The current U.S.C.A. reflects the amendments made to 19 U.S.C. § 1677e (2012) by the Trade Preferences Extension Act of 2015, Pub. L. No. 114–27, § 502, 129 Stat. 362, 383–84 (2015).  The TPEA amendments are applicable to all determinations made on or after August 6, 2015, and therefore, are applicable to this proceeding.  See Dates of Application of Amendments to the Antidumping and Countervailing Duty Laws Made by the Trade Preferences Extension Act of 2015, 80 Fed. Reg. 46,793, 46,794 (Dep't Commerce Aug. 6, 2015).

[2] Further citations to Section 1677-2 denote the specific subsection of that provision, if applicable. See 19 U.S.C. § 1677-2(1) ("Section 1677-2(1)"); 19 U.S.C. § 1677-2(2) ("Section 1677-2(2)").

From Spain: Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order, 83 Fed. Reg. 37,469 (Dep't Commerce August 1, 2018), P.R. 1417 ("Amended Final Determination").

Asociación de Exportadores e Industriales de Aceitunas de Mesa ("Asemesa"),[3] Aceitunas Guadalquivir, S.L.U. ("Guadalquivir"), Agro Sevilla Aceitunas S. Coop. And. ("Agro Sevilla"), and Angel Camacho Alimentación, S.L. ("Angel Camacho") (collectively, "Plaintiffs"), major producers and/or exporters of ripe olives from Spain, brought this action against the United States ("the Government") in opposition to Commerce's CVD determination and moved for judgment on the agency record pursuant to Rule 56.2 of the Rules of the Court of International Trade.  The court grants, in part, Plaintiffs' motion for judgment on the agency record.

## BACKGROUND

### I.    Legal and Regulatory Framework for Countervailing Duty Determinations

To empower Commerce to offset economic distortions caused by countervailable subsidies and dumping, Congress enacted the Tariff Act of 1930.  Sioux Honey Ass'n v. Hartford Fire Ins., 672 F.3d 1041, 1046–47 (Fed. Cir. 2012); ATC Tires Private Ltd. v. United States, 42 CIT __, __, 322 F. Supp. 3d 1365, 1366 (2018).  Under the Tariff Act's framework, Commerce may -- either upon petition by a domestic producer or of its own initiative -- begin an investigation into potential countervailable subsidies and, if appropriate, issue orders imposing duties on the subject merchandise.  Sioux Honey, 672 F.3d at 1046–47; ATC Tires, 322 F. Supp. 3d at 1366–67; 19 U.S.C. §§ 1671, 1673.  A subsidy is countervailable if the following elements are satisfied: (1) a government or public authority has provided a financial contribution; (2) a benefit is thereby

_____

[3] Asemesa describes itself as an interested "business association a majority of the members of which are producers, exporters, or importers of [subject] merchandise" as defined by Section 771(9)(A) and 516A(f)(3) of the Tariff Act of 1930. Compl. at 2, Sept. 28, 2018, ECF No. 7 (citing 19 U.S.C. §§ 1677(9)(A), 1516a(f)(3)).

conferred upon the recipient of the financial contribution; and (3) the subsidy is specific to a

foreign enterprise or foreign industry, or a group of such enterprises or industries.  19 U.S.C. §

1677(5).  Specific subsidies are also referred to as "coupled" subsidies. "Decoupled" refers to the

fact that a subsidy does not encourage production of a specific agricultural product, i.e. is not a

specific subsidy.  At issue here, a domestic subsidy is de jure specific "[w]here the authority

providing the subsidy, or the legislation pursuant to which the authority operates, expressly limits

access to the subsidy to an enterprise or industry."  19 U.S.C. § 1677(5A)(D)(i).

If Commerce determines that the government of a country is providing, directly or

indirectly, a countervailable subsidy with respect to the manufacture, production, or export of a

class or kind of merchandise imported, sold, or likely to be sold for import, into the United States,

and the International Trade Commission ("ITC") determines that an industry in the United States

is materially injured or threatened with material injury thereby, then Commerce shall impose CVD

upon such merchandise equal to the amount of the net countervailable subsidy.  <u>See</u> 19 U.S.C. §

1671(a).  However, when the merchandise subject to investigation involves a processed

agricultural product that meets the criteria under Section 1677-2, Commerce will include in its

analysis countervailable subsidies received by producers or processors of the raw agricultural

product and will deem such subsidies to be received by manufacturers, producers, and exporters

of the processed product.  <u>See</u> 19 U.S.C. § 1677-2.  Because the Tariff Act is silent on the

calculation methodology for imposing CVDs, Commerce calculates a duty rate by formulating a

calculation methodology in line with the statutory language and purpose.  <u>See</u> <u>Solarworld</u>

<u>Americas, Inc. v. United States</u>, 40 CIT __, __ 182 F. Supp. 3d 1372, 1376 (2016).

## II.    *Factual and Procedural History of This Case*

On June 22, 2017, Commerce received a CVD petition, filed on behalf of Coalition,

regarding imports of ripe olives from Spain.  <u>See</u> Pet. Vol. I.  Raw olives become edible and ready

for consumers by either becoming table olives or olive oil.  See Pet. Vol. I at 7.  Ripe olives are

one type of table olive, commonly referred to black olives.[4]  See Id. at 1−2; Agro Sevilla's

Affiliations Questionnaire Response at 8 (August 18, 2017), P.R. 344.  To produce ripe olives, raw

olives "are cured for multiple days in a de-bittering solution, usually alkaline," then rinsed in water

several times, followed by possible pitting, slicing, chopping, or wedging, as applicable.  Pet. Vol.

I at 7.  Ripe olives are then packaged in a container and topped with salt brine.  Id.  In its petition,

Coalition alleged that the EU through the Government of Spain provided countervailable subsidies

to raw olive growers that must then be attributed to processors of ripe olives.  Petition for the

Imposition of Antidumping and Countervailing Duties, Vol. III at 10 (June 21, 2017), P.R. 58.

Coalition claims these "subsidized imports of ripe olives . . . from Spain have materially injured

the U.S. domestic industry producing ripe olives and threaten to cause further material injury if

remedial action is not taken."  Pet. Vol. I at 1.

On July 12, 2017, based on Coalition's petition, Commerce initiated a CVD investigation

on ripe olives from Spain.  Ripe Olives from Spain: Initiation of Countervailing Duty Investigation

82 Fed. Reg. 33050 (Dep't Commerce July 19, 2017), P.R. 126.  Commerce selected as mandatory

respondents[5] three producers that accounted for the largest volume of ripe olives during the period

---

[4] Commerce described with specificity the ripe olives that were subject to investigation.  That
description and more detail on Commerce's subject merchandise is discussed in detail below.  See
Background infra Sec. B. ii.

[5] In CVD investigations or administrative reviews, Commerce may select mandatory respondents
pursuant to 19 U.S.C. § 1677f-1(e)(2), which provides:

If the administering authority determines that it is not practicable to determine
individual countervailable subsidy rates under paragraph (1) because of the large
number of exporters or producers involved in the investigation or review, the
administering authority may—

(A) determine individual countervailable subsidy rates for a reasonable
number of exporters or producers by limiting its examination to—

of investigation: Guadalquivir, Agro Sevilla, and Angel Camacho, all of which are plaintiffs in this action.[6]  Respondent Selection Memo at 1 (July 28, 2017), P.R. 132.  Commerce then issued questionnaires to these respondents regarding their use of subsidy programs as well as information about their sources of raw olives that were used to produce ripe olives.  Questionnaire on Sources of Raw and Ripe Olives Aceitunas Guadalquivir at 1 (August 4, 2017), P.R. 139 ("Guadalquivir Questionnaire").  Commerce simultaneously issued questionnaires to the European Commission and the Government of Spain regarding the subsidy programs applicable to respondents.  Initial CVD Questionnaire to European Commission (Aug. 4, 2017), P.R. 160; Initial CVD Questionnaire to Spain Embassy (Aug. 4, 2017), P.R. 227.  Commerce used the data and information collected through the questionnaire responses (1) in determining whether subsidies provided to imported Spanish olives were countervailable as de jure specific domestic subsidies under Section 1677-2; (2) in determining whether the subsidies could be attributed to ripe olives as the latter stage product; and (3) in calculating applicable duties under 19 U.S.C. § 1671(a).  See Issues and

---

> (i) a sample of exporters or producers that the administering authority determines is statistically valid based on the information available to the administering authority at the time of selection, or
>
> (ii) exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that the administering authority determines can be reasonably examined; or
>
> (B) determine a single country-wide subsidy rate to be applied to all exporters and producers.

The individual countervailable subsidy rates determined under subparagraph (A) shall be used to determine the all-others rate under section 1671d(c)(5) of this title.

[6] As noted above, Asemesa joins the respondents as a plaintiff in this action.

Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of Ripe Olives from Spain at 33 (Dep't Commerce June 11, 2018), P.R. 1300 ("IDM").

### A. Commerce's Determination That EU Subsidy Payments Are De Jure Specific to Olive Growers.

In the investigation, Commerce examined the EU's Common Agricultural Policy ("CAP"),[7] which includes the subsidy programs applicable to Plaintiffs, in order to determine whether these domestic subsidies were specific to the olive industry pursuant to Section 1677(5A). The Basic Payment Scheme ("BPS") is the most recent iteration of EU (and its predecessor the European Community) agricultural subsidy programs that apply to Spanish olives. Decision Memorandum for the Preliminary Determination in the Countervailing Duty Investigation of Ripe Olives from Spain at 18–19 (November 20, 2017), P.R. 1075 ("Preliminary Decision Memo"). Because parts of the current BPS program are based on past iterations of the EU's agricultural subsidy program, Commerce traced the history of these programs in making its determination that the current program is de jure specific. See id.

