Slip Op. 21-76

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **ASOCIACIÓN DE EXPORTADORES E INDUSTRIALES DE ACEITUNAS DE MESA, ACEITUNAS GUADALQUIVIR, S.L.U., AGRO SEVILLA ACEITUNAS S. COOP. AND., and ANGEL CAMACHO ALIMENTACIÓN, S.L.,** | |
| **Plaintiffs,** | |
| **v.** | **Before: Gary S. Katzmann, Judge** |
| **UNITED STATES,** | **Court No. 18-00195** |
| **Defendant,** | |
| **and** | |
| **COALITION FOR FAIR TRADE IN RIPE OLIVES,** | |
| **Defendant-Intervenor.** | |

### OPINION

[The court declines to affirm Commerce's <u>Remand Results</u> and remands for further action.]

Dated: <u>June 17, 2021</u>

<u>Matthew P. McCullough</u>, Curtis Mallet-Prevost, Colt & Mosle LLP, of Washington, D.C., for plaintiffs.

<u>Sonia W. Murphy</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant. With her on the brief were <u>Ethan P. Davis</u>, Acting Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, <u>Tara K. Hogan</u>, Assistant Director. Of counsel on the brief was <u>Saad Y. Chalchal</u>, Senior Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

<u>David J. Levine</u> and <u>Raymond Paretzky</u>, McDermott Will & Emery LLP, of Washington, D.C., for defendant-intervenor.

Katzmann, Judge: The court returns to an investigation by the United States Department of Commerce ("Commerce") into subsidies received by the Spanish olive industry. The case involves a claim from the U.S. domestic olive industry that the Government of Spain ("GOS") and European Union ("EU") unfairly subsidized Spanish olives that were then imported into the U.S. to the detriment of the U.S. industry. Before the court is Commerce's Final Results of Remand Redetermination (Dep't Commerce Jun. 1, 2020), ECF No. 47 ("Remand Results"), which the court ordered in Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States, 44 CIT __, 429 F. Supp. 3d 1325 (2020) ("Asemesa I") so that Commerce could further consider and explain its attribution of subsidies to ripe olives under 19 U.S.C. § 1677-2 ("Section 1677-2") and could provide a reviewable interpretation of 19 U.S.C. § 1677(5A)(D)(i) ("Section 1677(5A)"). Plaintiffs Asociación de Exportadores e Industriales de Aceitunas de Mesa, Aceitunas Gudalquivir, S.L.U., Agro Sevilla Aceitunas S. Coop. And., and Angel Camacho Alementación, S.L. (collectively, "Plaintiffs" or "Asemesa") challenge the Remand Results, arguing that the subsidy program at issue is not de jure specific under Section 1677(5A), and that Commerce's determination of the appropriate "prior stage product" under Section 1677-2 is unsupported by substantial evidence and contrary to law. Pls.' Cmts. on the Commerce Dep't's Final Results of Remand Redetermination, Jun. 30, 2020, ECF No. 49 ("Pls.' Br."). Defendant United States ("the Government") and Defendant-Intervenor Coalition for Fair Trade in Ripe Olives ("Coalition") request that the court affirm Commerce's Remand Results. Def.'s Reply to Cmts. on the Remand Redetermination, July 31, 2020, ECF No. 52 ("Def.'s Br."); Reply Cmts. of Def.-Inter. Addressing Remand Results, July 31, 2020, ECF. No. 51 ("Def.-Inter.'s Br."). The court remands both Commerce's finding of de jure specificity under Section 1677(5A) and its prior stage product analysis under Section 1677-2 for further proceedings consistent with this opinion.

## BACKGROUND

The court set out the relevant legal and factual background of the proceedings in further detail in its previous opinion, Asemesa I, 429 F. Supp. 3d at 1330–38. Information relevant to the instant opinion is set forth below.

### I.    Legal and Regulatory Framework

To empower Commerce to offset economic distortions caused by countervailable subsidies and dumping, Congress promulgated the Tariff Act of 1930. Sioux Honey Ass'n v. Hartford Fire Ins., 672 F.3d 1041, 1046–47 (Fed. Cir. 2012); ATC Tires Priv. Ltd. v. United States, 42 CIT __, __, 322 F. Supp. 3d 1365, 1366 (2018). Under the Tariff Act, Commerce may -- upon petition by a domestic producer or of its own initiative -- initiate an investigation into potential countervailable subsidies and, where such subsidies are identified, issue orders imposing duties on the subject merchandise. Sioux Honey, 672 F.3d at 1046–47; ATC Tires, 322 F. Supp. 3d at 1366–67; 19 U.S.C. §§ 1671, 1673. A countervailable subsidy exists when (1) a government or public authority has provided a financial contribution; (2) a benefit is thereby conferred upon the recipient of the financial contribution; and (3) the subsidy is specific to a foreign enterprise or foreign industry, or a group of such enterprises or industries. 19 U.S.C. § 1677(5). Where, as here, a domestic subsidy is at issue, such subsidy may be either de jure or de facto specific. 19 U.S.C. § 1677(5A)(D). In particular, a domestic subsidy is de jure specific "[w]here the authority providing the subsidy, or the legislation pursuant to which the authority operates, expressly limits access to the subsidy to an enterprise or industry." 19 U.S.C. § 1677(5A)(D)(i).

