C-469-818
Remand
Slip Op. 21-76
POI:  01/01/2016 – 12/31/2016
**Public Version** ~~Business Proprietary Document~~
E&C/OI:  Team

### FINAL REMAND REDETERMINATION

*Asociacion de Exportadores e Industriales de Mesa, Aceitunas Guadalquivir, S.L.U., Agro Sevilla Aceitunas S. COOP. And., and Angel Camacho Alimentacion, S.L. v. United States*, **Court No. 18-00195, Slip Op. 21-76 (CIT June 17, 2021)**

## I.    SUMMARY

The Department of Commerce (Commerce) prepared these final results of redetermination in accordance with the opinion and remand order of the U.S. Court of International Trade (the Court) in *Asociacion de Exportadores e Industriales de Mesa et al. v. United States*, Court No. 18-00195, Slip Op. 21-76 (CIT June 17, 2021) (*Second Remand Order*). These final results of redetermination concern Commerce's final determination in the countervailing duty investigation of ripe olives from Spain.[1]

In the *Second Remand Order*, the Court remanded:  (1) Commerce's finding that certain subsidies provided by the Government of Spain (GOS) to olive growers are *de jure* specific pursuant to section 771(5A)(D)(i) of the Tariff Act of 1930, as amended (the Act); and (2) Commerce's analysis pursuant to section 771B(1) of the Act and finding that the demand for raw olives principally suitable for the production of table olives is substantially dependent on the demand for table olives.[2]  With regard to the *de jure* specificity finding, the Court held that

---

[1] *See Ripe Olives from Spain:  Final Affirmative Countervailing Duty Determination*, 83 FR 28186 (June 18, 2018) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM); *see also Ripe Olives from Spain:  Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order*, 83 FR 37469 (August 1, 2018) (*Amended Final Determination and Countervailing Duty Order*).

[2] *See Second Remand Order* at 9-21; *see also* Final Results of Remand Redetermination:  *Asociacion de Exportadores e Industriales de Mesa, Aceitunas Guadalquivir, S.L.U., Agro Sevilla Aceitunas S. Coop. And., and Angel Camacho Alimentacion, S.L. v. United States*, Court No. 18-00195, Slip Op. 20-8 (CIT January 17, 2020), dated May 29, 2020 (First Remand Redetermination).

Commerce's interpretation "to permit a finding of *de jure* specificity where 'by law, there is no uniform treatment across the agricultural sector in the provision of benefits, is impermissible" and "deviates from the plain meaning... and thus from Congress's unambiguous intent."[3]  With regard to the analysis under section 771B(1) of the Act, the Court held that although "Commerce's determination that 'prior stage product' and 'raw agricultural product' are not coextensive... is both reasonable and in accordance with law," Commerce relied on an impermissible interpretation of "prior stage product" that "causes the statute as a whole to become superfluous."[4]  The Court remanded these two issues "to Commerce for further proceedings consistent with" the *Second Remand Order*.[5]

Consistent with the Court's *Second Remand Order*, Commerce:  (1) reconsidered its *de jure* specificity finding and finds that the subsidies provided by the GOS to olive growers are *de facto* specific pursuant to section 771(5A)(D)(iii)(III) of the Act; and (2) reconsidered its interpretation of "raw agricultural product" and "prior stage product" for purposes of the analysis under section 771B(1) of the Act and finds that the demand for distinct biological varietals of raw olives is substantially dependent on the demand for table olives.  These final results of redetermination pursuant to court remand resulted in no changes to the net countervailable subsidy rates determined in the *Amended Final Determination and Countervailing Duty Order*.

## II.    BACKGROUND

On June 18, 2018, Commerce published the *Final Determination* in the investigation of ripe olives from Spain.[6]  In the *Final Determination*, Commerce determined that subsidies provided to growers of raw olives were *de jure* specific under section 771(5A)(D)(i) of the Act

---

[3] *See Second Remand Order* at 15.
[4] *Id.* at 18-19.
[5] *Id.* at 21.
[6] *See Final Determination.*

and, pursuant to section 771B of the Act, we deemed those subsidies to have been provided with respect to the production of the processed product.[7]  On August 1, 2018, following the correction of certain ministerial errors, Commerce published the *Amended Final Determination and Countervailing Duty Order*, which established net countervailable subsidy rates of 27.02 percent *ad valorem* for Aceitunas Guadalquivir, S.L.U., 7.52 percent *ad valorem* for Agro Sevilla Aceitunas S. Coop. And., 13.76 percent *ad valorem* for Angel Camacho Alimentacion, S.L., and 14.97 percent *ad valorem* for all other producers or exporters of ripe olives from Spain.[8]

The three mandatory respondents in the investigation, together with Asociacion de Exportadores e Industriales de Aceitunas de Mesa (hereinafter collectively referred to as the ASEMESA), challenged Commerce's *Final Determination* and argued, among other things, that Commerce improperly concluded that certain grants provided to olive growers by the GOS are *de jure* specific under section 771(5A)(D)(i) of the Act and that Commerce improperly interpreted and applied section 771B(1) of the Act in concluding that the demand for raw olives is substantially dependent on the demand for processed table olives.[9]

On January 17, 2020, the Court issued a decision sustaining, in part, and remanding, in part, Commerce's *Final Determination*.  Relevant here, the *First Remand Order* remanded Commerce's *de jure* specificity finding under section 771(5A)(D)(i) of the Act and finding that the "substantially dependent" criterion under section 771B(1) of the Act had been satisfied.[10] With regard to Commerce's *de jure* specificity finding, the Court held that Commerce did not sufficiently explain its determination "because Commerce did not provide an interpretation of the

---

[7] *See Final Determination* IDM at Comments 1 and 3.
[8] *See Amended Final Determination and Countervailing Duty Order.*
[9] *See Asociacion de Exportadores e Industriales de Mesa et al. v. United States*, Court No. 18-00195, Slip Op. 20-08 (CIT January 17, 2020) (*First Remand Order*) at 17-18.
[10] *Id.* at 18-29.

statute in reaching its determination based on the record."[11]  Specifically, the Court held that Commerce's explanation was insufficient because it did not "explain how references to past subsidy programs as part of a larger subsidy calculation satisfy the 'express' requirement of the statute."[12]  As a result, the Court remanded for Commerce to explain its interpretation of the statute.  With regard to Commerce's finding that the demand for raw olives is substantially dependent on the demand for processed table olives, the Court concluded that Commerce applied an impermissible interpretation of the term "substantially dependent" in section 771B(1) of the Act and deviated from its past practice without adequate explanation.[13]

On June 1, 2020, Commerce filed the First Remand Redetermination with the Court.  On remand, Commerce further explained its interpretation of section 771(5A)(D)(i) of the Act for the *de jure* specificity finding.[14]  Commerce also reconsidered its interpretation of "prior stage product" for purposes of the analysis under section 771B(1) of the Act and found that the demand for the raw olives principally suitable for use in the production of table olives is substantially dependent on the demand for table olives.[15]  No changes were made to the rates determined in the *Amended Final Determination and Countervailing Duty Order* as a result of the First Remand Redetermination.

On June 17, 2021, the Court issued its *Second Remand Order* remanding the matter a second time.  With regard to the *de jure* specificity finding, the Court held that Commerce's interpretation of section 771(5A) of the Act to permit a finding of *de jure* specificity where "by law, there is no uniform treatment across the agricultural sector in the provision of benefits," is

---

[11] *Id.* at 18.
[12] *Id.* at 20.
[13] *Id.* at 20-29.
[14] *See* First Remand Redetermination at 6-20.
[15] *Id.* at 20-41.

impermissible.[16]  The Court concluded that the BPS legislation's "failure to provide uniform

treatment in the distribution of subsidies is not equivalent to its <u>explicit restriction</u> of those

benefits to a specific enterprise or industry."[17]  With regard to Commerce's finding that the

criterion under section 771B(1) of the Act had been satisfied, the Court rejected Commerce's

definition of "prior stage product" as "the raw agricultural product that the industry under

examination considers principally suitable for use in the prior stage of production of the latter

stage product."[18]  The Court held that "prior stage product" cannot be both distinct from the "raw

agricultural product" and also a subset of the raw agricultural product, and further, concluded

that such a definition of "prior stage product" renders the requirements of section 771B self-

fulfilling because raw olives principally suitable for use in table olive production are likely

processed into table olives.[19]  The two issues were remanded for a second time for proceedings

consistent with the *Second Remand Order*.

On October 7, 2021, we released the draft results of remand redetermination to interested

parties for comment.[20]  On October 12, 2021, we partially granted requests by the GOS and the

respondents for an extension of time to submit comments on the draft redetermination.[21]  On

October 18, 2021, we received comments from the GOS, ASEMESA, and Musco Family Olive

Company (Musco).[22]

---

[16] *See Second Remand Order* at 13 (quoting First Remand Redetermination at 14).

[17] *Id.* at 13 (emphasis in original).

[18] *Id.* at 18.

[19] *Id.* at 19.

[20] *See* Draft Results of Redetermination Pursuant to *Asociacion de Exportadores e Industriales de Mesa, Aceitunas Guadalquivir, S.L.U., Agro Sevilla Aceitunas S. COOP. And., and Angel Camacho Alimentacion, S.L. v. United States*, Court No. 18-00195, Slip Op. 21-76 (CIT June 17, 2021) (Draft Redetermination).

[21] *See* Commerce's Letter, Extension of Comment Deadline, dated October 12, 2021.

[22] *See* GOS's Letter, "Government of Spain Response to the Draft Results of Remand Redetermination issued by the Department of Commerce on October 7, 2021," dated October 18, 2021 (GOS's Comments); ASEMESA's Letter, "Comments on the Department's Draft Redetermination on Remand, Slip Op. 21-76, Court No. 18-00195, *Asociacion de Exportadores de Aceitunas de Mesa et al. v. United States*," dated October 18, 2021 (ASEMESA's Comments); Musco's Letter, "Ripe Olives from Spain; Remand, Slip Op. 21-76; Comments on Draft Results of

III.   **DISCUSSION**

   A.   **Commerce's Determination that Certain Subsidies to Olive Growers Are Specific Pursuant to Section 771(5A)(D) of the Act**

   1.   **Commerce's *Final Determination***

In the investigation, Commerce examined how Spain implemented Pillar I of the European Union (EU)'s Common Agricultural Policy (CAP), also known as the Basic Payment Scheme (BPS), to determine whether the subsidy program was specific to olive growers.[23]   We found that the manner in which Spain implemented the BPS program, as it relates to the provision of and the amount of benefits to olive growers, relied heavily on the provision of benefits under two predecessor programs:  the Common Organization of the Market in Oils and Fats (the Common Market Program), which was in place from 1997 to 2003 and provided annual grants only to Spanish olive growers on the basis of olive production volume (*i.e.*, olive growers received a grant amount in Euros (€) per kilogram of olives produced with different rates applied to olives grown for olive oil and olives grown for processing into table olives), and the Single Payment Scheme (SPS), which replaced the Common Market Program and was in place from 2003 through 2014.[24]   The BPS took effect in 2015 as the successor to the SPS and provided grants during the period of investigation (POI) to Spanish farmers, including olive growers, that met the eligibility requirements and applied for subsidies.  The EU claimed, during the

---

Remand Redetermination," dated October 18, 2021.  In its comments, Musco noted that Commerce has treated Attachment 1 of Commerce's memorandum entitled "Analysis of the Draft Remand Results for Finding the BPS Program *De Facto* Specific and the First Criterion of Section 771B is Satisfied" as business proprietary, but that it appears to contain only public information.  We agree with this comment and will treat this information as public in the memorandum issued in connection with these final results of redetermination.

[23] The BPS encompasses three subprograms under which farmers can receive payments:  Direct Payment, Greening, and Aid to Young Farmers.  *See Ripe Olives from Spain:  Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination with the Final Antidumping Duty Determination*, 82 FR 56218 (November 28, 2017) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum (PDM) at 18-21.

[24] *See Final Determination* IDM at 32-36; *see also Preliminary Determination* PDM at 21-23.

investigation, that because the benefits paid under the BPS were "decoupled" from production (*i.e.*, the payment of benefits was no longer contingent on the production of a particular product), Commerce could not find them to be specific.[25]  However, in the *Final Determination*, we found that Council Regulation 1307/2013, which implemented the BPS program, expressly relied on the amount of assistance a grower received under SPS to determine BPS grant amounts.[26]

The payments provided to farmers during the POI were based on a geographical indicator of farmland productivity prior to the implementation of these programs.[27]  Under the Common Market Program, which operated between 1999 and 2002, the EU required each Member State (including Spain) to collect information regarding the hectares, volume, and value (which depended on whether the olives were grown for the production of olive oil or the production of table olives) for each farm.[28]  Commerce observed that "{b}oth olive oil and table olives were specifically identified as products eligible to receive production aid under {the Common Market Program}, and the payments provided {between 1999 and 2002} were based on whether the olives were used to produce olive oil or table olives."[29]  Under the SPS, which operated from

---

[25] *See Final Determination* IDM at 33.

[26] *See* EU Council Regulations 1307/2013, Article 26 "Calculation of the initial unit value."  (1) "The unit value of payment entitlements referred to in Article 25(2) in Member States *which apply the single payment scheme in calendar 2014* and which have not decided to keep their existing payment entitlements in accordance with Article 21(3) shall be set in accordance with either of the methods set out in paragraphs 2 or 3.  (2) A fixed percentage of the payments the farmers *received for 2014 under the single payment scheme* in accordance with Regulation No. 73/2009, before reductions and exclusions provided for in Chapter 4 of Title II of that Regulation, shall be divided by the number of payment entitlements he is allocated in 2015, excluding those allocated from the national reserve or regional reserves in 2015.

[27] *See Final Determination* IDM at 33-36 (citing, *inter alia*, European Commission's Letter, "Countervailing Duty Investigation of Ripe Olives from Spain – CVD Questionnaire Response," dated September 18, 2017 (EU IQR) at Annex 12 "Council Regulation (EC) No. 1782/2003"; EU IQR at Annex 13 "Council Regulation (EC) No. 1307/2013"; and GOS QR at Exhibits A001 "Royal Decree 1075/2014" and A002 "Royal Decree 1076/2014"); *see also Preliminary Determination* PDM at 19.

[28] *See Final Determination* IDM at 32-33; *see also Preliminary Determination* PDM at 19 (citing EU IQR Annex 11 "Council Regulation (EC) No. 1638/98").

[29] *See Final Determination* IDM at 32 (citing EU IQR Exhibit 11 "Council Regulation (EC) No. 1638/98" and GOS's Letter, "Response of the Government of Spain to the Department's October 25, 2017 Supplemental Questionnaire," dated November 7, 2017 (GOS 1SQR) at Exhibit 21 "Council Regulation (EC) No. 1782/2003" at Article 33 and Annex VI, which references production aid given to the olive oil sector during the reference period pursuant to "Council Regulation (EC) No. 136/66") (internal footnote omitted).

7

2003 through 2014, the amount of aid each farmer was eligible to receive was calculated by multiplying the value per hectare by the area in hectares.[30]  By reference to the value per hectare calculated using data collected during the operation of the Common Market Program, Commerce found that the SPS program preserved the access of olive farmers to the assistance previously available to them, on a *de jure* specific basis, under the Common Market Program.

