## UNITED STATES COURT OF INTERNATIONAL TRADE
### Before: The Honorable Gary S. Katzmann

| | |
|---|---|
| _____ ) | |
| ) | |
| Asociación de Exportadores e Industriales ) | |
| de Aceitunas de Mesa, Aceitunas ) | |
| Guadalquivir, S.L.U., Agro Sevilla Aceitunas ) | |
| S. Coop. And., and Angel Camacho ) | |
| Alimentación, S.L., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| ) | Court No. 18-00195 |
| United States, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| Coalition for Fair Trade in Ripe Olives, ) | |
| ) | |
| Defendant-Intervenor. ) | |
| _____ ) | |

## PLAINTIFFS' COMMENTS ON COMMERCE'S

## SECOND REMAND REDETERMINATION

Matthew P. McCullough
Curtis Mallet-Prevost, Colt & Mosle LLP
1717 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
202-452-1717

*Counsel for Plaintiffs*

Dated: December 3, 2021

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. III

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................... 1

ARGUMENT ........................................................................................................ 3

I.   COMMERCE'S DE FACTO SPECIFICITY FINDING WITH RESPECT TO
     BPS / GREENING PAYMENTS IS NOT SUPPORTED BY SUSBTANTIAL
     EVIDENCE AND IS OTHERWISE CONTRARY TO LAW ........................... 3

     A.   Commerce Factual Foundation For Its Disproportiante Use Finding Are
          Data Related To Past Programs, Not The BPS/Greening Programs ...... 4

     B.   Commerce's Attempt To Corroborate Its Finding Actually Proves The
          Proportiante Nature Of BPS/Greening Payments ................................... 4

II.  COMMERCE'S "SUBSTANTIALLY DEPENDENT" FINDING IS NOT
     SUPPORTED BY SUBSTANTIAL EVIDENCE AND OTHERWISE
     CONTRARY TO LAW ................................................................................ 6

     A.   Key Facts ............................................................................................... 7

          1.   "Table," "Mill", and "Dual Use" Categories For Olive Varietals Do
               Not Determine End Use ................................................................ 8

          2.   There Is Tremendous Mobility In End Use Regardless Of "Table" or
               "Mill" Classification ................................................................... 10

          3.   The Majority Of Raw Olives Consumed To Produce Table Olives Are
               "Dual Use" Varietals Equally Suited To Table Or Oil Applications ......... 12

          4.   Demand For Raw Olives To Produce Oil Dwarfs The Demand For
               Raw Olives To Produce Table Olives ......................................... 14

     B.   Legal Standard ..................................................................................... 15

     C.   Using A Consumption Ratio To Discern "Substantially Dependent" Is
          Only Valid With Sufficient Context ...................................................... 16

          1.   The Statute Emphasizes The Relationship Between Demand And
               Dependence, Not Demand And Use ........................................... 16

          2.   The Context Here Proves The Limited Probative Value Of A
               Consumption Ratio Resting On Its Own ..................................... 18

D.      Even Assuming That Commerce's Consumption Ratio Is A Valid
        Measurement Of Dependence, It Does Not Meet The "Substantially
        Dependent" Legal Standard ................................................................20

E.      Commerce's 55 Percent Consumption Figure Reflects Mischaracterization
        And Faulty Assumptions To Exaggerate The Figure ...........................22

        1.      Commerce's Analysis In The Abstract ....................................22

        2.      Commerce's Analysis Tested By The Record ..........................24

        3.      Commerce's Consumption Ratio Calculation Suffers From Other
                Serious Conceptual And Factual Problems...............................27

        4.      Commerce Unreasonably Discarded Varietal-Specific Consumption
                Data .........................................................................................29

F.      The Department's Redetermination Fails To Address The Existence Of
        Distinct Ripe And Green Table Olive Production Lines After The Raw
        Stage..................................................................................................32

G.      The Department Wrongly Dismissed the Spanish Government's Varietal
        Hectare Data.......................................................................................32

**CONCLUSION** ..........................................................................................**34**

# TABLE OF AUTHORITIES

**Cases**

*American Grape Growers v. United States*, 604 F. Supp. 1245 (Ct. Int'l Trade 1985) .............. 15

*Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States*, 429 F. Supp. 3d 1325 (Ct. Int'l Trade 2020) ...................................................................................... passim

*Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States*, 523 F. Supp. 3d 1393 (Ct. Int'l Trade 2021)................................................................................... 1, 2, 27

*SKF USA Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001), aff'd, 332 F.3d 1370 (Fed. Cir. 2003)................................................................................................................................ 34

**Statutes**

19 U.S.C. § 1677(5A)(D)(iii)(III) ................................................................................... 3, 4

19 U.S.C. § 1677-2 .............................................................................................. passim

19 U.S.C. § 1677-2(1)........................................................................................... passim

19 U.S.C. § 1677e(c)(1) ................................................................................................. 5

**Other Authorities**

Miriam-Webster Dictionary Online, "Proportion"............................................................. 6

*Statement of Administrative Action Accompanying the Uruguay Round Agreements Act*, H.R. Doc. 103-316, 103d Cong., 2d Sess., Vol. 1 (1994) ................................................... 5

**Administrative Determinations**

*Certain Fabricated Structural Steel From Canada: Preliminary Negative Countervailing Duty Determination*, 84 Fed. Reg. 33,232 (July 12, 2019)................................................. 34

*Final Affirmative Countervailing Duty Determination and Countervailing Duty Order; Rice from Thailand*, 51 Fed. Reg. 12,356 (April 10, 1986).................................................. 15, 16

*Frozen Warmwater Shrimp from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 78 Fed. Reg. 50,391 (August 19, 2013)........................ 21

*Live Swine and Fresh, Chilled and Frozen Pork Products from Canada: Final Affirmative Countervailing Duty Determination*, 50 Fed. Reg. 25,097 (June 17, 1985) ........................... 15

**Regulations**

19 C.F.R. § 351.208(c)................................................................................................. 21

19 C.F.R. § 351.402(c)(2)............................................................................................. 21

19 C.F.R. § 351.408(c)(1)............................................................................................. 21

19 C.F.R. § 351.408(d)(i).............................................................................................. 21

## INTRODUCTION AND SUMMARY OF ARGUMENT

Before this Court is Commerce's third attempt to produce a lawful countervailing duty ("CVD") determination in the original investigation of Ripe Olives from Spain.  At the same time, the Spanish ripe olive industry is preparing to defend a <u>third</u> administrative review of the CVD order on Ripe Olives from Spain with the validity of the order remaining in serious doubt in this litigation.  This Court's second remand gave Commerce a full three months to fix the legally impermissible determinations with respect to: (1) its finding of *de jure* specificity in relation to the BPS/Greening programs at issue in the underlying investigation; and (2) its construction of 19 U.S.C. § 1677-2 (1) with respect to the definition of "raw agricultural product" and "prior stage product" as those terms are used in the statute.  *Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States*, 523 F. Supp. 3d 1393, 1408 (Ct. Int'l Trade 2021) ("*ASEMESA II*").

Commerce has had every chance to fix these legal errors.  To promote a constructive advancement of these two issues, allowing this Court to move on to other equally critical factual merits already briefed at length in the first remand proceeding, Plaintiffs consented to a full seven-week extension for Commerce to file its latest remand redetermination with the Court.  Thus, before the Court is the culmination of Commerce's reconsideration of the two issues identified by the Court over a period of nearly five months.  Commerce offered interested parties no more than eight days to file comments, and upon request from Plaintiffs for a mere seven additional days, provided only three days.  *See* Letter From Commerce To Interested Parties, Re: Deadline for Comments (Oct. 12, 2021) (2R.P.R. 5).

Commerce's redetermination remains legally flawed.  First, with respect to the question of BPS/Greening specificity, Commerce has finally abandoned its efforts to rationalize a finding

of *de jure* specificity and shifted to a theory of *de facto* specificity and disproportionate use.  In its attempt to corroborate secondary information used to render that finding, however, Commerce actually demonstrates the proportionate nature of the programs, undermining both the *de facto* specificity finding and the effort to corroborate.

