## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:     THE HONORABLE GARY S. KATZMANN, JUDGE

_____
                                        )
ASOCIACIÓN DE EXPORTADORES E             )
INDUSTRIALES DE ACEITUNAS DE MESA,       )
ACEITUNAS GUADALQUIVIR, S.L.U., AGRO     )
SEVILLA ACEITUNAS S. COOP. AND., and     )
ANGEL CAMACHO ALIMENTACIÓN, S.L.,        )
                                        )
            Plaintiffs,                  )
                                        )
    v.                                   )
                                        )    Court No. 18-00195
UNITED STATES,                           )
                                        )
            Defendant,                   )
                                        )
    and                                  )
                                        )
COALITION FOR FAIR TRADE IN RIPE         )
OLIVES,                                  )
                                        )
            Defendant-Intervenor.        )
_____)

## ORDER

Upon consideration of the Department of Commerce's second remand redetermination, ECF Nos. 73-1 and 74-1, plaintiffs' comments on the second remand redetermination, defendant's and defendant-intervenor's responses thereto, and all other pertinent papers and proceedings in this action, it is hereby

ORDERED that the second remand redetermination is sustained; it is further

ORDERED that judgment is entered in favor of the United States; and it is further

ORDERED that the subject entries enjoined in this action (ECF No. 65) be liquidated in accordance with the final court decision, as provided in section 516A(e) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(e).

Dated: _____
      New York, NY                                       _____
                                                                                      JUDGE

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:     THE HONORABLE GARY S. KATZMANN, JUDGE

_____
                                                    )
ASOCIACIÓN DE EXPORTADORES E                        )
INDUSTRIALES DE ACEITUNAS DE MESA,                  )
ACEITUNAS GUADALQUIVIR, S.L.U., AGRO                )
SEVILLA ACEITUNAS S. COOP. AND., and                )
ANGEL CAMACHO ALIMENTACIÓN, S.L.,                   )
                                                    )
                Plaintiffs,                         )
                                                    )        **PUBLIC VERSION**
        v.                                          )
                                                    )        Court No. 18-00195
UNITED STATES,                                      )
                                                    )        Business Proprietary Information
                Defendant,                          )        Deleted From Brackets [ ]
                                                    )
        and                                         )
                                                    )
COALITION FOR FAIR TRADE IN RIPE                    )
OLIVES,                                             )
                                                    )
                Defendant-Intervenor.               )
_____)

## DEFENDANT'S REPLY TO COMMENTS
## ON THE SECOND REMAND REDETERMINATION

<div style="margin-left:50%">

BRIAN M. BOYNTON
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

TARA K. HOGAN
Assistant Director

SONIA W. MURPHY
Trial Attorney
U.S. Department of Justice
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044

</div>

OF COUNSEL:
SAAD Y. CHALCHAL
Senior Attorney
Office of the Chief Counsel
    for Trade Enforcement and Compliance
U.S. Department of Commerce

January 12, 2022                                    Attorneys for Defendant United States

### TABLE OF CONTENTS

<div align="right">**PAGE**</div>

TABLE OF AUTHORITIES......................................................................................... ii

PROCEDURAL HISTORY......................................................................................... 2

ARGUMENT .............................................................................................................. 5

    I.     Standard Of Review .................................................................................. 5

    II.    Commerce's Second Remand Redetermination Complies With The Court's Order.............................................................................................. 5

    III.   The Court Should Sustain Commerce's Finding That The BPS Is *De Facto* Specific ...................................................................................................... 7

    IV.   Commerce's Interpretation And Analysis Of Section 1677-2(1) Is Supported By Substantial Evidence And In Accordance With Law .............. 15

          A.    Legal Framework For Section 1677-2............................................... 16

          B.    Commerce Reasonably Determined That The Demand For Certain Biologically Distinct Varietals Of Raw Olives Is "Substantially Dependent" On The Demand For Table Olives................................................................................................. 17

          C.    ASEMESA Fails To Demonstrate That Commerce's Finding Is Unlawful.............................................................................. 22

               1.    Commerce's Finding Satisfies The "Substantially Dependent" Standard........................................................ 22

               2.    Commerce's Calculation Is Supported By Substantial Evidence....................................................... 26

CONCLUSION.......................................................................................................... 33

# TABLE OF AUTHORITIES

**CASES**                                                                                    **PAGE**

*Agro Dutch Indus. Ltd. v. United States*,
   508 F.3d 1024 (Fed. Cir. 2007) .................................................................................19, 20

*American Grape Growers v. United States*,
   604 F. Supp. 1245 (Ct. Int'l Trade 1985) ......................................................... 24

*Asociacion de Exportadores e Industriales de Mesa et al. v. United States*,
   429 F. Supp. 3d 1325 (Ct. Int'l Trade 2020).............................................. *passim*

*Asociacion de Exportadores e Industriales de Mesa et al. v. United States*,
   523 F. Supp. 3d 1393 (Ct. Int'l Trade 2021).............................................. *passim*

*Ceramica Regiomontana, S.A. v. United States*,
   636 F. Supp. 961 (Ct. Int'l Trade 1986), *aff'd*, 810 F.2d 1137 (Fed. Cir. 1987) ............... 25

*Changzhou Hawd Floorin Co. v. United States*,
   947 F.3d 781 (Fed. Cir. 2020) ......................................................... 16

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
   467 U.S. 837 (1984).......................................................................... 16

*Columbia Broadcasting System v. United States*,
   316 U.S. 407 (1942).......................................................................... 17

*JBF RAK LLC v. United States*,
   790 F.3d 1358 (Fed. Cir. 2015) ...................................................25, 31

*Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States*,
   992 F.3d 1348 (Fed. Cir. 2021) ......................................................... 14

*Heckler v. Chaney*,
   470 U.S. 821 (1985).......................................................................... 33

*Matsushita Elec. Indus. Co. v. United States*,
   750 F.2d 927 (Fed. Cir. 1984) ......................................................... 32

*Mitsubishi Elec. Corp. v. United States*,
   898 F.2d 1577 (Fed. Cir. 1990) ......................................................... 24

**TABLE OF AUTHORITIES**
**-continued-**

*Murphy v. Smith,*
    138 S. Ct. 784 (2018) ............................................................................ 23

*Reiter v. Sonotone Corp.,*
    442 U.S. 330, 339 (1979) .................................................................... 19

*Rogero v. Sec'y of Health and Human Services,*
    748 Fed. Appx. 996 (Fed. Cir. 2018) ................................................. 32

*SEC v. Chenery,*
    332 U.S. 194 (1947) ............................................................................ 17

*SKF USA Inc. v. United States,*
    254 F.3d 1022 (Fed. Cir. 2001) ......................................................... 16

*TMK IPSCO v. United States,*
    222 F. Supp. 3d 1306 (Ct. Int'l Trade 2017) ...................................... 5

*Torrington v. United States,*
    68 F.3d 1347 (Fed. Cir. 1995) ........................................................... 33

*Wilmar Trading Pte Ltd. v. United States,*
    466 F. Supp. 3d 1334 (Ct. Int'l Trade 2020) ...................................... 8

*Xinjiamei Furniture (Zhangzhou) Co. v. United States,*
    968 F. Supp. 2d 1255 (Ct. Int'l Trade 2014) ...................................... 5

**STATUTES**                                                         **PAGE**

19 U.S.C. § 1516a(b)(1)(B)(i) ..................................................................... 5

19 U.S.C. § 1677(4)(E) ...................................................................17, 24, 25

19 U.S.C. § 1677(4)(E)(i)(I) ...................................................................... 26

19 U.S.C. § 1677(5)(A) ................................................................................ 7

19 U.S.C. § 1677(5A) ......................................................................... 4, 5, 8

19 U.S.C. § 1677(5A)(D) ....................................................................... *passim*

19 U.S.C. § 1677(5A)(D)(iii) ...................................................................... 8

**TABLE OF AUTHORITIES**
**-continued-**

19 U.S.C. § 1677(5A)(D)(iii)(III) ................................................................ 6, 7, 12

19 U.S.C. § 1677-2 .................................................................................... *passim*

19 U.S.C. § 1677-2(1) ............................................................................... *passim*

19 U.S.C. § 1677e ........................................................................................ 10

19 U.S.C. § 1677e(c) ................................................................................... 14

19 U.S.C. § 1677e(c)(1) ...........................................................................12, 14

28 U.S.C. § 2637(d) ..................................................................................... 31

**REGULATIONS**

19 C.F.R. § 351.502 ...................................................................................... 8

19 C.F.R. § 351.502(e) .................................................................................. 9

**FEDERAL REGISTER**                                                            **PAGE**

*Certain Fabricated Structural Steel from Canada,*
    84 Fed. Reg. 33,232 (Dep't of Commerce July 12, 2019) ................................ 33