From 1997 to 2003, the Common Organization of Market in Oils and Fats ("the Common Market Program") was the annual grant-to-farmer program applicable to Spanish olive growers. Preliminary Decision Memo at 22. The Single Payment Scheme ("SPS") replaced the Common Market Program in 2003 and remained in effect until 2014. Id. at 19, 22. The SPS program was then replaced by BPS, which took effect in 2015 and is the current grant-to-farmer program

---

[7] CAP includes various "Pillars," or categories of subsidy programs. See Preliminary Decision Memo at 23. The Basic Payment Scheme ("BPS") and Single Payment Scheme ("SPS") are part of Pillar I of CAP. Preliminary Decision Memo at 19. BPS includes three subprograms: Direct Payment, Greening, and Aid to Young Farmers. Preliminary Decision Memo at 18. Commerce also examined subsidies under CAP Pillar II. Preliminary Decision Memo at 27. However, Plaintiffs did not challenge Commerce's determination regarding the Aid to Young Farmers program nor Pillar II subsidies. See Pls.' Br. at 47–53. Thus, they will not be addressed here. All references to BPS are inclusive of the Direct Payment and Greening subprograms.

applicable to those Spanish olive growers that meet the eligibility requirements and apply for subsidies.  European Union's CVD Questionnaire Response at 20 (September 18, 2017), P.R. 383.

Both the SPS and BPS subsidies are based on a geographical indicator system created from information requested by the EU and provided by Spain regarding farmland productivity prior to the implementation of those programs.  Preliminary Decision Memo at 19, 22.  During the Common Market Program, between 1999 and 2002, Spain collected data on farmland per hectare, the type of crop produced in each hectare, and the amount of crop each hectare produced.  Id. at 19.  For olive growers, a value per hectare was calculated depending on whether the olives were grown for olive oil production or table olive production.  Id. at 22−23.  This value was then multiplied by a farm's number of hectares to determine the amount of aid that the farmer would receive.  Id. at 22.  In this way, the SPS program specifically identified certain crops and benefitted their producers by providing individual payments based on historical reference to the value per hectare calculated from the period of the Common Market Program.  Id. at 23; see European Union's CVD Questionnaire Response at 12.  Put simply, the SPS program distributed subsidies to farmers based on the type and amount of crop their land historically produced.

As the EU explained in its questionnaire response to Commerce, the SPS system was decoupled from production of a particular crop between 2006 and 2010, when Spain began providing subsidies to farmers regardless of the crop or amount of crop produced.  European Union's CVD Questionnaire Response at 11–12.  The implementation of the BPS program continued this decoupled model.  Id. at 20.  Under the EU's Council Regulation (EC) No. 1307/2013 and Spain's accompanying implementing legislation Section 6(1) of Royal Decree 1076/2014, Spain used the data previously used to create the SPS program to then create fifty agricultural regions to facilitate payments under the new BPS program.  IDM at 33; see also Ripe Olives from Spain: Final Affirmative Countervailing Duty Determination, 83 Fed. Reg. 28,186

(Dep't Commerce June 18, 2018), P.R. 1394 ("Final Determination").  Each region was assigned

a rate based on its productive potential and its productive orientation.[8]  Preliminary Decision

Memo at 19.  Commerce found that these regions facilitated the determination of payments

distributed under BPS.  IDM at 33−34.

Therefore, Commerce attributed regional variations in current BPS payments to the use of

crop-specific, historic regional data originally used to calculate subsidy rates under the SPS

program.  See Preliminary Decision Memo at 24.  Commerce summarized its finding of a chain of

specificity:

> In summary, the annual grant amount provided to olive farmers under BPS is based
> on the annual grant amount provided to olive farmers under SPS.  The grant amount
> provided to olive farmers under SPS is based on the average grant amount olive
> farmers received in 1999 through 2002 under the Common Organization of Markets
> in Oil program.  The grant amount provided in 1999 through 2002 to eligible
> farmers, which included olive farmers, was based on the type of crop grown and
> the production value created from the crop.  Therefore, the annual grant amount
> provided under BPS are based on annual grant amounts that were crop specific,
> thus the grant amounts received by olive growers under BPS in 2016 are directly
> related to the grant amount only olive growers received under Common
> Organization of Markets in Oil program.  All respondents and many of the olive
> growers that supply them, received benefits under this program during the [period
> of investigation].

Id. at 24.  Commerce thus determined that, under Section 1677(5A), BPS subsidy payments

as provided by the EU through the Spanish government were de jure specific to olive

growers because the two predecessor programs to BPS -- SPS and the Common Market

Program -- calculated annual grant amounts based on the type of crop and the volume of

production; those amounts provided the foundation for the current BPS subsidy

determination via express reference in the current regulation.  Id. at 18−27.

---

[8] "[P]roductive orientation is categorized as rainfed land, irrigated land, permanent crops, and
permanent pastures.  Olive groves are considered permanent crops."  Preliminary Decision Memo
at 19–20 (quotations omitted).

In sum, Commerce preliminarily determined that BPS subsidy payments were countervailable as a government provided financial benefit to a specific industry, here olive growers.  See id.

### B. Commerce's Determination Under Section 1677-2

Having determined that Spain's BPS program constituted countervailable subsidies, Commerce next determined that those subsidies could be attributed to ripe olive producers. Section 1677-2 provides that Commerce may treat countervailable subsidies provided to producers of a raw agricultural product as though the subsidies have been provided to processors of the raw agricultural product, if two criteria are met.  The statute states:

> In the case of an agricultural product processed from a raw agricultural product in which –
>
> (1) the demand for the prior stage product is substantially dependent on the demand for the latter stage product, and
>
> (2) the processing operation adds only limited value to the raw commodity,
>
> countervailable subsidies found to be provided to either producers or processors of the product shall be deemed to be provided with respect to the manufacture, production, or exportation of the processed product.

19 U.S.C. § 1677-2.

Commerce's investigation covered whether countervailing duties applied to the "subject merchandise," ripe olives, which Commerce defined as follows:

> The subject merchandise includes all colors of olives; all shapes and sizes of olives, whether pitted or not pitted, and whether whole, sliced, chopped, minced, wedged, broken, or otherwise reduced in size; all types of packaging, whether for consumer (retail) or institutional (food service) sale, and whether canned or packaged in glass, metal, plastic, multilayered airtight containers (including pouches), or otherwise; and all manners of preparation and preservation, whether low acid or acidified, stuffed or not stuffed, with or without flavoring and/or saline solution, and including in ambient, refrigerated, or frozen conditions.
>
> Included are all ripe olives grown, processed in whole or in part, or packaged in Spain.  Subject merchandise includes ripe olives that have been further processed

in Spain or a third country, including but not limited to curing, fermenting, rinsing, oxidizing, pitting, slicing, chopping, segmenting, wedging, stuffing, packaging, or heat treating, or any other processing that would not otherwise remove the merchandise from the scope of the investigation if performed in Spain.

Excluded from the scope are: (1) specialty olives (including "Spanish-style," "Sicilian-style," and other similar olives) that have been processed by fermentation only, or by being cured in an alkaline solution for not longer than 12 hours and subsequently fermented; and (2) provisionally prepared olives unsuitable for immediate consumption (currently classifiable in subheading 0711.20 of the Harmonized Tariff Schedule of the United States (HTSUS)).

Preliminary Decision Memo at 6−7.

Ripe olives are a type of processed table olive.  Agro Sevilla's Affiliations Questionnaire Response at 8.  Data from the Food Information and Control Agency, which is within Spain's Ministry of Agriculture, shows that of the 7.4 million tons of raw olives produced in Spain in 2016, only eight percent were used for table olives.  Id. at 9.  Of the 7.4 million tons of raw olives produced, only three percent were used for the subject merchandise, ripe olives.  See Supplier Supplemental Response of Aceitunas Guadalquivir S.L.U. at 3 (November 8, 2017), P.R. 1057. Raw olives become ripe olives through the processing and packaging described above.  See Pet. Vol. I at 7.  The remaining ninety-two percent of raw olives produced in Spain are used for olive oil production.  Id.

Applying both prongs of Section 1677-2, Commerce determined that demand for the prior stage product, raw olives, was substantially dependent on demand for the latter stage product, which Commerce defined as all table olives, and that the processing of raw olives into table olives added only limited value to the raw commodity.  Preliminary Decision Memo at 15.  In so concluding, Commerce relied on the legislative history of Section 1677-2,[9] as well as its prior

---

[9] For example, during debate over the bill, Senator Baucus explained that without Section 1677-2 "a foreign nation could avoid a U.S. countervailing duty on an agricultural product merely by doing some minor processing of the agricultural product before it is exported to the United States.

determinations,[10] to find that the term "latter stage product" is not limited to the subject merchandise of ripe olives, but rather encompasses the next-stage product of processed olives.  Id. at 15.