If Commerce determines that the government of a country is providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export of a class or kind of merchandise imported, sold, or likely to be sold for import, into the United States,

and the International Trade Commission ("ITC") determines that an industry in the United States is materially injured or threatened with material injury thereby, then Commerce shall impose CVD upon such merchandise equal to the amount of the net countervailable subsidy. See 19 U.S.C. § 1671(a). When the investigated merchandise includes a processed agricultural product for which (1) the demand for the prior stage, or raw, product is substantially dependent on the demand for the processed product, and (2) the processing operation adds only limited value to the raw commodity, Commerce further analyzes countervailable subsidies received by producers or processors of the raw agricultural product and will deem such subsidies to be received by manufacturers, producers, and exporters of the processed product. See 19 U.S.C. § 1677-2.

## II.    Factual and Procedural History

On July 12, 2017, Commerce initiated a CVD investigation into ripe olives from Spain in response to a petition from Coalition. Ripe Olives from Spain: Initiation of Countervailing Duty Investigation, 82 Fed. Reg. 33,050 (Dep't Commerce July 19, 2017), P.R. 63; Petition for Imposition of AD and CVD Duties, Vol. I (June 21, 2017), P.R. 1 ("Pet. Vol. I"). In its petition Coalition alleged that the EU, through the GOS, provided countervailable subsidies to raw olive growers that should properly be attributed to processors of ripe olives. Petition for the Imposition of Antidumping and Countervailing Duties, Vol. III at 10 (June 21, 2017), P.R. 1 ("Pet. Vol. III"). Ripe olives -- the product at issue in this litigation -- are a type of edible table olive produced by curing, rinsing, and brining raw olives. Asemesa I, 429 F. Supp. 3d at 1331. Raw olives are a raw and unprocessed agricultural product which can be transformed into an edible consumer product through processing into table olives or olive oil. Id.

At the conclusion of its initial investigation, Commerce determined that countervailable subsidies indeed existed with respect to ripe olive producers from Spain. Id. at 1337–38; see also

Issues and Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of Ripe Olives from Spain (Dep't Commerce June 11, 2018), P.R. 594 ("IDM"); Ripe Olives From Spain: Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order, 83 Fed. Reg. 37,469 (Dep't Commerce August 1, 2018), P.R. 622 ("Amended Final Determination").  In reaching this conclusion, Commerce determined that the subsidies provided to olive growers through the EU's Common Agricultural Policy ("CAP") are de jure specific domestic subsidies under Section 1677(5A), and further determined that the subsidies could be attributed to producers of table olives as a latter stage product of raw olives under Section 1677-2.  IDM at 32–36.

As discussed in Asemesa I, the CAP subsidies at issue are provided to Spanish olive growers through the Basic Payment Scheme ("BPS"): the most recent iteration of EU agricultural subsidy programs.  429 F. Supp. 3d at 1333.  Because portions of the current BPS subsidy program are based on past iterations of EU (and European Community) subsidy programs, Commerce "traced the history of these programs in making its determination that the current program is de jure specific." Id.  That history begins in 1997 with the Common Organization of Market in Oils and Fats ("the Common Market Program"), which was an annual grant-to-farmer program applicable to Spanish olive growers. Id.  In 2003 the Single Payment Scheme ("SPS") replaced the Common Market Program and remained in effect until 2014. Id.  The SPS program was replaced in 2015 by the current BPS program, which provides subsidies to those Spanish olive growers both that meet the eligibility requirements and apply for subsidies. Id.

While the BPS program provides subsidy payments based on geographical indicators of farmland productivity, those indicators are based on data collected by the GOS under the Common Market Program. Remand Results at 7.  This data reflects the hectares of farmland, quantity of