In implementing the BPS, Spain used the data collected under the SPS to create 50 agricultural regions to facilitate payments.[31]  Each region was assigned a rate based on its productive potential and its productive orientation (*i.e.*, rainfed, irrigated, permanent crops, and permanent pasture).[32]  Olive groves are considered "permanent crops," and this designation is factored into the calculation of the regional rate, which, in turn, is used to determine each hectare of farmland's "basic payment entitlement" and whether, and to what extent, a farmer was eligible to receive grants under the BPS.[33]  Therefore, Commerce concluded that the regional variations in BPS payments were a result of the use of the historical regional data that had been used to calculate the crop-specific subsidy payments under the SPS.

Similar to the BPS program, SPS grant amounts were calculated using a value of entitlements per hectare.[34]  To determine the SPS entitlement per hectare value, the calculation relied on a "reference amount,"[35] which was the three-year average of the total amounts of payments in place from 2000-2002.  However, the reference period for olives was slightly longer and referred to the marketing years 1999/2000 through 2002/2003.  The reference amount for the

---

[30] *See Final Determination* IDM at 32-33; *see also Preliminary Determination* PDM at 22 (citing EU IQR at Annex 10 "Council Regulation (EC) No. 864/2004" and Annex 12 "Council Regulation (EC) No. 1782/2003").
[31] *See Final Determination* IDM at 33 (citing GOS 1SQR at 26 and EU IQR at Exhibit 13 "Council Regulation (EC) No. 1307/2013"); *see also Preliminary Determination* PDM at 19-20.
[32] *See Final Determination* IDM at 33-34; *see also Preliminary Determination* PDM at 19-20.
[33] *See Final Determination* IDM at 34; *see also Preliminary Determination* PDM at 20.
[34] *See* EU IQR at 11-12 and Annex 12, Council Regulation (EC) No. 1782/2003 at Article 43.
[35] *See* EU IQR at Annex 12, Council Regulation (EC) No. 1782/2003 at Article 37.

olive sector was calculated using the four-year average of payments a farmer was granted under the olive oil support scheme, which was when the Common Market Program was in effect.[36] Both olive oil and table olives were identified as products to receive production aid under this program.  Specifically, hectares dedicated to olive oil production received assistance of 132.25 ECU/100kg.[37]  Assistance to farmers who produced table olives was calculated using a different calculation, in which the ratio of 100 kg of processed table olives was equal to 11.5 kg of olive oil eligible for production aid.[38]

> Commerce's analysis is summarized:
>
> In summary, the annual grant amount provided to olive farmers under BPS is based on the annual grant amount provided to olive farmers under SPS.  The grant amount provided to olive farmers under SPS is based on the average grant amount olive farmers received in 1999 through 2002 under the {Common Market Program}.  The grant amount provided in 1999 through 2002 to eligible farmers, which included olive farmers, was based on the type of crop grown and the production value created from the crop.  Therefore, the annual grant amount provided under BPS {is} based on annual grant amounts that were crop-specific, thus the grant amounts received by olive growers under BPS in 2016 are directly related to the grant amount only olive growers received under the {Common Market Program}.[39]

This analysis was the basis of Commerce's finding that the BPS provided subsidies that are *de jure* specific to olive growers.  Because the Common Market Program was available only to olive growers (*i.e.*, access to its benefits was "expressly limited" to the olive sector); the SPS calculated the grant amount based on data regarding the type of crop, and the volume and value of production collected under the Common Market Program (*i.e.*, preserving the limited access to benefits available to the olive sector under the Common Market Program); and, by law, access to

---

[36] *Id.* at Annex 12, Article 37.
[37] *See Preliminary Determination* PDM at 22.
[38] *Id.* at 22 (citing EU IQR at 11); *see also* European Commission's Letter, "Countervailing Duty Investigation on Ripe Olives from Spain – CVD Supplemental Questionnaire Response," dated November 8, 2017 at response to Question 26 and GOS 1SQR at 20.
[39] *See Preliminary Determination* PDM at 24.

the SPS grants provided the foundation of the BPS subsidy payments, the BPS retained the *de jure* specificity inherent in the Common Market Program.[40]

## 2.  The Court's *First Remand Order*

In its opinion, the Court stated "Commerce did not set forth an interpretation of {section 771(5A)(D)(i) of the Act} in determining that BPS subsidies to olive growers are *de jure* specific, and thus, without more, the Court cannot determine whether it was supported by substantial evidence and in accordance with law."[41]  The Court articulated its concern about what it identified as Commerce's failure to explain how, in administering the BPS program, the authority "expressly limits" access to the subsidy to an enterprise or industry, as required by section 771(5A)(D)(i) of the Act.[42]  In addition, the Court cited the respondents' argument that the "payments are not dependent on the production of specific crops under {the BPS} program, and thus they have been decoupled from the olive industry."[43]  The Court held that Commerce's *de jure* specificity finding was not sufficiently explained, stating, in relevant part:

> {T}he Government fails to explain how a program expressly based on a program that limited access of payments to a specific crop is equivalent to a statement that BPS itself 'expressly limit[  ]' access of payments to a specific crop, as the statute requires … Nor does the Government explain how references to past subsidy programs as part of a larger subsidy calculation satisfy the 'express' requirement of the statute because neither Commerce nor the Government makes more than a conclusory statement about the application of the statute to the facts of this subsidy program.  This does not constitute a sufficient explanation of why the BPS subsidies are expressly limited as the statute requires.  Without such an explanation of Commerce's interpretation of the statute, the Court cannot analyze whether Commerce made a decision supported by substantial evidence and in accordance with law.[44]

---

[40] *Id.* at 18-27; *Final Determination* IDM at Comment 3.
[41] *See First Remand Order* at 18.
[42] *Id*. at 20.
[43] *Id*. at 19.
[44] *Id*. at 20.

The Court therefore remanded the *de jure* specificity determination for Commerce to provide an explanation of its interpretation of the statute.[45]

### 3. Commerce's First Remand Redetermination

In its redetermination, Commerce further clarified its interpretation of section 771(5A)(D)(i) of the Act in support of its finding that the BPS provides benefits to Spanish olive producers that are *de jure* specific.[46] Commerce explained that the statute makes no provision for Commerce to examine whether a subsidy is coupled to or decoupled from production.[47] We further explained that the relevant inquiry for specificity under section 771(5A)(D)(i) of the Act is whether access to the subsidy is expressly limited by law to an enterprise or industry.[48] Moreover, we underscored that, under section 771(5A)(D)(ii) of the Act, a program is not *de jure* specific when the government or the legislation pursuant to which the program is administered establishes criteria or conditions governing the eligibility for, and the amount of, a subsidy that do not favor one enterprise or industry over another.[49] Commerce also consulted the SAA to explain Congress's intent and the purpose of the specificity test, which informs the *de jure* specificity analysis.[50]

We also addressed the regulatory framework for analyzing whether an agricultural subsidy is specific within the meaning of section 771(5A)(D) of the Act. Commerce regulations at 19 CFR 351.502(e) provide a special rule for specificity relating to agricultural subsidies.[51] Specifically, 19 CFR 351.502(e) stipulates that "{t}he Secretary will not regard a subsidy as

---

[45] *Id.*
[46] *See* First Remand Redetermination at 6-20.
[47] *Id.* at 10-11.
[48] *Id.* at 11.
[49] *Id.*
[50] *See* First Remand Redetermination at 11-12; *see also* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, vol. 1 (1994) (SAA) at 929-30.
[51] *See* First Remand Redetermination at 11-12.

being specific under section 771(5A)(D) of the Act solely because the subsidy is limited to the

agricultural sector."  We noted that the *Preamble* expands on this regulation, stating that "the

Secretary will find an agricultural subsidy to be countervailable only if it is specific within the

agricultural sector.[52]  As directed by the *Preamble*, we focused on determining whether the BPS

program is specific to a particular subset of the agricultural sector, how the agriculture sector

writ large was treated by the BPS program, and whether any sub-sector of the agricultural sector

was afforded special treatment by an express limitation on access to the subsidy.[53]

We explained that, in the investigation, we found that the Common Market Program

provided benefits that were expressly limited to olive growers.[54]  Benefits to olive growers under

the subsequent SPS program were determined not by any neutral or objective criteria, but by

using the average amount of grants provided from 1999 to 2002 under the Common Market

Program, which entrenched the crop-specific nature of the subsidy.[55]  We found that due to the

manner in which the GOS implemented the BPS program with reference to predecessor program,

the agricultural sector was not afforded uniform treatment, nor was the program implemented

pursuant to neutral or objective criteria.  Rather, we determined that the BPS subsidy for olive

growers was, as a matter of law, based on eligibility for assistance provided under the Common

Market Program, which expressly limited access to olive growers.  As a result, we concluded that

farmers holding BPS entitlements with values determined based on historical olive production

were expressly provided limited access to benefit amounts that retain the crop-specific

differences and favorable treatment to olive production under the Common Market Program.[56]

---

[52] *See Preamble*, 63 FR at 65357-58.
[53] *See* Final Remand Redetermination at 13-14.
[54] *Id.* at 15.
[55] *Id.* at 16.
[56] *Id.* at 18.

#### 4.   *Second Remand Order*

In its opinion, the Court concluded that Commerce's interpretation of section 771(5A) of

the Act to permit a finding of *de jure* specificity where "by law, there is no uniform treatment

across the agricultural sector in the provision of benefits," is impermissible.[57]  The Court held

that, under step one of the two-step framework set forth in *Chevron*,[58] the statutory language is

unambiguous and "the plain meaning of the statute is that a subsidy is *de jure* specific when the

authority providing the subsidy, or its operating legislation, directly, firmly, or explicitly assigns

limits to or restricts the bounds of a particular subsidy to a given enterprise or industry."[59]  The

Court's plain meaning analysis was informed by dictionary definitions for the terms "express"

and "limit."[60]  The Court concluded that the BPS legislation's "failure to provide uniform

treatment in the distribution of subsidies is not equivalent to its <u>explicit restriction</u> of those

benefits to a specific enterprise or industry."[61]

According to the Court, it is not sufficient for the legislation under consideration to

merely reference or incorporate prior legislation which itself may favor a specific sector and

Commerce's reading of the requirement under the statute "reduces the *de jure* specificity test to a

general finding of non-uniform treatment, without any determination that the subsidy in question

be explicitly limited to a specific enterprise or industry by the administering authority or its

implementing legislation."[62]  To illustrate its concerns, the Court provided the following

example:

> {I}t is conceivable that a prior subsidy scheme could be constructed to explicitly
> favor cabbage growers, and that the current scheme incorporates a regional

---

[57] *See Second Remand Order* at 13 (quoting First Remand Redetermination at 14).
[58] *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-45 (1984).
[59] *Id.* at 12-13.
[60] *Id.*
[61] *Id.* at 13 (emphasis in original).
[62] *Id.*

implementation of the prior favorable rates (as the BPS program does) - – but that changes in soil composition, weather patterns, or consumer demand has since caused most cabbage fields to be replaced by a wide range of alternative crops.  In such a case, Commerce's reading would require a finding of *de jure* specificity even where the historic data included in the statute has no relationship to current production and might even correspond to equal treatment across the agricultural sector despite what appears to be "non-uniform" distribution of subsidies.[63]

The Court further stated that the plain meaning of the statute provides that "subsidies are only *de jure* specific where the authority providing the *current* subsidy, or its operating legislation, directly and explicitly prescribes limitations on the distribution of subsidies to an enterprise or industry."[64]  As a result, the Court disagreed that it is "sufficient for the current scheme to exhibit 'a linkage between eligibility for... crop-specific payments provided under the prior legislation' and the payments currently provided, without more."[65]

Although the Court held that Commerce's reading of section 771(5A)(D)(i) deviated from the plain meaning of the provision and Congress's unambiguous intent, the Court explained that "Commerce is not precluded from further analyzing the distribution of benefits to determine whether the subsidy is specific on other grounds."[66]  Therefore, the Court remanded the issue for further proceedings consistent with its opinion.[67]

### 5.  Analysis

As an initial matter, Commerce respectfully disagrees with the Court's view that our interpretation of the statute as it relates to *de jure* specificity is unreasonable or insufficient.  The BPS provides annual grants to farmers and is expressly limited to the agricultural sector; however, 19 CFR 351.502(e) states that an agricultural subsidy will not be considered specific

---

[63] *Id.* at 14.
[64] *Id.* (emphasis added).
[65] *Id.* at 13 (quoting First Remand Redetermination at 48-49).
[66] *Id.* (citing section 771(5A)(B)–(C), (D)(iii)–(iv) of the Act).
[67] *Id.* at 15.

under section 771(5A)(D) of the Act because the subsidy is limited to the agricultural sector. This regulation codified Commerce's longstanding practice of considering the agricultural sector, as a whole, to constitute more than a single group of industries,[68] which has been upheld by the Court.[69]  Commerce's *Preamble* provides the following:

> {T}he Secretary will not consider a domestic subsidy to be specific solely because it is limited to the agricultural sector.  Instead, as under prior practice, the Secretary will find an agricultural subsidy to be countervailable only if it is specific within the agricultural sector, *e.g.*, a subsidy is limited to livestock, or livestock receives disproportionately large amounts of the subsidy.  *See, e.g.*, *Lamb Meat from New Zealand*, 50 FR 37708, 37711 (September 17, 1985).[70]

However, as we explained in the First Remand Redetermination, for an agricultural subsidy to qualify for this regulatory exception and not be considered specific, "the agricultural subsidy must include all agricultural products and there must be uniform treatment across all agricultural products."[71]  Thus, consistent with section 771(5A)(D) of the Act, the regulatory framework, and past practice of analyzing specificity of agricultural subsidies, Commerce examined whether the BPS benefits were uniformly available across the agricultural sector such that the subsidy provided would qualify for the exception under 19 CFR 351.502(e).

Information provided by the GOS and the EU demonstrated that access to, and the amount of, benefits provided to olive growers under the BPS, as a matter of law, relied for reference on the provision of benefits under the SPS and, in turn, access to and the amounts of benefits provided to olive growers under the SPS were determined by reference to the benefits provided under the Common Market Program.  Because the BPS legislatively incorporated by

---

[68] *See Final Negative Countervailing Duty Determination; Fresh Asparagus from Mexico*, 48 FR 21618, 21621 (May 14, 1983); *Fresh Cut Roses from Israel; Final Results of Administrative Review of Countervailing Duty Order*, 48 FR 36635, 36636 (August 12, 1983); and *Certain Fresh Cut Flowers from Mexico*, 49 FR 15007, 15008 (April 16, 1984).
[69] *See Roses Inc. v. United States*, 774 F. Supp. 1376, 1383-84 (CIT 1991).
[70] *See Countervailing Duties; Final Rule*, 63 FR 65348, 65355 (November 25, 1998) (*Preamble*).
[71] *See* First Remand Redetermination at 48 n.157.

reference the eligibility criteria and benefits provided under the SPS and the Common Market

Program, Commerce appropriately investigated those precursor programs to determine whether

the BPS subsidies were uniformly available across the Spanish agricultural sector.