Second, on the critical issue of whether the demand for the "prior stage product" is "substantially dependent" on the demand for the "latter stage product" within the meaning of 19 U.S.C. § 1677-2(1), this Court specifically instructed Commerce to reconsider self-serving interpretations of "raw agricultural product" and "prior stage product" as those terms are used in the statute before it would reach the factual merits.  *ASEMESA II* at 1407-1408.  Commerce purports to have done so by engaging in a varietal analysis of "substantially dependent" under the statute.  But even assuming Commerce has fixed these specific interpretive problems identified by the Court, it has remedied very little else in its new redetermination, and left intact its erroneous factual case about how olive varietals can be and are used.

In summary, Commerce: (1) continues to wrongly construe "substantially dependent" as that term is used in the statute, focusing on use instead of dependence; (2) engages in a demonstrably biased and unreasonable analysis using faulty adjustments and unsupported assumptions about how different olive varietals can be and are used; (3) incorrectly claims to engage in a varietal analysis when actually it is still using category-based data for "Table" and "Mill" olives; (4) inexplicably dismisses broader use of varietal-specific data that form part of its analysis that would obviate the need for dubious adjustments and assumptions; (5) ignores facts demonstrating two distinct table olive production lines beyond raw olives for green and ripe olives that bear on its "substantially dependent" analysis; and (6) dismisses yet additional

varietal-specific data sourced from the Government of Spain for no other apparent reason than its claim that they are not somehow the data that were requested.

But at the end of day, it all does not matter.  Even if this Court accepts Commerce's new analysis – the best results it could come up with -- it does not support an affirmative "substantially dependent" finding.  The results of Commerce's faulty analysis – a 55 percent consumption ratio -- still proves that Commerce has not satisfied 19 U.S.C. § 1677-2(1).  Though clearly exaggerated, 55 percent still falls well short of the legal standard, diminished further in light of incontrovertible evidence of extensive migration between oil and table applications for the varietals Commerce purportedly examines, and the sheer orders of magnitude between table olive and oil production.  On these facts, "substantially dependent" cannot be found.  Under the circumstances, this Court should order Commerce to reverse its affirmative "substantially dependent" finding since Commerce's best case, even if assumed to be valid, still does not meet the statutory standard.

## ARGUMENT

## I.   COMMERCE'S DE FACTO SPECIFICITY FINDING WITH RESPECT TO BPS / GREENING PAYMENTS IS NOT SUPPORTED BY SUSBTANTIAL EVIDENCE AND IS OTHERWISE CONTRARY TO LAW

Commerce now correctly concludes that BPS and Greening benefits are not *de jure* specific to olive farmers.  Final Remand Redetermination ("Redetermination II") (2R.P.R 10) at 15-16.[1]  It now wrongly concludes, however, that olive farmers receive a disproportionate amount of BPS and Greening benefits and therefore such benefits are *de facto* specific within the meaning of 19 U.S.C. § 1677(5A)(D)(iii)(III).  Redetermination II (2R.P.R. 10) at 19-22.

---

[1] This brief utilizes the following convention to identify the different records: (1) "P.R" refers to the record of the original investigation; (2) "R.P.R" refers to the record of the first remand proceeding; and (3) 2R.P.R refers to the record of the second remand proceeding.

Commerce's assessment of disproportionality remains improperly based on benefit estimates from past programs, not the BPS/Greening programs.  Moreover, Commerce's attempts to corroborate its disproportionate benefit finding show the opposite, and specifically that operation of the BPS/Greening programs leads to proportionate benefits.  As such, Commerce's disproportionate benefit finding cannot be sustained.

### A. Commerce Factual Foundation For Its Disproportionate Use Finding Are Data Related To Past Programs, Not The BPS/Greening Programs

Commerce renders a purportedly neutral facts available finding that BPS and Greening payments are *de facto* specific to olive farmers on the basis of disproportionate use within the meaning of 19 U.S.C. § 1677(5A)(D)(iii)(III).  *Id*. at 19.  This disproportionality finding is based on a claim in the Petition that the olives sector represented 25% of a total budget allocation of the programs in question.  *Id*.

However, the claim relied upon by Commerce is based on an amalgam of data and presumptions related to past programs, whether the Common Market Program for Oils and Fats or the SPS program.  *Id*. at 19-21.  Thus, at best it reflects some attempt at estimation of benefits related to those prior programs, not the BPS/Greening programs, the program under investigation.  As such, Commerce's selection of "facts available" does not concern facts actually attributable to the BPS/Greening program, and on that basis is not "neutral," and should not be used.  *See* ASEMESA Comments (2R.P.R. 8) at 6-7.

### B. Commerce's Attempt To Corroborate Its Finding Actually Proves The Proportionate Nature Of BPS/Greening Payments

Commerce otherwise claims to have corroborated its facts available finding of disproportionality by comparing the average amount of assistance under the BPS/Greening programs *per application* using the total applications and benefits reported by the Government of

Spain with benefits received under the program by the respondents.  Based on this comparison Commerce concludes the respondents received benefits anywhere between double and 83 times the average amount.  Redetermination II (2R.P.R. 10) at 22.

But Commerce's comparison does not corroborate any disproportionality of benefits as specified by 19 U.S.C. § 1677e(c)(1) because it does not analyze benefits on the basis they are administered.  The level of BPS/Greening benefits is not determined on an application or farmer basis, but on the number of entitlements declared in the application.  As Commerce verified, an application requires a farmer to identify land area in hectares and each hectare of land receives a corresponding entitlement.  To calculate the benefit amount available to a farmer, one must multiply the entitlement value by the number of hectares reported in the application.  *See* Government of Spain Verification Report (P.R. 534) at 7-8.  Thus, large operations possessed by the respondents would logically receive higher levels of *per-application* benefits than the average, which would also include smaller farms with fewer hectares, and therefore fewer entitlements reported in their applications.  Indeed, Commerce's attempt to corroborate actually proves the opposite -- that BPS/Greening benefits are scalable based on the size of operation (i.e., the number of hectares/entitlements possessed), and therefore fundamentally proportionate, not disproportionate.  This failure to corroborate what is already a tenuous calculation confirms that Commerce should decline to find *de facto* specificity.  *See* ASEMESA Comments (2R.P.R. 8) at 7-8.

"Corroborate" means that Commerce will satisfy itself that the secondary information to be used has probative value. *Statement of Administrative Action Accompanying the Uruguay Round Agreements Act*, H.R. Doc. 103-316, 103d Cong., 2d Sess., Vol. 1 (1994) ("SAA") at 870. Commerce acknowledges that this involves an examination of the reliability and relevance of the

information to be used.  Redetermination II (2R.P.R. 10) at 21, n.92.  But here, Commerce has adopted a theory of disproportionality that renders its meaning inutile.  Commerce asserts that "there is nothing in the Act or the SAA suggesting that Commerce is required to consider why a firm may have received more benefits than others in its de facto analysis of disproportionality." *Id*. at 49.  In effect, Commerce claims that so long as one number is bigger than another number, disproportionality exists.  Such an approach would lead to absurd results both for and against findings of disproportionality.  "Disproportionate" refers to something not in proportion.  Among the definitions of proportion" is the concept of "the correct or appropriate relationship between the size, shape, and position of the different parts of something."  Miriam-Webster Dictionary Online, at https://www.merriam-webster.com/dictionary/proportion.  To be reasonable, an examination of disproportionate use must take into account the relationship between the level of benefit and the applicants involved, not a simple comparison of two baskets of absolute levels of benefit.  But the facts utilized in Commerce's corroboration effort only show why BPS/Greening payments are in fact proportionate and should not be countervailed.