*Certain Frozen Warmwater Shrimp from the People's Republic of China,*
    78 Fed. Reg. 50,391 (Dep't of Comm. Aug. 19, 2013) ................................23, 26

*Countervailing Duties,*
    63 Fed. Reg. 65,348 (Dep't of Comm. Nov. 25, 1998) .................................... 8

*Live Swine and Fresh, Chilled and Frozen Pork Products from Canada,*
    50 Fed. Reg. 25,097 (Dep't of Comm. June 17, 1985) .................................... 22

*Rice from Thailand,*
    51 Fed. Reg. 12,356 (Dep't of Commerce Apr. 10, 1986) ...............................22, 23

*Ripe Olives from Spain,*
    83 Fed. Reg. 28,186 (Dep't of Comm. June 18, 2018) ..................................... 2

*Ripe Olives from Spain,*
    83 Fed. Reg. 37,469 (Dep't of Comm. Aug. 1, 2018) ...................................... 2

# TABLE OF AUTHORITIES
**-continued-**

**OTHER AUTHORITIES**                                                      **PAGE**

Statement of Administrative  Action Accompanying  the Uruguay Round
Agreements Act,
   H.R. Doc. No. 103-316 (1994) *reprinted in* 1994 U.S.C.C.A.N. 4040 .......................... 8, 12, 14

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:    THE HONORABLE GARY S. KATZMANN, JUDGE

_____
)
ASOCIACIÓN DE EXPORTADORES E    )
INDUSTRIALES DE ACEITUNAS DE MESA,    )
ACEITUNAS GUADALQUIVIR, S.L.U., AGRO    )
SEVILLA ACEITUNAS S. COOP. AND., and    )
ANGEL CAMACHO ALIMENTACIÓN, S.L.,    )
)
        Plaintiffs,    )
)
   v.    )
)
UNITED STATES,    )
)
        Defendant,    )
)
   and    )
)
COALITION FOR FAIR TRADE IN RIPE    )
OLIVES,    )
)
        Defendant-Intervenor.    )
_____)

**PUBLIC VERSION**

Court No. 18-00195

Business Proprietary Information
Deleted From Brackets [ ]

## DEFENDANT'S REPLY TO COMMENTS
## ON THE SECOND REMAND REDETERMINATION

Defendant, the United States, respectfully submits this reply to comments filed by the

plaintiffs (collectively, ASEMESA) regarding the second remand redetermination issued by the

Department of Commerce in response to the Court's order in *Asociacion de Exportadores e*

*Industriales de Mesa v. United States*, 523 F. Supp. 3d 1393 (Ct. Int'l Trade 2021) (*Second*

*Remand Order*). *See* Final Remand Redetermination, dated November 3, 2021, ECF Nos. 73-1

and 74-1 (Second Remand Redetermination). The Second Remand Redetermination complies

with the Court's order, is supported by substantial evidence, and is in accordance with law. We

therefore respectfully request that the Court sustain the Second Remand Redetermination and enter judgment in favor of the defendant.

## PROCEDURAL HISTORY

In this action, plaintiffs challenge the final determination in the countervailing duty (CVD) investigation of ripe olives from Spain. *Ripe Olives from Spain*, 83 Fed. Reg. 28,186 (Dep't of Comm. June 18, 2018), and accompanying Issues and Decision Memorandum (IDM), as amended by *Ripe Olives from Spain*, 83 Fed. Reg. 37,469 (Dep't of Comm. Aug. 1, 2018). During the investigation, Commerce examined the countervailability of certain grants that the government of Spain (GOS) provided to olive growers under the Basic Payment Scheme (BPS),[1] a subsidy program that implemented Pillar I of the European Union's Common Agricultural Policy. Commerce found the BPS grants to be *de jure* specific because eligibility was expressly based on the assistance provided under predecessor programs that, in turn, determined access to grants based on crop type, with both olive oil and table olives specifically identified as eligible products. IDM at 32-36. Commerce also found that the demand for raw olives is substantially dependent on the demand for table olives (the next-stage processed olive product inclusive of ripe olives), based on record evidence showing that eight percent of raw olives were used to produce table olives, and that the processing operation for table olives adds only limited value to the raw olives. IDM at 6-7, 21-24. Accordingly, countervailable subsidies provided to raw olives, including the BPS grants provided to Spanish olive growers, were deemed to have been

---

[1] The BPS encompasses three subprograms: Direct Payment, Greening, and Aid to Young Farmers. The scope of this litigation, including this remand, is limited to the Direct Payment and Greening subprograms. All references to the BPS pertain to those two subprograms. *First Remand Order*, 429 F. Supp. 3d at 1332 n.7.

provided to ripe olives through the application of 19 U.S.C. § 1677-2 and were included in the *ad valorem* subsidy rates established in the CVD order.

On January 17, 2020, the Court remanded Commerce's finding that the BPS grants are *de jure* specific and its finding that the demand for raw olives is substantially dependent on the demand for table olives. *Asociacion de Exportadores e Industriales de Mesa v. United States*, 429 F. Supp. 3d 1325, 1339-45 (Ct. Int'l Trade 2020) (*First Remand Order*). The Court found that Commerce did not adequately explain how a subsidy program that makes explicit reference to past subsidy programs as part of the methodology for determining grant amounts satisfies the "expressly limits" requirement for *de jure* specificity. *Id*. at 1339-41. The Court also held that the term "substantially dependent" is unambiguous regarding the threshold of demand required to satisfy section 1677-2(1) and remanded Commerce's affirmative finding because eight percent of raw olives processed into table olives did not satisfy the statutory standard. *Id*. at 1341-45. All other challenged aspects of the final determination were sustained. *Id*. at 1346-52.

In the first remand, Commerce further explained its interpretation of the statute to support its *de jure* specificity finding and reconsidered its interpretation and analysis of section 1677-2(1). First, Commerce explained that the BPS is *de jure* specific because the BPS's explicit reliance on past subsidy programs legislatively established non-uniform treatment, and farmers on lands that produced olives during the reference period (*i.e.*, when the Common Market Program was in operation) were expressly given limited access to BPS grants that retained the historical difference inherent in the crop-specific subsidies provided under the predecessor programs. Final Results of Remand Redetermination at 13-20, dated May 29, 2020, ECF No. 47-1. Second, Commerce reconsidered its analysis of section 1677-2(1) and interpreted the undefined term "prior stage product" as raw olives principally suitable for use in the prior

stage of producing table olives. *Id.* at 24-30. Commerce examined official GOS raw olive production statistics and concluded that the demand for the raw olives principally suitable for use in the production of table olives (prior stage product) is substantially dependent on the demand for table olives (latter stage product) because 96 percent of such raw olives were processed into table olives. *Id.* at 30-34. No changes were made to the *ad valorem* subsidy rates established in the CVD order.

On June 17, 2021, the Court again remanded both issues. *See Second Remand Order,* 523 F. Supp. 3d at 1401-08. In response to Commerce's further explanation of its *de jure* specificity finding, the Court held that Commerce's interpretation of section 1677(5A) is impermissible because the plain meaning of the statute provides that "a subsidy is *de jure* specific when the authority providing the subsidy, or its operating legislation, directly, firmly, or explicitly assigns limits to or restricts the bounds of a particular subsidy to a given enterprise or industry." *Id.* at 1403. The Court disagreed that the BPS legislation's failure to provide uniform treatment, without more, constitutes an explicit restriction of the subsidy to a specific enterprise or industry. *Id.* at 1403-04. The Court further explained that a linkage to crop-specific subsidies under predecessor programs is not enough because farmlands that produced a particular crop in the past may, for various reasons, be replaced with alternative crops over time. *Id.* The Court stated, however, that "Commerce is not precluded from further analyzing the distribution of benefits to determine whether the subsidy is specific on other grounds" and, therefore, remanded the issue for further proceedings. *Id.* at 1404-05. Additionally, although the Court agreed that the terms "prior stage product" and "raw agricultural product" in section 1677-2 are not coextensive, the Court rejected Commerce's definition of the "prior stage product." *See id.* at 1405-07. The Court held that defining the "prior stage product" as a subset of the "raw

agricultural product" "render{s} the requirements of Section 1677-2 largely self-fulfilling, insofar as raw olives principally suitable for use in table olive production are likely processed into table olives . . . ." *Id.* at 1407. Thus, the Court declined to consider Commerce's application of its interpretation of "prior stage product" to the record evidence and remanded for further proceedings. *Id.* at 1407-08.