Under Section 1677-2(1), Commerce determined that the eight percent of raw olives grown in Spain that are processed into table olives was a substantial amount and that the demand for raw olives is dependent on the demand for table olives.  Id. at 16.  Commerce reasoned that eight percent of raw olives in Spain were grown for the purpose of producing table olives and that if this demand were to cease, then eight percent of the market, or millions of dollars in export sales to the United States, would be negatively affected.  Id.  Based on this reasoning, Commerce concluded that the demand for raw olives was "substantially dependent" on the demand for table olives.  Id.

Under Section 1677-2(2), Commerce determined that the three percent value in processing raw olives represented a "limited value" added to the raw commodity.  Id.  Although Plaintiffs submitted data in their response questionnaires that total processing costs, including packaging, equaled sixty percent of the cost of the delivered product, Commerce relied on its prior determinations on agricultural subsidies to not include packaging costs in determining the value added by processing the raw product.  Id.; see also Supplier Supplemental Response of Guadalquivir at 5.  Commerce also noted that regardless of the relationship between cost and value,

_____

For example, a duty on raspberries could be avoided by merely freezing the raspberries before they are shipped to the United States."  133 Congressional Record S8814 (June 6, 1987) ("Statement of Senator Baucus").

[10] Specifically, Commerce referred to Live Swine and Fresh, Chilled and Frozen Pork Products from Canada; Final Affirmative Countervailing Duty Determination, 50 Fed. Reg. 25097-01 (Dep't Commerce June 17, 1985), Rice from Thailand; Final Results of Countervailing Duty Administrative Review, 51 Fed Reg. 12356 (Dep't Commerce April 10, 1986), and Rice from Thailand; Final Results of Countervailing Duty Administrative Review, 59 Fed. Reg. 8906 (Dep't Commerce Feb. 24, 1994) in making its determination. These determinations are discussed in further detail below. See Discussion, infra Sec. II. A.

the processing of raw olives to table olives did "not change the essential character of the olive"

and, therefore, satisfied Section 1677-2(2).  Preliminary Decision Memo at 16.

Thus, Commerce concluded that BPS subsidies provided to Spanish olive growers could

be attributed to ripe olive producers pursuant to Section 1677-2.

### C. Commerce's Countervailing Duty Calculation

In accordance with these statutory threshold determinations, Commerce next calculated the

duty rate that should apply to each producer of ripe olives as attributed recipients of countervailable

subsidies.  Commerce calculates CVD rates based on the authority provided to it by 19 U.S.C. §

1671(a).  However, the statute does not specify how a CVD rate should be calculated.  Commerce

thus promulgated a regulation which governs the calculation of this rate.  See 19 C.F.R. § 351.525.

Generally, Commerce "calculate[s] an CVD rate by dividing the amount of the benefit allocated

to the period of investigation . . . by the sales value during the same period of the product or

products to which [Commerce] attributes the subsidy under paragraph (b)."  19 C.F.R. § 351.525.

In this case, in its preliminary determination of Plaintiffs' CVD rate, Commerce attributed

the subsidy in question to all raw olives.  Preliminary Determination Calculation Memoranda for

Aceitunas Guadalquivir, S.L.U.; Angel Camacho Alimentacion, S.L.; and Agro Sevilla Aceitunas

S.Coop. (November 20, 2017), P.R. 1109.  The equation used by Commerce is demonstrated as:

$$\frac{\text{Weighted Average Per Kilogram Benefit} \times \text{Kilograms of Raw Olives Purchased}}{\text{Sales of Olives and Olive Products}}$$

See id. at 2−3.  Applying this equation in its preliminary CVD calculation, Commerce calculated

CVD rates of 2.31 percent for Guadalquivir, 2.47 percent for Agro Sevilla, 7.24 percent for Angel

Camacho, and an all-others rate of 4.47 percent.  Ripe Olives From Spain: Preliminary Affirmative

Countervailing Duty Determination, 82 Fed. Reg. 56,218, 56,218 (Dep't Commerce Nov. 28,

2017), P.R. 1160 ("Preliminary Determination").   In its final determination, Commerce changed

its methodology, concluding that:

> the applicability of section 771B of the Act . . . requires us to refine our
> methodology with regard to measuring the benefit provided to the production of
> subject merchandise . . . .  This methodology comports with the statutory intent set
> forth within section 701 of the Act, because we have accurately measured the
> subsidy conferred upon the subject merchandise.

IDM at 44.

Commerce changed both the numerator and the denominator of the equation in order to

reflect only purchases and sales of the subject merchandise rather than all raw olives and their

subsequent processed products.   The equation used by Commerce in its final determination is

demonstrated as:

$$\frac{\text{Weighted Average Per Kilogram Benefit} \times \text{Kilograms of Raw Olives Purchased for Subject Merchandise}}{\text{Sales of Subject Merchandise}}$$

See id.  Based on this new equation and in response to ministerial error comments, Commerce

calculated a final CVD rate of 27.02 percent for Guadalquivir, 7.52 percent for Agro Sevilla, 13.76

percent for Angel Camacho, and an all-others rate of 14.97 percent.   Amended Final Determination

at 37,470.

In calculating these rates, Commerce used data from Plaintiffs' questionnaire responses

regarding their sources of raw olives.  Preliminary Decision Memo at 17−18.  The parties dispute

whether the initial questionnaires requested data on Plaintiffs' sources of all raw olives or strictly

sources of raw olives that were processed into ripe olives.  See Pls.' Mot. for J. on Agency R. and

Supp. Opening Br. at 30, February 28, 2018, ECF No. 25 ("Pls.' Br."); Def.'s Resp. in Opp'n to

Pls.' Mot. for J. on the Agency R. at 34, ECF No. 30 ("Def.'s Br.").   The dispute arises because

Commerce used this initially requested data in the altered CVD equation it applied in the Final

Determination to calculate Plaintiffs' respective CVD rates.  One of the plaintiffs, Guadalquivir,

contends that, in contrast to the other plaintiffs, its sole submission to Commerce was data on its purchases of all raw olives and thus Commerce used an incorrect input for data on purchases of raw olives processed into ripe olives. See Pls.' Br. at 31−37. Commerce nonetheless relied on Guadalquivir's submitted data in its final CVD calculation. Amended Final Determination of Countervailing Duty Investigation Pursuant to Ministerial Error Allegation at 5 (July 12, 2018), P.R. 1406 ("Amended Final Investigation").

### D.  Commerce's Investigation Results

On November 28, 2017, Commerce published its preliminary affirmative CVD determination. Preliminary Determination. Commerce determined that producers of ripe olives benefitted from the countervailable subsidies provided to growers of raw olives during the period of investigation. Preliminary Decision Memo at 1. As such, Commerce calculated preliminary CVD rates for each plaintiff. Preliminary Determination at 56,218.

On June 18, 2018, following receipt of case and rebuttal briefs submitted by interested parties, Commerce published its final CVD determination, affirming its preliminary findings. Final Determination. However, both Coalition and Plaintiffs alleged ministerial errors, which Commerce accounted for by amending the Final Determination on August 1, 2018. Amended Final Investigation; Amended Final Determination. On July 25, 2018 the ITC informed Commerce of its requisite determination of material injury to the domestic olive industry because of the subsidies provided to ripe olives imported from Spain. ITC Notification, July 25, 2018, P.R. 1415. As noted above, on August 8, 2018 Commerce then applied CVD rates of 27.02 percent for Guadalquivir, 7.52 percent for Agro Sevilla, and 13.76 percent for Angel Camacho, as well as an all-others rate of 14.97 percent. Amended Final Determination at 37,470.

Plaintiffs challenge the Amended Final Determination before the court. Compl., Sept. 28, 2018, ECF No. 7. Coalition moved for and the court granted its intervention as a defendant-

intervenor on October 17, 2018.  Consent Mot. to Intervene as Def.-Inters., ECF No. 10; Court's

Order, ECF No. 14.  Plaintiffs filed a motion for judgment on the agency record on February 28,

2019.  Pls.' Br.  The Government and Coalition filed their responses on May 31, 2019.  Def.'s Br.;

Def.-Inter.'s Resp. to Pls.' Mot. for J. on the Agency R., ECF No. 29 ("Def.-Inter.'s Br.").

Plaintiffs replied on July 1, 2019.  Pls.' Reply Br. in Supp. of Mot. for J. on Agency R., ECF No.

31 ("Pls.' Reply").  The court held oral argument on November 6, 2019.  ECF No. 38.

### JURISDICTION, STANDARD OF REVIEW, AND INTERPRETATIVE FRAMEWORK

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c) because the

action arises from a CVD determination by Commerce.  The court reviews determinations by

Commerce according to 19 U.S.C. § 1516a(b)(1)(B)(i): "[t]he court shall hold unlawful any

determination, finding or conclusion found . . . to be unsupported by substantial evidence on the

record, or otherwise not in accordance with law."

"A finding is supported by substantial evidence if a reasonable mind might accept the

evidence as sufficient to support the finding."  Maverick Tube Corp. v. United States, 857 F.3d

1353, 1359 (Fed. Cir. 2017) (citing Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

"[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action

including a 'rational connection between the facts found and the choice made.'"  Motor Vehicle

Mfrs. Ass'n v. State Farm Mut. Auto. Ins., 463 U.S. 29, 43 (1983) (citing Burlington Truck Lines

v. United States, 371 U.S. 156, 168 (1962)).