crop produced per hectare, and type of crop produced in each hectare, for each qualifying farm. Id.; Decision Memorandum for the Preliminary Determination in the Countervailing Duty Investigation of Ripe Olives from Spain at 19–22 (Nov. 20, 2017), P.R. 329 ("Preliminary Decision Memo"). For olive growers, a value per hectare was calculated depending on whether the olives were grown for olive oil production or table olive production. Preliminary Decision Memo at 22–23. Under the SPS, this value was then multiplied by a farm's area in hectares to determine the amount of aid that a particular farmer would receive. Id. at 22; Remand Results at 8. In this way, the SPS program provided subsidy payments with reference to the value per hectare calculated under the Common Market Program. Preliminary Decision Memo at 23; Remand Results at 8. The BPS then relied upon data collected under the SPS to allocate subsidy payments using regional rates based on the "productive potential and . . . productive orientation" of a particular region. Remand Results at 8. The resultant rates assigned to participating farmers do not vary with the type and volume of crop produced but do reflect historic data regarding the agronomic practices carried out in the region, including whether it historically produced permanent crops -- among them, olives. IDM at 33–34. Commerce concluded that, as "the annual grant amount provided under BPS [is] based on annual grant amounts that were crop-specific . . . the grant amounts received by olive growers under BPS . . . are directly related to the grant amount only olive growers received under the [Common Market Program]," and are therefore de jure specific to olive growers. Preliminary Decision Memo at 24.

In further determining that the subsidies to olive growers are properly attributable to producers of table olives, Commerce identified the relevant "prior stage product" as raw olives. Remand Results at 20–21. Noting that table olives constitute eight percent of the market for raw olives, Commerce concluded that demand for raw olives is substantially dependent upon demand

for table olives, and that the subsidies to olive growers may therefore be attributed to ripe olive producers pursuant to Section 1677-2. Id.

Plaintiffs challenged Commerce's determination on September 28, 2018, arguing in relevant part that that the subsidies cannot properly be attributed to ripe olive producers because the demand for raw olives is not substantially dependent upon the demand for table olives as required by Section 1677-2, and that the subsidies are not de jure specific (and therefore are not countervailable). Compl., Sept. 28, 2018, ECF No. 7; Asemesa I, 429 F. Supp. 3d at 1340–41. The court determined that Commerce's interpretation of Section 1677-2 was arbitrary and not in accordance with law, concluding that Commerce applied an impermissible interpretation of the statutory term "substantially dependent," and that its interpretation of the term constituted an unexplained and arbitrary deviation from past practice. Asemesa I, 429 F. Supp. 3d at 1339, 1344. The court also concluded that Commerce's finding that the subsidies at issue were de jure specific and thus countervailable failed to include a reviewable interpretation of Section 1677(5A). Id. at 1339. Accordingly, the court remanded to Commerce for further proceedings consistent with its opinion. Id. at 1352.

### A.    The Remand Results

On June 1, 2020, Commerce submitted its Remand Results to the court. Pursuant to the court's instructions in Asemesa I, Commerce "reconsidered its interpretation and analysis of [Section 1677-2]." Remand Results at 2. On remand, Commerce first reiterated and clarified its finding that the EU subsidy payments at issue are de jure specific to olive growers, and thus countervailable. Id. at 10. Consistent with the Amended Final Determination, Commerce then determined that "the demand for the prior stage product is substantially dependent on the demand for the latter stage product," but clarified that it interprets "'prior stage product' to be the raw

agricultural product that the industry under examination considers principally suitable for use in the prior stage of production of the latter stage product" -- in this case, raw olives "principally suitable for . . . the production of table olives." <u>Id.</u> at 27, 29.

Following the issuance of the <u>Remand Results</u>, Plaintiffs filed comments on June 30, 2020, reiterating their original arguments and opposing Commerce's findings on remand.  Pls.' Br.  Defendant-Intervenor Coalition also filed comments on the <u>Remand Results</u> requesting that the court affirm Commerce's determination and dismiss the action.  Def.-Inter.'s Br.  The Government and Coalition each submitted replies to the Plaintiff's comments on July 31, 2020.  Reply to Cmts. on Remand Results, Jul. 31, 2020, ECF No. 51 ("Def.-Inter.'s Reply"); Reply to Cmts. on Remand Results, July 31, 2020, ECF No. 52 ("Def.'s Reply").   On January 6, 2021, the court issued questions prior to oral argument.  Letter Concerning Questions for Oral Arg., Jan. 6, 2021, ECF No. 59.  The parties filed their responses to the oral argument questions on January 19, 2021.  Resp. to Ct.'s Req. Regarding Questions for Oral Arg., Jan. 19, 2021, ECF No. 61 ("Pls.' OAQ Resp."); Resp. to Ct.'s Req. Regarding Questions in Advance of Oral Arg, Jan. 19, 2021, ECF 64 ("Def.'s OAQ Resp."); Resp. to Ct.'s Req. Regarding Questions for Oral Arg., Jan. 19, 2021, ECF No. 63 ("Def-Inter.'s OAQ Resp.").   Oral argument was held on February 9, 2021.  Oral Arg., Feb. 9, 2021, ECF No. 66.  On February 19, 2021, the parties filed supplemental submissions following oral argument.  Resp. to Ct.'s Req. Regarding Cmts. After Oral Arg., Feb. 19, 2021, ECF No. 68 ("Pls.' Post-Arg. Br."); Resp. to Ct.'s Req. for Post-Arg. Submission, Feb. 19, 2021, ECF. No. 69 ("Def.'s Post-Arg. Br."); Resp. to Ct.'s Req. for Post-Arg. Submission, Feb. 19, 2021, ECF No. 67 ("Def.-Inter.'s Post-Arg. Br.").