Notwithstanding our disagreement with the Court's decision, Commerce is complying

with the Court's *Second Remand Order* and concludes that the BPS program is not *de jure*

specific.[72]  Because the CIT held that a subsidy is *de jure* specific only where the authority, or

legislation pursuant to which the authority operates, explicitly restricts the distribution of

subsidies to an enterprise or industry, and that a finding of non-uniform treatment in the

distribution of benefits or linkage to crop-specific subsidies under predecessor programs is

insufficient grounds for determining *de jure* specificity, Commerce no longer finds the BPS

program to be *de jure* specific.  However, as noted above, in remanding the matter the Court

stated that "Commerce is not precluded from further analyzing the distribution of benefits to

determine whether the subsidy is specific on other grounds."[73]  Therefore, in accordance with

Commerce's sequential analysis and normal practice of analyzing specificity,[74] on remand we

have examined whether the BPS program is *de facto* specific.

Section 771(5A)(D)(iii) of the Act provides that a subsidy is *de facto* specific if any one

of the following four factors exist:

---

[72] As explained in the First Remand Redetermination, Commerce's *de jure* analysis relied on additional elements. Namely, the context in which this specificity analysis was conducted, *e.g.*, the so-called "agricultural exception" to the specificity rule, how the *de jure* specificity test operates in conjunction with the corollary to the *de jure* test as outlined in section 771(5A)(D)(ii) of the Act in the context of agricultural subsidies, and prior Commerce practice with respect to agricultural subsidies and finding that non-uniform treatment within the agricultural sector could render such a subsidy to be specific.  We also respectfully disagree with the Court's decision not to consider these additional factors and context in its ruling.

[73] *See Second Remand Order* at 13 (citing sections 771(5A)(B)–(C), (D)(iii)–(iv) of the Act).

[74] *See, e.g.*, *Alloy Magnesium from Canada:  Final Results of Countervailing Duty New Shipper Review*, 68 FR 22359 (April 28, 2003), and accompanying IDM at Comment 2 ("{B}ecause our specificity analysis is performed sequentially, we may examine *de facto* specificity when we fail to find *de jure* specificity."); *see also Preamble*, 63 FR at 65355 ("{I}f a subsidy is *de jure* specific or meets any one of the enumerated *de facto* specificity factors, in order of their appearance in section 771(5A)(D)(iii) of the Act, further analysis is unnecessary and is not undertaken.").

(I) The actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number.

(II) An enterprise or industry is a predominant user of the subsidy.

(III) An enterprise or industry receives a disproportionately large amount of the subsidy.

(IV) The manner in which the authority providing the subsidy has exercised discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored over others.

As set forth under 19 CFR 351.502(a), in determining whether a subsidy is *de facto* specific, Commerce will examine the factors contained in section 771(5A)(D)(iii) of the Act sequentially in order of appearance.  If a single factor warrants a finding of specificity, Commerce will not undertake further analysis.

During the course of the investigation, we asked the GOS and the EU to provide usage information relevant for determining whether the BPS program may be *de facto* specific.  In our initial questionnaire, we asked the GOS the following:

> Please provide the following information, in table form, regarding the number of recipient companies and industries and the amount of assistance approved under this program for the year in which any mandatory respondent was approved for assistance, as well as each of the preceding three years (*e.g.*, if a respondent was approved for assistance in 2014 and 2015, provide this information, by year, for 2011 through 2015).[75]

In response, the GOS replied with general information regarding the amount of total assistance approved under the BPS Basic Payment, Greening, and Young Farmers schemes during the POI and the number of applications submitted under each program.[76]  The GOS also provided information regarding the amount of assistance approved for the respondent companies and their cross-owned affiliates, but the GOS did not provide any information as to the amount of

---

[75] *See* Commerce's Letter, "Countervailing Duty Investigation on Ripe Olives from Spain:  Initial Questionnaire," dated August 4, 2017 (GOS Initial Questionnaire) at Section II, Standard Questions Appendix at question M.7.
[76] *See* GOS's Letter, "Response of Government of Spain to the Department's August 3, 2017 Initial Questionnaire," dated September 18, 2017 (GOS IQR) at 54.

assistance approved on a per industry basis.[77]  Specifically, in response to the question asking for

total assistance amounts provided to the olive industry and all other industries, the GOS

responded as follows:

> This question is not applicable as the payments are decoupled; it is not possible to
> determinate {sic} payments for the industry of table olives....  From the moment
> that subsidies on a sector have been decoupled (olive oil sector payments are fully
> decoupled since 2010); it is not possible to determine the share of this component
> which has been paid to a particular sector since there is no link between the
> specific crop and the payment.[78]

Following this response to our initial request for *de facto* usage information, we issued a

supplemental questionnaire to the GOS and asked additional questions to obtain the necessary

usage information for the BPS program.  Commerce asked for the total amount of CAP payments

(Pillar I and II) made during the POI to the agricultural districts within Andalusia and for the

total amount of CAP payments made to olive and table olive growers during the POI to the

agricultural districts with Andalusia.[79]  In response, the GOS provided information as to the total

amount of CAP assistance (Pillar I and II) but reiterated its previous response that decoupled

payments are not product specific and it is not possible to differentiate by productive orientation,

crop, or type of product.[80]

The GOS did not provide information in response to Commerce's initial or supplemental

questionnaire as to the amount of assistance provided to the olive industry and other industries

within the agricultural sector.  The requested information, such as amounts of assistance

provided to the agricultural sector under this program on an industry basis, is necessary to

determine whether the BPS is *de facto* specific and is not available on the record.  Because the

---

[77] *Id.* at 53-55.
[78] *Id.* at 55.
[79] *See* Commerce's Letter, "Countervailing Duty (CVD) Investigation of Ripe Olives from Spain:  Supplemental Questionnaire to the Government of Spain," dated October 25, 2017 at 3 (GOS Supplemental Questionnaire).
[80] *See* GOS 1SQR at 16.

GOS did not provide the requested information necessary for our *de facto* specificity analysis,

we must resort to the facts otherwise available on the record to conduct the analysis, pursuant to

sections 776(a)(1) and 776(a)(2)(B) of the Act.[81]  As explained below, we find, based on the

facts otherwise available, that the BPS is *de facto* specific in accordance with section

771(5A)(D)(iii)(III) of the Act.

We initiated an investigation of this program based on an allegation in the Petition that

was supported by adequate information that was available to the petitioner.[82]  For specificity, the

petitioner alleged that under the SPS program, the predecessor to the BPS program, olive farmers

in Spain received € 468 per hectare, per year.  This amount was based on a report that Spain's

former Minister of Agriculture, Food and Environmental Affairs provided to Spain's National

Parliament,[83] whereas, according to a published GOS report on the implementation of the SPS

campaign for 2014, the average Spanish farmer received € 258.03 per hectare, per year.[84]

Moreover, the petitioner estimated that Spanish agricultural producers received € 4.9 billion in

Pillar I SPS payments annually, based on a study by the U.S. International Trade Commission,[85]

with Spanish olive producers receiving € 1.28 billion of those payments, or approximately 25

percent of the total annual agricultural aid to Spain, despite accounting for only 3 percent of

---

[81] Sections 776(a)(1) and (2) of the Act provide that Commerce shall, subject to section 782(d) of the Act, apply "facts otherwise available" if necessary information is not on the record or an interested party or any other person: (A) withholds information that has been requested; (B) fails to provide information within the deadlines established, or in the form and manner requested by Commerce, subject to subsections (c)(1) and (e) of section 782 of the Act; (C) significantly impedes a proceeding; or (D) provides information that cannot be verified as provided by section 782(i) of the Act.

[82] The petitioner is the Coalition for Fair Trade in Ripe Olives, which consists of domestic olive processors Bell-Carter Foods and Musco.

[83] *See* Petitioner's Letter, "Petition for the Imposition of Antidumping and Countervailing Duties Pursuant to Sections 701 and 731 of the Tariff Act of 1930, As Amended," dated June 22, 2017 (Petition) at Volume III at 16 (citing Olive Oil Times, *Olive Regions Work on Joint Strategy to Maintain EU Subsidies*, April 2, 2012).

[84] *See* Petition at Volume III at 17 (citing Government of Spain, Report on the Implementation of Regional Payments in Spain-2014 Campaign, March 2015).

[85] *See* Petition at Volume III at 9.

Spain's agricultural output.[86]  The petitioner estimated that Spain's olive industry receives € 1.28

billion in annual benefits under the BPS program.  To calculate this estimate, the Petitioner relied

on EC Council Regulations 1638/98 and EC Regulation 1415/2001, which established the

guaranteed quantities of production levels of olive oil for which assistance shall be granted in

each Member State and estimated that the average guaranteed quantities of production of olive

oil for which Spain granted assistance during 1999 to 2003 was 1,089,159 tons.[87]  The

guaranteed quantities also includes table olives, which can be expressed as an olive oil

equivalent.[88]  Multiplying the average guaranteed quantity of production of olive oil, 1,089,159

tons, by the per unit benefit of ECU 132.225/100 kilograms of olive oil established under the

Common Market Program, equals € 1,440,412,777.50.[89]  The petitioner then multiplied the €

1,440,412,777.50 by 60 percent, the portion of direct SPS aid for olives excluding aid for olive

groves,[90] to derive a total of € 864,247,667 as an estimate of the direct SPS aid for olive growers.

To the € 864,247,667, the petitioner added an additional € 412 million, which it claims was

---

[86] The petitioner alleged that the average olive production in Spain from 1999 to 2003 was 1,089,159 tons.  *See* Petition at Volume III at 15 (citing Exhibit III-13, Council Regulation 1415/2001).  Multiplying this average by the amount of assistance olive growers received under the Common Market Program for Oils and Fats, EC Council Reg. 1638/98 of € 132.225/100 kilogram equals € 1,440,412,777.50.  *See* Petition at Volume III at 15.  The petitioner then multiplied the € 1,440,412,777.50 by 0.60 percent, the portion of direct SPS aid for olives excluding aid for olive groves, totaling € 864,247,667 as the direct SPS aid for olive growers.  *Id.*  To the € 864,247,667, the petitioner estimates that an additional € 412 million was provided under the Aid to Olive Groves payment, which was folded into the SPS payments to olive growers after the grove payments were terminated, making the annual payments to the olive sector approximately € 1.28 billion.
[87] *See* Petition at Exhibit III-5 referring to EC Council Regulation 1638/98 at Article 1; *see also* Petition at Exhibit III-13.
[88] *See* Petition at Exhibit III-13, Commission Regulation No. 1415/2001 at Clause (2).
[89] *See* Petition at Volume III at 15.
[90] *See* EU IQR and Annex 10, referring to EC Council Regulation 864/2004.  We are multiplying the amount of assistance, the olive industry received during the period from which the CMP was in effect, by 60 percent owing to Clause (11) of this regulation.  Clause (11) explains that at least 60% of the average of the production aid payments in the olive sector, during the reference period 2000 to 2002, should be converted into entitlements under the single payment scheme, and the calculation of entitlements for each farmer should be based on the marketing years 1999/2000 to 2002/2003.  *See* GOS IQR at 17 and EU IQR at Annex 12, EC Regulation, 1782/2003, establishing the Single Payment Scheme.  Articles 36 and 37 discuss payment per entitlement and Annex VII discuss the calculation of a reference amount upon which the entitlement is based.  Chapter 10B of this regulation establishes aid for Olive Groves, Article 110i, (3) which discusses that 60 percent of the SPS aid was granted on the basis of the value of entitlements per hectare held by olive growers and 40 percent of SPS was granted for maintaining olive groves.

annual assistance that was provided under the Aid to Olive Groves payment that was folded into the SPS payments to olive growers after the grove payments were terminated, making the annual payments to the olive sector approximately € 1.28 billion.

According to the European Commission (EC), funding for the BPS direct payment program in Spain is expected to remain at levels similar to SPS levels.  The EC maintained that the budget for Spanish farmers would remain stable during 2014 (when SPS was still in effect) through 2020, at just under € 5 billion a year,[91] closely approximating SPS levels cited by the petitioner.  Because the facts otherwise available indicate that the olive industry in Spain received about one-fourth of all payments that the GOS provided to farmers during the POI under the BPS program, we find, as facts otherwise available, that the BPS program is *de facto* specific within the meaning of section 771(5A)(D)(iii)(III) of the Act.

The information above can be corroborated and supported by the limited *de facto* usage data that the GOS provided on the record.[92]  Although the GOS did not provide a breakdown on the amount of assistance on an industry or a crop-specific basis, the GOS provided the total amount of assistance provided under the BPS program during the POI and the total number of approved applications.[93]  The GOS reported that they approved [                ] in assistance under the BPS program, including the Basic Payment and Greening programs during campaign

---

[91] *See* Petition at Volume III at Exhibit III-15, "CAP in Your Country."

[92] Section 776(c) of the Act provides that, when Commerce relies on secondary information rather than information obtained in the course of an investigation or review, it shall, to the extent practicable, corroborate that information from independent sources that are reasonably at its disposal.  Secondary information is defined as "information derived from the petition that gave rise to the investigation or review, the final determination concerning the subject merchandise, or any previous review under section 751 concerning the subject merchandise."  *See* SAA at 870. Examples of independent sources include, "for example, published price lists, official import statistics and customs data, and information obtained from interested parties during the particular investigation or review."  *Id.* The SAA clarifies that "corroborate" means that Commerce will satisfy itself that the secondary information to be used has probative value.  *Id.* To corroborate secondary information, Commerce will, to the extent practicable, examine the reliability and relevance of the information to be used.  However, the SAA emphasizes that Commerce need not prove that the selected facts available are the best alternative information.

[93] *See* GOS IQR at 53-54.

2015/financial year 2016,[94] and that the total number of approved applications under this program during this period was [      ];[95] thus, the average amount of assistance per application was [      ].  We divided the total amount of assistance received by the total number of applications received per year as a proxy for the total number of companies because the GOS indicated that farmers submit a single application to the Member State per application period.[96] We compared this average to the amount of assistance respondents and their cross-owned affiliates were approved for during this period and found that these respondents were approved for between [      ] to [        ] under the program, which was between double and 83 times the average amount of assistance.  We find that the information from the petitioner that we have relied upon as facts otherwise available in our *de facto* analysis is reliable and relevant because independent information submitted by the GOS in its questionnaire responses similarly show that the respondents, who operate within the olive industry, received considerably higher levels of assistance than the average.  Accordingly, we have corroborated the *de facto* information from the Petition to the extent practicable.  Taken together, the information from the Petition and the information provided by the GOS support a finding that the BPS program is *de facto* specific within the meaning of section 771(5A)(D)(iii)(III) of the Act and is a countervailable subsidy.

### B.  Commerce's Interpretation and Analysis of Section 771B(1) of the Act

#### 1.  Commerce's *Final Determination*

In the *Final Determination*, we relied on section 771B of the Act to examine and measure subsidies provided to olive growers (such as the CAP Pillar I programs) as though they were

---

[94] *Id.*
[95] *Id.*
[96] *See* GOS IQR at 50.

provided to the olive processors (*i.e.*, the respondents in this case).[97]  Section 771B of the Act

addresses the calculation of countervailable subsidies on certain processed agricultural products:

> In the case of an agricultural product processed from a raw agricultural product in which –
>> (1) the demand for the prior stage product is substantially dependent on the demand for the latter stage product, and
>> (2) the processing operation adds only limited value to the raw commodity,
> countervailable subsidies found to be provided to either producers or processors of the product shall be deemed to be provided with respect to the manufacture, production, or exportation of the processed product.