## II. COMMERCE'S "SUBSTANTIALLY DEPENDENT" FINDING IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND OTHERWISE CONTRARY TO LAW

In the sections that follow, Plaintiffs outline the serious flaws in Commerce's affirmative "substantially dependent" finding.  That finding, built upon the conclusion that 55 percent of the volume of the raw olive varietals Commerce deemed material to its analysis were consumed in table olive production, does not survive scrutiny factually or legally.  It is the product of avoidance.  It avoids facts demonstrating substantial shifting by the olive varietals in question between table and oil applications, undermining any notion of dependence.  It also avoids data, including varietal-specific data that would permit reasonable calculations and analysis showing a

figure much lower than 55 percent.  Commerce instead favors more generic data that do not control for the varietals Commerce purports to analyze and upon which it applies dubious assumptions and adjustments that are patently biased.  Finally, it avoids the law, including this Court's careful analysis of 19 U.S.C. § 1677-2(1) as set forth in *Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States*, 429 F. Supp. 3d 1325 (Ct. Int'l Trade 2020) ("*ASEMESA I*").

In the final analysis, there a number bases upon which this Court may find legal error as a matter of substantial evidence and law.  We address all of these points below.  But the points addressed below also reveal that this Court can simply accept Commerce's 55 percent consumption ratio – the best figure that Commerce could come up with – and despite all the flaws and exaggeration built into that figure, still find as a matter of fact and law that Commerce has not satisfied 19 U.S.C. § 1677-2(1).  We encourage the Court to reach that practical conclusion and simply order Commerce to reverse its affirmative "substantially dependent" finding on the basis of its own analysis and conclusions.

A.    **Key Facts**

Before addressing the serious flaws imbedded in Commerce's legal and factual determination of "substantially dependent" under 19 U.S.C. § 1677-2(1), it is important to recap several key facts found in the record of the underlying proceeding that Commerce either fails to consider, unreasonably dismisses, or in some instances trips over in apparent contradiction.  In particular, the record evidence shows:

- the categories "Mill," "Table", and "Dual Use" do not determine or limit actual use;

- varietals within each category actually have multiple uses;

- most varietal volume for table olive production falls into "Dual Use" anyway; and

- the demand for olives to produce oil dwarfs that for table olives.

We address each of these key facts, and Commerce's failings in addressing them, below.

1.     "Table," "Mill", and "Dual Use" Categories For Olive Varietals Do
        Not Determine End Use

There is no dispute that there are varietals of olives generally understood to be "Table"

varietals because of their fitness for the production of table olives, there are varietals of olives

understood to be "Mill" varietals because of their fitness for the production of olive oil, and there

are "Dual Use" varietals, so-classified because they have broad application and fitness across

table olive and oil production.  However, Commerce takes the added leap of concluding that

"Table" effectively means *only* fit for table; "Mill" effectively means *only* fit for the mill, and

*only* "Dual Use" olives may only conditionally travel between table and oil applications.

Redetermination II (2R.P.R. 10) at 51-52.  Commerce attempts to reinforce this understanding by

confirming in its final redetermination the notion that oil content fundamentally creates a

dividing line between "table" and "mill" olives.  *Id*. at 58, 60.  But Commerce's contentions are

completely discredited by other record evidence.  *See* ASEMESA Comments (2R.P.R. 8)  at 13-

17.  "Table" and "Mill" varietals are not hermetically siloed categories.  Record evidence

demonstrates that olive varietals generally understood to have a "fitness" for oil production are

also used in table olive production, while olive varietals generally understood to have  a "fitness"

for table olive production are also used to produce oil.  It may be a matter of degree depending

on the varietal, but Commerce has offered no credible evidence to dispute this fact.

For example, Commerce finds that Manzanilla, Gordal, and Carrasquena varietals are

"Table" varietals.  Redetermination II (2R.P.R. 10) at 30.  Record evidence demonstrates,

however, that these varietals are used in oil applications.  ASEMESA Comments (2R.P.R. 8) at

16, *citing* Jan. 15, 2020 submission (R.P.R. 2), Exhibit 4.  Commerce ignores this evidence even

though Commerce probed the very same evidence through a questionnaire, only to be dismayed by the response, never to speak of it again. *See* ASEMESA's Factual Information to Rebut, Correct, or Clarify Information Placed On Record of Remand Proceeding (Feb. 26, 2020) ("ASEMESA Feb. 26 Submission") (R.P.R. 15) at Exhibit 1, Responses to Questions 1 and 2(a). Remarkably, in terms of the Carrasquena varietal, evidence Commerce relies on to draw dividing lines between "Table", "Mill", and "Dual Use" olives – namely Government of Spain insurance regulations that establish different premiums by varietal and purpose – actually identifies Carrasquena in a "mixed use" role. *See* Musco's New Factual Information Submission (Feb. 5, 2020) ("Musco Feb. 5 Submission") (R.P.R. 3), Exhibit 1 at Annex VI (Unit Prices). Commerce acknowledges that "mixed use" refers to "Dual Use" olives. Redetermination II (2R.P.R. 10) at 64.

As for "Mill" olives, record evidence ignored by Commerce also shows their application in table olive use. This includes, for example, the Arbequina varietal. The evidence relied upon by Commerce to establish "Table," "Mill" and "Dual Use" varietals plainly identifies the Arbequina as a "Mill" varietal. *See* Musco Feb. 5 Submission (R.P.R. 3), Exhibit 2. Commerce would have the Court believe that this means Arbequina would not be used to produce table olives. Yet, evidence also shows that the Arbequina varietal is used to produce table olives. *See* ASEMESA Feb. 26 Submission (R.P.R. 15), Exhibit 1, internal Exhibit NFI-7.

Finally, as to oil content, in rebuttal Commerce appears to imply that oil content is an absolute dividing line, with low oil content being a disqualifying factor for oil applications and, consequently, high oil content serving as a disqualifying factor for table applications. *See* Redetermination II (2R.P.R. 10) at 58. Again, this implication runs headlong into facts. Arbequina is a "Mill" olive, and therefore can achieve higher oil content. Yet, as indicated

above, the record shows that Arbequina is also used as a table olive.  On the other hand, Hojiblanca has a relatively low oil content.  As indicated in Commerce's benchmark document for identifying "Mill", "Table", and "Dual Use" varietals, the Hojiblanca varietal "oil content is low but highly appreciated for its quality, although it has low stability."  *See* Musco Feb. 5 Submission (R.P.R. 3), Exhibit 2.  Similarly, as previously noted, Manzanilla, Gordal, and Carrasquena varietal – all "Table" varietals with presumably low oil content – are used in oil applications.  As explained to Commerce, this reflects the reality that oil content is only one determining factor in oil production.  *See* ASEMESA Feb. 26 Submission (R.P.R. 15), Exhibit 1 at 5.

In sum, the notion advanced by Commerce of absolute dividing lines among olive varietals as far as use is demonstrably false.  Yet, it is these artificial and unequivocal distinctions Commerce imposes that ultimately bleeds into its "substantially dependent" analysis through misrepresentations and assumptions applied to data that are indefensible.

2.      **There Is Tremendous Mobility In End Use Regardless Of "Table" or "Mill" Classification**

The primary data relied upon by Commerce in reaching its affirmative "substantially dependent" finding demonstrates the rather extensive switching that is possible between raw olives identified as for "Mill" or "Table" use and their actual end use.  For the Court's convenience, the relevant data are reproduced below:

| Harvest 2016 | | | |
|---|---|---|---|
| | **Total Production (Tons)** | **Industrial Use (Tons)** | |
| | | **Table Olives** | **Mill Olives** |
| **Table Olives** | 511,122 | 492,244 | 18,878 |
| **Mill Olives** | 6,571,428 | 90,404 | 6,481,024 |

| Harvest 2017 | | | |
|---|---|---|---|
| | **Total Production (Tons)** | **Industrial Use (Tons)** | |
| | | **Table Olives** | **Mill Olives** |
| **Table Olives** | 505,046 | 344,147 | 160,899 |
| **Mill Olives** | 6,044,453 | 226,148 | 5,818,305 |

| Harvest 2018 | | | |
|---|---|---|---|
| | **Total Production (Tons)** | **Industrial Use (Tons)** | |
| | | **Table Olives** | **Mill Olives** |
| **Table Olives** | 555,033 | 431,898 | 123,135 |
| **Mill Olives** | 9,264,536 | 172,208 | 9,092,328 |

*See* Musco's Submission of Factual Information (Feb. 25, 2020) ("Musco Feb. 25 Submission")

(R.P.R. 6), Exhibit 7B.