## ARGUMENT

## I.    Standard Of Review

The Court sustains any determination, finding, or conclusion by Commerce unless it is unsupported by substantial evidence, or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i). This standard applies equally to remand redeterminations, *see TMK IPSCO v. United States*, 222 F. Supp. 3d 1306, 1313 (Ct. Int'l Trade 2017), which are also reviewed for compliance with the Court's order. *Xinjiamei Furniture (Zhangzhou) Co. v. United States*, 968 F. Supp. 2d 1255, 1259 (Ct. Int'l Trade 2014).

## II.    Commerce's Second Remand Redetermination Complies With The Court's Order

The Court directed Commerce to conduct further proceedings consistent with the Court's decision. Commerce respectfully disagreed with the Court's holding regarding the unambiguous meaning of "expressly limits" in section 1677(5A) and its reasoning as to why a finding of non-uniform treatment in the distribution of benefits within the agricultural sector or an explicit linkage to crop-specific subsidies under predecessor programs does not suffice to make a *de jure* specificity finding. *See* Second Remand Redetermination at 14-16. Nonetheless, in accordance with the Court's decision, on remand, Commerce found that the BPS grants are not *de jure* specific to the olive industry. *See id.* at 16. Because the Court's order did not "preclude{} {Commerce} from further analyzing the distribution of benefits to determine whether the

subsidy is specific on other grounds," *Second Remand Order*, 523 F. Supp. 3d at 1404, Commerce evaluated whether the BPS grants are *de facto* specific. Commerce found that, despite multiple requests, the GOS did not provide necessary *de facto* usage information regarding the amounts of assistance that the GOS provided to the olive industry and other industries within the agricultural sector through the distribution of BPS grants. *See* Second Remand Redetermination at 17-18. Because the necessary information was not available on the record, Commerce resorted to facts otherwise available to complete its analysis and, on this basis, found that the BPS grants are *de facto* specific to the olive industry pursuant to section 1677(5A)(D)(iii)(III). *See id.* at 18-22. ASEMESA disagrees with the basis for Commerce's finding that the BPS grants are *de facto* specific, *see* ASEMESA Comments 3-6, but does not claim that Commerce failed to comply with the Court's order.

Additionally, Commerce reconsidered the meaning of "raw agricultural product" and "prior stage product" for purposes of the analysis under section 1677-2(1). Second Remand Redetermination at 28-29. Based on the record evidence, Commerce found that the relevant "raw agricultural product" is certain distinct biological varietals of raw olives, *i.e.*, the raw olive varietals that the GOS and the Spanish olive industry recognize as table or dual-use olive varietals. *Id.* at 29. Commerce continued to identify table olives as the relevant "latter stage product." *Id.* Because there is no intermediate stage of production between table olives and their raw form, Commerce defined the "prior stage product" to be the same as the "raw agricultural product." *Id.* Commerce's interpretation of the terms "raw agricultural product" and "prior stage product" is consistent with the Court's decision. To determine whether section 1677-2(1) is satisfied, Commerce examined production and consumption statistics collected and published by the GOS and devised a calculation method that used the total tonnage of table olives

processed from table and dual-use raw olive varietals as the numerator (latter stage product) and the total tonnage of table and dual-use raw olive varietals produced as the denominator (prior stage product). *Id.* at 30-36. Commerce found that 55.28 percent of table and dual-use raw olive varietals were processed into table olives in the 2016 harvest year and, therefore, concluded that the demand for the prior stage product is substantially dependent on the demand for the latter stage product. *Id.* at 36. ASEMESA asserts that, even if the Court were to accept Commerce's 55.28 percent calculation, it is not enough, and Commerce's conclusion is inconsistent with the *First Remand Order* regarding the threshold of demand required by the "substantially dependent" standard. *See* ASEMESA Comments 3, 20-22. But as explained below, Commerce's conclusion on remand comports with the Court's statements clarifying the bounds of what does and does not satisfy the statutory standard. Second Remand Redetermination at 55-59; *see also First Remand Order*, 429 F. Supp. 3d at 1341-45. Therefore, Commerce's revised analysis and conclusion comply with the Court's order.

## III.   The Court Should Sustain Commerce's Finding That The BPS Is *De Facto* Specific

A subsidy must be specific to be countervailable. *See* 19 U.S.C. § 1677(5)(A). A domestic subsidy is countervailable if it is specific as a matter of law (*de jure*) or specific as a matter of fact (*de facto*). *See* 19 U.S.C. § 1677(5A)(D). Before the Court is Commerce's finding, based on facts otherwise available, that BPS grants provided by the GOS to Spanish farmers are *de facto* specific under section 1677(5A)(D)(iii)(III) because the olive industry received a disproportionately large amount of the subsidy during the period of investigation. Commerce's finding should be upheld because the petition provided the only information on the

record regarding the distribution of BPS grants on an industry basis and showed that the olive industry received a disproportionately large amount of the subsidy.

A domestic subsidy is specific as a matter of fact if one or more of the following four factors exist:

> (I) The actual recipients of the subsidy, whether considered on an enterprise or industry specific basis, are limited in number.
> (II) An enterprise or industry is a predominant user of the subsidy.
> (III) An enterprise or industry receives a disproportionately large amount of the subsidy.
> (IV) The manner in which the authority providing the subsidy has exercised discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored over others.

19 U.S.C. § 1677(5A)(D)(iii).[2]   "The statute permits {Commerce} to rely on a single factor, if need be, in finding that a subsidy is *de facto* specific." *Wilmar Trading Pte Ltd. v. United States*, 466 F. Supp. 3d 1334, 1358 (Ct. Int'l Trade 2020).  Congress intended for Commerce to apply the specificity test as a "rule of reason" to "avoid the imposition of countervailing duties in situations where, because of the widespread availability *and use* of a subsidy, the benefits of the subsidy is spread throughout an economy" and the test "was not intended to function as a loophole through which narrowly focussed {sic} subsidies provided to or used by discrete segments of an economy could escape the purview of the CVD law."  Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316, at 930 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4242 (SAA) (emphasis in original).

Commerce's implementing regulation, 19 C.F.R. § 351.502, clarifies "those aspects of the specificity test that are not addressed explicitly in the statute or the SAA." *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,355 (Dep't of Comm. Nov. 25, 1998).  With respect to the third

---

[2] "{A}ny reference to an enterprise or industry is a reference to a foreign enterprise or foreign industry and includes a group of such enterprises or industries."  19 U.S.C. § 1677(5A).

*de facto* factor, "the analysis of whether an enterprise or industry or group thereof . . . has received disproportionate benefits under . . . a subsidy program should normally focus on the level of benefits provided rather than on the number of subsidies given to different industries," even if sometimes "it may be impracticable or impossible to determine the relative level of benefits." *Id.* at 65,359. The regulation clarifies that an agricultural subsidy will not be regarded as specific "solely because the subsidy is limited to the agricultural sector (domestic subsidy)." 19 C.F.R. § 351.502(e). To be specific, the subsidy must be specific to a subset of the agricultural sector, "*e.g.*, a subsidy is limited to livestock, or livestock receive disproportionately large amounts of the subsidy." 62 Fed. Reg. at 65,357-58.

At the outset of the investigation, Commerce requested the GOS to provide *de facto* usage information for the BPS to determine whether the subsidy is specific. Specifically, Commerce asked the GOS to provide the number of companies and industries that received BPS grants as well as the grant amounts approved for each mandatory respondent, the industry in which the mandatory respondents operate, and every other industry. *See* GOS Questionnaire, P.D. 83 at Question M.7 in Section II of the Standard Questions Appendix (Aug. 4, 2017). The GOS responded by providing the total number of grant applications submitted and the total amount of the grants approved, including the amounts approved for each of the three mandatory respondents and their cross-owned affiliates. Second Remand Redetermination at 17; *see also* GOS Questionnaire Response, P.D. 130 at 54-56 (Sept. 18, 2017). However, the GOS did not provide Commerce with any information to analyze whether the BPS grants are *de facto* specific on an industry basis. The GOS stated that Commerce's request for grant information on an industry basis "is not applicable as the payments are decoupled" and "it is not possible to

determine the share . . . paid to a particular sector since there is no link between the specific crop and the payment." GOS Questionnaire Response, P.D. 130 at 55.