To determine whether Commerce's interpretation and application of a statute is in

accordance with the law, the court must apply the two-step test laid out in Chevron, U.S.A., Inc.

v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984).  See also Apex Frozen Foods Private Ltd.

v. United States, 862 F.3d 1322, 1329 (Fed. Cir. 2017).  Under Chevron, the court first asks

"whether Congress has directly spoken to the precise question at issue."  467 U.S. at 842.  If yes,

"that is the end of the matter," and the court "must give effect to the unambiguously expressed intent of Congress." Id. at 843. However, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." Id. Deference to the agency's interpretation of a statute is only required by Chevron when that interpretation is reasonable. Koyo Seiko Co. v. United States, 36 F.3d 1565, 1573 (Fed. Cir. 1994). The court must give Chevron deference to an agency's policy changes, but if an agency changes its prior practice, it must provide an "adequate explanation" for its change or reversal of a policy. SKF USA Inc. v. United States, 630 F.3d 1365, 1373 (Fed. Cir. 2011). See also Nippon Steel Corp. v. U.S. Int'l Trade Comm'n, 494 F.3d 1371, 1378 n.5 (Fed. Cir. 2007). If Commerce's methodology is arbitrary and capricious, it is contrary to law and will be set aside. Changzhou Wujin Fine Chem. Factory Co. v. United States, 701 F.3d 1367, 1374 (Fed. Cir. 2012). See also Shandong Rongxin Import & Export Co. v. United States, 42 CIT __, __ 331 F. Supp. 1390, 1405 (2018). "Agencies act contrary to law if decision-making is not reasoned." Burlington Truck Lines, 371 U.S. at 167−168.

## DISCUSSION

Plaintiffs moved for judgment on the agency record, arguing that: (1) Commerce improperly concluded that Spain's CAP Pillar I payments are de jure specific subsidies under Section 1677(5A), Pls.' Br. at 47; (2) Commerce improperly interpreted and applied Section 1677-2(1) in concluding that the demand for raw olives is "substantially dependent" on the demand for processed table olives, id. at 7; (3) Commerce improperly interpreted and applied Section 1677-2(2) in concluding that the processing operation that transforms raw olives into processed table olives adds only "limited value," id. at 17; (4) Commerce improperly deviated from its general attribution practice for calculating the CVD rate by attributing subsidies received by growers of raw olives to sales of ripe olives rather than to sales of raw olives, id. at 23; and (5) Commerce

improperly determined that Guadalquivir's reported raw olive purchase data was sufficiently indicative of its purchases of raw olives used to produce ripe olives, id. at 29.

The Government responds that: (1) Commerce properly found that Spain's CAP Pillar I subsidy payments are de jure specific, Def.'s Br. at 40; (2) Commerce properly determined that Section 1677-2 applied to ripe olives from Spain, id. at 10; (3) Commerce's calculation methodology for determining the benefit attributable to Plaintiffs from subsidies provided to growers of raw olives is supported by substantial evidence on the record and in accordance with law, id. at 25; and (4) Commerce properly determined the benefit to Guadalquivir by using Guadalquivir's reported purchase volume of raw olives that were processed into ripe olives, id. at 33.

The court grants Plaintiffs' motion for judgment on the agency record with respect to two issues.  First, the court holds that Commerce's conclusion that BPS subsidy payments provided by the EU and Spain are de jure specific to the olive industry has not been sufficiently explained because Commerce did not provide an interpretation of the statute in reaching its determination based on the record.   Second, the court holds that Commerce applied an impermissible interpretation of the term "substantially dependent," pursuant to Section 1677-2(1), given the plain meaning and legislative history of the statute.  Despite the court's decision to remand these two issues alone, the court addresses the remaining issues in the interest of judicial efficiency to ensure that Commerce makes its determination on remand consistent with the court's findings.

## I.    *Commerce's Finding That the BPS Program Constitutes De Jure Specific Subsidies Did Not Include a Reviewable Interpretation of the Statute.*

Commerce did not set forth an interpretation of Section 1677(5A) in determining that BPS subsidies to olive growers are de jure specific, and thus without more the court cannot determine whether it was supported by substantial evidence and in accordance with law.  For a subsidy to be

countervailable, it must be specific under Section 1677(5A).  Under Section 1677(5A), a subsidy

is de jure specific where the authority providing the subsidy "expressly limits access to the subsidy

to an enterprise or industry" (emphasis added).

In determining that the subsidies at issue are de jure specific, Commerce analyzed the

specificity of three separate programs -- BPS, SPS, and the Common Market Program.   In

summary, Commerce determined that: (1) the Common Market Program, in place from

1999−2002, was de jure specific; (2) SPS, in place from 2003−2014, retained this specificity; and

(3) BPS, in place since 2015, relied on data from both programs and as a result is also de jure

specific.  See supra Background, Sec. II. A.  The Government contends that Commerce correctly

determined that the subsidies were de jure specific under Section 1677(5A) to olive growers

because "[t]he reliance on the annual grant amounts under the Common Market Program as a

historical basis for the annual grants provided during the period of investigation results in

variations in individual payments and, thus, access to the subsidies received by the olive farmers

is expressly limited to olive farmers."  Def.'s Br. at 47.

Plaintiffs argue that even if BPS payments are linked to a land region and its historical

production of crops, the payments are not dependent upon the production of specific crops under

the present program, and thus they have been decoupled from the olive industry.  Pls.' Br. at 51–

52.  Under BPS, any farmer that was entitled to payments under the Common Market Program or

SPS is entitled to payments under BPS, regardless of the type of crop or volume produced.  See

id.  In other words, BPS payments reflect data of a farm that grew olives from 1999−2002 and that

historical data does not change even if the same farm changed the crop it grew or the amount it

produced.  Plaintiffs thus argue that "[b]y definition, . . . these programs are not expressly limited

to an enterprise or industry, and therefore Commerce lacks evidence to reach a finding of

specificity under 19 U.S.C. § 1677(5A)(D)(i)."  Pls.' Br. at 50.  In responding to this argument,

the Government says that Commerce's determination that the subsidies were by operation of Spanish law "expressly based on the annual grant amounts provided on a de jure specific basis" is sufficient to support their conclusion.  Def.'s Br. at 47.

However, the Government fails to explain how a program expressly based on programs that limited access of payments to a specific crop is equivalent to the statement that BPS itself "expressly limit[s]" access of payments to a specific crop, as the statute requires.  See 19 U.S.C. § 1677(5A)(D)(i).  The Government merely repeats Commerce's logic in responding to Plaintiff's argument that expressly based does not equate to the statutory requirement that a subsidy be expressly limited.  See Def.'s Br. at 45–47.  Neither Commerce nor the Government provides an explanation or interpretation of the statute to support its conclusion that the BPS program is de jure specific.  Nor does the Government explain how references to past subsidy programs as part of a larger subsidy calculation satisfy the "express" requirement of the statute because neither Commerce nor the Government makes more than a conclusory statement about the application of the statute to the facts of this subsidy program.  This does not constitute a sufficient explanation of why the BPS subsidies are expressly limited as the statute requires.  Without such an explanation of Commerce's interpretation of the statute, the court cannot analyze whether Commerce made a decision supported by substantial evidence and in accordance with law.

Because Commerce did not set forth an interpretation of the statute in determining that the BPS subsidy payments are de jure specific, the court remands this determination to Commerce so that it may provide an explanation of its interpretation of the statute.

### II.  Commerce's Application of Section 1677-2(1) Is Not in Accordance with Law and Is Arbitrary.

The court concludes that Commerce's determination that processors of raw to ripe table olives could be attributed subsidies received by olive growers pursuant to Section 1677-2(1) is not

in accordance with law because Commerce applied an impermissible interpretation of the statutory

term "substantially dependent" based on its plain language and legislative history.  Furthermore,

Commerce's interpretation of "substantially dependent" is arbitrary because it constitutes an

unexplained and unjustified deviation from its past practice.  Finally, the court dismisses count

two of the complaint as waived.

### A. Commerce Applied an Impermissible Interpretation of Section 1677-2(1) in Determining That the Production of Raw Olives Is Substantially Dependent on the Production of Table Olives.

Section 1677-2(1) states the first of two requirements in determining whether

countervailable subsidies apply to an agricultural product processed from a raw product: "the

demand for [a] prior stage product is substantially dependent on the demand for [a] latter stage

product."  Under Chevron, the court must look to the "traditional tools of statutory construction"

in determining the reasonableness of the agency's interpretation of the statute.  Timex V.I., Inc. v.

United States, 157 F.3d 879, 882 (Fed. Cir. 1998) (quoting Chevron, 467 U.S. at 843 n.9).

Plaintiffs argue that the plain meaning and the legislative history of Section 1677-2(1) support

their claim that Commerce applied an impermissible interpretation of the statute to its CVD

determination of ripe olives.  Pls.' Br. at 10–13.  The court finds Plaintiffs' argument to be

persuasive.

The court begins with the statute's plain meaning and, accordingly looks to the dictionary

definition of "substantially" and "dependent" and the structure of the phrase where "substantially"

modifies the adjective "dependent."  "Substantial" is defined as "[o]f, relating to, or involving

substance," "[i]mportant, essential, and material," and "[c]onsiderable in amount or value."