## JURISDICTION, STANDARD OF REVIEW, AND INTERPRETIVE FRAMEWORK

The court has jurisdiction over this action pursuant to 19 U.S.C. § 1516a and 28 U.S.C. § 1581(c). The standard of review is set forth in 19 U.S.C. § 1516a(b)(1)(B)(i) which provides "[t]he court should hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." The court also reviews the determinations pursuant to remand "for compliance with the court's remand order." See Beijing Tianhai Indus. Co. v. United States, 39 CIT __, __, 106 F. Supp. 3d 1342, 1346 (2015) (citations omitted).

As laid out in Asemesa I, 429 F. Supp. 3d at 1338–39, the court reviews Commerce's interpretation of a statute by application of the two-step test laid out in Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837 (1984); see also Dupont Teijin Films USA, LP v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005). Under Chevron, the court first determines "whether Congress has directly spoken to the precise question at issue." 467 U.S. at 842. If so, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id. at 842–43. However, "if the statute is silent or ambiguous with respect to the specific issue," the court must then determine "whether the agency's answer is based on a permissible construction of the statute." Id. at 843. If the agency's interpretation of the statute is reasonable, it must withstand judicial scrutiny. Koyo Seiko Co. v. United States, 36 F.3d 1565, 1573 (Fed. Cir. 1994).

## DISCUSSION

Plaintiffs argue that (1) Commerce misinterpreted Section 1677(5A) such that Commerce's de jure specificity finding is not responsive to the court's remand order; and (2) Commerce's finding that the demand for raw olives principally suitable for the production of table olives is

substantially dependent on the demand for table olives is unsupported by substantial evidence and

not in accordance with law.  Pls.' Br. at 4, 13.  The Government and Coalition respond in support

of Commerce's Remand Results by arguing that (1) Commerce's construction of Section 1677(5A)

is permissible and accompanied with a reasonable explanation of BPS's de jure specificity; and

(2) Commerce's interpretation of Section 1677-2, and particularly its distinction between prior

stage and raw agricultural products, is reasonable and not unlawful.  Def.'s Br. at 11, 17; Def.-

Inter.'s Br. at 4, 10, 15–19.  The court concludes that Commerce's interpretations of de jure

specificity under Section 1677(5A), and of the meaning of "prior stage product" under Section

1677-2, are unreasonable and not in accordance with law.

### I.    *Commerce's Interpretation of Section 1677(5A)'s De Jure Specificity Inquiry is Unreasonable and Not in Accordance with Law.*

The court determined in Asemesa I that Commerce's finding that the BPS program

constituted a de jure specific subsidy did not include a reviewable interpretation of the statute.  429

F. Supp. 3d at 1339–40.  In relevant part, the court stated that:

> Neither Commerce nor the Government provides an explanation or interpretation
> of the statute to support its conclusion that the BPS program is de jure specific. Nor
> does the Government explain how references to past subsidy programs as part of a
> larger subsidy calculation satisfy the "express" requirement of the statute because
> neither Commerce nor the Government makes more than a conclusory statement
> about the application of the statute to the facts of this subsidy program.

Id. at 1340.  Accordingly, the court remanded the de jure specificity determination to Commerce

for explanation of its interpretation of the statute.

On remand, Commerce "further explain[ed] its interpretation of [Section 1677(5A)] for the

de jure specificity finding."  Remand Results at 2.  In so doing, Commerce emphasized Congress's

legislative intent, noting that the specificity test was "intended to function as a rule of reason and

to avoid the imposition of countervailing duties in situations where, because of the widespread

availability and use of a subsidy, the benefit of the subsidy is spread throughout an economy" and

not to provide "a loophole through which narrowly [focused] subsidies provided to or used by

discrete segments of an economy could escape the purview of the [countervailing duty] law." Id.

at 12 (quoting Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc.

No. 103-316, Vol. 1, 929 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4163). Commerce

concluded that, although the limitation of the BPS to the agricultural sector is itself not sufficient

basis to deem it a de jure specific subsidy program, its non-uniform application across the

agricultural sector does constitute an express limitation of the subsidy to an enterprise or industry.

Id. at 14–15. Finding that the legislation implementing the BPS incorporates by reference

eligibility data arising from the SPS, further finding that the SPS itself incorporated eligibility data

from the Common Market Program, and finding that the Common Market program expressly

limited access to olive growers, Commerce redetermined on remand that the BPS provides de jure

specific subsidies to olive growers. Id. at 15.