Commerce found that section 771B of the Act applied in this investigation because the

two-pronged test was satisfied.[98]  Regarding section 771B(1) of the Act, we found that the

demand for raw olives (*i.e.*, the prior stage product) was substantially dependent on the demand

for table olives (*i.e.*, the latter stage product, which includes ripe olives and other olives that are

eaten as processed), and we relied on record information showing that eight percent of all raw

olives are used to produce table olives.[99]  In our analysis, we explained that Congress has not

specified, nor has Commerce otherwise established through rulemaking or practice, a minimum

threshold requirement to satisfy the "substantially dependent" criterion.[100]

## 2.  The Court's *First Remand Order*

The Court held that Commerce's conclusion regarding the first criterion under section

771B(1) of the Act is not in accordance with the law because "Commerce applied an

impermissible interpretation of the statutory term 'substantially dependent' based on its plain

language and legislative history."[101]  The Court determined that, while Commerce found the

---

[97] *See Final Determination* IDM at 6-7.
[98] *Id.* at 21.
[99] *See Preliminary Determination* PDM at 16, unchanged in *Final Determination*.
[100] *Id.* at 16, unchanged in *Final Determination*.
[101] *See First Remand Order* at 21.

amount of raw olives used for processing into table olives, eight percent of all raw olives, to be substantial and that the demand for raw olives was dependent on the demand for table olives, Commerce failed to assess whether the demand for raw olives was "substantially dependent" because "an analysis of 'substantially dependent' that does not link those two terms is an impermissible interpretation of the statute."[102]  According to the Court, Commerce did not read the terms "substantially" and "dependent" in conjunction, but separated the terms to reach its conclusion that the demand for raw olives is substantially dependent upon the demand for table olives.[103]

Furthermore, the Court did not defer to Commerce's interpretation of "substantially dependent" because the Court concluded that "the statutory language is unambiguous regarding the threshold of demand required to satisfy {section 771B(1) of the Act}."[104]  In reaching this conclusion, the Court explained that the legislative history of section 771B of the Act illuminates Congress's unambiguous intent for the meaning of "substantially dependent," citing *Pork from Canada*[105] and *Rice from Thailand Inv.*[106] as the administrative cases that contain the analysis that Congress intended to adopt with the enactment of the statute.[107]  The Court observed that, in *Pork from Canada*, Commerce found that the first criterion would be satisfied if the demand for the prior stage good is derived almost exclusively from the demand for the latter stage product.[108] The Court noted that, in *Pork from Canada*, "Commerce also relied on the {International Trade Commission's} industry analysis, which determined that producers of a raw agricultural product

---

[102] *Id*. at 22.
[103] *Id*.
[104] *Id*. at 22-23.
[105] *See Final Affirmative Countervailing Duty Determination; Live Swine and Fresh, Chilled, and Frozen Pork Products from Canada*, 50 FR 25097 (June 17, 1985) (*Pork from Canada*).
[106] *See Final Affirmative Countervailing Duty Determination and Countervailing Duty Order; Rice from Thailand*, 51 FR 12356 (April 10, 1986) (*Rice from Thailand Inv.*).
[107] *See First Remand Order* at 23-26.
[108] *Id*. at 24 (quoting from *Pork from Canada*, 50 FR at 25098).

and producers of the processed product could be collapsed into a single industry where the raw product enters a single continuous line of production resulting in one end product."[109]  Similarly, the Court observed that, in *Rice from Thailand Inv.*, Commerce found that almost all of the raw agricultural product, paddy rice, is dedicated to the production of milled rice and stated that there was a single continuous line of production from paddy rice to milled rice.[110]

The Court further concluded that after the enactment of section 771B of the Act, Commerce developed a consistent practice of finding the first criterion satisfied when the demand for the latter stage product is "most or at least half of the demand of the raw agricultural product."[111]  However, the Court determined that Commerce deviated from its past interpretation of "substantially dependent" in the *Final Determination*.[112]  The Court acknowledged that Commerce previously found that 44.7 percent satisfied the "substantially dependent" criterion in *Shrimp from China*,[113] but stated that "44.7 percent is significantly higher than eight percent."[114]

In sum, the Court concluded that Commerce deviated from the plain language of the statute, Congress's unambiguous intent, and Commerce's practice in determining that the demand for raw olives is substantially dependent on the eight percent of raw olives used to produce table olives.  The Court therefore remanded Commerce's analysis under section 771B(1) of the Act for further proceedings consistent with the Court's decision.[115]

---

[109] *Id.* at 24-25 (quoting *Pork from Canada*, 50 FR at 25099 (internal quotations omitted)).
[110] *Id.* at 25 (quoting *Rice from Thailand Inv.*, 51 FR at 12358).
[111] *Id.* at 27 (citing *Fresh, Chilled, and Frozen Pork from Canada:  Final Affirmative Countervailing Duty Determination*, 54 FR 30774 (July 24, 1989); and *Rice from Thailand:  Final Results of Countervailing Duty Administrative Review*, 59 FR 8906 (February 24, 1994) (*Rice from Thailand 1994*)).
[112] *Id.* at 26-28.
[113] *Id.* at 28 (discussing *Certain Frozen Warmwater Shrimp from the People's Republic of China:  Final Affirmative Countervailing Duty Determination*, 78 FR 50391 (August 19, 2013) (*Shrimp from China*)).
[114] *Id.*
[115] *Id.* at 40.

### 3.   Commerce's First Remand Redetermination

In the first remand, Commerce reopened the record and new factual information on the record established that there is recognition by the GOS and the Spanish olive industry that certain raw olive varietals are grown specifically for producing table olives, other raw olive varietals are grown as mill olives to produce olive oil, and other raw olive varietals can be used for either purpose, *i.e.*, dual-use olives.[116]  Based on the information, and in the absence of a statutory definition, we reconsidered the meaning of "prior stage product" and interpreted the term to include "raw olive varietals principally suitable for use in the production of table olives."[117]  We found that redefining "prior stage product" in this way was supported by the manner in which GOS agencies collect and publicize data on Spanish olive production, and by Spanish industry data sources demonstrating it is accepted in the olive sector that, at their source, raw olives, based on their varietal and specific cultivation practices for dual-use olives, are grown for use as either table olives or olive oil.[118]  Information from the Ministry of Agriculture demonstrated that certain raw olive varietals (both table and dual-use) are grown specifically for table olive production[119] and that 96 percent of raw table and dual-use olive varietals principally suitable for use in the production of table olives were processed into table olives during the POI.[120]  Therefore, Commerce continued to find section 771B(1) of the Act to be satisfied because the demand for the prior stage product, varietals of raw olives principally suitable for use in the production of table olives, is substantially dependent on the demand for the latter stage product, table olives.

---

[116] *See* First Remand Redetermination at 24, 29.
[117] *Id.*
[118] *See* First Remand Redetermination at 29-30.
[119] *See* Final Remand Redetermination at 33.
[120] *Id.*

### 4.  The Court's *Second Remand Order*

The Court held that Commerce's conclusion that "prior stage product" and "raw agricultural product" are not coextensive in the context of section 771B of the Act is both reasonable and in accordance with law.[121]  The Court agreed that Commerce's construction of section 771B of the Act ensures that both "raw agricultural product" and "prior stage product" are given meaningful effect.[122]  However, the Court rejected Commerce's definition of "prior stage product" as "the raw agricultural product that the industry under examination considers principally suitable for use in the prior stage of production of the latter stage product."[123]  The Court held that "prior stage product" cannot be both distinct from the "raw agricultural product" and also a subset of the raw agricultural product, and concluded that such a definition of "prior stage product" renders the requirements of section 771B of the Act self-fulfilling because raw olives principally suitable for use in table olive production are likely processed into table olives.[124]  Because the Court rejected Commerce's interpretation and definition of "prior stage product," it declined to rule on Commerce's application of its interpretation of that term in its revised analysis of section 771B(1) of the Act and remanded the issue for further proceedings.[125]

### 5.  Analysis

Section 771B of the Act directs Commerce to deem countervailable subsidies provided to producers of a raw agricultural product as though they have been provided with respect to the manufacture, production, or exportation of the processed agricultural product, if two criteria are met.  Relevant for purposes of this remand, the first criterion of the analysis under section

---

[121] *See Second Remand Order* at 18-19.
[122] *Id.*
[123] *Id.* at 19-20.
[124] *Id.* at 19.
[125] *Id.* at 20.

27

771B(1) of the Act requires determining whether "the demand for the prior stage product is substantially dependent on the demand for the latter stage product."

For the reasons stated in the First Remand Redetermination, we continue to respectfully disagree with the Court's holding in the *First Remand Order* that, under step one of the two-step framework set forth in *Chevron*, the statutory language is unambiguous regarding the threshold of demand required to satisfy the "substantially dependent" criterion and that Commerce applied an impermissible interpretation of that term in the *Final Determination*.[126]  In compliance with the *First Remand Order*, we reexamined whether this criterion is satisfied and revised our analysis.[127]  However, the Court held in the *Second Remand Order* that Commerce's revised interpretation of "prior stage product" as "the raw agricultural product that the industry under examination considers principally suitable for use in the prior stage of production of the latter stage product" is an impermissible construction of 771B(1) of the Act.[128]  The Court explained that Commerce's interpretation results in an impermissible construction of the provision because an interpretation that allows the "prior stage product" to be a subset of the "raw agricultural product" causes the statute as a whole to become superfluous.[129]  As explained below, in compliance with the *Second Remand Order*, we have reconsidered the meaning of "raw agricultural product" and "prior stage product" for purposes of the analysis under section 771B(1) of the Act in this case and find that the demand for distinct biological varietals of raw olives (the relevant raw agricultural product that is also the prior stage product) is substantially dependent on the demand for table olives (the latter stage product).

---

[126] *See* First Remand Redetermination at 34-41.
[127] *Id.* at 20-41.
[128] *See Second Remand Order* at 16-20.
[129] *Id.* at 19.

In the First Remand Redetermination, we explained that the Act does not define "raw agricultural product," "prior stage product," and "latter stage product" as those terms are used in section 771B of the Act.[130]  For purposes of identifying the relevant industry for the domestic like product, the Act defines "raw agricultural product" as "*any* farm or fishery product."[131] Commerce has, through practice, adopted a similar definition of the term "raw agricultural product" for purposes of section 771B of the Act.[132]  Although in the *Final Determination* and the First Remand Redetermination Commerce identified all raw olives as the raw agricultural product, the information on the record discussed below demonstrates that there are distinct biological varietals of raw olives and only those varietals that the GOS and the Spanish olive industry recognize as table or dual-use olive varietals represent the relevant raw agricultural product in this investigation on ripe olives.[133]  We continue to identify table olives as the latter stage product, for the reasons previously explained in the *Final Determination* and the First Remand Redetermination.[134]  Further, because there is no intermediate stage of production between table olives and their raw form, we consider it appropriate in this case to define the "prior stage product" to be the same as the "raw agricultural product" (*i.e.*, table and dual-use raw olive varietals).  Therefore, Commerce is conducting the analysis under section 771B(1) of the Act by using a "raw agricultural product" and "prior stage product" that is defined as table and dual-use raw olive varietals that are biologically distinct from other raw olive varietals and a "latter stage product" that is defined as table olives.

---

[130] *See* First Remand Redetermination at 25-26.
[131] *See* section 771(4)(E)(iv) of the Act (emphasis added).
[132] *See* First Remand Redetermination at 25 (citing *Shrimp from China*; *Rice from Thailand 1994*).
[133] The Court acknowledged the possibility that a "distinct biological varietal can be considered a distinct raw agricultural product under the definition Commerce employs . . . ."  *See Second Remand Order* at 20 n.5.
[134] *See Final Determination* IDM at 21; First Remand Redetermination at 26, 84-85 n.229.

Data from both the respondents' and the petitioner's submissions demonstrate that there are only five biological varietals of raw olives that the GOS considers suitable for table olive production. The GOS confirmed that it tracks table olive production statistics by variety because the production process and marketing differ by varietals for table olive production whereas statistics are not collected by varietal for olives grown for olive oil because the production process is similar for mill olive varietals and there is no differentiation in the market based on mill olive varietals.[135]

According to Spain's Ministry of Agriculture Food Information and Control Agency (AICA) and Interaceituna, a Spanish interprofessional organization for the table olive industry, the five principal raw olive varietals are manzanilla, gordal, hojiblanca, cacerena, and carrasquena, which accounted for 602,020 tons of table olives production,[136] or 95 percent of total table olive production during the 2015/2016 campaign, which most closely corresponds with the POI.[137] The record indicates that Spain considers three of these varietals, manzanilla, gordal, and carrasquena, as table olive varietals,[138] and two of these varietals, hojiblanca and cacerena, as dual-use olive varietals.[139] The GOS's Ministry of Agriculture indicates that the

---

[135] *See* First Remand Redetermination at 98 (citing the GOS's Letter, Countervailing Duty Investigation of Ripe Olives from Spain-Department of Commerce's Draft Remand Redetermination," dated April 17, 2020 at 11 and 13; and Musco's Letter, "Ripe Olives from Spain; 1st Administrative Review; Response to Request for Additional Information," dated February 25, 2020 (Musco's February 25 Response) at 8).

[136] *See* ASEMESA, Agro Sevilla Aceitunas S.Coop.And. (Agro Sevilla), and Angel Camacho Alimentacion, S.L. (Camacho)'s Letter, "Factual Information Submission of 'Substantial Dependence,'" dated January 15, 2020 at Exhibit NFI-5; *see also* ASEMESA, Agro Sevilla, and Camacho's Letter, "Response to the Request for Additional Information on Substantial Dependence-Ripe Olives from Spain (C-469-818)," dated February 21, 2020 (ASEMESA's February 21 Response) at Exhibit NFI-3; Musco's February 25 Response at Exhibits 10 and 11.

[137] *See* GOS IQR at 33. "Usually, table olives are collected from September to November, but it takes three or four months to prepare before consuming. The production is collected at the end of the year and is marketed the following year. Then, production of POI (2016) corresponds to the production of the 2015/2016 season." The GOS does not collect production data on a calendar year. Because they explained that the marketing year 2015/2016 that most closely corresponds to the POI, we are using production data for the 2015/2016 campaign which includes data through June 30, 2016. *See* ASEMESA's February 21 Response at NFI-2.

[138] *See* Musco's Letter, "Ripe Olives from Spain; 1st Administrative Review; Submission of New Factual Information," dated February 5, 2020 (Musco's February 5 Response) at 4 and Exhibit 2; *see also* GOS 1SQR at 4.