As illustrated in the tables above, between 2016 and 2017 the volume of "Table" raw olives sent to oil production increased by more than 142,000 metric tons (160,899 – 18,878 = 142,021). At the same time, the volume of "Mill" raw olives sent to table olive production increased by more than 135,000 metric tons (226,148 – 90,404 = 135,744). In total, these shifts in volume in and out of table olive production by "Table" raw olives and "Mill" raw olives amounted to over 277,000 metric tons, or nearly 81 percent of the volume of "Table" raw olives actually used to produce table olives (277,765 / 344,147 = 80.7%), and nearly 55 percent of the total volume of raw olives produced and placed in the "Table" raw olive statistical category (277,765 / 505,046 = 54.9%). In addition, the data show that the total amount of "Table" raw olives actually used to produce oil, and "Mill" raw olives actually used to produce table olives in 2017 – 387,047 metric tons – is larger than the volume of "Table" raw olives actually used to produce table olives – 344,147 metric tons. Similar shifts can be seen between 2016 and 2018. These massive shifts occurred in the span of a single harvest year; they are not the end result of some long transition over a period of years. These data therefore reveal an extremely fluid market in which large volumes of raw olives can quickly be repurposed in both directions. *See* ASEMESA Comments (2R.P.R. 8) at 14.

### 3.   The Majority Of Raw Olives Consumed To Produce Table Olives Are "Dual Use" Varietals Equally Suited To Table Or Oil Applications

The record evidence allows one to examine consumption of raw olives consumed to produce table olives on a varietal basis. While Commerce ultimately relies on data utilizing a category approach, between "Table" and "Mill" categories with "Dual Use" imbedded somewhere in-between, it does in fact rely on the varietal data, if only to perform different adjustments to its analysis of the category data to account for "Dual Use" Hojiblanca and Cacerena production. *See* Redetermination II (2R.P.R.) at 35 and 53. With respect to the five

main varietals used to produce table olives for which data are tracked, accounting for 95 percent

of table olive production, those data are as follows:

| Varietal | Metric Tons |
|---|---|
| Manzanilla | 137,290 |
| Gordal | 41,250 |
| Hojiblanca | 290,850 |
| Cacerena | 45,420 |
| Carrasquena | 57,340 |
| **TOTAL** | **572,150** |

*See* ASEMESA Feb. 26 Submission (R.P.R. 15), Exhibit 1, internal Exhibit NFI-2.

These data show that the "Dual Use" varietals Commerce itself identifies as equally

suited for table or oil applications, and namely Hojiblanca and Cacerena, account for 58.8

percent of table olive production (336,270 / 572,150).  *See* ASEMESA Comments (2R.P.R. 8) at

16 (employing same calculation but also incorporating "other" varietals).  To that end,

Commerce has itself established by reasonable means that the volume of Hojiblanca used to

produce oil, alone, is 175% of the volume of Hojiblanca used to produce table olives (290,850 /

509,306), or 89% of the total volume of the five main varietals used to produce table olives

(including Hojiblanca) (572,150 / 509,306).  Redetermination II (2R.P.R. 10) at 35.  This does

not even account for Cacerena, the other dual use varietal acknowledged by Commerce.  Nor

does it account for any volume of "Table" olive varietals generally, or their use in oil

applications, which demonstrably does occur.

Another way of illustrating the same point is through hectare data that break down

"Table", "Dual Use", and "Mill" hectares.  ASEMESA Comments (2R.P.R. 8) at 15.  Those data

- 13 -

also demonstrate that there are significantly more hectares of "Dual Use" varietals than "Table" varietals:

| Category | Hectares |
|---|---|
| Table Olives | 76,120 |
| Dual Purpose | 113,674 |
| Olive Oil Olives | 2,543,827 |

*See* Musco Feb. 25 Submission (R.P.R. 6) at Exhibit 4A.

Commerce dismisses the significance of these hectare data on the basis of a finding that the "dual purpose" category only represents those hectares where the "Dual Use" varietals were *grown for table olives*.  Redetermination II (2R.P.R. 10) at 63-64.  Commerce misses the point. In a case where Commerce is purportedly undertaking a varietal analysis to discern whether certain varietals are "substantially dependent" on demand for table olives, Commerce's response is a non sequitur in as much as "Dual Use" varietals are equally suited for table or oil applications.  Moreover, Commerce's dismissal only confirms that significantly more hectares of "Dual Use" olives exist within the "Olive Oil Olives" category of these data.  *Id*.

### 4. Demand For Raw Olives To Produce Oil Dwarfs The Demand For Raw Olives To Produce Table Olives

In terms of overall orders of magnitude, and again using Commerce's data set, raw olive consumption for oil is anywhere between 3.3 million metric tons and 9.2 million metric tons, or as much as 6 to 15 times larger than raw olive consumption for table olives in the period 2010-2018.  *See* Musco Feb. 25 Submission (R.P.R. 6), Exhibit 7B.  Indeed, just the swings in consumption of raw olives for oil production during this period were anywhere between 1 and 5 million metric tons, or anywhere between 3 and 15 times the volume of "Dual Use" Hojiblanca

and Cacerena consumption actually used to produce table olives (336,270 metric tons) in harvest

year 2016.  Given these orders of magnitude, it would be absurd to conclude that these "Dual

Use" tons used in table applications would not simply be absorbed by oil demand.  *See*

ASEMESA Comments (2R.P.R. 8) at 13-15.

### B.   Legal Standard

19 U.S.C. § 1677-2(1) codifies Commerce practice as set out in two prior Commerce

decisions.  "Commerce's understanding and application of this analysis in both determinations is

persuasive in understanding Congress's intent in enacting" 19 U.S.C. § 1677-2(1).  *ASEMESA I*

at 1343, citing *Live Swine and Fresh, Chilled and Frozen Pork Products from Canada: Final*

*Affirmative Countervailing Duty Determination*, 50 Fed. Reg. 25,097 (June 17, 1985) ("*Pork*

*from Canada*") and *Final Affirmative Countervailing Duty Determination and Countervailing*

*Duty Order; Rice from Thailand*, 51 Fed. Reg. 12,356 (April 10, 1986) ("*Rice from Thailand*").

This codified practice was motivated by special legislative concern over trade in

agriculture products.  *Pork from Canada* at 25,098-25,099.  But as Commerce also recognized,

the "{t}he logic of the legislative concern ... extends only to agricultural products which are

completely devoted to the production of the more advanced product under investigation." *Id*.,

quoting *American Grape Growers v. United States*, 604 F. Supp. 1245, 1247-48 (Ct. Int'l Trade

1985).  To meet the requisite standard, "the raw product can be sold in only one market; it enters

a 'single, continuous line of production resulting in one end product.'" *Pork from Canada* at

25,099.  In practice, Commerce took special care to confirm that the standard was met when

"substantially *all* of the raw product" was dedicated to the downstream product.  *Id*. (emphasis in

original).

Under Commerce's codified practice substantial dependence was found where there existed a single, continuous line of production "where demand for the prior stage good is derived *almost exclusively* from the demand for the latter stage," *Id*. at 25,098, or where "*substantially all* of the raw agricultural product . . . is dedicated to the production of unprocessed pork . . . . *Id*. at 25,099 (emphasis added), or where "*{a}lmost all* of the raw agricultural product . . . is dedicated to the production milled rice. *Rice from Thailand* at 12,358 (emphasis added). These findings match the plain meaning of the statute, which the Court found requires that "the demand for the prior stage product must be 'largely, but not wholly,' 'contingent' on the demand for the latter stage product." *ASEMESA I* at 1341.