Commerce made another attempt to obtain the necessary usage data that would allow Commerce to evaluate whether BPS grants are specific, requesting the GOS to provide the total amount of payments made by the GOS under Pillars I and II of the European Union's Common Agricultural Policy, as well as the amount of payments to the agricultural districts within Andalusia and to olive growers in the agricultural districts within Andalusia. *See* Second Remand Redetermination at 18; *see also* GOS Supplemental Questionnaire, P.D. 206 at 3 (Oct. 25, 2017). The GOS provided the total amount of Pillar I and II payments, "but reiterated its previous response that decoupled payments are not product specific and it is not possible to differentiate by productive orientation, crop, or type of product." Second Remand Redetermination at 18; *see also* GOS Supplemental Questionnaire Response, P.D. 225 at 14-16 (Nov. 7, 2017).

Each of the four *de facto* factors requires information on an industry basis to analyze whether the BPS grants are specific as a matter of fact. Because "{t}he GOS did not provide information in response to Commerce's initial and supplemental questionnaire as to the amount of assistance provided to the olive industry and other industries within the agricultural sector," the information "necessary to determine whether the BPS is *de facto* specific is not available on the record." Second Remand Redetermination at 18. Therefore, pursuant to 19 U.S.C. § 1677e(a)(1) and (a)(2)(B), Commerce relied on facts otherwise available on the record to determine whether the BPS grants are *de facto* specific.

The petition is "the only information on the record regarding the distribution of assistance under the BPS on an industry basis." Second Remand Redetermination at 41. Information in the

petition estimated that Spain's olive industry, which accounts for just 3 percent of Spain's total agricultural output, received € 1.28 billion in BPS grants and this amount represents approximately 25 percent of Spain's total annual funding for Spanish farmers under the BPS. *Id.* at 19-21; *see also* Petition: Volume III, P.D. 4 at 15 (June 21, 2017). Commerce provided a detailed summary as to how the petition arrived at this estimate. Second Remand Redetermination at 20-21; *see also id.* at 40-47.

ASEMESA contends that the petition's estimates are improperly based on the BPS's predecessor programs rather than the BPS itself. ASEMESA Comments 4. Although the figures are derived from the predecessor Single Payment Scheme, the petition also supplied information showing that, according to the European Commission, the approximately € 5 billion annual budget for assistance to Spanish farmers would remain stable from 2014 (the final year of the Single Payment Scheme and the year before the BPS took effect) through 2020. *See* Second Remand Redetermination at 21 and 43 (citing Petition: Volume III, P.D. 10 at Exhibit 15). Further, the BPS explicitly refers to its predecessor programs as part of the methodology for distributing assistance to farmers in Spain and determining BPS grant amounts. *Id.* at 46 (citing EU Questionnaire Response, P.D. at Exhibit 13, Article 26 of "Council Regulation (EC) No 1307/2013" (Sept. 18, 2017)). ASEMESA does not challenge Commerce's explanation that the petition's estimates reasonably correlate to the BPS. Indeed, "{t}he parties have not pointed to any other information on the record disputing the amounts" Commerce relied on, "nor did any of the parties supplement the record with information other than that provided in the Petition at any point during the investigation." *Id.* at 46-47. Relying on the information from the petition as facts otherwise available, Commerce found that the olive industry received a disproportionately large amount of BPS grants (*i.e.*, 25 percent of total assistance relative to the industry's 3 percent

11

contribution to Spain's total agricultural output) and concluded that the subsidy is *de facto* specific within the meaning of section 1677(5A)(D)(iii)(III). *Id.* at 21.

Further, Commerce fulfilled its statutory obligation to corroborate the petition information it relied upon in finding that BPS grants are *de facto* specific. *See* 19 U.S.C. § 1677e(c)(1); SAA at 870 (defining "secondary information" to include information derived from the petition). Commerce found that information submitted by the GOS in its questionnaire responses is an independent source that corroborates the petition information. *See* Second Remand Redetermination at 21-22. The information on the record regarding the distribution of BPS grants was limited because "the GOS did not provide a breakdown on the amount of assistance on an industry or a crop-specific basis." *Id.* at 21. However, the record contained information on the total amount of assistance provided under the BPS program (*i.e.*, [            ]) and the total number of approved applications (*i.e.*, [        ]). *Id.* at 21-22; *see also* GOS Questionnaire Response, P.D. 130 at 53-54. This information allowed Commerce to calculate [          ] as the average amount of assistance per application, and Commerce explained that it is appropriate to treat this average as an average amount received by a farmer because the GOS reported that farmers submit a single application per year. *See* Second Remand Redetermination at 22.

Commerce compared the average farmer's amount of assistance to the amount of assistance the three mandatory respondents and their cross-owned affiliates were approved for during the same period and "found that these respondents were approved for between [          ] to [          ] under the program, which was between double and 83 times the average amount of assistance." *Id.* at 22. Commerce explained that the petition information showing disproportionate distribution of benefits to the olive industry is reliable and relevant

(*i.e.*, probative) because comparing the amounts received by the mandatory respondents to the average amount received by all other farmers "similarly show that the respondents, who operate within the olive industry, received considerably higher levels of assistance than the average." *Id.* Thus, Commerce corroborated the petition information to the extent practicable using information obtained from the GOS during the investigation.

ASEMESA posits that "Commerce has adopted a theory of disproportionality that renders its meaning inutile" because a reasonable *de facto* analysis requiring "an examination of disproportionate use must take into account the relationship between the level of benefit and the applicants involved, not a simple comparison of two baskets of absolute levels of benefit." ASEMESA Comments 6. ASEMESA misunderstands, however, that the "analysis of the amount of funding for the respondents relative to the average user was done for corroboration and not for the disproportionality analysis itself." Second Remand Redetermination at 48. Commerce's *de facto* specificity finding is based on information from the petition "showing that the olive industry received about one-fourth of all payments that the GOS provided to farmers during the {period of investigation} under the BPS program even though olives account for only 3 percent of the country's total agricultural output . . . ." *Id.* Thus, even if the Court were to accept ASEMESA's definition of "disproportionate" and its view on what would be a reasonable finding of disproportionality, there is no error in Commerce's analysis and conclusion because the facts otherwise available show that the olive industry received assistance that is disproportionately large relative to olive production in Spain's agricultural sector.

Next, ASEMESA argues that Commerce failed to corroborate the petition information showing that the olive industry received a disproportionately large amount of the subsidy because Commerce compared the amounts approved in the *applications* for the mandatory

respondents and the average for all farmers rather than the *entitlement values* for each hectare of land declared in the applications.  ASEMESA Comments at 5.  But Commerce explained that "the GOS failed to provide the information necessary for a fulsome analysis of *de facto* specificity" and ASEMESA fails to "point to any data on the record that would allow Commerce to corroborate the information from the Petition relied upon as facts otherwise available in the manner . . . suggest{ed}, such as unit amounts per hectare received under each application." Second Remand Redetermination at 47-48.  "The statute requires Commerce to corroborate secondary information not perfectly, but 'to the extent practicable.'" *Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States*, 992 F.3d 1348, 1354 (Fed. Cir. 2021) (quoting 19 U.S.C. § 1677e(c)).  ASEMESA ignores the fact that "it is the inability of the GOS to provide information on amounts received by the olive industry and other industries that has resulted in a record that does not contain the information that is necessary to analyze whether the BPS is *de facto* specific, and which leaves Commerce in a position where it must rely on the Petition as facts otherwise available for this analysis." Second Remand Redetermination at 46.  ASEMESA demands that "the facts available be compared with the missing information, which obviously cannot be done."  SAA at 870.  Consistent with section 1677e(c)(1), Commerce used the information reasonably at its disposal and found that it is appropriate to corroborate the petition information by "determining the average amount of assistance received under the program and comparing this amount to the amount of assistance the respondents received." *Id.* at 48.