Substantial, BLACK'S LAW DICTIONARY (10th ed. 2009).  "Substantial" is also defined as "being

largely but not wholly that which is specified."  Substantial, MERRIAM-WEBSTER (Jan. 14, 2020,

3:30 PM), https://www.merriam-webster.com/dictionary/substantial.  "Dependent" is defined as

"determined or conditioned by another: contingent" and "relying on another for support." Dependent, MERRIAM-WEBSTER (Jan. 14, 2020, 3:35 PM), https://www.merriam-webster.com/dictionary/dependent.  The plain meaning thus requires the demand for the prior stage product must be "largely, but not wholly," "contingent" on the demand for the latter stage product. See Substantial, MERRIAM-WEBSTER (Jan. 14, 2020, 3:30 PM), https://www.merriam-webster.com/dictionary/substantial; Dependent, MERRIAM-WEBSTER (Jan. 14, 2020, 3:35 PM), https://www.merriam-webster.com/dictionary/dependent.   The meaning of this phrase is determined by reading the terms "substantially" and "dependent" in conjunction because "substantially" is an adverb that modifies the adjective "dependent."  The court thus concludes that an analysis of "substantially dependent" that does not link those two terms is an impermissible interpretation of the statute.

In interpreting Section 1677-2(1), Commerce did not read these two terms in conjunction, but instead separated those terms to reach its conclusion that the demand for raw olives is substantially dependent upon the demand for table olives.  Commerce found the amount of raw olives used for processing into table olives, eight percent of all raw olives, to be substantial.  Def.'s Br. at 16; Preliminary Decision Memo at 16; IDM at 21–22.  Commerce then found the demand for raw olives was dependent on the demand for table olives because eight percent of the market, or millions of dollars in export sales to the United States, depends upon the demand for table olives. Id.  Commerce's interpretation was impermissible under the plain meaning of the statute because it failed to assess whether the demand for raw olives was "substantially dependent," or "largely, but not wholly," "contingent" on the demand for table olives.  See Substantial, MERRIAM-WEBSTER (Jan. 14, 2020, 3:30 PM), https://www.merriam-webster.com/dictionary/substantial; Dependent, MERRIAM-WEBSTER (Jan. 14, 2020, 3:35 PM), https://www.merriam-webster.com/dictionary/dependent.   Under step one of Chevron, the statutory language is

unambiguous regarding the threshold of demand required to satisfy Section 1677-2(1).[11]
Therefore, the court need not defer to Commerce's interpretation of the statute.

The legislative history of Section 1677-2(1) illuminates Congress's unambiguous intent for
the meaning of "substantially dependent."  Plaintiffs argue that the legislative history of Section
1677-2(1) is consistent with the statute's plain meaning.  Pls.' Br. at 13.  The court agrees.
Congress enacted Section 1677-2 in response to <u>Canadian Meat Council v. United States</u>, in which
the court held that Commerce had no statutory authority to impose CVDs on a processed
agricultural product where the raw agricultural product was being subsidized.[12]  11 CIT 362, 661
F. Supp. 622 (1987), <u>vacated on other grounds</u>, 12 CIT 108, 680 F. Supp. 390 (1988).  Plaintiffs

---

[11] Although the court finds that Section 1677-2(1) is unambiguous under <u>Chevron</u> step one, the
court will address the Government's arguments pursuant to <u>Chevron</u> step two.  <u>See</u> <u>supra</u>,
Jurisdiction, Standard of Review, and Interpretative Framework.  The Government does not cite
to case law interpreting the specific statute in question but rather argues that case law supports
Commerce's interpretation of the word "substantial".  Def.'s Br. at 17–18 (citing <u>Committee for
Fairly Traded Venezuelan Cement v. United States</u>, 372 F.3d 1284, 1289–1290 (Fed. Cir. 2004)
("[The word substantial] does not imply a specific number or cut-off.  What may be substantial in
one situation may not be in another situation.  The very breadth of the term 'substantial' undercuts
[Plaintiff's] argument that Congress spoke clearly in establishing a standard for the Commission's
regional antidumping and countervailing duty analyses.  It therefore supports the conclusion that
the Commission is owed deference in its interpretation of 'substantial proportion.'"))  This view
of "substantial" is inapposite in light of the legislative history specific to this statute, discussed
below.  As such, Commerce's application of the term "substantially dependent" is not reasonable
and not in accordance with law under step two of <u>Chevron</u>.

[12] As Senator Baucus noted:

> The court said, "If the [current] statutory approach is inadequate, it is not the role
> of Commerce or the court, but the Congress to remedy any deficiency." . . .  The
> glitch must be dealt with through a floor amendment.  That is why Senator Grassley
> and myself, with the support of Senator Pryor, are today offering an amendment to
> the trade bill that directs the Commerce Department to place duties on processed
> agricultural products if the raw agricultural product is being subsidized.

Statement of Senator Baucus.

correctly argue that the enactment of Section 1677-2 affirmed Commerce's past practice as applied in Live Swine and Fresh, Chilled and Frozen Pork Products from Canada: Final Affirmative Countervailing Duty Determination, 50 Fed. Reg. 25,097 (Dep't Commerce June 17, 1985) ("Pork from Canada 1985") and Rice from Thailand: Final Results of Countervailing Duty Administrative Review, 51 Fed. Reg. 12,356 (Dep't Commerce April 10, 1986) ("Rice from Thailand 1986"). Pls.' Br. at 13–14; see 133 Cong. Rec. S8814 (June 26, 1987).[13]    Therefore, Commerce's understanding and application of this analysis in both determinations is persuasive in understanding Congress's intent in enacting Section 1677-2.

In Pork from Canada 1985, Commerce noted that, due to the agricultural nature of the products, a distinct approach from its typical analysis of upstream manufactured products would be required to determine whether producers of processed fresh, chilled, and frozen pork from hogs could be attributed subsidies offered to Canadian hog farmers.    See Pork from Canada 1985 at 25,098.    Specifically, Commerce focused on two criteria: (1) "the degree to which the demand for the prior stage product is dependent on the demand for the latter stage product" and (2) whether the processed product "contribute[s] significantly to the value" of the raw product.    See id. at 25,098–99.    In explaining the first criterion, Commerce stated that it would be met where "demand for the prior stage good is derived almost exclusively from the demand for the latter stage . . . ." Id. at 25,098 (emphasis added).    Commerce relied on the ITC's industry analysis, which determined that producers of a raw agricultural product and producers of the processed product could be collapsed into a single industry where the raw product "enters a single continuous line of

---

[13] "[T]he Department of Commerce developed the rule codified in the proposed amendment. The rule was most recently applied in the final affirmative countervailing duty determination: [Pork from Canada 1985], and in the final affirmative countervailing duty determination and countervailing duty order: Rice from Thailand [1986] . . . ."  Statement of Senator Grassley, 133 Cong. Rec. S8814 (June 26, 1987) ("Statement of Senator Grassley").

production resulting in one end product." Id. at 25,099 (internal quotations omitted). Commerce

went on to cite a decision by this court upholding an ITC finding that grape growers and wine

producers could not be combined into a single industry because grapes were not "completely

devoted to the production of the more advanced product under investigation." See id. (quoting

American Grape Growers v. United States, 9 CIT 103, 104, 604 F. Supp. 1245 (1985)). Based on

this reasoning, Commerce found in Pork from Canada 1985 that the "primary, if not the sole,

purpose of all segments of the industry in this case is to produce a single end product – pork meat."

Id.

        Prior to the enactment of Section 1677-2, Commerce also issued a final determination for

Rice from Thailand 1986, relying on the standard developed in Pork from Canada 1985. See Rice

from Thailand 1986 at 12,358. Commerce attributed subsidies for growers of paddy rice to

producers of milled rice because "[a]lmost all of the raw agricultural product, paddy rice, is

dedicated to the production of milled rice." See Rice from Thailand 1986 at 12,358. Commerce

also used the same language it used in Pork from Canada 1985 in stating that there was a "single,

continuous line of production from paddy rice to milled rice," which was offered as evidence that

the demand for milled rice is substantially dependent on the demand for paddy rice. See Rice from

Thailand 1986 at 12,358.

        The consistency in reasoning and analysis of Commerce's agricultural subsidy attributions

in Pork from Canada 1985 and Rice from Thailand 1986 is strong support for Plaintiffs' argument

that Commerce's determination that the demand for raw olives substantially depends on the

demand for table olives was not in accordance with the law enacted by Congress adopting these

two decisions. Here, eight percent of raw olives used to produce table olives cannot reasonably

be considered "[a]lmost all" of raw olives produced, see Rice from Thailand 1986 at 12,358, nor

can it be said that the demand for raw olives "is derived almost exclusively" from the demand for

table olives, see Pork from Canada 1985 at 25,098.  Therefore, in determining that the demand for

table olives was substantial and that the demand for raw olives was dependent on the demand for

table olives, Commerce impermissibly applied an interpretation of Section 1677-2(1) that deviated

from the plain language and Congress's unambiguous intent.  In short, Commerce did not act in

accordance with law.

### B. Commerce's Deviation From its Past Practice Was Arbitrary and Thus Not in Accordance with Law.

Furthermore, Commerce's interpretation and application of the term "substantially

dependent" deviated from its past practice and was arbitrary and capricious.  Commerce may

"enjoy[] wide latitude" in its application of Section 1677-2, but this discretion is not unlimited.