        Plaintiffs argue that Commerce's interpretation of the statute is incorrect because it fails to

account for the unambiguous language of Section 1677(5A). Pls.' Br. at 4. In particular, Plaintiffs

argue that the phrase "expressly limits access" requires Commerce to "show that the BPS program

(through the administering authority or the legislation under which it operates) makes clear that its

purpose is to control eligibility for BPS payments such that olive growers have a right to, or use,

BPS payments in a manner that is limited to them." Id. at 5 (emphasis in original). Plaintiffs

conclude that, because BPS subsidy payments are made available without reference to specific

crops or farmers, Commerce's determination that the BPS program "'limited [subsidy] access' to

'olive growers,'" disregards the unambiguous meaning of the statute and is therefore unlawful. Id.

at 9–10. The Government and Coalition respond that Commerce correctly interpreted the meaning

of "expressly limits access" to permit a finding of de jure specificity where "by law, there is no uniform treatment across the agricultural sector in the provision of benefits." Remand Results at 14; see Def.'s Br. at 9–10; Def.-Inter.'s Br. at 5. The Government contends that the statute is clearly ambiguous, and that the court is therefore obligated to defer to Commerce's reasonable interpretation of the de jure specificity analysis. Def.'s Br. at 7–8. Both the Government and Coalition conclude that Commerce reasonably determined that the incorporation of historical production data in the BPS program's implementing legislation resulted in the law's non-uniform treatment of olive growers, and therefore in de jure specificity under Section 1677(5A). Id. at 9– 11; Def.-Inter.'s Br. at 11–12.

Chevron requires that the court begin with the plain meaning of the statute, for "if the text answers the question [of Congress's intent], that is the end of the matter." Timex V.I., Inc. v. United States, 157 F.3d 879, 882 (Fed. Cir. 1998) (citations omitted). Thus, in determining whether step one of Chevron is satisfied, the court looks first to the statute's text, and employs the "traditional tools of statutory construction." Id. (quoting Chevron, 467 U.S. at 843 n.9). Here, Section 1677(5A) provides that "[w]here the authority providing the subsidy, or the legislation pursuant to which the authority operates, expressly limits access to the subsidy to an enterprise or industry, the subsidy is specific as a matter of law." The dictionary definition of the adjective "express" is "directly, firmly, and explicitly stated." Express, Merriam-Webster, https://www.merriam-webster.com/dictionary/express (last visited June 8, 2021). The dictionary definition of the adjective "limit" is "to assign certain limits to" or "to restrict the bounds or limits of," while the noun is defined as "something that bounds, restrains, or confines." Limit, Merriam-Webster, https://www.merriam-webster.com/dictionary/limit (last visited June 8, 2021). Thus, the plain meaning of the statute is that a subsidy is de jure specific when the authority providing the

subsidy, or its operating legislation, directly, firmly, or explicitly assigns limits to or restricts the bounds of a particular subsidy to a given enterprise or industry.  There is no ambiguity in this reading.[1]

The court therefore rejects Commerce's interpretation of Section 1677(5A) as permitting a finding of de jure specificity when "by law, there is no uniform treatment across the agricultural sector in the provision of benefits."  Remand Results at 14.  The law's failure to provide uniform treatment in the distribution of subsidies is not equivalent to its explicit restriction of those benefits to a specific enterprise or industry.  It is not sufficient, as Commerce and the Government suggest, for the legislation underlying the subsidy under consideration to merely "reference[] and incorporate[]" prior legislation which itself may favor a specific sector.  Remand Results at 48; see Def.'s Br. at 10–11.  Such reading reduces the de jure specificity test to a general finding of non-uniform treatment, without any determination that the subsidy in question be explicitly limited to a specific enterprise or industry by the administering authority or its implementing legislation.  See Pls.' Post-Arg. Br. at 2–3.  As Plaintiffs note, it therefore fails to give meaning to the statute's requirement that a de jure specific subsidy must exhibit explicit restriction to an enterprise or industry.  Id. (citing Colautti v. Franklin, 439 U.S. 379, 392 (1979)).  Nor is it sufficient for the current scheme to exhibit "a linkage between eligibility for . . . crop-specific payments provided under the prior legislation" and the payments currently provided, without more.  Remand Results

---

[1] While the Government contends that "[b]y directing Commerce to explain its interpretation of the statute, the [c]ourt acknowledged that the statute is silent on whether 'a program expressly based on programs that limited access of payments to a specific crop' is de jure specific," this is not correct.  Def.'s Br. at 11.  Rather, the court is unable to make any determination as to whether Commerce's determination is supported by substantial evidence and in accordance with law if neither Commerce nor the Government provide any explanation for that determination.  Asemesa I, 429 F. Supp. 3d at 1340–41.  Conclusory statements without more are not reviewable even where the statute applied by Commerce is unambiguous.