[139] *See* Musco's February 5 Response at Exhibit 2

Seville Camomile, otherwise known as manzanilla de Sevilla or carrasquena,[140] and gordal

varietals are fit solely for table production.[141]  Further, the GOS reported that almost 90 percent

of the manzanilla olives were processed into green olive production.[142]  Because the GOS states

that almost all manzanilla olives are used as table olives and makes no mention of them being

dual-use in its discussion of dual-use olives, we are considering manzanilla as fit for table.[143]

Unlike mill varietals, these table olive varietals have a lower oil content, are larger in size, are

more symmetrical in shape, and generally are characterized as having a higher pulp-to-bone

ratio.[144]  Information from the GOS website and industry sources indicate that table olive

varietals tend to be larger than mill olive varietals.[145]  Additionally, orchards dedicated to

growing table and dual-use olive varietals for table olive production (*e.g.*, hojiblanca) require

larger amounts of water than mill olive orchards and often are located in the south and western

regions of Spain where there is high rainfall.[146]  In comparison, growers of mill olives minimize

water consumption in order to maximize oil content.[147]  The pruning practices for table and dual-

use olive varietals grown for table also are distinctly different than those for growing mill

olives.[148]  Growers of table olive varietals and dual-use olive varietals grown for table

intensively prune the orchard branches to maximize their size and follow more stringent pest

management practices.[149]  Moreover, olives must pass the International Olive Council (IOC)

---

[140] *Id.* at 4.

[141] *See* Musco's February 25 Response at Exhibit 2A.

[142] *See* GOS's Letter, "Response of the Government of Spain in the Department's October 25, 2017 Supplemental Questionnaire," dated November 7, 2017 at 4.

[143] *Id.*

[144] *See* Musco's February 5 Response at 5 and Exhibit 2.

[145] *Id.* at 2; *see also* and Musco's February 25 Response at Exhibit 13.

[146] *See* Musco's February 25 Response at Exhibit 5A.

[147] *Id.*; *see also* Musco's February 5 Response at 7.

[148] *See* Musco's February 5 Response at 7; *see also* Musco's February 25 Response at Exhibit 13.

[149] *Id.*

standards and industry requirements for table olive production.[150]  The IOC emphasizes that table

olives can only be produced from certain varietals.  Specifically, the IOC states that "the table

olive is the fruit of *certain varieties* of the cultivated healthy olive tree, taken in the state of

adequate maturity and quality that, subject to the appropriate preparations, gives a product of

consumption and good conservation as commercial merchandise."[151]  Mill olive varietals

generally do not meet the IOC standards referenced above.[152]  For Harvest 2016 (corresponding

to the 2015/2016 campaign), only 1 percent of mill varietals were processed into table olives.[153]

Because manzanilla, gordal, hojiblanca, and carrasquena account for 87 percent of olive

production grown for table during the POI, we are relying on these four table and dual-use raw

olive varietals as the "prior stage product" in our "substantial dependence" analysis.  Cacerena is

also considered a dual-use raw olive varietal, as explained above.[154]  However, the record does

not contain sufficient information regarding the total production volumes, mill production

volumes, or the total hectares dedicated to the production of cacerena that would allow us to

include this varietal in the substantial dependence calculation.  Furthermore, the evidence on the

record suggests that the production volume of cacerena comprises a small percentage of the total

volume of olive varietals grown for table.[155]

To conduct this analysis, the numerator consists of the manzanilla, gordal, carrasquena,

and hojiblanca varietals of olives processed into table olives (the latter stage product), and the

denominator consists of total tonnage of manzanilla, gordal, carrasquena, and hojiblanca

produced (the prior stage product).  We are not considering strictly mill varietals that were used

---

[150] *See* Musco's February 5 Response at Exhibit 3.
[151] *See* Musco's February 25 Response at Exhibit 2A.
[152] *Id.*
[153] *Id.* at Exhibit 7B.
[154] *See* Musco's February 25 Response at Exhibit 2 and Musco's February 5 Response at Exhibit 1.
[155] *See* ASEMESA's February 21 Response at Exhibit NFI-2.

as table in the numerator because of their biological differences, higher oil content, smaller size, and the fact that mill olives generally do not meet IOC standards. In addition, GOS statistics demonstrate that typically only 1 percent of mill olives are sent to table.[156]

In the draft redetermination, we relied on record evidence showing the actual volume the prior stage product used for table olives and found that 582,648 tons of manzanilla, gordal, carrasquena, and hojiblanca varietals were processed into table olives during Harvest 2016. The 582,648 tons include the 492,244 tons of manzanilla, gordal, carrasquena, and hojiblanca grown for table plus 90,404 tons of mill olives used for table olive production.[157] We included the 90,404 tons of dual-use and mill olives grown for mill but used as table.[158] However, in the calculation, we stated that we presumed that a portion of these mill olives used as table may be hojiblanca, because this varietal is often used as table and it is a dual-use olive which makes it more likely than mill olives to have the inherent physical characteristics to be used as table because strictly mill olives are even less likely to meet the IOC standards.[159] Since the issuance of the draft redetermination, Commerce has received comments from ASEMESA that the 90,404 tons of mill olives used for table olive production may not only be hojiblanca grown for mill, but could also be cacerena and other varietals grown for the mill.[160] We agree that, other than hojiblanca, these dual-use olives grown for mill and used for table olive production should not be included in the numerator because the record does not contain sufficient data regarding these varietals and we have not accounted for them in the denominator. Because we do not have data on cacerena and other dual-use olives grown for mill, we find it reasonable to infer that the

---

[156] *See* Musco's February 25 Response at Exhibit 7B.
[157] *See* ASEMESA's February 21 Response at Exhibit NFI-2.
[158] *See* Memorandum to the File from Mary Kolberg, "Countervailing Duty Investigation of Ripe Olives from Spain: Analysis of the Draft Remand Results for Finding the BPS Program de facto Specific and the First Criterion of Section 771B is Satisfied," dated October 7, 2021.
[159] *Id.*; *see also* Musco's February 5 Response at 3 and Exhibit 2.
[160] *See* ASEMESA's Comments at 17.

percentage of dual-use varietals grown for table olives on a varietal-by-varietal basis is the same as the percentage of dual-use varietals grown for mill.[161]  Subtracting the estimated amount of cacerena and "other" dual-use varietals grown for mill but used for table olive production, which is 18,590 tons, from the numerator, we arrive at a revised numerator of 564,058 tons, which includes 492,244 tons of manzanilla, gordal, carrasquena, and hojiblanca grown for table, plus the 71,814 tons of hojiblanca grown for mill but used for table olive production in Harvest 2016.[162]

For the denominator, the record evidence shows that 511,122 tons of manzanilla, gordal, carrasquena, and hojiblanca olives are grown for table olives.[163]  However, hojiblanca olives are a dual-use olive varietal that is also used to produce olive oil.  Therefore, we find that the hojiblanca mill olives should also be included in the denominator of the substantial dependence varietal analysis.  Because the record does not include a figure that represents the total volume of hojiblanca olives used to produce olive oil, we need to derive this information based on the production volume data and hectare data on the record.

We begin our analysis by calculating yield rates for table olives (and dual-use olives grown for table) and mill olives.  Data from the GOS's Annual Crop Surfaces and Productions publication illustrates that 511,122 tons of table and dual-use olive varietals grown for table were produced during Harvest 2016.[164]  Dividing the 511,122 tons of table and dual-use olive varietals by 160,400 hectares,[165] the total number of cultivated hectares dedicated to the production of table olives during Harvest 2016 (a change from the draft redetermination where we used total

[161] See Memorandum, "Countervailing Duty Investigation of Ripe Olives from Spain:  Analysis of the Final Remand Results for Finding the First Criterion of Section 771 is Satisfied," dated November 3, 2021 (Final Calculation Memorandum).
[162] See Musco's February 25 Response at Exhibit 7B.
[163] Id.
[164] Id. at Exhibit 7B.
[165] See ASEMESA's February 21 Response at Exhibit NFI-1.

34

hectares), we arrive at a 3.19 tons per hectare yield rate for table olives. Similarly, we calculate a yield rate for mill olives, taking the total production of mill olives, 6,571,428 tons,[166] and divide by the number of cultivated hectares dedicated to mill olive production, 2,243,700[167] hectares, resulting in a yield rate for mill olives of 2.93 tons per hectare.

Having derived the yield rate for table and mill olives, we can determine the number of cultivated hojiblanca hectares dedicated to table and mill olive production. Data from Spain's AICA indicate that 290,850 tons of hojiblanca grown for table olives were produced during the 2015/2016 campaign.[168] To determine the number of cultivated hojiblanca hectares dedicated to table olives, we divided the 290,850 tons grown for table olives by the yield rate for table olives, 3.19 tons per hectare, and determined that 91,176 hojiblanca hectares were dedicated to table olives.[169] To determine the number of cultivated hojiblanca hectares dedicated to mill olives, we took the total number of hojiblanca hectares, 265,000 hectares,[170] and subtracted the 91,176 hojiblanca hectares dedicated to table olives and concluded that 173,824 hojiblanca hectares were dedicated to mill olives during Harvest 2016.[171] To determine the total volume of hojiblanca olives grown for use as mill olives, we multiplied the number of hojiblanca hectares dedicated to growing mill olives, 173,824, by the yield rate for mill olives, 2.93 tons per hectare, and found that 509,304 tons of hojiblanca olives were grown for mill olives during Harvest 2016.

To calculate the number of tons of manzanilla, gordal, carrasquena, and hojiblanca produced during the POI (used in the denominator of our calculation), Commerce added the 509,304 tons of hojiblanca mill olives and the 511,122 tons of manzanilla, gordal, carrasquena,

---

[166] *See* Musco's February 25 Response at Exhibit 7B.
[167] *See* ASEMESA's February 21 Response at Exhibit NFI-1.
[168] *Id.* at Exhibit NFI-2.
[169] *See* Final Calculation Memorandum.
[170] *See* Musco's February 25 Response at Exhibit 2A.
[171] *See* Final Calculation Memorandum.

and hojiblanca grown for table olives to determine that 1,020,426 tons of manzanilla, gordal, carrasquena, and hojiblanca olive varietals were produced in Harvest 2016.[172]  Finally, we conducted our substantial dependence analysis, using the 564,058 tons of manzanilla, gordal, hojiblanca, and carrasquena varietals processed into table olives as the numerator and divided by 1,020,426 tons of all the manzanilla, gordal, hojiblanca, and carrasquena varietals produced during Harvest 2016, which revealed that 55.28 percent of the manzanilla, gordal, hojiblanca, and carrasquena varietals were processed into table olives.[173]  Because 55.28 percent of the manzanilla, gordal, hojiblanca, and carrasquena varietals, the prior stage product, were processed into table olives, the latter stage product, we find that the demand for these varietals is substantially dependent on processed table olives.  Thus, we find that section 771B of the Act applies in this investigation because the two-pronged test in this provision is satisfied.  Because we have determined that subsidies provided to growers of raw olives under the BPS program are *de facto* specific within the meaning of section 771(5A)(D)(iii)(III) of the Act, and that the criteria in section 771B of the Act are satisfied, we deemed the subsidies provided under this program to have been provided with respect to the production of the processed product (table olives).  Our findings here have not resulted in any changes to the net countervailable subsidy rates determined in the *Amended Final Determination and Countervailing Duty Order*.

---

[172] *Id.*
[173] *Id.*

## IV.   SUMMARY AND ANALYSIS OF COMMENTS FROM INTERESTED PARTIES

### Comment 1:  Whether Commerce Correctly Determined that the BPS/Greening Program is *De Facto* Specific

*GOS's Comments:*[174]

*Information Relied Upon as Facts Otherwise Available*

- Commerce indicates that the BPS budget for Spanish farmers remained constant with respect to the SPS.  However, there is no linearity in the aid received between the two programs.  The national ceiling for BPS is much lower than the ceiling for SPS.

- The integration of direct aid in the SPS program for olive groves was carried out in 2006 with 93.61 percent decoupling to reach 100 percent in 2010 and not 60-40 percent as indicated in the calculations.

- The average value of the SPS entitlement per hectare (258.03 €/ha) is reduced to 144.78 €/ha in 2019.

*Corroboration*

- Commerce calculated the average amount of assistance received under the BPS program by dividing the total budget allocated to Pillar I aid by the number of applications and compared this average BPS amount with amounts received by suppliers to the olives respondents under investigation to conclude that the respondents' benefits are much higher than the national average, and therefore the aid is *de facto* specific.  However, this is erroneous given that:  (1) the amounts received by farmers are total amounts and not unit amounts per hectare, so it is not possible to draw any conclusions from them since the sector receiving the aid is not specified; (2) the aid is the result of multiplying the total area of each beneficiary by its unit value and, consequently, we cannot know what

---

[174] *See* GOS's Comments at 1-5.

the unit value of the entitlements of the beneficiaries are –  whether they are lower or

higher than the average value, nor do we know which sectors were integrated into the

SPS or BPS entitlement system when these benefits were allocated; the aid received lacks

traceability by crop and is allocated according to eligible hectares.  This means that

recipients receive aid irrespective of the type of area; and it is not known what type of

production gave rise to the entitlement; (3) it is also not certain that the olive trees were

present at the time of the allocation of entitlements and that the entitlements derive from

the allocation to that holder and not from transfer of entitlements.

*ASEMESA's Comments:*[175]

*Information Relied Upon as Facts Otherwise Available*

- In determining that the BPS/Greening program is *de facto* specific, Commerce relied on

   calculations included in the Petition.  Specifically, Commerce relied upon the petitioner's

   allegation that the average olive production in Spain from 1999 to 2003 was 1,089,159

   tons, from which the petitioner derived € 1.28 billion in assistance is provided to olive

   farmers each year.  However, the 1,089,159 tons refers to tons of processed olive oil not

   tons of raw olives, as the source of the document referred to by the petitioner is entitled

   "fixing the actual production of olive oil and the unit amount of the production aid for the

   1999/2000 marketing year."  Other record evidence demonstrates that annual olive

   production in Spain beginning in 2007 ranges anywhere between 4 to 9 million tons.

- Secondly, the petitioner's purported per unit benefit used in the calculation of total

   benefits to the olive sector is mischaracterized.  Commerce multiplies the

   mischaracterized average olive production of 1,089.159 tons by the average amount of

---

[175] *See* ASEMESA's Comments at 1 and 5-8.

assistance olive growers received under the Common Market Program of EUR 132.225/100 kilograms.  However, this figure is nearly two decades old and expressed in terms of the volume of olive oil production, not olive production.

- Lastly, Commerce relies on past programs, such as the Common Market Program, to render its final calculation of the total benefits to olive growers for the existing BPS/Greening program.  Commerce's selection of "facts available" does not concern facts attributable to the BPS/Greening program and should not be used.

- Even assuming the 25 percent figure is reasonable, Commerce does not demonstrate how this figure is disproportionate within the meaning of section 771(5A)(D)(iii)(III) of the Act.  It merely presumes disproportionality from the figure itself.

*Corroboration*

- Commerce claims to have corroborated its facts that the Spanish olive industry received a disproportionate amount by comparing the average amount of assistance under the BPS/Greening programs per application using the total applications and benefits reported by the GOS with benefits received under the program by the respondents.  Based on this comparison, Commerce concludes that the respondents received benefits between double and 83 times the average amount.

- Commerce's analysis of GOS data does not corroborate disproportionality of BPS/Greening benefits because it does not analyze benefits on the basis on which they were administered.  The level of BPS/Greening benefits is not determined on an application basis, but on the number of entitlements declared in the application.

- To calculate the benefit amount to a farmer, one must multiply the entitlement value by the number of hectares reported in the application.