### C.      Using A Consumption Ratio To Discern "Substantially Dependent" Is Only Valid With Sufficient Context

Commerce asserts that "{b}ecause 55.28 percent of the manzanilla, gordal, hojiblanca, and carrasquena varietals, the prior stage product, were processed into table olives, the latter stage product, we find that the demand for these varietals is substantially dependent on processed table olives." Redetermination II (2R.P.R. 10) at 36. By this statement, Commerce reveals its use of a simple consumption pattern for various olive varietals from a single year to determine substantially dependent demand. Setting aside the serious conceptual, arithmetic, and fundamental legal flaws in Commerce's analysis, discussed later, Commerce ignores the meaning of the statute as clarified by the Court and factual context which render its simplistic consumption ratio analysis legally impermissible.

### 1.      The Statute Emphasizes The Relationship Between Demand And Dependence, Not Demand And Use

Pointing to a 55 percent consumption rate without further context and declaring "substantially dependent" demand on that basis alone is legally wrong. The statutory standard is

not "substantial volume." The statute does not specify that Commerce need only show some ascertained volume of the prior stage product is consumed in the production of the latter stage product. To the contrary, the statute requires that a finding of *dependence* on the demand for that volume. That demand for the prior stage product must be "substantially dependent" on demand for the latter stage product. 19 U.S.C. § 1677-2(1).

With respect to the proper interpretation of "substantially dependent," this Court has already devoted considerable attention to the meaning of this statutory language and Congressional intent as discussed above. In its original remand order, this Court found that the statute requires "the demand for the prior stage product must be 'largely, but not wholly,' 'contingent' on the demand for the latter stage product. *ASEMESA I* at 1341. In other words, Commerce needs to show that, but for demand for table olives, largely all of the raw olive varietal volume it identifies as substantially dependent would not exist for some other purpose; that the demand for that volume is *contingent* on table olive demand.

Commerce's response fundamentally misconstrues the emphasis and key question presented by the statutory terms of 19 U.S.C. § 1677-2(1). Commerce finds that "an analysis of consumption ratios is a reasonable method to determine whether section 771B(1) of the Act is satisfied because the concept of demand hinges on use." Redetermination II (2R.P.R. 10) at 59. This position ignores the Court's thorough analysis in *ASEMESA I* and the statute's terms. The term "dependent" has meaning, both in plain terms, the history of Commerce practice, and ultimate codification of that practice by Congress. The notion of something that is dependent or contingent is clearly linked to the concept of a single continuous line of production featured in Commerce practice prior to codification. It is the idea of a unitary capacity of use -- that a prior stage product would not exist but for demand for the latter stage product. That is the very

- 17 -

definition of "dependent" demand.  Commerce mixes up the emphasis.  Contrary to Commerce's assertion, whether or not the concept of demand hinges on use has nothing to do with the question presented by the statute.  The statute is not asking about the relationship between demand and use, but demand and dependence.  Commerce again impermissibly reads the key terms "substantially dependent" out of the statute.

**2.    The Context Here Proves The Limited Probative Value Of A Consumption Ratio Resting On Its Own**

A consumption ratio could be a valid basis for finding "substantially dependent" demand, but only if supported by other evidence and context revealing why it would be unreasonable to expect repurposing of the prior stage product for other available end uses.  But if record evidence demonstrates ease of mobility between applications – as is true here -- then a consumption ratio alone is of limited value since it sheds little light on dependence.

As previously noted, the data relied upon by Commerce to reach its "substantially dependent" finding reveal significant mobility between "Table" and "Mill" categories in terms of end use in table and oil applications, undercutting Commerce's finding.  Commerce's primary attempt to dismiss the significance of these data is to point out that "only after 2016, when CVD and antidumping orders were imposed, were there greater shifts in table olives being sent to the mill."  Redetermination II (2R.P.R. 10) at 63.  But this admission only confirms that there are limited restraints on use between "Table" and "Mill" categories even within a relatively short period of time.  What may cause the shifts is irrelevant; the shifts occur.

The data also disprove Commerce's assumption that "at their source, dual-use olives are grown for one purpose or other. . . ."  *Id*.  If one accepts that the large movements in Commerce's data mainly reveal movements of "Dual Use" varietals within the "Table" and

- 18 -

"Mill" categories (as Commerce appears to contend), the reality the data reflects is far from Commerce's construction of the market for "Dual Use" olives.  Nonetheless, Commerce in rebuttal asserts that cultivation and insurance practices stand as durable and impermeable barrier between table and oil applications based on economic limitations/restraints.  *Id*. at 58, 62-63.  But there are serious problems with Commerce's theory, both factually and conceptually.

Commerce's proposes that higher costs/prices for raw "Table" olives makes them a "less economically viable" source for oil producers, and therefore locks in dependence to table olive demand.  *Id*. at 58-59.  But 160,899 tons of raw "Table" olives in Commerce's own utilization data – the amount used to produce oil in 2017 -- disprove that point.  And even if "less economically viable," that is not equivalent to "dependence" or a "contingence" on demand.  At best, the record may suggest higher "Table" production costs associated with more intensive watering, pruning, and handling practices over "Mill" olives within the harvest year.  Redetermination II (2R.P.R. 10) at 62-63.  But again, Commerce's own data show these practices, to the extent they constitute any restraint at all, can quickly be eliminated and have no bearing on whether the varietals in question can be used for oil production, or whether demand for them is "contingent" on table olive demand.

The fact remains that Commerce never answers how cultivation practices can be an impediment to how olives are actually used.  The record shows that  in 2017 the total amount of "table" raw olives actually used to produce oil, and "mill" raw olives actually used to produce table olives – 387,047 metric tons – was larger than the volume of "table" raw olives actually used to produce table olives – 344,147 metric tons.  Commerce just ignores this fact.  But the data show these large volumes can be shifted in and out of table olive and oil production within just a matter of a few months.  These data are also consistent with the verified record.  Indeed, as

noted in Commerce's verification report, "some varieties of olives can be used to produce both table olives and olive oil, and that the farmer will decide for which production the olive will be used based on <u>current</u> market conditions." Government of Spain Verification Report (P.R. 534) at 2 (emphasis added).

Petitioner otherwise admitted the reality that "a table olive grower faced with substandard olives will generally choose to keep that fruit on the trees for a later harvest, enabling late-season adjustments in irrigation and handling to maximize oil content." *See* Musco Feb. 5 Submission (R.P.R. 3) at 11. But nothing on the record shows that this opportunity is inherently limited to substandard olives. To the contrary, the utilization information relied upon by Commerce to make its "substantially dependent" demand finding shows precisely the opposite.

Conceptually, Commerce's use of cultivation and insurance practices is simply misplaced. It does not reflect a varietal analysis, including how certain varietals are used and can be used. There is nothing inherent in a "Dual Use" varietal that *requires* a particular cultivation or insurance practice. These externalities do not determine the varietal's existence; that existence is only determined by whether a demand exists for the varietal. At best, Commerce may have established that the practices in question are substantially dependent on table olive demand, but not the varietals themselves, which can be used, and are frequently used, for other purposes.

**D.    Even Assuming That Commerce's Consumption Ratio Is A Valid Measurement Of Dependence, It Does Not Meet The "Substantially Dependent" Legal Standard**

Even assuming Commerce can simply declare a consumption figure and find certain olive varietals are substantially dependent on table olive demand, its stated 55 percent figure does not meet the legal standard under the statute as discussed above. In summary, 55 percent does not

reflect "completely devoted", "all", "substantially all", "almost exclusively", or "largely" all of the production of the raw olive varietals in question.  Nor does it comport with any concept of "substantially" found in Commerce's own standards across various regulations.  *See, e.g.,* 19 C.F.R. § 351.408(d)(i) ("Substantially complete" means replacement of "nearly all" production machinery); 19 C.F.R. § 351.408(c)(1) ("Substantially all" constitutes 85 percent or more of the total volume); 19 C.F.R. § 351.208(c) ("Substantially all" accounts for not less than 85 percent); and 19 C.F.R. § 351.402(c)(2) ("Exceed substantially" means at least 65 percent).  Indeed, it would not survive under the touchstone of Commerce's practice taken all the way back to *American Grape Growers,* where this Court upheld a U.S. International Trade Commission determination not to collapse grape growers and wine producers based on a finding that only 55 percent of all grapes suitable for use in ordinary table wine are so used.  *See American Grape Growers v. United States,* 604 F. Supp. 1245, 1248 (Ct. Int'l Trade 1985).