According to ASEMESA, Commerce's corroboration analysis shows a lack of disproportionality and proves "that BPS/Greening benefits are scalable based on the size of operation (i.e., the number of hectares/entitlements possessed)."  ASEMESA Comments 5.  This argument is speculative.  As Commerce explained, "ASEMESA has identified no record

evidence suggesting that the average is driven by smaller farmers." Second Remand Redetermination at 49 (internal quotations omitted). "{I}nformation on the size of enterprises benefitting from BPS is not on the record for Commerce to consider." *Id*. There is no indication that the average amount of assistance approved for each application is skewed by an inordinate number of applications based on small-sized farmlands. As such, ASEMESA cannot demonstrate that the average amount of assistance approved for each application was an unreasonable measure to compare with the amount of assistance received by the mandatory respondents for purposes of *corroborating* the evidence of disproportionate benefits received by the olive industry. *Id*. at 21-22. Again, Commerce's *de facto* specificity finding is based on facts otherwise available showing disproportionality on an *industry* basis. Commerce examined the amounts received by specific *enterprises* that operate within the olive industry to corroborate the petition information that Commerce relied upon for its industry-based finding. Further, the statute "does not call on Commerce to inquire further into why an industry has received a disproportionately large amount of the subsidy for purposes of the *de facto* specificity analysis, nor has Commerce adopted such a requirement through practice." Second Remand Redetermination at 49. Commerce's *de facto* specificity finding should be sustained because the facts otherwise available constitute substantial evidence that Spain's olive industry received a disproportionate amount of total BPS grant amounts distributed across Spain's agriculture sector and Commerce corroborated the facts relied upon to the extent practicable.

## IV.   Commerce's Interpretation And Analysis Of Section 1677-2(1) Is Supported By Substantial Evidence And In Accordance With Law

On remand, Commerce conducted a lawful section 1677-2(1) analysis and reasonably concluded that the demand for raw table and dual-use raw olive varietals (the "prior stage product") is substantially dependent on the demand for table olives (the "latter stage product").

A. **Legal Framework For Section 1677-2**

Section 1677-2 provides:

> In the case of an agricultural product processed from a raw agricultural product in which--
>
> > (1) the demand for the prior stage product is substantially dependent on the demand for the latter stage product, and
> > (2) the processing operation adds only limited value to the raw commodity,
>
> countervailable subsidies found to be provided to either producers or processors of the product shall be deemed to be provided with respect to the manufacture, production, or exportation of the processed product.

If the criteria are satisfied, countervailable subsidies to producers of a raw agricultural product are to be treated as though the subsidies have been provided with respect to the processed agricultural product.

Because the statute does not specify how Commerce must analyze each criterion, Commerce is authorized "'to fill any gap left, implicitly or explicitly, by Congress.'" *SKF USA Inc. v. United States*, 254 F.3d 1022, 1030 (Fed. Cir. 2001) (quoting *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984)). This Court held that the term "substantially dependent" requires the demand for the prior stage product to be "largely, but not wholly" or "contingent" on the demand for the latter stage product to satisfy the statutory standard. *First Remand Order*, 429 F. Supp. 3d at 1341. This Court also acknowledged that other aspects of the statute are ambiguous. *Second Remand Order*, 523 F. Supp. 3d at 1406-07. Commerce's resolution of ambiguous statutory language governs if it is reasonable. *Changzhou Hawd Flooring Co. v. United States*, 947 F.3d 781, 786 (Fed. Cir. 2020) (quoting *Chevron*, 467 U.S. at 844).

**B.      Commerce Reasonably Determined That The Demand For Certain Biologically Distinct Varietals Of Raw Olives Is "Substantially Dependent" On The Demand For Table Olives**

Before Commerce may treat subsidies to producers of a "raw agricultural product" as though the subsidies have been provided with respect to a processed agricultural product under section 1677-2, Commerce must determine that "the demand for the prior stage product is substantially dependent on the demand for the latter stage product." Neither section 1677-2 nor its legislative history defines the terms "raw agricultural product," "prior stage product," and "latter stage product." Second Remand Redetermination at 29 (citing First Remand Redetermination at 25-26). Commerce conducts its analysis of section 1677-2 on a case-by-case basis and the "raw agricultural product," "prior stage product," and "latter stage product" are identified based on the specific facts on the record of the product and industry at issue. *Id.* at 58; *see also SEC v. Chenery*, 332 U.S. 194, 203 (1947) (explaining that "the choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency") (citing *Columbia Broadcasting System v. United States*, 316 U.S. 407, 421 (1942)).

Commerce explained that, through practice, it has adopted a definition for "raw agricultural product" similar to that provided in section 1677(4)(E)(iv), which defines the term as "any farm or fishery product" to identify the relevant industry for the domestic like product. Second Remand Redetermination at 29. This Court "'acknowledged the possibility that a 'distinct biological varietal can be considered a distinct raw agricultural product under the definition Commerce employs . . . .'" *Id.* at 29 n.133 (quoting *Second Remand Order*, 523 F. Supp. 3d at 1407 n.5). In its final determination and the First Remand Redetermination, Commerce defined *all* raw olives as the "raw agricultural product." IDM at 22; First Remand

Redetermination at 75-83.  However, Commerce found that the record evidence "demonstrates that there are distinct biological varietals of raw olives and only those varietals that the GOS and the Spanish olive industry recognize as table or dual-use olive varietals represent the relevant raw agricultural product in this investigation on ripe olives."  Second Remand Redetermination at 29.

Differences in physical characteristics (*e.g.*, oil content, size, and shape), cultivation practices (*e.g.*, pruning and geographic location of orchards to maximize water content and size of table olives), and quality requirements (*e.g.*, raw olives for table olive production must meet specific industry standards) distinguish raw olive varietals fit for table olive production from raw olive varietals fit for olive oil production.  Second Remand Redetermination at 31-32; *see also* Petitioner's First Factual Information Submission, First Remand P.D. 3 at 2-11 and Exs. 2 and 3 (Feb. 5, 2020); Petitioner's Second Factual Information Submission, First Remand P.D. 5 and 8 at Exs. 5A and 13 (Feb. 25, 2020).  The GOS and the Spanish table olive industry identify five raw olive varietals that are fit for table olive production: manzanilla, gordal, carrasquena, hojiblanca, and cacerena.  These varietals accounted for 95 percent of total table olive production during the 2016 harvest year.  Second Remand Redetermination at 30.  Spain categorizes manzanilla, gordal, and carrasquena as table olive varietals and hojiblanca and cacerena as dual-use olive varietals.  *Id.* (citing First Remand P.D. 3 at 4 and Ex. 2; P.D. 225 at 4).  ASEMESA agrees that the record reasonably supports Commerce's identification of the main varietals at issue.  ASEMESA Comments 23-24.  Based on the record evidence, Commerce reconsidered the "raw agricultural product" and defined the term to encompass "table and dual-use raw olive varietals that are biologically distinct from other raw olive varietals."  Second Remand Redetermination at 29.

Commerce "continued{d} to identify table olives as the latter stage product." Second Remand Redetermination at 29 (citing IDM at 21 and First Remand Redetermination at 26, 84-85 n.229). Commerce previously explained that "prior stage product" should not be interpreted in a manner that would give the term the same meaning as "raw agricultural product" in *all* cases because such an interpretation would be inconsistent with the language chosen by Congress and would not give effect to every word Congress used. First Remand Redetermination at 25-27; *see also Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) ("In construing a statute {courts} are obliged to give effect, if possible, to every word Congress used.").

At the same time, Commerce recognized that "in some cases the prior stage product is coterminous with the raw agricultural product" because "the statute recognizes the connection between the prior stage product and the latter stage product in the production process" and "{s}uch a result is not *per se* contrary to the statute." First Remand Redetermination at 80. This Court upheld Commerce's construction of the statute because it is well-reasoned and ensures that the statutory terms are given meaningful effect. *Second Remand Order*, 523 F. Supp. 3d at 1406-07. Here, "because there is no intermediate stage of production between table olives and their raw form, {Commerce} considered it appropriate in this case to define the 'prior stage product' to be the same as the 'raw agricultural product' (*i.e.*, table and dual-use raw olive varietals)." Second Remand Redetermination at 29. In sum, Commerce conducted its analysis "by using a 'raw agricultural product' and 'prior stage product' that is defined as table and dual-use raw olive varietals that are biologically distinct from other raw olive varietals and a 'latter stage product' that is defined as table olives." *Id*. Commerce thus revised its definitions of the terms used in section 1677-2(1) in a way that gives meaning to each term and avoids a construction that would render any term (or the statute as a whole) superfluous. *See Agro Dutch Indus. Ltd. v.*

*United States*, 508 F.3d 1024, 1032 (Fed. Cir. 2007) (stating "a statute ought . . . to be so construed that . . . no clause, sentence, or word shall be superfluous" (internal quotations and citation omitted)); *see also Second Remand Order*, 523 F. Supp. 3d at 1407 (rejecting interpretation of "prior stage product" to be a subset of the "raw agricultural product" because such an interpretation "causes the statute as a whole to become superfluous").