See Def.'s Br. at 21.  Commerce deviated from its past interpretations of Section 1677-2(1) but

failed to provide an "adequate explanation" for this deviation, and thus its treatment of similar raw

agricultural subsidy attribution was arbitrary.  See SKF USA Inc. v. United States, 263 F.3d 1369,

1382 (Fed. Cir. 2001), aff'd, 332 F.3d 1370 (Fed. Cir. 2003) ("[A]n agency action is arbitrary

when the agency offer[s] insufficient reasons for treating similar situations differently." (quoting

Transactive Corp. v. United States, 91 F.3d 232, 237 (D.C. Cir. 1996)); see also  Huzhou Muyun

Wood Co. v. United States, 42 CIT __, __, 324 F. Supp. 3d 1364, 1375 (2018), as amended (July

27, 2018).  In stating that eight percent of the market would be negatively affected if the demand

for table olives were to cease, Commerce did not explain why the olive industry should be treated

distinctly from its previous investigations into pork and rice.  See Def.'s Br. at 16.

In addition to the determinations in Pork from Canada 1985 and Rice from Thailand 1986

detailed above, Commerce made similar determinations regarding pork and rice after the

enactment of Section 1677-2.  See Fresh, Chilled, and Frozen Pork from Canada: Final Affirmative

Countervailing Duty Determination, 54 Fed. Reg. 30,774 (Dep't Commerce July 24, 1989) ("Pork

from Canada 1989"); Rice from Thailand: Final Results of Countervailing Duty Administrative Review, 59 Fed. Reg. 8,906 (Dep't Commerce Feb. 24, 1994) ("Rice from Thailand 1994"). In 1989, Commerce applied the newly enacted Section 1677-2 to the same Canadian pork industry and again determined that "the demand for live swine depends substantially upon the demand for fresh, chilled, and frozen pork" because "[s]wine producers raise most swine for slaughter[,] [p]ork constitutes the primary product of the slaughtered pig[, and] [t]hus, the demand for pork and for live swine are inextricably linked." Pork from Canada 1989 at 30,775. In 1994, Commerce published a further order on rice applying Section 1677-2 that stated "substantially all of the raw agricultural product, paddy rice, is dedicated to the production of milled rice" in explaining its determination that the demand for paddy rice is substantially dependent upon the demand for milled rice. See Rice from Thailand 1994 at 8,909. Thus, Commerce developed a consistent practice in these decisions that it then deviated from here by concluding that the eight percent of raw Spanish olives processed into table olives constituted a substantially dependent demand upon table olives, despite not being almost exclusively, almost all, most, or substantially all the demand for raw olives. See, e.g., Ranchers-Cattlemen Action Legal Found. v. United States, 23 CIT 861, 884–85, 74 F. Supp. 2d 1353, 1374 (1999) ("An action . . . becomes an 'agency practice' when a uniform and established procedure exists that would lead a party, in the absence of notification of change, reasonably to expect adherence to the established practice or procedure.") (citations omitted); Huvis Corp. v. United States, 31 CIT 1803, 525 F. Supp. 2d 1370, 1378 (2007) (same) (citations omitted).

First, Commerce deviated from its past interpretation of "substantially dependent," which it previously found to include most or at least half of the demand of the raw agricultural product. See, e.g., Pork from Canada 1985; Rice from Thailand 1986; Pork from Canada 1989; Rice from Thailand 1994. Second, it is significant that there is not a "single continuous line of production"

resulting in one end product, as previously considered by Commerce in <u>Pork from Canada 1985</u> and <u>Rice from Thailand 1986</u>.  Rather there are at least two clear end products, olive oil and table olives.  Of the two, it would be more reasonable to consider the demand for raw olives to be "substantially dependent" on the demand for olive oil, constituting ninety-two percent of the demand for raw olives.  These two end products make this industry more like the grape industry under investigation in <u>American Grape Growers</u>, which Commerce relied on in formulating the substantially dependent prong later adopted by Congress.  <u>See</u> 604 F. Supp. at 1247–48 (affirming the ITC's decision not to treat the grape industry in a continuous line with the wine industry because raw grapes were used to produce both wine and fruit).

Notably, the Government relies on Commerce's analysis of Section 1677-2(1) in the Issues and Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of Certain Frozen Warmwater Shrimp from the People's Republic of China, C-570-98978 (August 19, 2013) ("Shrimp from China IDM"), where Commerce applied the same deconstructed analysis of "substantially dependent" as it did here.  In the Shrimp from China IDM, Commerce attributed subsidies provided to growers of fresh shrimp to producers of frozen shrimp, finding that 44.7 percent of fresh shrimp used for processing into frozen shrimp was "substantial" and that the demand for fresh shrimp is "dependent" on the demand for frozen shrimp.  ¶ 195.  Even considering the Shrimp from China IDM, 44.7 percent is significantly higher than eight percent; therefore, Commerce's current finding with respect to table olives cannot be considered consistent with its past determinations.

In sum, based on its previous findings of countervailable subsidies on processed products, Commerce's finding that the demand for raw olives is substantially dependent on the demand for table olives is an arbitrary deviation from its past practice and thus is not in accordance with law.

> ### C. Plaintiffs' Argument That Commerce Improperly Defined "Latter Stage Product" Under Section 1677-2(1) as Table Olives Is Waived as a Matter of Law.

Plaintiffs also alleged in count two of their complaint that Commerce's finding under Section 1677-2(1) that the "latter stage product" comprises all table olives is not supported by substantial evidence and is otherwise contrary to law.  <u>See</u> Amended Compl. ¶¶ 15−17.  The Government correctly argues in its responding brief that under this court's well-established law, arguments that a plaintiff does not raise in its opening brief are considered waived.  <u>See</u> Def.'s Br. at 15 n.4 (citing <u>SmithKline Beecham Corp. v. Apotex Corp.</u>, 439 F.3d 1312, 1319 (Fed. Cir. 2006)).  Accordingly, the court dismisses count two of the complaint.[14]

### III.    Remaining Questions

Apart from the previously discussed issues regarding the interpretation and application of Section 1677A and Section 1677-2(1), Plaintiffs raise three other questions which, while arguably could be deferred, the court now addresses in the interest of judicial and litigation economy.  The court concludes the following: (A) Commerce's application of Section 1677-2(2), that processing adds only "limited value," was supported by substantial evidence on the record and in accordance with law; (B) Commerce's calculation methodology regarding the attribution of subsidy benefits to ripe olive producers was supported by substantial evidence on the record and in accordance with law and; and (C) Commerce's determination that Guadalquivir's reported raw olive purchase data was sufficiently indicative of its purchases of raw olives used to produce ripe olives is supported by substantial evidence.

---

[14] Further, at oral argument on November 6, 2019, Plaintiffs acknowledged that they did not raise count two in its opening brief and took no issue with dismissal of the argument.

### A. *Commerce's Application of Section 1677-2(2) Was Supported by Substantial Evidence and in Accordance with Law.*

The court concludes that Commerce's application of Section 1677-2(2) to determine that the processing of ripe olives added only limited value to raw olives was supported by substantial evidence on the record and in accordance with law as evidenced by legislative history citing two CVD determinations issued by Commerce.

### i. *Commerce Applied the Unambiguous Intent of Congress in Finding That the Processing of Ripe Olives Added Only Limited Value to Raw Olives in Accordance with Law.*

After determining that the demand for raw olives was substantially dependent upon table olives under Section 1677-2(1), Commerce then concluded that the processing of raw olives into table olives added only limited value to the prior stage product under Section 1677-2(2).  IDM at 6, 22−23.  Commerce applied a permissible interpretation of Section 1677-2(2) consistent with the legislative intent behind the statute and Commerce's prior determinations on which the statute is based.  The second requirement for a finding of countervailable subsidies on processed agricultural products, codified under 19 U.S.C. § 1677-2(2), states that where an agricultural product is processed from a raw agricultural product, "the processing operation [must] add only limited value to the raw commodity . . . ."  Plaintiffs argue that Commerce's finding that processing table olives from raw olives added only limited value to ripe olives is unsupported by substantial evidence and contrary to law because (1) Commerce failed to address Plaintiffs' argument that processing changes the essential character of the raw olive and (2) Commerce failed to consider that packaging of table olives is an inherent part of processing the raw product.  Pls.' Br. at 19−23.  The Government argues that the legislative history and record evidence support Commerce's determination that processing for table olives added only limited value to the raw olive.  Def.'s Br. at 21−25.  The court agrees.

Applying <u>Chevron</u>, the court notes that the legislative history of Section 1677-2 reveals the unambiguous intent of Congress in the meaning of "limited value" under Section 1677-2(2). <u>See</u> <u>Chevron</u>, 467 U.S. at 842−43. The legislative history evidences that the purpose of the statute is to prevent a foreign nation from circumventing a CVD on an agricultural product "merely by doing some minor processing of the agricultural product before it is exported to the United States." Statement of Senator Baucus, 133 Cong. Rec. S8814 (June 26, 1987). Senator Baucus mentions pork and raspberries as two examples of this. Specifically, he states that "[h]ogs and pork are both the same product" and that the process of freezing raspberries created the "same raspberries -- they[]'re just frozen." <u>Id.</u>

Plaintiffs argue that "Commerce did little more than state that 'an olive, is an olive, is an olive.'" Pls.' Br. at 22. In fact, Commerce concluded that ripe olives "are olives when they are raw and olives when they are processed." IDM at 23. In coming to this conclusion, Commerce reasoned that the processing operations that convert raw olives into ripe olives "do not change the 'essential character' of the raw product." <u>Id.</u> Plaintiffs further argue that processing of ripe olives does change the "essential character" of raw olives because "processing renders the raw olive edible and ready for its intended use." Pls.' Br. at 22.