at 48–49.  For example, it is conceivable that a prior subsidy scheme could be constructed to explicitly favor cabbage growers, and that the current scheme incorporates a regional implementation of the prior favorable rates (as the BPS program does) -- but that changes in soil composition, weather patterns, or consumer demand has since caused most cabbage fields to be replaced by a wide range of alternative crops.  In such a case, Commerce's reading would require a finding of de jure specificity even where the historic data included in the statute has no relationship to current production and might even correspond to equal treatment across the agricultural sector despite what appears to be "non-uniform" distribution of subsidies. [2]  Under the plain meaning of Section 1677(5A), subsidies are only de jure specific where the authority providing the current subsidy, or its operating legislation, directly and explicitly prescribes limitations on the distribution of subsidies to an enterprise or industry.

As both Plaintiffs and the Government acknowledge, the purpose of the specificity test is to "function as an initial screening mechanism" to avoid the imposition of duties on subsidies which are truly generally available across the agricultural sector.  Pls.' Br. at 5 (quoting SSA at 929); Def.'s Br. at 9 (quoting SSA at 913).  As such, the test contemplates a number of avenues for determining specificity.  Where, as here, a subsidy is not directly and expressly limited in its application, and is therefore not de jure specific, Commerce is not precluded from further analyzing the distribution of benefits to determine whether the subsidy is specific on other grounds.  See, e.g., 19 U.S.C. § 1677(5A)(B)–(C), (D)(iii)–(iv).  There is therefore no basis to conclude that, as

---

[2] Coalition makes much of the BPS program's express provision of favorable subsidy rates to permanent crops as defined under the Common Market Program.  See Def.-Inter.'s Post-Arg. Br. at 3–6.  However, neither Commerce nor Coalition provides sufficient evidence for the court to conclude that identified "'permanent crop' regions of Spain" meaningfully correspond to those regions engaged in olive farming for any period beyond the specific period during which the Common Market Program data was gathered.  Id.; see Remand Results at 8.  Without more, this is not enough to constitute an express limitation to an industry or enterprise.

the Government and Coalition suggest, that application of the plain meaning of Section 1677(5A)

risks allowing "shielding [from duties] subsidies that on their face provide differentiated treatment

to subsets of the agricultural sector," or otherwise undermining the purpose of the statute.[3]  Def.-

Inter.'s Br. at 8; see also Def.'s Br. at 11.

        In sum, Commerce's interpretation Section 1677(5A) to permit a finding of de jure

specificity where "by law, there is no uniform treatment across the agricultural sector in the

provision of benefits," is impermissible.  Remand Results at 14.  Interpreting "expressly limits" to

require the uniform provision of benefits statute deviates from the plain meaning of Section

1677(5a) and thus from Congress's unambiguous intent.  The court concludes that Commerce's

interpretation of the statute is unreasonable and not in accordance with law.

        Accordingly, the court does not consider whether Commerce's application of the statute to

the BPS program was in accordance with law and supported by substantial evidence.[4]  The court

remands the question of de jure specificity in the instant case to Commerce for further proceedings

consistent with this opinion.

---

[3] The Government argues, in line with the Remand Results, that "[a]n interpretation that would 'require the BPS program to restate the entirety of the laws and regulations pursuant to which the SPS and Common Market Program were implemented would create a loophole through which foreign governments could provide countervailable subsidies in the guise of a "new" program and avoid the imposition of countervailing duties.'" Def.'s Br. at 11 (quoting Remand Results at 20). However, if the favorable treatment of olive growers is indeed fully incorporated in the BPS by reference to the prior schemes, neither Commerce nor the Government provides any basis for the court to conclude it would survive an analysis of its de facto specificity.  The court therefore rejects this argument as without merit.

[4] Although the Government argues that the BPS is nevertheless de jure specific under a plain language reading of Section 1677(5A), the explanation provided by the Government in large part overlaps with Commerce's impermissible reading of the statute.  See Def.'s Br. at 11–15.  The court has accordingly considered and rejected the Government's contentions that "express limitation need not be in terms of a particular crop or farmer," and that express reference to prior legislation which itself codifies non-uniform treatment is sufficient for a finding of de jure specificity.  Id. at 15.