- It is not surprising to find the large operations possessed by the respondents receiving higher levels of per-application benefits than the average because the average would be driven by the numerous smaller farmers with fewer hectares and, therefore, fewer entitlements reported in their applications.

- Commerce's attempt to corroborate highlights that BPS/Greening benefits are scalable based on the size of operation, and therefore, fundamentally proportionate, not disproportionate.  Therefore, Commerce should decline to find this program *de facto* specific.

**Commerce's Position**:

*Information Relied Upon as Facts Otherwise Available*

We disagree with the respondents and continue to find that the BPS program is *de facto* specific because the olive industry received a disproportionately large amount of assistance under the program.  During the investigation, we asked the GOS and the EU to provide usage information relevant for determining whether the BPS program may be *de facto* specific.  We asked for information on the number of companies and industries and the amount of assistance approved for this program to the olive industry and to every other industry in which companies were approved for assistance under the program.[176]  In response, the GOS replied with general information regarding the amount of total assistance approved under the BPS Basic Payment, Greening, and Young Farmers schemes during the POI and the number of applications submitted under each program.[177]  The GOS also provided information regarding the amount of assistance approved for the respondent companies and their cross-owned affiliates, but despite our request, the GOS did not provide any information as to the amount of assistance approved on a per

---

[176] *See* GOS Initial Questionnaire at Section II, Standard Questions Appendix at question M.7.
[177] *See* GOS IQR at 54.

industry basis.[178]  In a supplemental questionnaire to the GOS, we asked additional questions to obtain the necessary usage information for the BPS program, specifically asking for the total amount of CAP payments (Pillar I and II) made during the POI to the agricultural districts within Andalusia and for the total amount of CAP payments made to olive and table olive growers during the POI to the agricultural districts within Andalusia.[179]  In response, the GOS provided information as to the total amount of CAP assistance (Pillar I and II) but reiterated its previous response that decoupled payments are not product specific and it is not possible to differentiate by productive orientation, crop, or type of product.[180]

The GOS did not provide information in response to Commerce's initial or supplemental questionnaire as to the amount of assistance provided to the olive industry and other industries within the agricultural sector.  The requested information, such as amounts of assistance provided to the olive and other industries under this program, is necessary to determine whether the BPS is *de facto* specific and is not available on the record.  Because the GOS did not provide the requested information necessary for our *de facto* specificity analysis, we must resort to the facts otherwise available on the record to conduct the analysis, pursuant to sections 776(a)(1) and 776(a)(2)(B) of the Act.  As explained below, we continue to find, based on the facts otherwise available, that the BPS is *de facto* specific in accordance with section 771(5A)(D)(iii)(III) of the Act.

The facts underlying our *de facto* specificity determination come from the Petition, the only information on the record regarding the distribution of assistance under the BPS on an industry basis.  We initiated an investigation of this program based on an allegation in the

---

[178] *Id.* at 53-55.
[179] *See* GOS Supplemental Questionnaire at 3.
[180] *See* GOS 1SQR at 16.

Petition that was supported by adequate information that was available to the petitioner.  For

specificity, the petitioner alleged that under the SPS program, the predecessor to the BPS

program, olive farmers in Spain received € 468 per hectare, per year.  This amount was based on

a report that Spain's former Minister of Agriculture, Food and Environmental Affairs, provided

to Spain's National Parliament,[181] whereas, according to a published GOS report on the

implementation of the SPS campaign for 2014, the average Spanish farmer received € 258.03 per

hectare, per year.[182]  Moreover, the petitioner estimated that Spanish agricultural producers

received € 4.9 billion in Pillar I SPS payments annually, based on a study by the U.S.

International Trade Commission,[183] with Spanish olive producers receiving € 1.28 billion of

those payments, or approximately 25 percent of the total annual agricultural aid to Spain.[184]  As

explained above, the petitioner estimated that Spain's olive industry receives € 1.28 billion in

annual benefits under the BPS program.  To calculate this estimate, the petitioner relied on EC

Council Regulations 1638/98 and EC Regulation 1415/2001, which established the guaranteed

quantities of production levels of olive oil for which assistance shall be granted in each Member

State,[185] and estimated that the average guaranteed quantities of production of olive oil for which

Spain granted assistance during 1999 to 2003 was 1,089,159 tons.[186]  The guaranteed quantities

also includes table olives, which can be expressed as an olive oil equivalent.[187]  Multiplying the

average guaranteed quantity of production of olive oil, 1,089,159 tons, by the per unit benefit of

ECU 132.225/100 kilograms of olive oil established under the Common Market Program, equals

---

[181] *See* Petition at Volume III at 16 (citing Olive Oil Times, *Olive Regions Work on Joint Strategy to Maintain EU Subsidies*, April 2, 2012).
[182] *See* Petition at Volume III at 17 (citing Government of Spain, Report on the Implementation of Regional Payments in Spain-2014 Campaign, March 2015).
[183] *See* Petition at Volume III at 9.
[184] *See* Petition at Volume III at 15.
[185] *See* Petition at Exhibit III-5 referring to EC Council Regulation 1638/98 at Article 1.
[186] *See* Petition at Exhibit III-13.
[187] *See* Petition at Exhibit III-13, Commission Regulation No. 1415/2001 at Clause (2).

€ 1,440,412,777.50.[188]  The petitioner then multiplied the € 1,440,412,777.50 by 60 percent, the

portion of direct SPS aid for olives excluding aid for olive groves,[189] to derive a total of €

864,247,667 as an estimate of the direct SPS aid for olive growers.  To the € 864,247,667, the

petitioner added an additional € 412 million, which it claims was annual assistance that was

provided under the Aid to Olive Groves payment and was folded into the SPS payments to olive

growers after the grove payments were terminated, making the annual payments to the olive

sector approximately € 1.28 billion.  While the GOS claims there is no linearity between the SPS

and BPS programs, the EC reported that the annual budget for the CAP direct payment program

(for Spanish farmers) was to remain at levels similar to SPS levels, at just under € 5 billion, from

2014 (when SPS was still in effect) through 2020,[190] closely approximating SPS levels cited by

the petitioner.  The facts otherwise available indicate that the olive industry in Spain received

about one-fourth of all payments that the GOS provided to farmers during the POI under the BPS

program, which is a disproportionately large amount of assistance relative to other industries

within Spain's agricultural sector considering that olives account for only 3 percent of the

country's total agricultural output.[191]  Therefore, we find, as facts otherwise available, that the

BPS program is *de facto* specific within the meaning of section 771(5A)(D)(iii)(III) of the Act.

---

[188] *See* Petition at Volume III at 15.
[189] *See* EU IQR and Annex 10, referring to EC Council Regulation 864/2004.  We are multiplying the amount of assistance the olive industry received during the period from which the CMP was in effect by 60 percent owing to Clause (11) of this regulation.  Clause (11) explains that at least 60% of the average of the production aid payments in the olive sector during the reference period 2000 to 2002 should be converted into entitlements under the single payment scheme, and the calculation of entitlements for each individual farmer should be based on the marketing years 1999/2000 to 2002/2003.  GOS IQR at 17 and EU IQR at Annex 12, EC Regulation 1782/2003, establishing the Single Payment Scheme.  Article 36 and Article 37 discuss payment per entitlement and Annex VII discusses the calculation of the reference amount upon which the entitlement is based.  Chapter 10B of this regulation establishes, Aid for Olive Groves, Article 110i,( 3 ) which discusses that 60 percent of the SPS aid was granted on the basis of the value entitlements held by olive growers and 40 percent of SPS aid was granted for maintaining olive groves.
[190] *Id.* at Exhibit III-15, "Spain-CAP in Your Country" at 2.
[191] *See* Petition at Volume III at 15, citing "Spain-CAP in Your Country."

Commerce acknowledges that recent annual olive production in Spain is greater than the 1,089,159 tons included in the benefit calculation.[192]  However, EC Council Regulation 1638/98 established the maximum production levels of olive oil for which assistance shall be granted in each Member State.[193]  To determine the amount of assistance granted to the olive industry, Commerce used the average of the guaranteed quantities of production of olive oil for which Spain granted assistance during 1999 to 2003.[194]  The 1,089,159 tons used by Commerce in the draft redetermination refers to the average of the guaranteed quantities of production of olive oil for which aid would be granted during this period.[195]  The guaranteed quantities also includes table olives, which can be expressed as an olive oil equivalent.[196]  We use this guaranteed quantity of olive oil for which assistance was given under the Common Market Program to estimate the amount of aid provided to the olive industry.  We multiplied the average guaranteed quantity of production of olive oil, 1,089,159 tons, by the per unit benefit of ECU 132.225/100 kilograms of olive oil established under the Common Market Program, which equals € 1,440,412,777.50.[197]  We then multiplied the € 1,440,412,777.50 by 60 percent, the portion of direct SPS aid for olives excluding aid for olive groves.[198]  We multiplied the amount of assistance that the olive industry received under the Common Market Program by 60 percent

---

[192] *See* Musco February 25 Response at Exhibit 7B; *see also* ASEMESA February 21, 2020 at Exhibit NFI-1.
[193] *See* Petition at 11 and Exhibit III-5 referring to EC Council Regulation 1638/98 at Article 1.
[194] *Id.* at Exhibit III-13.
[195] *Id.* at 15.
[196] *Id.* at Exhibit III-13, Commission Regulation No. 1415/2001 at Clause (2).
[197] *Id.* at Volume III at 15.
[198] *See* EU IQR and Annex 10, referring to EC Council Regulation 864/2004.  We are multiplying the amount of assistance the olive industry received during the period from which the CMP was in effect by 60 percent owing to Clause (11) of this regulation.  Clause (11) explains that at least 60% of the average of the production aid payments in the olive sector during the reference period 2000 to 2002 should be converted into entitlements under the single payment scheme, and the calculation of entitlements for each farmer should be based on the marketing years 1999/2000 to 2002/2003.  GOS IQR at 17 and EU IQR at Annex 12, Single Payment Scheme at Chapter 10B, Aid for Olive Groves, Article 110i, 3, which discusses that 60 percent of the SPS aid was granted based on the value entitlements held by olive growers and 40 percent of SPS aid was granted for maintaining olive groves.

44

based on clause (11) of EC Council Regulation 864/2004, which stipulates that at least 60 percent of the average production payments made to the olive sector during 1999 to 2002 should be converted to entitlements under the single payment scheme. This calculation of SPS benefits is also discussed in EC Regulation 1782/2003, which established the single payment scheme. Article 36 of this regulation stipulates that assistance under the single payment scheme is based on entitlements which are calculated based on a reference amount, which is calculated based on aid olive growers received for production during 2000 to 2002. According to Annex VII, to calculate the amount of assistance received under the single payment plan one would base their calculation on the amount of assistance received under the Common Market Program multiplied by 60 percent to derive a total of € 864,247,667 under SPS aid for olive growers. To the € 864,247,667, we estimated that an additional € 412 million[199] was provided under the Aid to Olive Groves program, which was folded into the SPS payments to olive growers after the grove payments were terminated, making the annual payments to the olive sector approximately € 1.28 billion.[200] We disagree with the GOS comments that aid for maintenance for olive groves under the SPS program was decoupled in 2010, and therefore should not be included in our calculation of assistance to the olive industry.[201] In the investigation, we found that, while aid to farmers for maintenance of olive groves was terminated in 2010, olive growers continued to receive assistance for maintaining their groves under the general SPS program through 2015.[202] The amount olive growers received under SPS in 2014 was based on both entitlements per hectare

---

[199] *See* EU IQR at Annex 10, EC Council Regulation 864/2004, at Article 110i, which discusses Aid for Olive Groves. Paragraph 3 under this article specifies that the maximum amount of aid for Spain would be € 412.45 million.
[200] *See* Petition at Volume III at 13 (citing USITC study saying that starting in 2010, all payments to olive oil growers in the EU were integrated into the SPS program).
[201] *See* GOS's Comments at 3.
[202] *See Preliminary Determination* PDM at 22.

under SPS and assistance for maintaining olive groves, and the BPS program uses the amount farmers received under SPS in 2014.

Moreover, we disagree with the respondents that benefits received by the Spanish olive industry under the Common Market Program should not be used to determine benefits to the olive industry under the BPS program.  As we explained in the investigation, the annual grant amount provided to olive growers under BPS relied for reference on the amount of benefits under the SPS,[203] and, in turn, access to and the amount of benefits provided to olive growers under SPS was determined by reference to the amount of benefits provided under the Common Market Program from 1999 to 2002.[204]

We continue to find that our calculation of the amount of assistance provided to the Spanish olive industry is reasonable.  The Act does not mandate a specific methodology in conducting a *de facto* specificity analysis and Commerce has the discretion to apply any reasonable methodology in light of the facts and circumstances in each case.[205]  We reiterate that despite parties' comments regarding, among other things, the age of the data, it is the inability of the GOS to provide information on amounts received by the olives industry and other industries that has resulted in a record that does not contain the information that is necessary to analyze whether the BPS is *de facto* specific, and which leaves Commerce in the position where it must rely on the Petition as facts otherwise available for this analysis.  The parties have not pointed to

---

[203] *See* EU IQR at Exhibit 13, Article 26, "Calculation of the initial unit value- The initial unit value of payment entitlements referred to in Article 25(2) in Member States which apply the single payment scheme in calendar year 2014…."

[204] *See* EU IQR at Exhibit 12, Council Regulation 1782/2003 establishes the Single Payment Scheme (SPS).  Article 37 of this regulation states that "for olive oil the reference amount shall be the four-year average of the total amounts of payments which a farmer was granted under the olive oil support scheme referred to in Annex VI, calculated and adjusted according to Annex VII, during the marketing years 1999/2000, 2000/01, 2001/02, 2002/03."  Annex VI states that direct payments should be based on production aid.

[205] *See, e.g.*, *AK Steel Corp. v. United States*, 192 F.3d 1367, 1385 (Fed. Cir. 1999) (stating that "determinations of disproportionality and dominant use are not subject to rigid rules, but rather must be determined on a case-by-case basis taking into account all the facts and circumstances of a particular case").

any other information on the record disputing the amounts we have relied on above, nor did any of the parties supplement the record with information other than that provided in the Petition at any point during the investigation.

While the GOS reports that the average value of the SPS entitlement per hectare (258.03 €/ha) was reduced to (144.78 €/ha) under BPS, this is based on information for 2019, three years after the POI, and therefore, is not pertinent to our analysis.  Therefore, because the GOS has not provided information on the amount of assistance under the BPS program provided to the olive industry and all other industries in the POI or pointed to any other record evidence that speaks to this issue,[206] we must rely on information in the Petition to calculate BPS assistance to the olives industry as facts otherwise available.

*Corroboration*

Information from the GOS's original submission corroborates that the olive industry received a disproportionate amount of benefits under this program.  The GOS reported that the average amount of assistance received was [      ] per application, whereas the respondents and their cross-owned affiliates received between double and 83 times the average amount.

The GOS and ASEMESA argue that the level of BPS Direct Payment and Greening benefits should not be determined on total amounts received by growers, but based on unit amounts per hectare, or entitlements, *etc*.  We disagree.  As an initial point, it is worth noting that in their comments, neither the GOS nor ASEMESA point to any data on the record that would allow Commerce to corroborate the information from the Petition relied upon as facts otherwise available in the manner they suggest, such as unit amounts per hectare received under each

---

[206] *See* GOS IQR at 54-55.

application.  That is because, as we have noted previously, the GOS failed to provide the information necessary for a fulsome analysis of *de facto* specificity.