Commerce's response is to cite instances where it made affirmative findings under 19 U.S.C. § 1677-2(1) with lower consumption ratios under an interpretation of the statute that this Court has already rejected.  *See* Redetermination II (2R.P.R. 10) at 57, citing *Frozen Warmwater Shrimp from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 78 Fed. Reg. 50,391 (August 19, 2013), IDM at 47.  We acknowledge that Commerce rested a "substantially dependent" finding in that case on the basis that 44.7 percent of the fresh shrimp market was accounted for by frozen shrimp, *id.*, but this finding has no meaning for purposes of 19 U.S.C. § 1677-2(1).  As this Court already found, Commerce in that case "applied the same deconstructed analysis of 'substantially dependent'" as it did in the underlying original investigation at issue in this proceeding.  *ASEMESA I* at 1345.  The Court found such analysis contrary to law.  *Id.* at 1341-1344.  Even considering Commerce's

calculation in that case -- that 44.7 percent of fresh shrimp used for processing into frozen shrimp was "substantial" and that the demand for fresh shrimp is "dependent" on the demand for frozen shrimp – such a figure would be inconsistent with the statutory standard, Congressional intent, or even with Commerce's past practice since it does not represent "almost exclusively, almost all, most, or substantially all" the demand for fresh shrimp.  *Id*. at 1344.

### E.   Commerce's 55 Percent Consumption Figure Reflects Mischaracterization And Faulty Assumptions To Exaggerate The Figure

At the outset, it is important to clarify the parameters of Commerce's "substantially dependent" analysis.  This includes Commerce's stated intent in setting up its consumption calculation, and then its execution of the calculation, where Commerce's conceptually simplistic undertaking quickly unravels.  In application, it is apparent that Commerce's analysis is built upon a series of mischaracterizations and unsupported assumptions that bias the results, all in reliance on data that do not permit a true varietal analysis.

### 1.   Commerce's Analysis In The Abstract

In its analysis, Commerce relies primarily on two data sets to conduct its analysis.  One is varietal-specific consumption data for raw olives consumed in table olive production published by a Government of Spain agency, AICA.  Redetermination II  (2R.P.R. 10) at 35.  The other data consists of category-based production and end use figures for "Table" and "Mill" olives.  *Id*. at 33-34.  The AICA data are used by Commerce to calculate the volume of "Dual Use" Hojiblanca consumed in the production of oil and to perform exclusion adjustments in the ascertained volume of "Mill" olives reported in the category-based data as used in the production of table olives.  *Id*. at 35.  The category-based data, however, are the ultimate basis of Commerce's "substantially dependent" finding.  *Id*. at 35-36.  These data were provided in Sections II.A.2 (Category-based) and II.A.3 (AICA) of this brief.  Through clarification in its

final redetermination submitted to the Court, Commerce imposes an additional rule on the use of

these data -- an assumption that "Table" varietals are only fit for table olives, "Mill" varietals are

only fit for oil production, and "Dual Use" varietals, "at their source, . . . are grown for one

purpose or other."  *Id*. at 52 and 63.

Fundamentally, Commerce's purports to base its analysis on: (1) a numerator comprised

of the volume of the main varietals used to produce table olives actually consumed in that

application; and (2) a denominator comprised of the total volume of production of the same main

varietals.  Commerce reasonably identifies the main varietals at issue on the basis of the AICA

data to include Manzanilla, Gordal, Hojiblanca, Cacerena, and Carrasquena.  Commerce further

identifies manzanilla, gordal, and carrasquena as "Table" varietals, and hojiblanca and cacerena

as "Dual Use" varietals.  *Id*. at 30.  Commerce admits that its analysis is not comprehensive as it

affirmatively seeks to exclude the Cacerena varietal for which Commerce claims it lacks data to

perform necessary calculations.  *Id*. at 32.  The calculation and data components of the analysis

as represented by Commerce are as follows:

|  | Tons | Components |
|---|---|---|
| **Numerator** | 564,400 | **(492,244 + 71,814)**  The 492,244 figure is derived from the category-based data representing "Table" olives used for table olive production.  Commerce asserts this figure consists only of Manzanilla, Hojiblanca, Gordal and Carrasquena.  The 71,814 is derived from the category-based date representing "Mill" olives used for table olive production that Commerce claims represent only Hojiblanca volume after adjusting for Cacerena and "other" varietal volume.  *Id*. at 33-34. |
| **Denominator** | 1,020,406 | **(511,122 + 509,304)**  The 511,122 figure is derived from the category-based data representing "Table" olives used to produce table olives and "Mill" olives used to produce table olives.  The 509,304 figure represents a reasonable calculation of the volume of "Dual Use" Hojiblanca used to produce oil based on AICA Hojiblanca consumption data for table, Government of Spain Statistics for "Table" and "Mill" olive |

| | | yield rates, and aggregate hojiblanca hectare information. *Id*. at 34-36. |
|---|---|---|

### 2.     Commerce's Analysis Tested By The Record

In application, Commerce's analysis starts out on reasonable footing.  The identification of the five main varietals used for table olive production is sound, based on clear, varietal-specific consumption data for table olive production published by the Government of Spain.  Similarly, Commerce's calculation to account for "Dual Use" Hojiblanca used to produce oil is grounded in substantial evidence.  But it is at this point that Commerce's analysis quickly falls apart, addressed below.

### a.     Commerce's attempts to exclude Cacerena and "Other" varietal volume from its analysis are ineffectual and unreasonable

In its new redetermination, Commerce finds that it does not have sufficient information to calculate the volume of Cacerena used to produce oil and therefore purports to exclude Cacerena from its analysis.  *Id*. at 32.  The overall propriety of excluding Cacerena is addressed later below, but the mechanics of Commerce's attempted exclusion are faulty on their own.  Specifically, Commerce attempts to control for Cacerena in its numerator by reducing the amount of "Mill" olive volume used to produce table olives (90,404 tons) based on a simple ratio of Cacerena's contribution to table olive production as reflected in the AICA data, for a reduction of 11,215 tons.  *See* Final Calculations (2R.P.R 12).  This adjustment rests on Commerce's assertion that it is "reasonable to infer that the percentage of dual-use varietals grown for table olives on a varietal-by-varietal basis is the same as the percentage of dual-use varietals grown for mill."  Redetermination II (2R.P.R. 10) at 33-34.  Commerce points to no support in the record for that conclusion.  In fact, the record otherwise repudiates such an

inference.  It is obvious that this 11,215 adjustment in the numerator does not control for

Cacerena since the AICA data relied upon by Commerce shows that 45,420 tons of Cacerena

olives were consumed in the production of table olives.  *See* Final Calculations (2R.P.R 12).  The

only way you could adjust the 90,404 tons of "Mill" olives used to produce table olives to ensure

a true exclusion of Cacerena would be to deduct the entire 45,420 tons of Cacerena reported in

the AICA data.

Commerce also recognizes that it needed to control for "other" varietals reflected in the

AICA varietal-specific data used to produce table olives in its analysis,  as they would also be

imbedded in the category-based "Table" and "Mill" olive data it relies upon to calculate its

consumption ratio.  Redetermination II (2R.P.R. 10) at 33-34.  To do so, it performs a similar

adjustment to the 90,404 tons of "Mill" olives used to produce table as used for Cacerena,

resulting in a further reduction of Commerce's numerator by 7,375 tons.  *See* Final Calculations

(2R.P.R 12).  But like Cacerena, this does not effect a true exclusion since the AICA data report

29,870 tons of such "other" varietals consumed to produce table olives.  *Id.*  Commerce's 7,375

ton adjustment accounts for a mere fraction of that amount.  Again, the only way to adjust the

90,404 tons of "Mill" olives used to produce table olives to ensure a true exclusion of "other"

varietals  would be to deduct the entire 29,870 tons reported in the AICA data.