Having identified the appropriate prior and latter stage products in this case, Commerce analyzed whether the "substantially dependent" criterion is satisfied and devised a calculation method that used the total tonnage of table olives processed from table and dual-use raw olive varietals as the numerator (latter stage product) and the total tonnage of table and dual-use raw olive varietals produced as the denominator (prior stage product). Second Remand Redetermination at 30-36. Commerce did not include mill raw olive varietals in the calculation "because of their biological differences, higher oil content, smaller size, and the fact that mill olives generally do not meet {table olive production} standards." *Id*. at 32-33. Commerce relied on official GOS published statistics that track raw olive production by varietal, classify the varietals of raw olives into either the "table" or "mill" category, and indicate whether the raw olive was actually used for table olive or olive oil production. *Id*. at 32-36; *see also* First Remand P.D. 9 at Ex. 7B.

Some figures relevant to the analysis are missing from the record because the GOS tracks production of olives grown for table by varietal but does not track production of olives grown for mill by varietal. Second Remand Redetermination at 30. Specifically, Commerce did not have total production figures of the dual-use raw olive varietals (hojiblanca and cacerena) that were used to produce olive oil and this information was needed for the denominator of the calculation. *Id*. at 32-34. Commerce was able to derive the total volume of hojiblanca raw olives used to

produce olive oil by using the production and hectare data on the record. *Id.* at 34-35. However, Commerce explained that it could not derive the total volume of cacerena raw olives used to produce olive oil because "the record does not contain sufficient information regarding the total production volumes, mill production volumes, or the total hectares dedicated to the production of cacerena . . . ." *Id.* at 32. In the absence of such information, Commerce excluded cacerena raw olives from the analysis by ensuring that such olives were not included in either the numerator or the denominator of the calculation. *Id.* at 32-34.

Based on these parameters and after making the necessary adjustments, Commerce performed the calculation "using the 564,058 tons of manzanilla, gordal, hojiblanca, and carrasquena varietals processed into table olives as the numerator and divided by 1,020,426 tons of all the manzanilla, gordal, hojiblanca, and carrasquena varietals produced during Harvest 2016, which revealed that 55.28 percent of the manzanilla, gordal, hojiblanca, and carrasquena varietals were processed into table olives." *Id.* at 36; *see also* Second Remand Redetermination Analysis Memorandum, Second Remand P.D. 11 (Nov. 3, 2021). Commerce found that the 55.28 percent consumption rate satisfies the "substantially dependent" standard "because it comports with the Court's statements that the demand for the latter stage product must be 'largely, but not wholly,' or must account for 'most' of, the demand for the prior stage product." Second Remand Redetermination at 57. Thus, the demand for the prior stage product (the table and dual-use raw olive varietals that are biologically distinct from mill olive varietals) is substantially dependent on the demand for the latter stage product (table olives). Commerce's affirmative finding under section 1677-2(1) should be sustained because the analysis is based on a permissible construction of the statute, the calculation is supported by substantial evidence, and

the result of the calculation satisfies the minimum threshold of demand required under the "substantially dependent" standard.

### C.   ASEMESA Fails To Demonstrate That Commerce's Finding Is Unlawful

ASEMESA disputes numerous aspects of Commerce's affirmative finding under section 1677-2(1), arguing that the finding is not consistent with the "substantially dependent" standard and that Commerce's calculation is factually flawed. ASEMESA Comments 6-34. We address each of ASEMESA's arguments below, none of which demonstrates that Commerce's finding is unlawful.

### 1.   Commerce's Finding Satisfies The "Substantially Dependent" Standard

We disagree with ASEMESA that "{t}he 55 percent figure does not meet the legal standard under the statute." ASEMESA Comments 20-21. ASEMESA seeks to replace the words Congress has chosen—"substantially dependent"—with an unreasonably high standard that would require the demand for the prior stage product to be, at a minimum, "almost exclusively," "substantially all," or "almost all" the demand for the latter stage product. ASEMESA Comments 16, 21. Commerce acknowledged that it used these phrases in two of its determinations prior to the enactment of section 1677-2 where the factual circumstances satisfied the salient demand criterion. Second Remand Redetermination at 55-56; *see also Live Swine and Fresh, Chilled and Frozen Pork Products from Canada*, 50 Fed. Reg. 25,097, 25,099 (Dep't of Commerce June 17, 1985); *Rice from Thailand*, 51 Fed. Reg. 12,356, 12,358 (Dep't of Commerce Apr. 10, 1986). But Congress did not adopt a statutory standard that mimicked the same words that Commerce used in *Pork from Canada* and *Rice from Thailand*. Second Remand Redetermination at 58. "Respect for Congress's prerogatives as policymaker means carefully

attending to the words it chose rather than replacing them with others of our own." *Murphy v. Smith*, 138 S. Ct. 784, 787-88 (2018).

Although this Court explained that section 1677-2 is a codification of Commerce's practice and the decisions in *Pork from Canada* and *Rice from Thailand* provide helpful context in discerning Congress's intent, *see First Remand Order*, 429 F. Supp. 3d at 1342-43, the Court did not hold that "substantially dependent" establishes a minimum threshold of demand as high as ASEMESA contends. As Commerce stated, "the Court explained that the plain meaning of 'substantially dependent' requires the demand for the prior stage product to be 'largely, but not wholly' or 'contingent' on the demand for the latter stage product to satisfy the statutory standard." Second Remand Redetermination at 56-57. Commerce reasonably understood the Court to hold that the demand for the latter stage product in quantitative terms must be at least half, or more than fifty percent, of the demand for the prior stage product. *Id*. at 57. Thus, Commerce rejected the notion that *Pork from Canada* and *Rice from Thailand* established a "universally applicable threshold that must be met in all cases, with respect to all products and all situations," and found that 55.28 percent is consistent with the *First Remand Order*. *Id*. ASEMESA takes issue with Commerce's discussion of *Certain Frozen Warmwater Shrimp from the People's Republic of China*, 78 Fed. Reg. 50,391 (Dep't of Commerce Aug. 19, 2013), where Commerce found that 44.7 percent satisfied section 1677-2(1), but ASEMESA's arguments in this respect are unpersuasive. Commerce cited that determination for the limited purpose of showing Commerce has not "articulate{d} a requirement that the demand for the prior stage product be 'almost all' or 'almost exclusively' dependent." Second Remand Redetermination at 57.

ASEMESA cites provisions in Commerce's regulations where the word "substantially" is used and states that 65 percent is the minimum that Commerce has established would satisfy these regulatory standards. ASEMESA Comments 21. The non-uniform percentages in these regulations were established for other contexts and say nothing about the degree of demand required for purposes of section 1677-2(1). The Court has already ruled that "substantially dependent" is unambiguous regarding the minimum level of demand required and, as explained above, 55.28 percent is above the minimum requirement. ASEMESA relies upon *American Grape Growers v. United States*, 604 F. Supp. 1245 (Ct. Int'l Trade 1985), a case from over thirty-five years ago that reviewed the International Trade Commission's (ITC) decision not to collapse grape growers and wine producers into a single industry, to argue that 55.28 percent does not satisfy the minimum threshold of demand required under section 1677-2(1). ASEMESA Comments 21. However, Commerce and the ITC operate independently and pursuant to distinct statutory mandates and authorities. *See Mitsubishi Elec. Corp. v. United States*, 898 F.2d 1577, 1584 (Fed. Cir. 1990). Prior to the enactment of section 1677-2 Commerce occasionally referenced the ITC's two-part test used to identify the relevant industry for purposes of the injury analysis, *see* First Remand Redetermination at 69-70, but Congress codified sections 1677-2 and 1677(4)(E) as distinct provisions and there is nothing in the statutory text or legislative history that suggests these provisions contain identical standards or that the statutory tests were intended to be applied by the two different agencies to achieve uniform results.