The court finds that this argument is without merit. As discussed above, Congress relied on Commerce's <u>Pork from Canada 1985</u> decision in enacting Section 1677-2. <u>See</u> Discussion <u>supra</u> Sec. II. A. There, Congress adopted Commerce's limited value analysis. <u>See</u> 133 Cong. Rec. S8814 (June 26, 1987). A hog is not edible until it becomes pork, yet Congress believed such processing only added limited value to the raw product. <u>See</u> 133 Cong. Rec. S8814 (June 26, 1987); <u>Pork from Canada 1985</u>. In <u>Pork from Canada 1985</u>, Commerce found that the processing of the subject merchandise, fresh, chilled pork, which consisted of "immobilizing, stunning, dehairing, eviscerating, and splitting," constituted only ten percent of the value added to the final

product. <u>Pork from Canada 1985</u> at 25,099. As such, Commerce determined that processing added only limited value to latter stage product. <u>Id.</u> Although the process in <u>Pork from Canada 1985</u> is not identical to the process of producing ripe olives from raw olives, <u>see</u> Background <u>supra</u> Sec. II, the number of steps and value added by these operations is comparable. Since Congress relied on this CVD determination in enacting 19 U.S.C. § 1677-2, the determinations indicating Commerce's prior analysis of processing operations for the purposes of Section 1677-2(2) are persuasive. Given this legislative history, Commerce's finding that the processing operations of ripe olives added only limited value to the raw product is in accordance with law.

> ### ii. *Commerce Relied on Substantial Evidence in Determining That Processing of Ripe Olives Added Only Limited Value to Raw Olives.*

Commerce's application of Section 1677-2(2) to Plaintiffs' processing operations is permissible and consistent with Commerce's prior determinations and supported by record evidence. Commerce determined that forty percent of the product value of ripe olives is attributable to the cost of the raw product, that only three percent is attributable to processing, and that the remaining fifty-seven percent is "attributable to post-processing operations, including packaging." Def.'s Br. at 23. Plaintiffs do not dispute that a total of sixty percent of the value of ripe olives is attributable to processing <u>and</u> packaging. Pls.' Br. at 20 (emphasis added). Rather, Plaintiffs argue that Commerce failed to consider that the packaging of ripe olives is an inherent part of the processing operations; however, Plaintiffs have not cited any precedent or authority that would require Commerce to make such a consideration. Pls.' Br. at 20−21. The Government points to its prior determinations to support Commerce's position that it need not consider packaging costs. <u>See</u> Def.'s Br. at 23 (citing <u>Pork from Canada 1989</u> at 30,776; <u>Rice from Thailand 1994</u> at 8,909). In neither of these determinations did Commerce consider packaging as part of the processing operations used to determine the added value to the raw product. <u>See Pork from</u>

Canada 1989 at 30,775; Rice from Thailand 1994 at 8,909.  Plaintiffs, in support of their contention

that packaging of ripe olives is inseparable from the processing of ripe olives, argue that "[r]ipe

olives are not delivered to the consumer in a truck and then dumped at their doorstep.  Packaging

is an inherent part of the processed product."  Pls.' Br. at 20.

      Under the Plaintiffs' rationale, Commerce would have to include packaging in its analysis

of value added to the raw product for every agricultural product sold.  For example, pork is

packaged and then sold to purchasers – the meat is not "dumped at their doorstep."  See Pls.' Br.

at 20.  Yet, Commerce cannot, and did not, consider this packaging as inherent to the processing

operations of pork simply because it would be inconsistent with Congress's intent.[15]  See Pork

from Canada 1989 at 30,776.  In excluding the fifty-seven percent of processing attributable to

packaging from its analysis of value added to raw olives in the production of ripe olives,

Commerce acted consistently with its prior practice.  As such, Commerce's finding that three

percent of added value to the raw product is considered "limited value" under Section 1677-2(2)

is reasonable and supported by substantial evidence.  See Maverick Tube, 857 F.3d at 1359;

Consol. Edison, 305 U.S. at 217.

      ***B. Commerce's Calculation Methodology for Determining the Benefit Attributable to Plaintiffs from Subsidies Provided to Growers of Raw Olives Is Supported by Substantial Evidence and in Accordance with Law.***

      The court concludes that Commerce applied a permissible methodology in calculating

Plaintiffs' CVD rates given its attribution of subsidies pursuant to Section 1677-2.  When

calculating a CVD rate, Commerce will divide the amount of benefit allocated to the period of

investigation by the sales value during the same period of the product or products to which

---

[15] The legislative history of Section 1677-2 explained that countervailable duties should not be evaded "merely by changing the form of the product" by subjecting it to packing or processing, citing examples of frozen raspberries or fresh, chilled pork.  See Statement of Senator Grassley.

Commerce attributes the subsidy.  19 C.F.R. § 351.525.  In general, "if a subsidy is tied to the production or sale of a particular product, [Commerce] will attribute the subsidy only to that product." 19 C.F.R. § 351.525(b)(5)(i).  Plaintiffs argue that Commerce improperly deviated from its general attribution practice for calculating the CVD rate by attributing subsidies received by growers of raw olives to sales of ripe olives rather than to sales of raw olives.  Pls.' Br. at 24.  The Government argues that 19 C.F.R. § 351.525 does not "strictly govern" Commerce's attribution of agricultural subsidies for the purposes of its CVD calculation because the typical attribution or "tying" rules under the regulation do not comport with the application of Section 1677-2.  Def.'s Br. at 31, 33.  The court agrees.

Commerce stated that its authority in selecting a calculation methodology stemmed from 19 U.S.C. § 1671, which states, "[if the administering authority determines that the government of a country . . . is providing . . . a countervailable subsidy[,] . . . then there shall be imposed upon such merchandise a countervailing duty . . . equal to the amount of the net countervailable subsidy." IDM at 43.  In order to ensure that any methodology used to determine the amount of countervailable subsidy accurately measures the subsidies conferred upon the subject merchandise, Commerce implemented attribution rules under 19 C.F.R. § 351.525.  Id.  However, the Government argues that "[t]he Preamble also states that [Commerce's] intent is to apply these attribution rules as harmoniously as possible, recognizing that unique and unforeseen factual situations may make complete harmony among these rules impossible."  Def.'s Br. at 28 (citing IDM at 43); see also Countervailing Duties: Final Rule, 63 Fed. Reg. 65,348, 65,400 (Dep't Commerce November 25, 1998)).  It is Commerce's position that the application of Section 1677-2 was a "unique factual scenario" that required a deviation from the rules of 19 C.F.R. § 351.525. Def.'s Br. 28.  Specifically, neither Section 1677-2 nor 19 C.F.R. § 351.525 provided an attribution methodology for agricultural subsidies under Section 1677-2.  The Government cites Solarworld

Americas, Inc. v. United States for the proposition that "'Commerce has considerable discretion

to develop a methodology' when 'neither the statute nor the regulation' dictate a methodology."

Def.'s Br. at 29 (quoting Solarworld Americas, Inc., 40 CIT __, __ 182 F. Supp. 3d 1372, 1376

(2016). The Government further contends that Commerce's methodology was a "reasonable

means of effectuating the statutory purpose . . . ." Ceramica Regiomontana, S.A. v. United States,

10 CIT 399, 404–405 636 F. Supp. 961, 966 (1986).

Plaintiffs first argue that Commerce's reliance on 19 U.S.C. § 1671 is misplaced because

Commerce offered no explanation for why its altered methodology is more accurate than its

traditional tying practice. Pls.' Br. at 26–27. Plaintiffs state that "[h]igher subsidy margins are

not a benchmark for accuracy." Id. at 27. However, as the Government asserts, Commerce

changed both the numerator and the denominator in the final calculation to reflect "the same

universe of goods," ripe olives, in order to avoid "over- or understat[ing] the subsidy attributable

to the subject merchandise." See Def.'s Br. at 30 (quoting Certain Iron-Metal Castings from India:

Final Results of Countervailing Duty Administrative Review, 62 Fed. Reg. 32,297, 32,302 (Dep't

of Commerce June 13, 1997)). Commerce explained that by changing both the numerator and

denominator to ripe olive data, Commerce's calculation more accurately reflected subsidies

attributed to the subject merchandise pursuant to Section 1677-2. IDM at 44. The court concludes

this was a reasonable adjustment to the calculation methodology in line with the statute's purpose

of countervailing attributed subsidies.

Plaintiffs next argue that Commerce's reliance on Section 1677-2 is misplaced because the

statute does not explicitly include an attribution methodology for agricultural subsidies. Pls.' Br.

at 28. Specifically, Plaintiffs argue that nothing in the statute or the regulation, 19 C.F.R. §

351.525(b), expressly applies to agricultural subsidies. Id. The Government responds that

Commerce is entitled to deference in constructing a new methodology to calculate CVD rates for

agricultural subsidies that comports with Congress's intent.  Def.'s Br. at 29.  The court agrees and notes that it is precisely because the statute and regulation are silent on what methodology Commerce should use in calculating CVD rates for agricultural subsidies that Commerce has "considerable discretion" in selecting a particular methodology.  See Solarworld Americas, 182 F. Supp. 3d at 1376.

In sum, Commerce's methodology for calculating the CVD rate, in this instance, by attributing subsidies received by growers of raw olives to sales of table olives is supported by substantial evidence and in accordance with law.