II.     ***Commerce's Interpretation of Section 1677-2's "Substantially Dependent" Requirement is Not in Accordance with Law.***

The court determined in <u>Asemesa I</u> that Commerce applied an impermissible interpretation of Section 1677-2, and that its deviation from past practice with respect to the meaning of "substantially dependent" was arbitrary and not in accordance with law.  <u>429 F. Supp. 3d</u> at 1341, 1344.    The court's determination was rooted in Commerce's failure to acknowledge the unambiguous language of the statute, and its unexplained deviation from past practice in finding that table olives' control of eight percent of the market for raw olives constituted substantial dependence.  <u>Id.</u> at 1342–44.  The court ultimately remanded to Commerce for further analysis and for explanation of its interpretation of the statute.

Commerce's analysis of Section 1677-2 on remand raises two questions before the court: first, whether Commerce permissibly interpreted the statute on remand, and second, whether Commerce reasonably found substantial dependence in the present case.  Accordingly, the court begins by considering whether Commerce set out a permissible construction of Section 1677-2.

A.     ***Commerce Permissibly Concluded that "Prior Stage Product" is Not Coextensive with "Raw Agricultural Product," but Applied an Impermissible Interpretation of Section 1677-2 in Determining that "Prior Stage Product" is Properly Defined as "the Raw Agricultural Product that the Industry Under Examination Considers Principally Suitable for Use in the Prior Stage of Production of the Latter Stage Product."***

In its <u>Remand Results</u>, Commerce identified a statutory ambiguity that satisfies the first step of the <u>Chevron</u> analysis.  <u>Remand Results</u> at 25–26.  Section 1677-2 provides that:

> In the case of an agricultural product processed from a raw agricultural product in which--
>> (1) the demand for the prior stage product is substantially dependent on the demand for the latter stage product, and
>> (2) the processing operation adds only limited value to the raw commodity, countervailable subsidies found to be provided to either producers or processors of the product shall be deemed to be provided with respect to the manufacture, production, or exportation of the processed product.

19 U.S.C. § 1677-2.  Neither the term "raw agricultural product" nor the term "prior stage product" is defined by the statute, although Commerce noted that it has, "through its practice, adopted a . . . definition of the term 'raw agricultural product'" similar to that provided in 19 U.S.C. § 1677(E)(iv), namely, "any farm or fishery product."  Remand Results at 25.  With respect to the term "prior stage product," Commerce acknowledged that it has, "in past cases and in the Final Determination, . . . defined the raw agricultural product and the prior stage product to be the same."  Id. at 25–26.  However, Commerce explained on remand that it concluded that continuing to treat the two terms as coterminous in the context of its investigations "would give 'raw agricultural product' and 'prior stage product' the same meaning," in conflict with the text of the statute.  Id. at 26–27.

Accordingly, Commerce explained that it revised its interpretation of "prior stage product" so that it is meaningfully distinct from "raw agricultural product" in reflection of the "strong presumption that Congress expresses its intent through the language it chooses and that the choice of words in a statute is therefore deliberate and reflective."  Id. at 26 (quoting KYD, Inc. v. United States, 35 CIT 475, 479, 779 F. Supp. 2d 1361, 1367 (2011)).  Rather, Commerce found that "[t]he language used in the statute . . . shows that Congress contemplated that a raw agricultural product could undergo several stages of production and that each stage of production may produce a distinct processed agricultural product."  Id. at 27.  Ultimately, Commerce determined that "[t]he plain language and structure of the statute signals that Congress intended the 'prior stage product' to be the raw agricultural product that the industry under examination considers principally suitable for use in the prior stage of production of the latter stage product."  Id.

Plaintiffs argue that this determination constitutes an impermissible attempt to limit the denominator of its substantial dependence analysis on remand.  Pls.' Br. at 13–16.  In particular,

Plaintiffs argue that (1) "raw agricultural product" and "prior stage product" are not distinct and exclusive, and (2) that even if the terms are in fact distinct, "prior stage product" cannot merely be a subset of "raw agricultural product. Id. The Government responds that the use of both "raw agricultural product" and "prior stage product" in the statute supports an interpretation of Section 1677 that distinguishes between the terms so as to avoid rendering either superfluous. Def.'s Br. at 18–19. The Government and Coalition together argue that, in the instant case, Commerce correctly found that the appropriate prior stage product is olive varietals suitable for the production of table olives, and not all raw olives varietals inclusive of raw mill olives suitable only for the production of olive oil. Id. at 19–21; Def.-Inter.'s Br. at 21–22.

The court concludes that, while Commerce has reasonably determined that "prior stage product" and "raw agricultural product" are not coextensive, its decision to define "prior stage product" as "the raw agricultural product that the industry under examination considers principally suitable for use in the prior stage of production of the latter stage product" represents an impermissible construction of Section 1677-2. Remand Results at 27.