As explained above, Commerce requested information regarding assistance given to the olive industry under the BPS program relative to other industries.  However, the GOS responded that it did not have specific information related to the olive industry or other industries because the BPS program was purportedly "decoupled."  Because the GOS did not provide the requested information, we relied on facts available and were able to compare the total average payment under the program to the total received by the respondents.  Using the limited information available, we continue to find that determining the average amount of assistance received under the program and comparing this amount to the amount of assistance the respondents received is appropriate for this corroboration exercise.  Because the respondents and their cross-owned affiliates received between double and 83 times the average amount, we continue to find our *de facto* specificity finding with respect to the BPS program to be corroborated.  In addition, our analysis of the amount of funding for the respondents relative to the average user was done for corroboration and not the disproportionality analysis itself.  Our *de facto* specificity finding is supported by information from the Petition showing that the olive industry received about one-fourth of all payments that the GOS provided to farmers during the POI under the BPS program even though olives account for only 3 percent of the country's total agricultural output, as explained above.  We have corroborated this information to the extent practicable based on independent information submitted by the GOS in its questionnaire responses showing that the respondents, which operate within the olive industry, received considerably higher amounts of assistance under the program compared to the average amount of assistance.

Furthermore, we disagree with ASEMESA's contention that "the average would be driven by the numerous smaller farmers with fewer hectares and, therefore, fewer entitlements reported in their applications" and that large farms, such as the respondents, receiving more benefits is not surprising, and in fact demonstrates that assistance is proportionate. First, ASEMESA has identified no record evidence suggesting that the average is "driven by smaller farmers." Furthermore, if the average is indeed driven by a large amount of smaller farmers, it is unclear how this is supportive of their position, rather than even greater support for Commerce's findings that the respondents are receiving benefit amounts many times greater than the average farmer. Finally, there is nothing in the Act or the SAA suggesting that Commerce is required to consider *why* a firm may have received more benefits than others in its *de facto* analysis of disproportionality. That an industry or firm *did*, *in fact*, receive a disproportionate level of benefits demonstrates specificity, and the reason for the disproportionate distribution of assistance to those that operate in a particular industry is immaterial to Commerce's analysis. It appears ASEMESA is of the view that a subsidy that would otherwise be *de facto* specific under section 771(5A)(D)(iii)(III) of the Act is not countervailable if the reason for the disproportionately large amount of assistance is based on objective criteria or conditions, such as the size of the enterprise. A similar principle is established under section 771(5A)(D)(ii) of the Act; however, that statutory provision is explicitly limited in application to the *de jure* specificity analysis. The Act does not call on Commerce to inquire further into why an industry has received a disproportionately large amount of the subsidy for purposes of the *de facto* specificity analysis, nor has Commerce adopted such a requirement through practice. In addition, information on the size of enterprises benefiting from BPS is not on the record for Commerce to consider, even if it deemed it appropriate to do so.

**Comment 2:  Whether Commerce Correctly Calculated both the Numerator and the Denominator in its Substantial Dependence Analysis**

*ASEMESA's Comments:*

- Commerce's presumption that table and mill varietals have only one use is not supported by the record.

- Although dual-use varietals have broad application for both oil and table olive production, that does not mean they are the only varietals that can be used in both applications.

- Commerce's assumption that the 90,404 tons of raw mill olives used to produce table olives are simply hojiblanca dual-use olives is unsupported.  They could very well be other olives.

- Commerce's exclusion of the cacerena varietal also unreasonably biases its analysis.  The volume of cacerena used to produce table olives in Harvest Year 2016 was not small.  In fact, it was larger than the production of gordal, which Commerce included in its analysis.

- The exclusion of cacerena olives is self-serving and biased given that cacerena is a dual-use olive equally suited for table or oil production and therefore, could have disproportionate effects on the analysis as for Commerce's denominator.

- Commerce cannot include the 90,404 mill olives in its numerator as this may include cacerena olives and these were not included in the denominator.

- The fact that 90,404 tons of raw olives were categorized as mill olives is important.  Commerce places significance on the fact that these olives were ultimately used to produce table olives.  However, statistics show that by categorizing them as mill that they had initial disposition toward mill production.  The fact that they were used for table

production, whether they were classified as table, dual-use, or mill varietals, demonstrates that there was no contingency associated with this volume.

- Commerce has erroneously calculated yield rates. Commerce should have used yield rates based on the total cultivated areas of table and mill olives, not the total surface area, which includes cultivated and non-cultivated areas. Uncultivated land is not used in the production of olives and must be excluded.

- Commerce's substantial dependence analysis has created an impermissible subset of the raw agricultural product that under a reconfigured, lawful analysis demonstrates no substantial dependence. Commerce's substantial dependence calculation examines only 87 percent of olive production grown for table during the POI. This approach is defective for a number of reasons: (1) it is predicated on a false assumption that data from both the respondents and the petitioner's submission demonstrate that there are only five biological varietals of raw olives that the GOS considers suitable for table olive production; and (2) it excludes the dual-use cacerena varietal that Commerce expressly identified as part of the raw agricultural prior stage product, accounting for another 8 percent of table olive production. To correct this legal error, Commerce would need to consider the entire volume of the raw agricultural /prior stage product in its denominator—the total olive production used to produce table olives, plus dual-use olives used to produce oil.

**Commerce's Position**: Commerce continues to conclude that table and mill varietals are fit for one use or the other and are generally not interchangeable, and growers of dual-use varietals also determine whether their olives are to be used for table or mill at the beginning of the growing

season.  The GOS publishes information on different olive varietals including their fitness.[207]
The GOS indicates that some are only fit for table; others are fit for the mill, and other varietals
are considered dual use.[208]  As explained further above, we find that the 90,404 tons of mill
olives represent dual-use varietals that were originally grown as mill but were instead used as
table olives mill.  In the draft remand, we treated the 90,404 tons of olives designated as mill but
were used as table as if they were all from the hojiblanca varietal, the most prevalently used
dual-use varietal.  We acknowledge that our treatment of the 90,404 tons of olives grown for mill
but used for table olive production as hojiblanca olives may have been inaccurate, to a certain
extent.  Judging from the information provided by the GOS concerning the high olive content of
mill varietals and their inability to meet IOC standards, we continue to find that it is unlikely that
a strictly mill olive varietal was used for table.  We therefore continue to consider it reasonable
that these amounts of olives grown for mill and used for table olive production were dual-use
olives, though we also acknowledge that these may have been of the cacerena varietal and a
small amount of other dual-use varietals grown for mill but used as table olive production, as the
respondents note in their comments.  And, as noted elsewhere in this remand, we have not
included the total production data for the cacerena varietal grown for mill in the denominator of
our substantial dependence analysis because the Spanish government does not track production
of olives grown for mill by varietal and the production information needed to include the
cacerena varietal in the analysis is not available on the record.  Therefore, to avoid any distortion
in our substantial dependence analysis, we are estimating the percentage of these 90,404 tons that
may have been cacerena, or the very small amount of "other" dual-use varietals grown for mill
but used for table olive production in campaign 2015/2016 and deducting this amount from the

---

[207] *See* Musco's February 5 Response at Exhibit 2.
[208] *Id.*

90,404 tons mill tons in the numerator of our substantial dependence analysis. Because we do not know the amount of hojiblanca, cacerena, and other dual-use varietals grown for the mill, we are considering that the percentage of hojiblanca, cacerena, and the small amount of "other" dual-use varietals grown for mill is comparable to the amounts of each varietal that are grown for table olive production. Data from the AICA for the 2015/2016 campaign year show that the production of hojiblanca, cacerena, and other varietals grown for table equal 366,140 tons, with hojiblanca accounting for 79.44 percent of the total amount, cacerena accounting for 12.41 percent, and the other dual-use varietals accounting for 8.16 percent.[209] Adding the 12.41 percent of cacerena and the 8.16 percent of "other" dual-use varietals together, we find that cacerena and "other" dual-use varietals account for 20.57 percent of the dual-use varietal production for table. We multiply the 20.57 percent by the 90,404 tons of dual-use olives grown for mill used for table olive production and estimate that 18,590 tons of this amount were cacerena and "other" dual-use varietals grown for mill but used as table olives. Subtracting the 18,590 tons from the 90,404 tons, we are left with 71,814 tons of olives that we consider to be hojiblanca olives grown for mill but used as table. By adding the 71,814 tons of hojiblanca to the 492,244 tons of table olives, our revised numerator for our substantial dependence analysis is now 564,058 tons.

We also agree with ASEMESA that to calculate more accurate table and mill olive yield rates, Commerce should divide the total production of the table or mill olives by the total cultivated area rather than the total surface area. We have recalculated the yield rates using total cultivated area and the result is a total of 800,154 tons of hojiblanca olives in the denominator of the calculation. After removing an estimated amount of potential cacerena and "other" dual-use

---

[209] *See also* ASEMESA's February 21 Response at Exhibit NFI-2.

varietals grown for mill and used for table from our numerator and using corrected yield rates, our revised substantial dependence analysis demonstrates that 55.28 percent of manzanilla, gordal, carrasquena, and hojiblanca varietals were used to produce table olives during the relevant period.

**Comment 3:  Whether Commerce's Analysis of Distinct Biological Varietals of Olives Processed into Table Olives Satisfies the "Substantially Dependent" Standard Under Section 771B(1) of the Act**

*ASEMESA's Comments:*

- Commerce offers no legal standard as to why its findings meet the substantial dependence standard.  Commerce merely asserts that "because 59 percent of the manzanilla, gordal, hojiblanca, and carrasquena varietals, the prior stage product, were processed into table olives, the latter stage product, we find that the demand for these varietals is substantially dependent on processed table olives."  It is not legally sufficient for Commerce to assert a consumption figure and conclude substantially dependent demand, nor does Commerce's biased calculation of 59 percent support such a conclusion.

- Consumption is not a proxy for substantially dependent demand.  The statutory standard is not "substantial volume."  The statute does not specify that all Commerce needs to show is that some ascertained volume of the prior stage product is consumed in the production of the latter stage product.  To the contrary, the statute requires that there be a *dependence* on the demand for that volume.  Commerce needs to show that, but for demand from table olives, largely all the raw olive varietal volume it identifies as substantially dependent would not exist for some other purpose; that the demand for those biological varietals is contingent on table olive demand.  Commerce must

demonstrate that the demand for the prior stage good is derived *almost exclusively* or *substantially all* from the demand for the latter stage,[210] or that *almost all* the raw agricultural product … is dedicated to the production of milled rice.[211]

- Section 771B(1) of the Act is a codification of Commerce practice established in two prior cases—*Pork from Canada* and *Rice from Thailand Inv.*.  To meet the substantial dependence standard, the raw product can only be sold in one market; it enters a single, continuous line of production resulting in one end product.

**Commerce's Position:**  ASEMESA has selectively referenced prior cases to claim that Commerce has not satisfied the legal standard for "substantially dependent" demand because a 59 percent consumption ratio (the ratio calculated in the draft remand) is insufficient.  We will address these past cases and ASEMESA's arguments in turn.

Before the enactment of section 771B of the Act, Commerce conducted a number of countervailing duty investigations of agricultural products in which it included subsidies to prior stage products in determining the benefit to producers of the processed product.  In *Pork from Canada*, Commerce considered subsidies to producers of live swine, the prior stage product, in determining the benefit to producers of the latter stage product, slaughtered swine.  In that case, Commerce found that it was inappropriate to consider live swine an "input" because there was a low level of value added and the processor was merely making the product ready for the next consumer.  In *Pork from Canada*, Commerce did not establish a finding that the demand for live swine was "almost exclusively" dependent on a latter-stage product; rather, Commerce stated that the "salient criterion is the degree to which the demand for the prior stage product is

---

[210] *See* ASEMESA's Comments at 12 (quoting *Pork from Canada*, 50 FR at 25098-99).
[211] *Id.* (quoting *Rice from Thailand Inv.*, 51 FR at 12358).

dependent on the demand for a latter-stage product,"[212] but we did not establish a minimum

threshold requirement of demand to satisfy the demand criterion.  Similarly, in *Rice from

Thailand Inv.* , Commerce determined that the prior stage product, paddy, or unmilled rice, was

dedicated to the production of the latter stage product, milled rice, but we did not establish a

minimum threshold of demand to satisfy the "substantial dependence" criterion.

In the enactment of section 771B of the Act, it is evident that Congress's main concern

was to prevent producers of minimally processed agricultural products from circumventing

remedies provided by the countervailing duty law on raw agricultural products.[213]  Congress

discussed raspberries as an example of a potential agricultural product where circumvention

could easily occur merely by minimally processing the raw agricultural product.[214]  Congress

considered how foreign producers could easily circumvent a duty on fresh raspberries by simply

freezing the raspberries before shipping to the United States.[215]  We highlight for purposes of this

redetermination that there is nothing in the legislative history demonstrating that demand for

fresh raspberries is derived "almost exclusively" from the demand for frozen raspberries or that

"almost all" fresh raspberries are dedicated to the production of frozen raspberries.  Rather,

Congress's principal concern was to prevent producers of minimally processed agricultural

products from circumventing the order on raw agricultural products regardless of whether the

product was almost wholly contingent on demand for one particular end-use product.

Furthermore, while ASEMESA notes that Commerce found the substantial dependence

criterion to be satisfied in *Pork from Canada* and *Rice from Thailand Inv.* because the prior stage

product was dedicated almost exclusively to the latter stage product, the Court explained that the

---

[212] *See Pork from Canada*, 50 FR 25098.
[213] *See* 133 Senate Congressional Record S. 8787.
[214] *Id.*
[215] *Id.*

plain meaning of "substantially dependent" requires the demand for the prior stage product to be "largely, but not wholly" or "contingent" on the demand for the latter stage product to satisfy the statutory standard.[216]  The Court further explained the contours of the statutory standard and looked to Commerce's determinations regarding pork and rice after the statute's enactment.[217]  The Court observed that prior cases satisfied the "substantially dependent" standard where the latter stage product accounted for "most or at least half" of the demand of the prior stage product.[218]  Therefore, we find that the 55.28 percent of table and dual-use varietals used for table olive production satisfies the "substantially dependent" standard because it comports with the Court's statements that the demand for the latter stage product must be "largely, but not wholly," or must account for "most" of, the demand for the prior stage product.

Notably absent from ASEMESA's comments are any references to Commerce's findings in *Shrimp from China*, a more recent case where Commerce utilized section 771B of the Act.  In that investigation, Commerce found that the "substantially dependent" criterion under section 771B(1) of the Act was satisfied because 44.7 percent of the fresh shrimp market depends upon the demand for frozen shrimp.[219]  Nowhere in this case does Commerce articulate a requirement the demand for the prior stage product be "almost all" or "almost exclusively" dependent.