Commerce's redetermination also imposes the added unsupported assumption that the

"other" varietals it is controlling for in its numerator are in fact "Dual Use" varietals,

Redetermination II (2R.P.R. 10) at 34, even though: (1) the "Table" and "Mill" category data

upon which it relies to calculate its consumption ratio offers no such statement; (2) the numerator

adjustment effected by Commerce to take into account these "other" varietals is on the 90,404

"Mill" olives used to produce table olives; (3) other record evidence shows that "Mill" and

"Table" varietals can be used to make table olives and oil, respectively, as previously discussed. This means the "other" varietals found in the AICA data Commerce attempts to control for in utilizing its category-based data could just as easily be "Table" or "Mill" varietals, and not simply "Dual Use" varietals.  While Commerce evidently believes that this is not a concern on the basis of its conclusions that "Table" varietals are only fit for table olives, "Mill" varietals are only fit for oil production, and "Dual Use" varietals, "at their source, . . . are grown for one purpose or other," those conclusions are not supported by the record, as previously addressed in Sections II.A.1 and II.D above.

> **b.    Commerce's failed attempts to exclude Cacerena and "Other" varietals reveal that it has no real ability to control for the varietal volume included in its calculations**

Commerce's failure to substantiate and effect reasonable exclusions for Cacerena and "Other" varietals reveal that it has no real ability to control for what varietals are included in its calculation or their relative volumes.  This is a direct function of Commerce's continued reliance on category data for "Table" and "Mill" olives that offer no ability to discern what varietals are included in those figures.  This reliance leads to characterizations of the data used in Commerce's analysis that facially cannot be true.  Based on the discussion above, it is demonstrably untrue that, according to Commerce, the numerator and denominator of its analysis only contain Manzanilla, Gordal, Carrasquena, Hojiblanca.  Redetermination II (2R.P.R. 10) at 36.  This reality also means that, despite Commerce's contention that it has performed a varietal analysis, it has done no such thing.  Rather, through its general and flawed conclusions regarding how "Table," "Mill" and "Dual Use" varietals can be used, and its reliance on category data for production and end use of "Table" and "Mill" olives, Commerce in effect still clings to a definition of "prior stage product" predicated on "varietals of raw olives principally suitable for

use in the production of table olives" that this Court previously rejected.  *See ASEMESA II* at

1407.

       **3.**      **Commerce's Consumption Ratio Calculation Suffers From Other Serious Conceptual And Factual Problems**

       **a.**      **The "Mill" olive volume incorporated in Commerce's numerator has no contingency and should not be included**

Commerce erroneously includes "71,814 tons of Hojiblanca grown for mill but used for

table olive production in its numerator."  Redetermination II (2R.P.R. 10) at 34.  This undercuts

the very basis of Commerce's argument that end uses for "Dual Use" olives are determined at the

start of the season.  *Id*. at 52Commerce either (1) has to accept that "Dual Use" varietals have

broad cross-application in both table use and olive oil which militates a conclusion in favor of

lack of contingency, or (2) has to assume, as it attempts, that "growers of dual-use varietals also

determine whether their olives are to be used for table or mill <u>at the beginning of the growing

season</u>". *Id*. at 51 (emphasis added).  Commerce cannot have it both ways.

No matter what approach Commerce takes, it is unreasonable to include the "Mill" tons

into its numerator that Commerce presumes to all be "Dual Use" varietals.  If Commerce accepts

that these "Mill" olives were cross-applied for table use, by definition, this volume is not

contingent on the demand for table olives.  *See* ASEMESA Comments (2R.P.R. 8) at 18-19.

Alternatively, if Commerce believes that growers have to determine whether these particular

"Mill" olives are to be used as table or mill at <u>the beginning of the season</u>, then Commerce

cannot justify their inclusion in its numerator, which reflects table olive production, as by its own

measure, once determined at the beginning of the season, they would not be interchangeable.

Simply put, Commerce's numerator should not include any "Mill" olives actually used

for table olive production.  In Commerce's calculation, this would include the 71,814 tons of

"Mill" olives it presumes to be "Dual Use" Hojiblanca.  Deducting 71,814 tons from

Commerce's numerator and keeping all other things equal, its consumption ratio drops to 48.2

percent, further cementing the fact that Commerce cannot render an affirmative "substantially

dependent" finding in this case.

> **b.    Commerce cannot reasonably exclude "Dual Use" Cacerena from its analysis**

The distortive effects of excluding Cacerena from Commerce's analysis are obvious.

While we have already identified certain problems in Commerce's attempts at exclusion in the

numerator, more significant is the impact on Commerce's denominator.  Cacerena is a "Dual

Use" olive equally suited for table or oil production and so the exclusion has disproportionate

effects on the analysis as far as the Department's denominator.  ASEMESA Comments (2R.P.R.

8) at 17-18.  By example, and as referenced above, Commerce reasonably calculates that "Dual

Use" Hojiblanca used to produce oil is 175% of the volume of Hojiblanca used to produce table

olives and includes that additional volume in its denominator.  *See* Final Calculations (2R.P.R.

12).  To that end, there is no reason not to expect a similar ratio in the case of "Dual Use"

Cacerena.  Indeed, Cacerena is the main varietal in the provinces of Caceres and Badajoz

(Extremadura).  *See* Musco Feb. 25 Submission (R.P.R. 4-13), Exhibit 2A at 19.  These

provinces account for over 568,000 metric tons of raw olives on over 287,000 hectares of olive

groves overall.  *Id*., Exhibit 7A at 3 and Exhibit 4A at 38.  By excluding Cacerena, Commerce is

substantially under-representing the relevant denominator, even under its own flawed analysis,

inflating its results.

Commerce justifies the exclusion of Cacerena on the basis that there is not sufficient

record evidence to include it.  Redetermination II (2R.P.R. 10) at 32.  But this is erroneous.

Commerce has at least two reasonable ways for estimating the amount of Cacerena used to

produce oil.  This includes data on Cacerena hectares sourced from the Government of Spain

discussed in Section II.H below, by which it could  perform the same calculation of volume for

oil as it did for Hojiblanca.  Alternatively, Commerce could have estimated Cacerena volume

used to produce oil using the same table to oil ratio reflected for Hojiblanca – i.e., oil volume is

175% of table volume.  Either approach would further cement the fact that no "substantially

dependent" finding can be made in this case.

### 4.   Commerce Unreasonably Discarded Varietal-Specific Consumption Data

The numerous flaws explicitly, implicitly, and inherently imbedded in Commerce's

analysis, discussed above again expose the most fundamental problem with Commerce's

analysis:  For all its claims, it has not engaged in a varietal analysis.  Commerce mentions

varietals by name, conducts some calculations on a varietal-specific basis on the periphery of its

analysis, but the emperor still has no clothes.  The core of Commerce's analysis and calculations

remains wedded to generic, category-based data where it cannot control for varietals.  It attempts

that control with groundless assumptions about how different varietals can be used and are used,

but even then it cannot really say which varietals are in its data.

Commerce avoids varietal-specific data that it actually utilizes for ancillary purposes –

the AICA data – that would permit it to discard some of the worst of its assumptions and

adjustments applied to make its category-based data "work".  For example, with the AICA data it

is possible to know with certainty the volume of the five main varietals – by varietal -- used to

produce table olives.  ASEMESA Feb. 26 Submission (R.P.R. 15), Exhibit 1, internal Exhibit

NFI-2.  Instead, Commerce has to make adjustments to "Mill" olives evidently grown for oil but

then used to produce table, contrary to Commerce's paradigm that olives are grown for <u>one</u> use

or another.  It makes these adjustments based on unsubstantiated assumptions to account for

what it contends are all "Dual Use" varietals (also unsubstantiated) that it seeks to exclude from its analysis, whether Cacerena or "other" varietals.  Redetermination II (2R.P.R. 10) at 52.