ASEMESA posits that a "simplistic consumption ratio analysis" is not a permissible method to conduct the analysis under section 1677-2(1). ASEMESA Comments 16-17. Yet, section 1677-2(1) "does not specify how Commerce must determine whether the demand for the

prior stage product is 'substantially dependent.'" Second Remand Redetermination at 59. When "a statute fails to make clear any Congressionally mandated procedure or methodology for assessment of the statutory tests," Commerce "may perform its duties in the way it believes most suitable." *JBF RAK LLC v. United States*, 790 F.3d 1358, 1363 (Fed. Cir. 2015) (internal quotations omitted). Thus, Commerce has wide latitude in choosing a methodology and the chosen methodology must be upheld so long as the methodology is a "reasonable means of effectuating the statutory purpose." *Ceramica Regiomontana, S.A. v. United States*, 636 F. Supp. 961, 966 (Ct. Int'l Trade 1986), *aff'd*, 810 F.2d 1137, 1139 (Fed. Cir. 1987). Commerce explained why its methodological choice is reasonable:

> We find that an analysis of consumption ratios is a reasonable method to determine whether section {1677-2(1)} is satisfied because the concept of demand hinges on use. The usage of products is driven by the demand of its consumers; therefore, it is fair to use consumption as a measure of a product's demand. The degree to which the prior stage product is used in the production of the latter stage product is a corollary of the prior stage product's dependence on the latter stage product.

Second Remand Redetermination at 59.

Nonetheless, ASEMESA insists that "{t}he notion of something that is dependent or contingent is clearly linked to the concept of a single continuous line of production featured in Commerce practice prior to codification." ASEMESA Comments 17; *see also id.* at 32. Commerce, however, disagreed that section 1677-2(1) "mandate{s} that products under consideration be in a 'single, continuous line of production." Second Remand Redetermination at 58. The ITC, operating under its own statutory authority and for purposes of its injury analysis, considers whether there is a single continuous line of production analysis when determining whether to collapse producers and processors of a raw agricultural product into a single industry. 19 U.S.C. §1677(4)(E). As explained above, section 1677-2(1) "does not

specify how Commerce must determine whether the demand for the prior stage product is 'substantially dependent.'" Second Remand Redetermination at 59. Nothing in the statute or the legislative history suggests section 1677-2(1), which focuses on a prior stage product's degree of dependence on a latter stage product, requires a single continuous line of production between the raw agricultural product and the processed agricultural product as provided under section 1677(4)(E)(i)(I). In addition, Commerce has not referenced or relied upon the single continuous line of production analysis in other determinations, both before and after the statute's enactment, indicating the ITC's test has a limited role in Commerce's analysis of section 1677-2(1). First Remand Redetermination at 70-71. As Commerce stated in *Certain Frozen Warmwater Shrimp from the People's Republic of China*, whether there is a single continuous line of production can contribute to the analysis, but it is not a necessary condition to satisfy the substantially dependent criterion. Second Remand Redetermination at 59 (citing 78 Fed. Reg. 50,391, and accompanying Issues and Decision Memorandum at 47). There is no basis to construe the "substantially dependent" standard as requiring a single continuous line of production.

ASEMESA states that a consumption ratio analysis "sheds little light on dependence" when raw olives may be repurposed and used for either table olive and olive oil production. ASEMESA Comments 18. However, the record supports Commerce's conclusion that raw olives grown for table olive production are generally not interchangeably used for olive oil production as ASEMESA vigorously claims.

### 2.   Commerce's Calculation Is Supported By Substantial Evidence

ASEMESA argues that table and mill raw olive varietals are not "hermetically siloed" categories and "{r}ecord evidence demonstrates that olive varietals generally understood to have a 'fitness' for oil production are also used in table olive production, while olive varietals

generally understood to have a 'fitness' for table olive production are also used to produce oil." ASEMESA Comments 8. Commerce never found that table and mill varietals *could not* be used to produce either table olives or olive oil. That raw olives *could* be used to produce either product does not undermine the reasonableness of Commerce's finding that important differences exist between raw olives fit for table olive production and those fit for olive oil production. This finding does not create a dividing line based on oil content alone, as ASEMESA suggests. ASEMESA Comments 9-10. Commerce explained that there are also key differences in the size, shape, and quality requirements in table olive production standards that mill raw olive varietals generally are unable to meet. Second Remand Redetermination at 31-32, 52. Thus, ASEMESA incorrectly states that Commerce "assumes" that the varietals of raw olives each are fit for a particular purpose and only dual-use varietals are grown for either table olive or olive oil production. ASEMESA Comments 23.

Further, Commerce recognized that "the demand for manzanilla, gordal, carrasquena, and hojiblanca varietals were not *wholly* contingent on the demand for processed table olives." Second Remand Redetermination at 60. It explained that "manzanilla, gordal, and carrasquena are considered solely fit for table use and not fit for use as olive oil" because, for example, "{t}hese varietals tend to have lower oil content and are larger than mill olives." *Id.* Commerce also found that the "dual-use olives grown for one application generally are not used for another." *Id.* Dual-use olives grown for table olive production are not *per se* interchangeably used for olive oil production because such olives "would tend to be larger, free of blemishes unlike {their} mill counterparts, and represent a greater investment in resources to produce table-olive quality olives." *Id.* Although dual-use olives grown for table olive production could possibly be used for olive oil production, Commerce reasonably concluded that "a farmer would

generally seek to sell such olives as table olives to recuperate the greater growing costs and maximize profits." *Id.* By contrast, dual-use olives grown for olive oil production generally would not be used for table olive production "because they would be smaller, most likely be of a higher oil content, have more blemishes, and would not meet {table olive} standards." *Id.* at 65. The record supports Commerce's understanding because during the 2016 harvest year, 99 percent of mill olives (*i.e.*, mill raw olive varietals and dual-use raw olive varietals grown for olive oil production) were used to produce olive oil, and 96 percent of table olives (*i.e.*, table raw olive varietals and dual-use raw olive varietals grown for table olive production) were used to produce table olives. P.D. 6 at Ex. 7B; *see also* Second Remand Redetermination at 32-33; First Remand Redetermination at 90. This evidence shows little to no difference between a raw olive's fitness and actual use. Although ASEMESA downplays the importance of table olive production in the Spanish olive industry, ASEMESA Comments 12-15, the amount of raw olives fit for table olive production used for olive oil represent an incidental and fugitive use.

ASEMESA argues that "massive shifts" after 2016 in the GOS data that show "an extremely fluid market in which large volumes of raw olives can quickly be repurposed in both directions" because raw olives fit for table olive production were increasingly used for olive oil and raw olives fit for olive oil production were increasingly used for table olives. ASEMESA Comments 10-12. ASEMESA's interpretation of the published GOS statistics is misleading because there was little to no shift in volumes in all the years leading up to and including the period of investigation. The data is stable from harvest year 2010 through harvest year 2016 with "only one or two percent of olives grown for the mill . . . sent to table olive use" and "farmers tend to continue to harvest olives for the same end use." Second Remand Redetermination at 63; *see also* P.D. 6 at Ex. 7B. Similarly, raw olives fit for table olive

production were used for olive oil remained at less than ten percent from harvest year 2010 through harvest year 2016. P.D. 6 at Ex. 7B. Commerce reasonably attributed the increased use of raw olives fit for table olive production for olive oil after harvest year 2016 to the antidumping and countervailing duty investigations and the duties imposed. Second Remand Redetermination at 63. Even after harvest year 2016, only 4 percent and 2 percent of total raw olives fit for olive oil production used for table olives in harvest year 2017 and 2018, respectively. P.D. 6 at Ex. 7B. Also, the data for harvest year 2018 show a shift in the opposite direction with the numbers for raw olives fit for table olive production trending back to circumstances that existed from harvest year 2010 through harvest year 2016. *Id.* Commerce looked at the data holistically and explained why the data after harvest year 2016 do not reveal a lack of dependence.