### C. Commerce's Determination That Guadalquivir's Reported Raw Olive Purchase Data Was Sufficiently Indicative of its Purchases of Raw Olives Used to Produce Ripe Olives Is Supported by Substantial Evidence.

Commerce acted permissibly in calculating Guadalquivir's CVD rate given the evidence on the record, which, as in all cases, Plaintiffs were responsible for providing.  Commerce issued questionnaires to each Plaintiff regarding their sources of raw olives that were processed into ripe olives during the period of investigation.  See, e.g., Guadalquivir Questionnaire.  Commerce used the data submitted by Plaintiffs in the numerator of its calculation for the CVD rate.[16]  Def.'s Br. at 36.  Plaintiffs contend that the initial purchase data submitted by Guadalquivir was for all raw olives and that this data was never updated with its purchase data for only raw olives that were then processed into ripe olives.  Pls.' Br. at 33−35.  According to Plaintiffs, Commerce found that the original data submitted by Guadalquivir on its raw olive purchases was "indicative" of its purchases of raw olives used for production of ripe olives in the Final Determination.  Pls.' Br. at 36.  Plaintiffs argue that this finding is not supported by substantial evidence.  Pls.' Br. at 38–46. Plaintiffs' main contentions are that (1) Commerce failed to adequately limit its request for

---

[16] The numerator referred to is the amount, in kilograms, of raw olives purchased for processing into ripe olives.  See Background supra Sec. C. ii.

purchase data from Guadalquivir to raw olives used for ripe olive production; (2) Commerce failed

to give Guadalquivir notice of the data it required for its CVD calculation; and (3) Commerce's

finding that Guadalquivir's reported purchases of raw olives is indicative of its purchases of raw

olives produced into ripe olives is unreasonable. Id. The Government and Defendant-Intervenor

respond that Commerce made reasonable conclusions regarding data submitted by Guadalquivir

based on the evidence of record. Def.'s Br. at 37–40; Def-Inter.'s Br. at 37–39. The court agrees.

It is Plaintiffs' position that Commerce failed to request data from Guadalquivir on its

purchases of raw olives limited to those produced into ripe olives. Pls.' Br. at 40. However, the

Government is correct in its response that "Commerce has not 'hidden the ball' in this case."

Def.'s Br. at 37–38 (citing Allegheny Ludlum Corp. v. United States, 24 CIT 1424, 1443 215 F.

Supp. 2d 1322, 1339 (2000)). In the cover letter to the initial questionnaire sent to Guadalquivir,

Commerce requested "information on [Guadalquivir's] sources of raw olives that were processed

into ripe olives during the period of investigation . . . ." Guadalquivir Questionnaire at 1. Plaintiffs

argue that Commerce's request regarding "sources" is not equal to a request regarding "purchases"

because supplier-specific information is not the same as use-specific information. Pls.' Br. at 41.

The court finds this argument to be misleading because it ignores that Guadalquivir must purchase

raw olives from its sources in order to process them into ripe olives.

Plaintiffs further argue that the cover letter directed Guadalquivir to answer questions that

did not limit the raw olive data requested to only data of raw olives processed into ripe olives. Id.

While Plaintiffs point to multiple questions from Commerce asking for data in raw olive inputs,

Plaintiffs highlight the portions of these questions that support their theory yet fail to consider the

portions in context of the whole question. See Pls.' Br. at 30−31. For example, Question 5 asks

that "processors" of ripe olives complete a questionnaire on their raw olive suppliers. Guadalquivir

Questionnaire, Attach. 1 at ¶5. Data of a ripe olive processor's raw olive suppliers inherently

refers to the purchase of raw olives for processing into ripe olives. This analysis can be applied to all the questions cited by Plaintiffs in support of their theory. See Pls.' Br. at 30–31. The cover letter and questions sent by Commerce in the initial questionnaire are sufficient evidence such that a "reasonable mind might accept as adequate" to support the Government's argument that Commerce made clear requests for data on Guadalquivir's raw olive purchases for processing into ripe olives. See Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) (quoting Consol. Edison, 305 U.S. at 229 (1938)).

Next, Plaintiffs point to the Clarification Letter sent by Commerce on September 27, 2017, which requested information on volume and value of all raw olive purchases by Plaintiffs. Pls.' Br. at 42−43 (citing Clarification of the Department's September 26, 2017 Letter at 2 (September 27, 2017), P.R. 984 ("Clarification Letter")). Specifically, Plaintiffs argue that this request reflects Commerce's "original expectation" in the initial questionnaire for data regarding all raw olive sources and that, by not submitting updated responses, Guadalquivir implied that its original responses reflected data on all raw olive sources. Id. However, these contentions support the Government's argument that its request was clear from the beginning in two ways. See Def.'s Br. at 38. First, Commerce issued the Clarification Letter to receive new information on raw olive sources, regardless of the processed product for which the raw olives were used. See Clarification Letter. Commerce's original expectation is irrelevant when its revised understanding of the initial data submitted by Plaintiffs was that the original data reflected raw olive purchases used to process ripe olives. Based on this understanding, the court agrees with the Government that it is "reasonable for Commerce to find that Guadalquivir's reported purchase volume was responsive to the original questionnaire . . . ." Def.'s Br. at 39. Plaintiffs contend that Commerce failed to provide Guadalquivir with notice of what data it required in its investigation, Pls. Br. at 43, but it is Guadalquivir that "had a statutory obligation to prepare an accurate and complete record in

response to questions plainly asked by Commerce," Def.'s Br. at 38 (quoting <u>Allegheny</u>, 215 F. Supp. 2d at 1339−1340).  Nothing in the record evidence suggests that Guadalquivir reached out to Commerce in an attempt to clarify its understanding of what data Commerce requested nor was there any reason for Commerce to believe that Guadalquivir misunderstood what data it needed to provide.

Commerce further gave Guadalquivir another opportunity to clarify the data it provided to Commerce in its initial questionnaire during Commerce's verification of Guadalquivir's responses.  Verification of the Questionnaire Responses of Aceitunas Guadalquivir, S.L.U. (March 22, 2018), P.R. 1222 ("Verification").  Upon verification, Commerce "discovered a considerable volume of additional unreported olive purchases."  Amended Final Investigation at 5.  Guadalquivir explained this discrepancy by reminding Commerce that "[Guadalquivir] explained that because Commerce requested only purchases of ripe olives, [Guadalquivir] reported only olives purchased in acetic acid."  <u>Id.</u>at 7.

This explanation provided by Guadalquivir itself suggests that it understood that Commerce required data on raw olives that would ultimately become ripe olives.  Guadalquivir made specific distinctions in the data it reported based on whether the resulting product was subject or non-subject merchandise, which supports the Government's argument that Commerce had no reason to doubt Guadalquivir's understanding of what data Commerce required.

Plaintiff reiterates that the missing data on Guadalquivir's raw olive purchases used to process into ripe olives created a significant disparity in calculated subsidy margins.  Pls.' Br. at 46.  However, "[w]hen either necessary information is not available on the record or a respondent (1) withholds information that has been requested by Commerce, (2) fails to provide such information by Commerce's deadlines for submission of the information or in the form and manner requested, (3) significantly impedes an antidumping proceeding, or (4) provides information that

cannot be verified, then Commerce shall use the facts otherwise available in reaching the applicable determination." Shandong Rongxin Import & Export Co. v. United States, 43 CIT __, __ 355 F. Supp. 3d 1365, 1370 (2019) (quoting Dillinger France S.A. v. United States, 42 CIT __, __ 350 F. Supp. 3d 1349, 1356 (2018) (additional citations omitted)).(2018)).  Commerce's initial request for the parties' purchase data was clear, and Commerce provided additional opportunities in the Clarification and Verification for Guadalquivir to submit the requested data, despite Commerce not being required to do so.  See Shandong Rongxin, 355 F. Supp. 3d at 1374 (quoting ABB Inc. v. United States, 43 CIT __, __ 355 F. Supp. 3d 1206, 1222 (2019) ("Commerce is not obligated to issue a supplemental questionnaire to the effect of, 'Are you sure?'")).  Guadalquivir's continuous failure to correct its submitted data on its sources of raw olives, or to even clarify what data Commerce required gives rise to "reasonable inferences" that support the reasonableness of Commerce's conclusions.  See Matsushita Elec. Ind. Co. v. United States, 750 F.2d 927, 933 (Fed. Cir. 1984).  Given the reasoning set forth above, Commerce's finding that Guadalquivir's original reported raw olive purchase data was sufficiently indicative of its purchases of raw olives used to produce ripe olives is supported by substantial evidence.

## CONCLUSION

The court remands to Commerce for further proceedings consistent with this opinion. Specifically, the court remands to Commerce on issues of (1) Commerce's determination that the EU and Spain's subsidies to olive growers are de jure specific pursuant to Section 1677(5A); and (2) Commerce's analysis of subsidies attributed to ripe olives pursuant to Section 1677-2(1). Commerce shall file with this court and provide to the parties its remand results within 90 days of the date of this order; thereafter, the parties shall have 30 days to submit briefs addressing the revised final determination with the court, and the parties shall have 30 days thereafter to file reply briefs with the court.

**SO ORDERED.**

/s/   *Gary S. Katzmann*
Gary S. Katzmann, Judge

Dated: January 17, 2020
        New York, New York