Commerce's determination that "prior stage product" and "raw agricultural product" are not coextensive in the context of Section 1677-2 is both reasonable and in accordance with law. It is well-established that "[t]he language of the statute is the best indication of Congress's intent." Shoshone Indian Tribe of Wind River Res. v. United States, 364 F.3d 1339, 1345 (Fed. Cir. 2004) (citing Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 118 (1980)). In the present case, while the meaning of the term "prior stage product" is left ambiguous in the statutory text, Commerce's construction of Section 1677-2 is well-reasoned and ensures that both "raw agricultural product" and "prior stage product" are given meaningful effect. As Chevron requires deference to Commerce's interpretation of the law, so long as that interpretation is reasonable, 407

U.S. at 843, the court finds that Commerce's determination that "prior stage product" is distinct from "raw agricultural product" is in accordance with law.

However, the court rejects Commerce's determination that the intended definition of "prior stage product" is "the raw agricultural product that the industry under examination considers principally suitable for use in the prior stage of production of the latter stage product." Remand Results at 27. It does not follow from the conclusion that "prior stage product" is distinct from "raw agricultural product" that a prior stage product may also be a subset of the raw agricultural product. Rather, such a definition of "prior stage product" seems to render the requirements of Section 1677-2 largely self-fulfilling, insofar as raw olives principally suitable for use in table olive production are likely processed into table olives, or tomatoes principally suitable for canning are likely processed into canned tomatoes. Commerce's interpretation cannot be "consistent with language and structure of the statute" if, by giving meaning to the term "prior stage product," it simultaneously causes the statute as a whole to become superfluous. See Def.'s Br. at 19 (citing Agro Dutch Indus. Ltd. v. United States, 508 F.3d 1024, 1032 (Fed. Cir. 2007)). Thus, Commerce's interpretation of "prior stage product" as used in Section 1677-2 is unreasonable and not in accordance with law.

Arguments by the Government and Coalition to the contrary are unavailing. The Government asserts that interpreting the prior stage product to be a subset of the raw agricultural product "avoids a construction that would render either term superfluous." Id. at 19. As the court has explained, Commerce's interpretation risks superfluity of a different kind. While Chevron obligates the court to defer to Commerce's interpretation of a statute so long as it is reasonable -- even if it is not "the only possible interpretation, nor even the interpretation deemed most reasonable by the courts" -- it does not require the court to accept one erroneous interpretation to

avoid another.  Entergy Corp. v. Riverkeeper, Inc., 556 U.S. 208, 218 (2009).  Nor is the court

convinced by Coalition's argument that the rejection of Commerce's interpretation of "prior stage

product" necessarily risks "preclud[ing] . . . CVD remed[ies] for processed products" and thereby

undermining Congressional intent.  Def.-Inter.'s Br. at 18.  Such risk is only present to the extent

that Commerce has determined that "raw agricultural product" cannot itself be delimited; for

example, if the appropriate raw agricultural product in the production of diced, canned tomatoes

is necessarily "all tomatoes."  As no such determination is apparent from the Remand Results,[5]

the court declines to consider Coalition's argument further.

Accordingly, the court finds that Commerce's interpretation of Section 1677-2 is not in

accordance with law, and remands for further proceedings consistent with this opinion.

> ### B.    The Court Does Not Reach Commerce's Conclusion that the Demand for Olive Varietals Principally Suitable for the Production of Table Olives is Substantially Dependent on the Demand for Table Olives.

Commerce concludes, pursuant to its interpretation of Section 1677-2, that the appropriate

prior stage product for analysis of substantial dependence in the instant case is those raw olive

varietals principally suitable for the production of table olives.  Remand Results at 29, 81–82.

Applying this construction to the record, Commerce ultimately determined that the demand for

raw olive varietals principally suitable for the production of table olives is substantially dependent

on the demand for table olives.  Remand Results at 30–34.  In light of the foregoing, the court

declines to reach this determination on the basis that it relies on an impermissible interpretation of

Section 1677-2.

---

[5] Indeed, Plaintiffs argue, and Commerce acknowledged, that "a distinct biological varietal can be considered a distinct raw agricultural product under the definition Commerce employs, specifically, 'any farm or fisheries product' as used in 19 U.S.C. § 1677(4)(E)(iv)."  Pls.' Br. at 17; see Remand Results at 80–81.

## CONCLUSION

For the foregoing reasons, the court concludes that Commerce's interpretations of Section 1677(5A)'s de jure specificity test and of Section 1677-2's prior stage product analysis are not in accordance with law.  The court therefore remands to Commerce for further proceedings consistent with this opinion.  Commerce shall file with this court and provide to the parties its remand results within 90 days of the date of this order; thereafter, the parties shall have 30 days to submit briefs addressing the revised remand determination with the court, and the parties shall have 30 days thereafter to file reply briefs with the court.

**SO ORDERED.**

/s/   *Gary S. Katzmann*
Gary S. Katzmann, Judge

Dated:  June 17, 2021
          New York, New York