Therefore, while we acknowledge ASEMESA's citations to *Pork from Canada* and *Rice from Thailand Inv.*, where Commerce noted that demand for the prior stage product was "almost all" or "almost exclusively" dependent on the demand for the latter stage product, we disagree with their claims and attempts to articulate a universally applicable threshold that must be met in all cases, with respect to all products and all situations.  Even these cases cited by ASEMESA do

---

[216] *See First Remand Order* at 21-22.
[217] *Id.* at 26-27.
[218] *Id.* at 27.
[219] *See Shrimp from China* IDM at 47.

not articulate a numerical threshold or standard to be applied in *all* cases.  Rather, the findings

expressed in *Pork from Canada* and *Rice from Thailand Inv*. reflect the specific facts and

circumstances of the agricultural products and industries at issue.  Furthermore, nowhere in

section 771B of the Act or the legislative history is a requirement that demand for the prior stage

product be "almost all" or "almost exclusively" dependent on the demand for the latter stage

product.  Congress did not intend to establish such a requirement for substantial dependence.

This is evident from the reference to raspberries in the legislative history, a reference which

makes no mention of a threshold of "almost all" or "almost exclusively."  Congress also did not

prescribe specific factors that Commerce must consider.  Therefore, we also disagree with the

respondents' attempts to mandate that products under consideration be in a "single, continuous

line of production."  While this scenario may have been present in *Pork from Canada* or *Rice

from Thailand Inv.*, neither these cases nor the statute or legislative history mandate that this be a

factor under consideration in all cases utilizing section 771B of the Act going forward.  As is

appropriate for this provision, the analyses of substantial dependence are done on a case-by-case

basis and may necessarily be different depending on the product being investigated.  Here, for

instance, we examined other factors that would determine an olive's end destination (*e.g.*, oil

versus table olives).  Based on characteristics of the olive varietals, only some portion of dual-

use olive varietals would potentially swing over to olive oil usage if table olive demand were to

cease.  Table olive varietals do not have the characteristics desired by the industry for olives used

to make olive oil.  Table olive varietals have a lower oil content than mill olives.  The growing of

table olives is more labor intensive, requires more water consumption, more pruning, and more

money spent on pest management.[220]  Also, growers of table olives command higher prices so

---

[220] *Id.* at 7.

table olive varietals are a less economically viable source of oil for Spain's olive oil producers.[221] Finally, *Shrimp from China* also rebutted the notion that a "single, continuous line of production" need be a characteristic present in the market of all agricultural products being investigated. There, we acknowledged that examining whether a single, continuous line of production exists might contribute to the analysis but is not a necessary condition to satisfy the "substantially dependent" criterion.[222]  Therefore, we reject ASEMESA's attempt to establish an unreasonably high threshold for agricultural products to meet the "substantially dependent" criterion; an attempt at odds with the statute, legislative history, and Commerce practice.

Moreover, ASEMESA's argument that consumption cannot be used as a proxy for establishing demand is without merit.  Section 771B(1) of the Act requires Commerce to determine whether the demand for the prior stage product substantially depends on the demand for the latter stage product, but the provision does not specify how Commerce must determine whether the demand for the prior stage product is "substantially dependent."  We find that an analysis of consumption ratios is a reasonable method to determine whether section 771B(1) of the Act is satisfied because the concept of demand hinges on use.  The usage of products is driven by the demand of its consumers; therefore, it is fair to use consumption as a measure of a product's demand.  The degree to which the prior stage product is used in the production of the latter stage product is a corollary of the prior stage product's dependence on the latter stage product.  This argument is, once again, an attempt by ASEMESA to establish an extraordinarily high standard for demand to be considered "substantially dependent," an attempt with no basis in the statute or legislative history.

---

[221] *See* Musco February 5 Response at 10.
[222] *See Shrimp from China* IDM at 47.

Even though the demand for manzanilla, gordal, carrasquena, and hojiblanca varietals were not wholly contingent on the demand for processed table olives, this does not signify that these varietals can be interchangeably used for oil. As mentioned earlier, manzanilla, gordal, and carrasquena are considered solely fit for table use and not fit for use as olive oil. These varietals tend to have lower oil content and are larger than mill olives. Similarly, dual-use olives grown for one application generally are not used for another. For example, hojiblanca grown for table, would tend to be larger, free of blemishes unlike its mill counterparts, and represent a greater investment in resources to produce table-olive quality olives.[223] While such olives could be used as mill olives, we find it reasonable to conclude that a farmer would generally seek to sell such olives as table olives to recuperate the greater growing costs and maximize profits,[224] and not view them as interchangeable *per se*.

In this remand, we find that the demand for the prior stage product (*i.e.*, table and dual-use raw olive varietals that are biologically distinct from other raw olive varietals) is substantially dependent on the demand for the latter stage product (*i.e.*, table olives) because 55.28 percent of the prior stage product is used for table olive production. Therefore, we find that the first criterion of section 771B of the Act to be satisfied.

**Comment 4:  Whether Commerce's Analysis of Dual-Use Varietals was Proper**

*ASEMESA's Comments:*

- By treating all olives used to produce table olives the same within the numerator of its analysis, regardless of whether they are "table," "dual-use," or "mill," Commerce effectively determined that this volume of olives is necessarily dependent, or contingent,

---

[223] *See infra* at 63-64.
[224] *Id.*

on table olive demand.  This determination is fundamentally contradicted by the facts and is not consistent with the statute.

- Given that Commerce acknowledges that dual-use varietals are equally suited for table and oil applications, and that raw olive consumption for oil production dwarfs raw olive consumption for table olive product, and fluctuations in raw olive production of oil product also dwarfs total raw olive consumption for table production, it is implausible to presume that 290.85 thousand tons of dual-use hojiblanca that happen to be used to produce table olives would not simply be absorbed into olive oil production in the absence of table olive production.

- Between 2016 and 2017, the volume of "table raw olives sent to oil production increased by more than 142,000 metric tons.  At the same time, the volume of "mill" raw olives sent to table olive production increased by more than 135,000 metric tons.

- Shifts in the volume in and out of table olive production by "table" raw olives and "mill" raw olives amounted to over 277,000 metric tons, or nearly 81 percent of the volume of table raw olives used to produce table olives and nearly 55 percent of the total volume of raw olives produced and placed in the table raw olive category.

- Massive shifts occurred in the span of a single harvest year between 2016 and 2017.  The volume of "table" raw olives sent to oil production increased by more than 142,000 metric tons.  At the same time, the volume of mill raw olives sent to table olive production increased by more than 135,000 metric tons.  These shifts in volume in and out of table olive production amounted to over 277,000 metric tons, or nearly 81 percent of the volume of "table" raw olives used to produce table olives and nearly 55 percent of the volume of raw olives produced and placed in the table olive statistical category.

These massive shifts occurred in the span of a single harvest year; they are not the result of a long transition over a period of years, demonstrating the flexibility of dual-use olives.

- By definition, "dual-use" varietals are not contingent on any single demand source—that is precisely the point of dual use.

- Far more hectares of land are devoted to "dual-use" varietal olive production than "table" olive varietal production.

- Commerce conceded that the information provided in its initial remand that 113,674 hectares of farmland are dedicated to producing dual-use varietals is incorrect, because in the second remand it acknowledged that 265,000 hectares are devoted to the hojiblanca varietal.

- The majority of table olive production in harvest year 2016—56.9 percent—is attributable to dual-use hojiblanca, whereas only 36.3 percent of hojiblanca production is used to produce table olives and the remainder is used for oil.  This data completely undercuts Commerce's affirmative finding of substantially dependent demand.

**Commerce's Position:**  As mentioned in Comment 2, while it is true that dual-use varietals can be used for both table and oil production, record evidence demonstrates that, at their source, dual-use olives are grown for one purpose or other.  Once grown, they are not used interchangeably as a table or mill olive.  We acknowledge that the largest varietal grown for table olives in harvest year 2016 is the dual-use varietal, hojiblanca.  However, as we have noted in this remand redetermination, dual-use olives, such as hojiblanca, grown for use as table olives require different cultivation practices than hojiblanca grown for mill use.[225]  Olive growers of

---

[225] *Id.* at 7.

hojiblanca and cacerena for example, will spend more resources on their orchards, installing more irrigation systems, spending more resources on pruning, and pest management than olive growers of hojiblanca grown for use as mill olives.[226]  Moreover, farmers wishing to purchase insurance for dual-use olives must establish in advance the number of hectares that will be dedicated to mill production versus the number of hectares dedicated for table olive production as separate premiums are established for hojiblanca grown for table versus mill.[227]  For example, farmers are paid more for hojiblanca grown for table olives than hojiblanca grown for the mill.[228] Moreover, hojiblanca or cacerena grown for table olives must meet certain trade standards for table olives that are not necessary if they were grown for the mill.

We also disagree with ASEMESA that there are massive shifts in the volume of raw table olive production over the years, rather, we find the data to be stable.  As can be seen from the published GOS statistics, from harvest year 2010 through harvest year 2016, only one or two percent of olives grown for the mill were sent to table olive use, and that from year to year, farmers tend to continue to harvest olives for the same end use.  This is largely because, as we have established elsewhere in this remand redetermination, mill olives do not meet IOC standards,[229] and at their source, dual-use olives are grown for one purpose or other.  We also note that only after 2016, when CVD and antidumping orders were imposed, were there greater shifts in table olives being sent to the mill.

The data that ASEMESA uses from the GOS's Survey (to purportedly demonstrate that there are far more hectares of dual-use olives and, therefore, there is much opportunity for the olive grower to alter production from table to mill olives or vice versa) is incorrect.  We wish to

---

[226] *Id.*
[227] *See* Musco February 5 Response at Exhibit 1.
[228] *Id.*
[229] *Id.*

emphasize that, in the First Remand, we substantiated that the 113,674 hectares that ASEMESA

is referring to as dual use were not actually used as dual use hectares.[230]  Rather, these dual-use

hectares identified in the GOS's Survey on Area on Yield were grown for table olives.  In the

First Remand, published data in this Survey indicated that there were 76,120 hectares of

farmland dedicated to the production of raw table olives and 113,674 hectares dedicated to the

production of dual-use olives for 2019.[231]  Multiplying the number of hectares dedicated for each

use by the yield per hectare statistics provided in the GOS Statistical Yearbook,[232] we conclude

that 228,360 MT of raw table olives and 341,022 MT of dual-use olives were produced in 2019,

totaling 569,382 MT of olives.  We compared the volume of table and dual-use olives produced

in 2019 with data from the AICA for the 2018/2019 campaign.  Data from the AICA revealed

that 587,800 MT of raw table varietals identified as for processing into table olives were

produced during this time,[233] closely following the estimated production figures that we derived

from the hectare data.  We also substantiated the accuracy of our estimated production figures

against the production and end-use data published by the Ministry of Agriculture.[234]  We find

that it is logical to determine that the dual-use olive hectare information included in the GOS's

Survey on Areas and Yield solely refers to production grown for table olives because the GOS

insurance regulations provide different premiums for hojiblanca as a mixed-use, (meaning dual-

use varietal) and hojiblanca grown for the mill.[235]  Moreover, both the GOS and Musco

confirmed that the GOS does not publish production information on mill olives by varietals,

which would include the portion of hojiblanca identified as grown for mill.  Finally, we continue

---

[230] *See* Musco's February 25, 2020 Response at Exhibit 7B.
[231] *See* Musco's February 25, 2020 Response at Exhibit 4A.
[232] *See* ASEMESA's February 21 Response at Exhibit NFI-1.
[233] *Id.* at Exhibit NFI-2.
[234] *See* Musco's February 25 Response at Exhibit 7B.
[235] *See* Musco's February 5 Response at Exhibit 1.

to maintain that there is no discrepancy in our statistics between the first and second remand.  As stated above, the number of hectares of dual-use varietals dedicated to table olives for 2019 was 113,674 and the total number of hojiblanca hectares for use as table *or* mill olives is estimated at 265,000 hectares.[236]  The 265,000 hectares includes hectares of hojiblanca olives dedicated to both table and mill olives.  Similarly, the fact that the majority of olives used for table olive production is of the hojiblanca varietal has no impact on our substantial dependence analysis.  As mentioned above, hojiblanca grown for table olive production are not interchangeable with those grown for the mill.  Record evidence indicates that it is less feasible from an economic standpoint for farmers to bear the additional expense to grow larger, lower oil content hojiblanca that are free of blemishes and use them for mill olives when they could be sold for a higher price as table olives.  Conversely, growers of hojiblanca to be used as mill olives would not try to sell their olives for table olive production because they would be smaller, most likely be of a higher oil content, have more blemishes, and would not meet IOC standards.

**Comment 5:  Whether Commerce Should Rely on the Respondents' Submitted Varietal Hectare Data**

*ASEMESA's Comments:*

- Commerce requested that the Spanish industry provide production data by the main varietals used in table olive production, regardless of end use.

- The provided data demonstrate that less than 40 percent of the volume of these varietals, in total, are used in table olive production

- Commerce needs to consider and address the record evidence as a whole and cannot simply pick and choose the bits of evidence that support its narrative.

---

[236] *See* Musco's February 25 Response at Exhibit 4A.

**Commerce's Position:**  We do not intend to rely on the respondents' proposed data, nor alter our substantial dependence analysis regarding the varietal hectare data used to calculate table olive production by varietal.  As stated in the First Remand Redetermination, the respondents' data was unpublished and extrapolated from different sources:  the BPS data for the 2018/2019 campaign and an internal report dating from 2008.[237]  ASEMESA did not provide the underlying source data.  Moreover, ASEMESA has not provided supporting documentation demonstrating that the number of hectares dedicated to the production of each varietal is accurate.  In particular, ASEMESA reported that the number of hectares of hojiblanca produced for table totaled 311,429 hectares, whereas Musco provided information from the GOS stating that 265,000 hectares of farmland were dedicated to growing hojiblanca olives.[238]  Additionally, ASEMESA's estimate of the total surface area of the main varieties used for table production totaled 490,529 hectares, whereas Musco provided published GOS data showing the surface area dedicated to olive production for 2019 in Spain for table and dual-use olives is 189,794 hectares.[239]  Further, ASEMESA incorrectly titles the table olive production data from Spain's AICA as production used for table instead of total table production.  Therefore, we continue to find ASEMESA's varietal information unreliable and not suitable for our substantial dependence analysis.

---

[237] *See* First Remand Redetermination at Comment 12.
[238] *See* Musco's February 25 Response at Exhibit 2A at 58; *see also* ASEMESA's February 21 Response at 7.
[239] *See* Musco's February 25 Response at 5; *see also* ASEMESA's February 21 Response at 7.

## IV.     FINAL RESULTS OF REDETERMINATION

Pursuant to the Court's *Second Remand Order*, Commerce:  (1) reconsidered its *de jure* specificity finding and finds that the BPS subsidies provided by the GOS to olive growers are *de facto* specific pursuant to section 771(5A)(D)(iii)(III) of the Act; and (2) reconsidered its interpretation of "raw agricultural product" and "prior stage product" for purposes of the analysis under section 771B(1) of the Act and finds that the demand for distinct biological varietals of raw olives (table and dual-use olive varietals) is substantially dependent on the demand for table olives.

11/3/2021

X ~~Ryan Majerus~~

Signed by: RYAN MAJERUS

Ryan Majerus
**Deputy Assistant Secretary**
  for Policy and Negotiations,
  performing the non-exclusive functions and duties of the
  Assistant Secretary for Enforcement and Compliance