None of these adjustments are necessary with the AICA data since the AICA data provide the actual volumes used to produce table olives by each of the five main varietals.  There are no adjustments to arrive at that number.  The more granular AICA data could be used to segregate "Dual Use" olives with no contingency to perform its analysis.  The total amount of dual use Hojiblanca and Cacerena used to produce table olives is 336,270 thousand tons for harvest 2016 (Hojiblanca alone being 290,850 thousand tons), whereas remaining volume is  just 265,750 thousand tons, or just 44.1 percent of total table olive production.  ASEMESA Comments (2R.P.R. 8) at 16.  But that is just one example of how the data could be used to simplify the analysis and avoid untenable assumptions and adjustments.  Indeed, Commerce could still perform its chosen Hojiblanca analysis, adding the oil component of Hojiblanca to its denominator and conclusively deduct Cacerena from its numerator.  With the varietal-specific AICA data that produces a numerator of 526,730 tons of Hojiblanca, Carrasquena, Gordal, and Manzanilla, and a denominator that further includes 509,206 tons of Hojiblanca for oil that Commerce calculated, for a total of 1,081,456 tons.  In that case, the ratio is 48.71%.  Commerce could have even included Cacerena and adjusted its denominator by additional Cacerena oil tons using the Hojiblanca table/oil ratio of 175% discussed earlier in this brief.  In that case, the numerator would be 572,150 tons based on the AICA data for the five main varietals and the numerator would be 1,160,556 tons (572,150 + 509,260 Hojiblanca oil tons calculated by Commerce + 79,100 Cacerena oil tons based on 175% of the 45,250 tons of Cacerena used to produce table olives).  In that case, the ratio is 49.3% (572,150 / 1,160,556).

Yet, despite these unburdened alternatives, Commerce has rigidly and unreasonably stuck with its category-based data and unsupportable assumptions / adjustments.  It is extremely difficult to discern why.  One possibility appears to be that Commerce discounts the AICA data on the basis that it only reflects volume "grown for table olives" and not definitively used to produce table olives.  *See, e.g.,* Redetermination II (2R.P.R. 10) at 53 and 64.  But such a distinction is absurd on a number of levels, making it unclear Commerce actually used such a rationale.  First, in at least one instance Commerce also references the same AICA data and finds that it does in fact represent production figures.  *Id*. at 30 ("According to Spain's Ministry of Agriculture Food Information and Control Agency (AICA) . . . the five principal raw olive varietals are manzanilla, gordal, hojiblanca, cacerena, and carrasquena, which accounted for 602,020 tons of table olives production.").  Second, such a rationale suggests uncertainty in actual use, which again breaks Commerce's paradigm that olives are grown for <u>one</u> use of another.  In effect, "olives grown for table" are used in table and so in Commerce's world it should be a distinction without a difference.  Third, the characterization is simply wrong.  The AICA data plainly show beginning and ending inventory stocks of the varietals in question *within the table olive production chain*, with figures reconciling from beginning inventories to ending inventories in the year.  *See* ASEMESA Feb. 26 Submission (R.P.R. 15), Exhibit 1, internal Exhibit NFI-2.  These same AICA figures also reconcile to ripe and green table olive production figures provided elsewhere in the report.  *Id*., Exhibit 1, *cf*. internal Exhibit NFI-2 (varietal volumes) and NFI-4 (showing production of ripe and green olives in 2015/16 harvest year is 602.02 thousand tons, which reconciles to total varietal volume in the same harvest year of 602.02).

As it stands, the only plausible explanation for Commerce's refusal to use the AICA data is that Commerce sought the highest possible consumption ratio it could contort into creation. But in light of all the discussion above, Commerce's approach is unreasonable, does not withstand even the slightest scrutiny, and is therefore not supported by substantial evidence. But as also discussed above, no matter how you slice the numbers – unreasonably or reasonably – they do not support a "substantially dependent" finding.

### F.    The Department's Redetermination Fails To Address The Existence Of Distinct Ripe And Green Table Olive Production Lines After The Raw Stage

Commerce's failure to identify a single continuous line of production reaches beyond the distinction between table olive an oil production. Commerce still has not addressed record evidence demonstrating that the two principal categories of "table olives" -- "ripe or black olives" and "green or fermented olives" -- travel along distinct production lines after the same raw stage. *Id.*, Exhibit 1 at 2-3 and Exhibit NFI-6. Record evidence also demonstrates that the volume of raw olives consumed in the production of green olives is more than twice the volume of raw olives used to produce ripe olives. *Id.*, Exhibit 1 at 3 and NFI-4. The existence of that other line of production, again revealing no single, continuous line of production, and the Department's failure to address this evidence in any way it further renders its draft redetermination not supported by substantial evidence and contrary to law. *See* ASEMESA Comments (2R.P.R. 8) at 23.

### G.    The Department Wrongly Dismissed the Spanish Government's Varietal Hectare Data

The Department requested that the Spanish Industry provide production data by the main varietals used in table olive production, regardless of end use. Using data on surface area by varietal collected by the Government of Spain and other published and undisputed government

data on olive yield per hectare, the Spanish Industry complied with the Department's request.

Moreover, the provided data, compared against the volume of the same main varietals actually

used in table olive production, also published by the Government of Spain, show that less than

40 percent of the volume of these varietals, in total, are actually used in table olive production,

again showing no substantially dependent demand. *See* ASEMESA Comments (2R.P.R. 8) at 23-

25.

Commerce's new redetermination again dismisses these data claiming principally that

ASEMESA "failed to provide the underlying data" and "has not provided supporting

documentation demonstrating that the number of hectares dedicated to the production of each

varietal is accurate."  Redetermination II (2R.P.R. 10) at 66.  Commerce's claims are

absurd.  The data ASEMESA provided <u>are</u> the underlying hectare data as they are not part of any

statistical publication, but provided directly from the GoS.  *See* ASEMESA Feb. 26 Submission

(R.P.R. 15), Exhibit 1 at 5-6 and Exhibit 6 (R.P.R. 15).  Plaintiffs complied with Commerce's

request to "provide total raw olive production data for each of these varietals, regardless of end

use, for the 2017/2018 campaign, and for calendar years 2017 and 2018."  *Id.,* Exhibit 1 at 5.

Commerce ignores that the GoS, through its own submission, expressly confirmed the source

and accuracy of the data.  The GoS further explained that the data were presented "in a

reasonable manner in relation to other government statistical data, <u>and are readily verifiable</u>

<u>records of the Government of Spain and the regional government of Andalucia</u>." *Id.*, Exhibit 6 at

2 (emphasis added).  Commerce could have issued a questionnaire to the GoS, or it could have

verified the information with the GoS.  It did neither.  Commerce has accepted tabulated data

from governments similar to the hectare data in other contexts, such as when it examines de facto

specificity.  *See Certain Fabricated Structural Steel From Canada: Preliminary Negative*

*Countervailing Duty Determination*, 84 Fed. Reg. 33,232 (July 12, 2019), IDM at 22-23.  Its

rejection here is arbitrary.  *See SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir.

2001), aff'd, 332 F.3d 1370 (Fed. Cir. 2003) ("{A}n agency action is arbitrary when the agency

offer{s} insufficient reasons for treating similar situations differently.").

## CONCLUSION

In light of the discussion above, this Court should remand Commerce's second

redetermination back to Commerce with instructions consistent with the arguments above.

Specifically, the Court should order Commerce to find that: (1) the BPS/Greening programs are

not de facto specific; and (2) that the requirements of 19 U.S.C. § 1677-2(1) permitting a

presumption of subsidy pass through are not satisfied in this case.

Respectfully submitted,

/s/ Matthew P. McCullough

Matthew P. McCullough

Curtis Mallet-Prevost, Colt & Mosle LLP
1717 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
202-452-1717

*Counsel for Plaintiffs*

**Word Count Certificate of Compliance**

This brief has been prepared utilizing Microsoft Word 2010 using a proportionally spaced typeface 12 point Times New Roman font.

In accordance with the Rules of the United States Court of International Trade, the undersigned certifies that this brief complies with the relevant word limitations.  Specifically, excluding those exempted portions of the brief as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains 9,946 words.  In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Matthew P. McCullough

Matthew P. McCullough

Curtis Mallet-Prevost, Colt & Mosle LLP
1717 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
202-452-1717