ASEMESA argues that the volume of the prior stage product that is consumed in the production of the latter stage product does not show that "the demand for that volume is *contingent* on table olive demand" because the prior stage product "would not exist for some other purpose." ASEMESA Comments 17 (emphasis in original). Commerce explained that it examined many factors (*e.g.*, physical traits, cultivation practices, quality requirements, profitability) and "{b}ased on characteristics of the olive varietals, only some portion of dual-use olive varietals would potentially swing over to olive oil usage if table olive demand were to cease." Second Remand Redetermination at 58. Therefore, Commerce's consumption ratio calculation and the record evidence showing that certain raw olives have a fitness for table olive production provide ample support for Commerce's finding that the demand for table and dual-use raw olive varietals is contingent (albeit not wholly) on the demand for table olives.

ASEMESA incorrectly asserts that Commerce "has not engaged in a varietal analysis" because it has chosen to rely on "category-based data." ASEMESA Comments 29. The GOS's published statistics that Commerce relied upon do not contain specific breakdowns by varietal. However, the published statistics are based on data collected by the GOS on a varietal basis, the production numbers are tabulated and totaled separately for raw olives identified as for table or for mill, and then the raw olives are classified according to whether the actual end use was for table or for mill. P.D. 6 at Ex. 7B. It is reasonable for Commerce to rely on Spain's varietal-based official published statistics for the analysis. Moreover, Commerce satisfied itself of the data's reliability and accuracy with other olive production data on the record. Second Remand Redetermination at 64; *see also* First Remand Redetermination at 32-33, 99-100.

ASEMESA contests Commerce's exclusion of cacerena olives from its calculation. ASEMESA Comments 24, 28. Although the total tonnage of cacerena olives used to produce table olives is on the record and ideally would have been included in the numerator of the calculation, Commerce explained that the total tonnage of production for cacerena olives regardless of end use needed for the denominator is not on the record. Second Remand Redetermination at 32. "{T}he Spanish government does not track production of olives grown for mill by varietal and the production information needed to include the cacerena varietal in the analysis is not available on the record." *Id*. at 52. Total tonnage of production for hojiblanca olives also is not on the record, but other production and hectare data reasonably allowed Commerce to derive an estimate to use in the calculation. The same could not be done for cacerena olives. Commerce sought to avoid creating a mismatch in the numerator and denominator, which would distort the analysis. ASEMESA suggests that cacerena olives are used more in the production of olive oil than table olives merely by virtue of its dual-use

categorization, ASEMESA Comments 28, but fails to provide any record support for its claim that excluding cacerena olives from both the numerator and denominator has a disproportionate effect on the calculation and inflated the results. Thus, given the state of the record, Commerce's decision to exclude cacerena olives from the analysis is reasonable.

ASEMESA proposes that Commerce should have derived the total tonnage of cacerena olives used to produce olive oil by using the ratio of hojiblanca olives used to produce table olives and olive oil. ASEMESA Comments 28. ASEMESA failed to exhaust its administrative remedies by not raising this new argument in its comments on the draft remand redetermination. 28 U.S.C. § 2637(d); *JBF RAK LLC*, 790 F.3d at 1366 (noting this Court's "strict view" of the exhaustion requirement) (citation omitted). In any event, it was reasonable for Commerce not to assume that the table olive and olive oil production ratio of two different varietals would be the same.

According to ASEMESA, "a true exclusion of Cacerena would be to deduct the entire 45,420 tons of Cacerena reported in the AICA data" from the "90,404 tons of 'Mill' olives used to produce table olives." ASEMESA Comments 25. The 45,420 tons of cacerena olives that ASEMESA relies upon are already accounted for in the "Table" category from the published GOS official statistics. First Remand Redetermination at 100. Commerce reasonably estimated the portion of cacerena olives (and other dual-use varietals) that should be deducted from the 90,404 tons of mill olives, which Commerce explained are dual-use olives grown for olive oil production but used for table olives. Second Remand Redetermination at 51-52. This estimate relied on an inference that the proportion of each dual-use olive varietal grown and used for table olive production is comparable to the proportion of the same varietal grown for olive oil production and used for table olives. *Id*. at 52. Such "reasonabl{e} inferences from the record"

are permissible. *See Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984). Commerce deducted an estimated 18,590 tons of dual-use olives other than hojiblanca from the 90,404 tons and included 71,814 tons in the numerator. Second Remand Redetermination at 53.

ASEMESA theorizes that Commerce could have used varietal-specific data on the record that would allow for an analysis of the five main varietals without the need to make adjustments. ASEMESA Comments 29-32. Commerce, however, reasonably chose to rely primarily on published GOS official statistics as a reliable and credible source to conduct its analysis. *See Rogero v. Sec'y of Health and Human Services*, 748 Fed. Appx. 996, 1001 (Fed. Cir. 2018) ("Determinations of relative weight of different evidence are generally for the trier of fact."). Additionally, the AICA data provides varietal-specific production data only and relying on the AICA data to conduct the analysis would require presuming that *all* olives fit for table olive production were, in fact, processed into table olives. ASEMESA's argument to use the AICA data to achieve a more favorable result conflicts with its other arguments that challenge the notion that an olive fit for table olive production must be used to produce table olives.

Lastly, ASEMESA argues that Commerce wrongly dismissed its alternative analysis that is based on data on surface area by varietal, which shows less than forty percent of the varietals in question are actually used in table olive production. ASEMESA Comments 32-33. Commerce explained that ASEMESA's analysis is based on data that is incomplete, unpublished, and had been extrapolated and not taken directly from a specific source. Second Remand Redetermination at 66; *see also* First Remand Redetermination at 97-100. Although the GOS endorsed the data's accuracy in comments, "{t}here is no explanation as to what exactly is collected in the BPS application or why, or whether ASEMESA is assuming that crops, and

olives specifically, are grown on every single hectare claimed in the application." First Remand Redetermination at 97-98. ASEMESA states that Commerce could have issued a supplemental questionnaire to seek additional information and satisfy itself of the accuracy of the data or Commerce could have verified the data. ASEMESA Comments 33. However, "agencies with statutory enforcement responsibilities enjoy broad discretion in allocating investigative enforcement resources." *Torrington v. United States*, 68 F.3d 1347, 1351 (Fed. Cir. 1995) (citing *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)). Alternative data on the record allowed Commerce to conduct the analysis and make a finding under section 1677-2(1) without the need to reopen the record and request for additional information in the context of a remand. ASEMESA claims Commerce's decision not to rely on the respondents' preferred analysis was arbitrary because it has accepted similar data in other contexts. ASEMESA relies on a preliminary determination and a situation where Commerce relied on facts otherwise available. ASEMESA Comments 33-34 (citing *Certain Fabricated Structural Steel from Canada*, 84 Fed. Reg. 33,232 (Dep't of Commerce July 12, 2019)). ASEMESA has not demonstrated that Commerce unreasonably declined to use its alternative analysis.

## CONCLUSION

For these reasons, we respectfully request that the Court sustain the Second Remand Redetermination and enter judgment in favor of the defendant.

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

TARA K. HOGAN
Assistant Director

OF COUNSEL:                                  SONIA W. MURPHY
SAAD Y. CHALCHAL                             Trial Attorney
Senior Attorney                              U.S. Department of Justice
Office of the Chief Counsel                  Commercial Litigation Branch
   for Trade Enforcement and Compliance      P.O. Box 480
U.S. Department of Commerce                  Ben Franklin Station
                              Washington, D.C. 20044

January 12, 2022                             Attorneys for Defendant United States

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:      THE HONORABLE GARY S. KATZMANN, JUDGE

_____

|  |  |
|---|---|
| ASOCIACIÓN DE EXPORTADORES E INDUSTRIALES DE ACEITUNAS DE MESA, ACEITUNAS GUADALQUIVIR, S.L.U., AGRO SEVILLA ACEITUNAS S. COOP. AND., and ANGEL CAMACHO ALIMENTACIÓN, S.L., <br><br>            Plaintiffs, <br><br>      v. <br><br> UNITED STATES, <br><br>            Defendant, <br><br>      and <br><br> COALITION FOR FAIR TRADE IN RIPE OLIVES, <br><br>            Defendant-Intervenor. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br> Court No. 18-00195 |

_____

## CERTIFICATE OF COMPLIANCE WITH WORD COUNT LIMITATION

Pursuant to Standard Chambers Procedure ¶ 2(B)(2), I hereby certify that this brief complies with the word-count limitation set forth in Standard Chambers Procedure ¶ 2(B)(1).  In making this certification, I have relied upon the word count function of the Microsoft Word processing system used to prepare this brief.  According to the word count, this brief contains 9,963 words.

/s/ Sonia W. Murphy