## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: HONORABLE GARY S. KATZMANN, JUDGE

|  |  |
|---|---|
| ASOCIACION DE EXPORTADORES E INDUSTRIALES DE ACEITUNAS DE MESA, et al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| UNITED STATES, | ) ) |
| Defendant, | ) ) |
| and | ) ) |
| COALITION FOR FAIR TRADE IN RIPE OLIVES, | ) ) |
| Defendant-Intervenor | ) ) |

Court No. 18-00195

PUBLIC DOCUMENT

### RESPONSIVE COMMENTS OF DEFENDANT-INTERVENOR ADDRESSING SECOND REMAND REDETERMINATION

David J. Levine
Raymond Paretzky

MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, N.W.
Washington, D.C.  20001-1531
202-756-8000
Counsel for Defendant-Intervenor

Dated: January 12, 2022

## <u>TABLE OF CONTENTS</u>

Page

I.   INTRODUCTION AND SUMMARY OF ARGUMENT ........................................2

II.  COMMERCE'S FINDING OF *DE FACTO* SPECIFICITY FOR THE BPS
     SUBSIDY IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND IN
     ACCORDANCE WITH LAW................................................................................4

     A.   Commerce's *De Facto* Specificity Finding is Supported by the Facts on
          the Record..................................................................................................4

     B.   Commerce Properly Corroborated its *De Facto* Specificity Finding..........7

III. COMMERCE'S FINDING OF "SUBSTANTIALLY DEPENDENT" DEMAND
     IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND IN ACCORDANCE
     WITH LAW.......................................................................................................8

     A.   Record Evidence Refutes Each of Plaintiffs' Alleged "Key Facts"............9

     B.   Section 771B(1) does not "Codify" Commerce Practice ..........................12

     C.   Commerce Reasonably Used a Consumption Ratio to Determine
          Substantial Dependence..........................................................................13

     D.   Commerce Reasonably Found that 55 Percent Meets the Legal Standard
          for Substantial Dependence ....................................................................16

     E.   Commerce's Analysis Was Reasonable and Supported by Substantial
          Evidence ..................................................................................................17

     F.   Commerce Reasonably Refused to Rely on the Varietal Hectare Data
          Submitted by Plaintiffs'...........................................................................22

IV.  CONCLUSION ..............................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AK Steel Corp. v. United States*, 192 F.3d 1367 (Fed. Cir. 1999) ............................................7

*Asociacion de Exportadores e Industriales de Mesa et al. v. United States*,
    523 F. Supp. 3d 1393 (Ct. Int'l Trade 2021) ("*ASEMESA II")* ...................................1, 4, 8

*Asociacion de Exportadores e Industriales de Mesa et al. v. United States,* 429
    F. Supp. 3d 1325 (Ct. Int'l Trade 2020) ("*ASEMESA I*") ...................................... 1, 16-17

**Statutes**

Section 771(5A)(D)(i) of the Tariff Act, 19 U.S.C. § 1677(5A)(D)(i).....................................4

Section 771(5A)(D)(iii) of the Tariff Act, 19 U.S.C. § 1677(5A)(D)(iii) ............................5, 8

Section 771(5A)(D)(iii)(III) of the Tariff Act, 19 U.S.C. § 677(5A)(D)(iii)(III)..........2, 4, 6-7

Section 771B(1) of the Tariff Act, 19 U.S.C 1677-2(1) .................................................. *passim*

**Other Authorities**

133 Cong. Rec. S8815 (1987)...................................................................................................12

*Live Swine and Fresh, Chilled and Frozen Pork Products from Canada*, 50
    Fed. Reg. 25,097 (June 17, 1985) ........................................................................ 12-13, 14

*Rice from Thailand,* 51 Fed. Reg. 12,356 (April 10, 1986)...............................................12-13

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HONORABLE GARY S. KATZMANN, JUDGE

_____

|  |  |  |
|---|---|---|
| ASOCIACION DE EXPORTADORES E INDUSTRIALES DE ACEITUNAS DE MESA, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| UNITED STATES, | ) ) | Court No. 18-00195 |
| Defendant, | ) ) | PUBLIC DOCUMENT |
| and | ) ) | |
| COALITION FOR FAIR TRADE IN RIPE OLIVES, | ) ) | |
| Defendant-Intervenor | ) ) | |

_____

## RESPONSIVE COMMENTS OF DEFENDANT-INTERVENOR ADDRESSING SECOND REMAND REDETERMINATION

On behalf of the Coalition for Fair Trade in Ripe Olives (the "Coalition"), Defendant-Intervenor in this action and Petitioner in the underlying countervailing duty ("CVD") investigation, we hereby respond to the December 3, 2021 comments filed by Plaintiffs ("*Plaintiffs' Comments*"), ECF 76, addressing the Final Remand Redetermination of Defendant, the United States Department of Commerce ("Commerce") ("Second Remand Redetermination" or "*Redetermination II*"), ECF 74-1, which was filed by Commerce in accordance with the opinion and remand order of the Court, *Asociacion de Exportadores e Industriales de Mesa et al. v. United States,* 523 F. Supp. 3d 1393 (Ct. Int'l Trade 2021) ("*ASEMESA II*").[1]

---

[1] Citations are also made herein to the Court's first remand opinion, *Asociacion de Exportadores e Industriales de Mesa et al. v. United States,* 429 F. Supp. 3d 1325 (Ct. Int'l Trade 2020) ("*ASEMESA I*"), and Commerce's first redetermination, Final Results of Remand Redetermination ("First Remand Redetermination" or "*Redetermination*"), ECF 47-1.

## I.        INTRODUCTION AND SUMMARY OF ARGUMENT

Commerce on remand comprehensively addressed the concerns raised in the Court's initial decision and rigorously responded to every objection raised by Plaintiffs.  In their comments, Plaintiffs fail to provide any valid objections to Commerce's Second Remand Redetermination.

With regard to the issue of specificity, Commerce in the Second Remand Redetermination found that the BPS subsidy is *de facto* specific under Section 771(5A)(D)(iii)(III) of the Tariff Act of 1930, as amended (the "Act"),  19 U.S.C. § 1677(5A)(D)(iii)(III), because olive farmers receive a disproportionately large amount of the BPS benefits.  There is no merit to Plaintiffs' claims that the data relied upon by Commerce related to past subsidy programs and that Commerce failed adequately to corroborate those data.  Commerce considered and properly rejected these arguments in the Second Remand Redetermination.  The Court should likewise reject Plaintiffs' arguments and affirm Commerce's *de facto* specificity finding.

With regard to the issue of substantial dependence, Plaintiffs continue to insist that Congress in enacting Section 771B(1) of the Act, 19 U.S.C 1677-2(1), intended to require Commerce to adhere slavishly to every facet of the methodology it employed in two cases from the 1980's, regardless of differences in products and industries that may require new approaches consistent with the statutory language.  In fact, as Commerce has repeatedly explained, there is ample evidence that Congressional intent was to the contrary.  Plaintiffs' approach would be not only faulty policy, leaving numerous agricultural industries without recourse from unfair foreign subsidies, but also faulty statutory interpretation, ignoring the uncontroverted evidence that Congress intended for subsidies provided to disparate products to be actionable under the new provision.  Commerce responsibly interpreted the statutory

language broadly, in accordance with the statutory intent and within the bounds of the statutory text.

Nor is there any validity to Plaintiffs' various objections to Commerce's second remand methodology. Commerce acknowledged Plaintiffs' legitimate objections to specific calculations in its draft remand decision and corrected these items in the Second Remand Redetermination. Commerce's use of consumption as a proxy for establishing demand is consistent with both its past practice and the statutory language and legislative history, as was Commerce's rejection of Plaintiffs' baseless insistence that there must be a "single continuous line of production" for a substantial dependence finding to be valid. The record, moreover, does not support Plaintiffs' claim that table olive and mill olive varietals are grown interchangeably. Rather, the evidence on the record demonstrates that there is in practice little crossover between these categories.

Finally, notwithstanding Plaintiffs' desperate attempts to massage the data on the record to support their arguments, substantial record evidence supports Commerce's finding of substantial dependence. Commerce relied on abundant official Spanish government data tracking production of each olive varietal by end use, and calculated a substantial dependence percentage of 55%. Plaintiffs fundamentally misrepresent the interplay between these data sources, interpreting net olive production figures as if they were olive consumption figures and assigning 100% of dual use production to a category that includes only dual use olives grown for mill. Commerce's rejection of the defective varietal hectare data that Plaintiffs submitted, moreover, was amply supported by substantial evidence.

DM_US 185635577-1.102498.0011

II.   **COMMERCE'S FINDING OF *DE FACTO* SPECIFICITY FOR THE BPS SUBSIDY IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND IN ACCORDANCE WITH LAW**

In *ASEMESA II*, the Court found that Commerce applied an impermissible interpretation of Section 771(5A)(D)(i) of the Act, 19 U.S.C. § 1677(5A)(D)(i), to find that subsidies under the BPS and BPS Greening programs (collectively, "BPS") are *de jure* specific.  The Court expressly provided, however, that on remand Commerce could "further analyz{e} the distribution of benefits to determine whether the subsidy is specific on other grounds."  *ASEMESA II*, 523 F. Supp. 3d at 1404.  Commerce properly did just that and found that the BPS subsidy is *de facto* specific under Section 771(5A)(D)(iii)(III) of the Act, 19 U.S.C. § 1677(5A)(D)(iii)(III), because the Spanish olive industry receives a disproportionately large amount of the BPS benefits.  *Redetermination II* at 16-22.  Plaintiffs challenge this Commerce finding, claiming that the data relied upon by Commerce related to past subsidy programs and that Commerce failed adequately to corroborate those data. *Plaintiffs' Comments* at 3-6.  Plaintiffs raised these same objections with Commerce and, in response, Commerce fully supported its finding and rebutted Plaintiffs' claims.  *See Redetermination II* at 37-49; *see also id.* at 15-22.  The Court should likewise reject Plaintiffs' arguments here and affirm Commerce's *de facto* specificity finding.

A.   **Commerce's *De Facto* Specificity Finding is Supported by the Facts on the Record**

As Commerce summarized in *Redetermination II* at 17-19, during the CVD investigation Commerce provided in repeated questionnaire requests multiple opportunities for the Government of Spain ("GOS") to provide information on the distribution of BPS benefits to different agricultural industries in Spain, specifically including the olive industry. As Commerce correctly noted, the requested information, such as amounts of assistance

4

provided to the agricultural sector under this program on an industry basis, is necessary to

determine whether the BPS is *de facto* specific under Section 771(5A)(D)(iii) of the Act, 19

U.S.C. § 1677(5A)(D)(iii).   *Redetermination II* at 18.  The GOS never provided the

requested information, claiming that BPS payments were "decoupled" from specific products

and that it was not possible for it to differentiate such payments by productive orientation,

crop, or type of product.  *See Id*. at 18, 48.

The GOS's assertion that it was unable to respond to Commerce's requests for it to

provide information that differentiated BPS payments by productive orientation, crop, or type

of product is not credible.  As the investigation record makes clear, the GOS collects,

maintains, aggregates, and publishes volume of meticulous data and statistics on Spanish

*crop-specific* agricultural production operations, sales, acreage, and ownership, as well as

information on agricultural subsidy programs and payments.  In the case of BPS and other

subsidies, likewise, the GOS collects mandatory *crop-specific* information in the subsidy

applications required to be completed and filed by all BPS applicants:  the BPS application

form requires applicants to certify their active farming operations and to *identify their

specific crops*.  *See* Commerce Verification Report for GOS, March 29, 2018 (P.R. 534) at

12; Case Brief of European Commission, April 23, 2018 (P.R. 549) at 12-13; Commerce

Final Issues & Decision Memorandum, June 11, 2018 (P.R. 594) at 28.  This crop-specific

BPS application information is readily available to the GOS and could be compiled,

aggregated, and published by the GOS in the same way that it does for the large volume of

other agricultural data that it routinely collects and publishes.  This belies the GOS's repeated

claims that it was unable to provide such information to Commerce.

Because the GOS failed to provide the required information, Commerce had to rely

on facts otherwise available to analyze the *de facto* specificity of BPS.  The only information

DM_US 185635577-1.102498.0011

on the record directly relevant to Commerce's disproportionality analysis for *de facto* specificity is data provided in the petition, which showed that the olive sector in Spain received a grossly disproportionate share of the subsidy.  While the petition-based facts available information relied upon by Commerce in reaching its *de facto* specificity finding necessarily included data from various sources and time frames available to petitioners, it provides a reasonable estimate of the much larger share of BPS received by the Spanish olive sector as compared to other crops.  First, as the record makes clear, BPS payments amounts are based on levels paid under the SPS program, the predecessor subsidy program to BPS. *Redetermination II* at 7 note 26.  Second, although the subsidy payment data used in the petition-based estimation related to SPS, Commerce was careful to note that the European Commission had confirmed that BPS payments through 2020 would remain stable from the levels for SPS in 2014.  *Redetermination II* at 21 note 91.  Plaintiffs nowhere refute that the BPS administering authority itself, the European Commission, confirmed that BPS payments would remain stable from SPS levels.  Plaintiffs therefore have no basis now to claim that Commerce's selection of facts available does not concern facts attributable to BPS, are not neutral, or should not be used.

Based on these facts available on the record, Commerce reasonably concluded that the Spanish olive industry, despite accounting for only 3 percent of Spanish agricultural output, *Redetermination II* at 19-20 note 86, received about 25 percent of all BPS payments made by the GOS to farmers during the period of investigation – a clearly disproportionate share for the olive industry relative to total agriculture recipients.  This finding fully supported Commerce's determination of *de facto* specificity within the meaning of Section 771(5A)(D)(iii)(III).  Notably absent from Plaintiffs' complaint about Commerce's reliance on "data related to past programs" is any claim that the 3 percent figure understates the

proportion of olive production relative to all Spanish agricultural output or that the 25 percent figure overstates the disproportionate share of BPS benefits for the Spanish olive sector, just as the GOS itself never refuted these figures during the investigation.   In any event, based on the facts and circumstances presented here, including the GOS's failure to provide relevant information during the investigation, Commerce was well within its statutory discretion to apply this reasonable methodology for its *de facto* specificity analysis.  *See Redetermination II* at 46 note 205, citing *AK Steel Corp. v. United States*, 192 F.3d 1367, 1385 (Fed. Cir. 1999) ("{D}eterminations of disproportionality and dominant use are not subject to rigid rules, but rather must be determined on a case-by-case basis taking into account all the facts and circumstances of a particular case").

    **B.    Commerce Properly Corroborated its *De Facto* Specificity Finding**

    Plaintiffs' second contention is that Commerce's comparison – of average levels of BPS assistance per application to levels of BPS assistance received by respondents – did not properly corroborate the agency's facts available disproportionality finding because BPS benefit amounts depend on the number of entitlements claimed in applications rather than on the number of applications.  *Plaintiffs' Comments* at 4-6.  This argument is meritless.

    Just as for the underlying facts available finding that the Spanish olive industry receives a disproportionate share of BPS benefits, neither Plaintiffs nor the GOS provided any evidence that refuted, or that would have allowed Commerce to refute or corroborate, the information on this topic in the petition.  It is therefore not surprising that Plaintiffs can point to no information on the record that contradicts the corroborating evidence relied upon by Commerce for its disproportionality finding.  While Plaintiffs claim that BPS levels for individual BPS applications will vary based on the size of operations and entitlements held by each applicant, Commerce analyzed the amount of funding for the respondents relative to

7

the average applicant for corroboration purposes, not the disproportionality analysis itself. This corroborating evidence, moreover, not only confirmed the finding that the Spanish olive industry (not specific, individual farmers) received a disproportionate share of BPS, but showed that the olive industry may in fact be receiving an even greater disproportionate share of BPS, as Commerce found that respondents and their cross-owned affiliates received between double and 83 times the average BPS payment amount. *Redetermination II* at 48.

In short, because the GOS repeatedly failed to provide crop- or industry-specific BPS funding data, as requested in multiple questionnaires, Commerce properly resorted to the best available information on the record to analyze the disproportionate level of BPS payments to the Spanish olive industry and then to corroborate its finding of disproportionality. Accordingly, Commerce's finding is well supported by the record and is fully in accordance with Section 771(5A)(D)(iii) of the Act. The Court, therefore, should reject Plaintiffs' arguments and affirm Commerce's finding of *de facto* specificity of BPS.

## III.   COMMERCE'S FINDING OF "SUBSTANTIALLY DEPENDENT" DEMAND IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND IN ACCORDANCE WITH LAW

In *ASEMESA II*, the Court rejected Commerce's first remand definition of "prior stage product," holding that the "prior stage product" cannot be both distinct from the "raw agricultural product" and also a subset of the raw agricultural product. In response, Commerce in the Second Remand Redetermination reconsidered the definition of "raw agricultural product" and "prior stage product" in this case such that the products are identical and not distinct, in full compliance with the Court's opinion. Commerce then found based on substantial record evidence that the demand for particular biological varietals of olives (the relevant raw agricultural product that is also the prior stage product) is

DM_US 185635577-1.102498.0011

substantially dependent on the demand for table olives (the latter stage product).  The Court should affirm these decisions, as they are both fully compliant with the law as interpreted by the Court and amply supported by record evidence.

### A.     Record Evidence Refutes Each of Plaintiffs' Alleged "Key Facts"

Plaintiffs begin their attack on Commerce's well-considered remand determination by alleging the truth of certain "key facts."  The record evidence, however, carefully considered by Commerce, supports Commerce's factual conclusions, not Plaintiffs'.

First, Plaintiffs contend that Commerce "conclude{ed} that 'Table' effectively means *only* fit for table; 'Mill' effectively means *only* fit for the mill, and *only* 'Dual Use' olives may only conditionally travel between table and oil applications," a formulation that Plaintiffs then rebut by showing that some subset of production of the table and mill varietals is used for the opposite purpose.  *Plaintiffs' Comments* at 8-10 (emphasis in original), *citing Redetermination II* at 51-52.  This is a straw man argument.  Commerce did not in fact conclude that the table and mill varietals are exclusively used for their principal purposes. Rather, Commerce "conclude{d} that table and mill varietals are fit for one use or the other and are generally not interchangeable, and growers of dual-use varietals also determine whether their olives are to be used for table or mill at the beginning of the growing season." *Id.*  This conclusion is supported by a wealth of supporting evidence, much of it published by the GOS itself, *see id.* at 30-32 and record evidence cited therein, none of which is refuted or even addressed by Plaintiffs.[2]

---

[2] Commerce noted, moreover, that "{f}or Harvest 2016 (corresponding to the 2015/2016 campaign), only 1 percent of mill varietals were processed into table olives."  *Redetermination II*  at 32, *citing* R.P.R. 6 (Musco's Feb. 25, 2020 submission), Exh. 7B.  This fact alone would fully justify Commerce's decision not to include these mill varietals in the "raw agricultural product" and "prior stage product."

Second, Plaintiffs contend: "There Is Tremendous Mobility In End Use Regardless Of 'Table' or 'Mill' Classification." *Plaintiffs' Comments* at 10; *see id.* at 10-12.  Commerce, however, relying on extensive record evidence, explicitly found that this assertion is simply untrue:

> We also disagree with ASEMESA that there are massive shifts in the volume of raw table olive production over the years, rather, we find the data to be stable. <u>As can be seen from the published GOS statistics, from harvest year 2010 through harvest year 2016, only one or two percent of olives grown for the mill were sent to table olive use</u>, and that from year to year, farmers tend to continue to harvest olives for the same end use. This is largely because, as we have established elsewhere in this remand redetermination, mill olives do not meet IOC standards, and at their source, dual-use olives are grown for one purpose or other. <u>We also note that only after 2016, when CVD and antidumping orders were imposed, were there greater shifts in table olives being sent to the mill</u>.
>
> The data that ASEMESA uses from the GOS's Survey (to purportedly demonstrate that there are far more hectares of dual-use olives and, therefore, there is much opportunity for the olive grower to alter production from table to mill olives or vice versa) is incorrect.

*Redetermination II* at 63 (emphasis added; footnotes omitted); *see also* further discussion at 63-65.  As Commerce found, the record shows that only after Spanish processors faced potential AD and CVD tariffs on their ripe olive exports did they switch some production of table olives to ordinarily less profitable olive oil.  Even then, the data cited by Plaintiffs shows that the vast majority (344,147/505,046 = 68% in 2017; 431,898/555,033 = 78% in 2018) of harvested "Table Olives" (including dual-use olives) were used to make table olives, while the mill olive varietals excluded from Commerce's substantial dependence calculation continued to produce only tiny amounts of table olives (226,148/6,044,453 = 3.7% in 2017; 172,208/9,264,536 = 1.9% in 2018) each year.  *See Plaintiffs' Comments* at 11.  The complete figures for 2010-2018, sourced from official GOS data, thus strongly support Commerce's AD/CVD theory, showing that prior to the investigations there was very

little shift in the volumes of raw table olives sent to oil and vice versa.  *See* R.P.R. 6

(Musco's Feb. 25, 2020 submission), Exh. 7B.  Even in 2017, moreover, an aberrational year

in which a lower proportion of raw olives intended for table was used to produce table olives

than any other that decade, *see id.*, the volumes are more than sufficient to support

Commerce's substantially dependent ruling.

        Third, Plaintiffs claim:  "The Majority Of Raw Olives Consumed To Produce Table

Olives Are 'Dual Use' Varietals Equally Suited To Table Or Oil Applications."  *Plaintiffs'*

*Comments* at 12; *see id.* at 12-14.  In fact, Commerce's substantial dependence calculations

specifically took into account <u>all</u> Spanish production (including hectares cultivated for mill)

of Hojiblanca olives, by far the most significant dual use varietal, and still concluded that

more than 50% of the demand for the distinct varietals of raw olives that are grown for table

use (including both "Table" and "Dual Use" varietals) is dependent on the demand for table

olives.

        Finally, Plaintiffs assert that because demand for raw olives to produce oil allegedly

"{d}warfs" demand for raw olives to produce table olives, "it would be absurd to conclude

that these 'Dual Use' tons used in table applications would not simply be absorbed by oil

demand."  *Plaintiffs' Comments* at 14-15.  Plaintiffs' conclusion, however, does not follow

from the premise.  The fact that so much oil is already produced does not mean that yet more

oil would be produced if table olive demand were to cease; if anything, it shows that the vast

majority of oil demand is already being met by the many hectares of mill olives varietals and

of dual use varietals cultivated for oil production.  If table olive demand were to disappear,

there is no reason to think that the hectares currently producing table olives would all

suddenly be diverted to yet more lower-profit oil production for which there might be no

additional demand.  It is equally or more likely that these hectares would be repurposed for other high-profit crops, such as almonds, or redirected to other uses.

B.      **Section 771B(1) does not "Codify" Commerce Practice**

Plaintiffs claim in their "Legal Standard" section that Section 771B(1) "codifies Commerce practice as set out in two prior Commerce decisions."  *Plaintiffs' Comments* at 15. This contention, made repeatedly by Plaintiffs in every segment of this proceeding, is incorrect.

The two prior Commerce decisions that Plaintiffs allege are codified in Section 771B(1) are *Live Swine and Fresh, Chilled and Frozen Pork Products from Canada*, 50 Fed. Reg. 25,097 (June 17, 1985) ("*Pork*") and *Rice from Thailand,* 51 Fed. Reg. 12,356 (April 10, 1986) ("*Rice*").  In fact, there is no evidence that Congress considered Commerce's methodologies in *Pork* and *Rice*, which the agency adopted to handle the specific facts of those cases, to be so perfect and so final that the agency would not have the discretion to adopt different methodologies in cases on other products.  Indeed, the evidence is to the contrary.  Before enacting Section 771B, Congress referenced raspberries as an example of an agricultural crop for which the CVD law could be circumvented if subsidies provided to farmers were not attributed to a further processed product, such as frozen raspberries, and noted that foreign producers could avoid a duty on raspberries by freezing them before shipment to the United States.  133 Cong. Rec. S8815 (1987); *Redetermination II* at 56; *Redetermination* at 38.  Besides raspberries, Congress also referenced CVD cases on fish, lamb, "and many other products."  133 Cong. Rec. S8815 (1987); *Redetermination* at 39.

Raspberries and fish differ from pork and rice (and each other) in many ways, and Congress could not have meant to require Commerce to slavishly apply every aspect of its practice in *Pork* and *Rice* to every agricultural case to follow, no matter how different the

12

product.  Most saliently for the current inquiry, demand for a product such as fresh

raspberries is plainly dependent on the demand for several end-use products, such as

raspberry jam.  The "substantially dependent" criterion could not be satisfied for <u>any</u>

processed raspberry product if it required Commerce to find that almost all, or even a

majority, of fresh raspberry production were dedicated to any particular downstream product.

To treat the facts in *Pork* and *Rice* as having established a high minimum threshold for

substantial dependence is not only faulty policy, leaving industries such as raspberry and

olive processors without the recourse from unfair foreign subsidies that Congress intended to

grant them, but also faulty statutory interpretation, ignoring the uncontroverted evidence that

Congress intended for subsidies provided to disparate products such as raspberries and fish--

and olives--to be actionable under the new provision.

### C.  Commerce Reasonably Used a Consumption Ratio to Determine Substantial Dependence

Plaintiffs allege that Commerce's measurement of olives consumption to determine

substantial dependence was inconsistent with the CVD statute.  *Plaintiffs' Comments* at 16-

20.  The Court should reject this argument.

First, Commerce's use of consumption as a proxy for establishing demand is

consistent with both its past practice and the statutory language and legislative history.  As

Commerce stated:

> The usage of products is driven by the demand of its consumers;
> therefore, it is fair to use consumption as a measure of a product's
> demand. The degree to which the prior stage product is used in the
> production of the latter stage product is a corollary of the prior stage
> product's dependence on the latter stage product. This argument is,
> once again, an attempt by ASEMESA to establish an extraordinarily
> high standard for demand to be considered "substantially dependent,"
> an attempt with no basis in the statute or legislative history.

*Redetermination II* at 59.  Indeed, Plaintiffs fail to offer any alternative suggestion as to how

Commerce is supposed to satisfy the statutory directive that it determine whether the demand

for the prior stage product is substantially dependent on the demand for the latter stage

product if it is unable to use consumption as a proxy for demand.

Second, Commerce correctly rejected yet again Plaintiffs' baseless "single continuous

line of production" argument.  Plaintiffs contend:

> The notion of something that is dependent or contingent is clearly
> linked to the concept of a single continuous line of production featured
> in Commerce practice prior to codification. It is the idea of a unitary
> capacity of use -- that a prior stage product would not exist but for
> demand for the latter stage product. That is the very definition of
> "dependent" demand.

*Plaintiffs' Comments* at 17-18; *see also id.* at 32.  In fact, the statute nowhere requires there

to be a single, continuous line of production from the prior stage product to the latter stage

product.  In *Pork*, Commerce referenced the two-part test used by the International Trade

Commission (ITC) for determining whether to collapse producers and processors of a raw

agricultural product into a single industry, a test that includes the continuous line of

production criterion, because the ITC had more experience with agricultural products.  *Pork*,

50 Fed. Reg. at 25,099.  Commerce and the ITC, however, operate independently and

pursuant to distinct statutory mandates and authorities.  The ITC's analysis provided support

for Commerce' analysis, but Commerce made clear that the ITC's test had a purpose entirely

distinct from Commerce's task of determining whether subsidies provided to raw product

producers should be considered in determining the benefit to processors of that product.  *Id.*

While Congress, moreover, "codified, as a distinct injury provision, the ITC's single

continuous line of production framework in the same legislation that enacted section 1677-2

… the single continuous line of production framework is not mentioned at any point in the

14

legislative history for section 1677-2." *Redetermination* at 70.  There is no support in the statute or legislative history, nor in Commerce's practice before or after enactment of Section 771B, *see Redetermination II* at 58-59, for Plaintiffs' claim that a single continuous line of production is a precondition to a substantial dependence finding.  Moreover, Plaintiffs' assertion that the statute requires "that a prior stage product would not exist but for demand for the latter stage product," *Plaintiffs' Comments* at 17, is absurd.  That would be an "absolute dependence" requirement, not the "substantial dependence" standard that Congress actually enacted.

Third, Plaintiffs contend that consumption would be a reasonable proxy for establishing the ratio of dependence if not for the "significant mobility between 'Table' and 'Mill' categories in terms of end use in table and oil applications." *Plaintiffs' Comments* at 18.  As shown above, however, Plaintiffs' premise is flawed.  Based on abundant supporting evidence, much of it published by the Government of Spain itself, Commerce found that in every year prior to and including the period of investigation, only one or two percent of olives grown for milling were sent to table olive use, and that only after trade remedies were imposed was a still relatively modest percentage of varietals intended for table olive production diverted into olive oil production, while even then mill olive varietals continued to produce tiny amounts of table olives each year.  *See supra* Section III.A.  In light of these facts, it was eminently reasonable for Commerce to base its substantial dependence determination on consumption data.

Finally, right after claiming that Commerce failed to consider relevant context in making its substantial dependence determination, Plaintiffs object to Commerce's reliance on the contextual evidence that is actually on the record, i.e., evidence regarding Spanish olive growers' cultivation and insurance practices.  Plaintiffs sum up their objections as follows:

15

> Conceptually, Commerce's use of cultivation and insurance practices is simply misplaced. <u>It does not reflect a varietal analysis, including how certain varietals are used</u> and can be used. There is nothing inherent in a "Dual Use" varietal that *requires* a particular cultivation or insurance practice. <u>These externalities do not determine the varietal's existence; that existence is only determined by whether a demand exists for the varietal.</u>

*Plaintiffs' Comments* at 20 (emphasis added).  In fact, Commerce's examination of cultivation and insurance practices does reflect how certain varietals are used; Plaintiffs have never cited any evidence to the contrary.  Plaintiffs, moreover, are once again attempting to establish so high a standard for demand to be considered substantially dependent that it could never be satisfied.  The standard is not whether the prior stage varietal product would "exist" if demand for the latter stage product were eliminated, but rather whether the level of demand for the prior stage product is substantially dependent on the demand for the latter stage product.  In this case, the record shows that growers find it economical to grow certain varietals that have lower oil content and/or require extra cultivation expenditures because there is demand for higher-profit table olives.  If table olive demand were to collapse, growers would grow varietals that are higher in oil content and/or cheaper to cultivate; consequently, demand for the table and dual use varietals would decline substantially.  *See Redetermination II* at 60.

## D. Commerce Reasonably Found that 55 Percent Meets the Legal Standard for Substantial Dependence

The Court should reject Plaintiffs' contention that 55 percent dependence is insufficient to meet the statutory threshold for substantial dependence.  *See Plaintiffs' Comments* at 20-22.

This Court found in its first remand decision that demand for the prior stage product must be "largely, but not wholly" contingent on demand for the latter stage product.

16

*ASEMESA I,* 429 F. Supp. 3d at 1341.  The Court did <u>not</u> find, however, that "largely, but not wholly" is equivalent to "almost exclusively" or "substantially all," as Plaintiffs imply. Rather, the Court found that in prior cases Commerce had found the "substantially dependent" standard to have been satisfied where the latter stage product accounted for "most or at least half" of the demand of the prior stage product.  *See id.* at 1345.  That is exactly the finding that Commerce made in this case.

Moreover, the statute and legislative history do not support the establishment of even a strict 50% requirement for substantial dependence.  As discussed in Section III.B *supra*, in referencing products such as raspberries, fish, and lamb as examples of agricultural products crop for which the CVD law could be circumvented if subsidies provided to farmers and growers were not attributed to a further processed product, Congress made clear that the substantial dependence factor could be satisfied even when the demand for the prior stage product is dependent on the demand for multiple end-use products.  That the Congressional drafters prominently showcased how the new law would apply to frozen raspberries, for example--when the frozen category is only one of many outlets for that raw product (fresh, frozen, dried, jams and jellies, puree, concentrate)--makes clear that they had no intention of creating high numerical hurdles, but simply wanted to prevent lightly processed next-stage agricultural products that have been subsidized at the prior stage from escaping CVD review through that limited processing.

### E.   Commerce's Analysis Was Reasonable and Supported by Substantial Evidence

Plaintiffs contend that "Commerce's analysis is built upon a series of mischaracterizations and unsupported assumptions that bias the results, all in reliance on data that do not permit a true varietal analysis."  *Plaintiffs' Comments* at 22.  There is no support

17

in the record for these assertions.  In fact, Commerce's analysis was reasonable and supported by substantial evidence.

First, Plaintiffs assert that the mechanics of Commerce's exclusions of Cacerena and "other" olives are faulty.  *Plaintiffs' Comments* at 24-27.  The only basis Plaintiffs cite for this claim, however, is a perceived disproportion in Commerce's calculation between the 90,404 tons of olives grown for mill but used to produce table olives and AICA data showing that "45,420 tons of Cacerena olives {and 29,870 tons of "other" varietals} were consumed in the production of table olives."  *Id.* at 24-25.  It is Plaintiffs' understanding that is faulty, however, not Commerce's calculation.  In fact, the AICA data submitted by ASEMESA and relied upon by Commerce show net olive production, not olive consumption.  Thus, for Cacerena, the data show that 45,420 tons of table olives were produced from Cacerena olives, not that 45,420 tons of Cacerena olives were consumed in the production of table olives.  *See* Second Remand Final Calculations (2R.P.R 12), Step 4, Column C ("Production of Dual use varietals grown for table").  This is confirmed by ASEMESA's own exhibit, which was the source of the data relied upon by Commerce.  *See* ASEMESA Feb. 21, 2020 submission, Exh. NFI-2 at pages 3-4 (R.P.R. 15) ("REPORT BY AICA ON THE MARKET OF OLIVE OIL AND TABLE OLIVES (CAMPAIGN 2015/2016)"; "Results of the Campaign by Varieties").  *See also Redetermination II* at 66 ("ASEMESA incorrectly titles the table olive production data from Spain's AICA as production used for table instead of total table production.")

More significantly, Plaintiffs err when they argue that "{t}he only way you could adjust the 90,404 tons of 'Mill' olives used to produce table olives to ensure a true exclusion of Cacerena would be to deduct the entire 45,420 tons of Cacerena reported in the AICA data."  *Plaintiffs' Comments* at 25.  This statement reflects a misunderstanding of the GOS

18

data that is the source of the 90,404 figure.  As Commerce noted, *see Redetermination II* at

51-53, *see also Redetermination* at 89, the GOS data report in the row for "Table" only those

hectares of dual use varietals that are cultivated for table use.  The hectares of dual use

varietals that are cultivated for mill use are included in the "Mill" category.  Thus, the 90,404

tons figure for "Mill" olives used to produce table olives includes not the entire 45,420 tons

of Cacerena reported in the AICA data, but rather only the much smaller tonnage of Cacerena

table olives that were grown on Cacerena hectares cultivated for mill use.  Plaintiffs' critique

of Commerce's calculation as out of proportion and thus "obvious{ly}" wrong, therefore, is

itself misguided and incorrect.[3]  Commerce reasonably concluded, rather, that just as table

olives produced from Cacerena olives grown for table comprised 12.41% of total table olive

production from dual use olives grown for table, Cacerena olives could be estimated to have

comprised 12.41% of the 90,404 tons of dual use olives grown for mill but ultimately used as

table, i.e., 11,215 tons.  *See* Second Remand Final Calculations (2R.P.R 12), Step 4.

Second, Plaintiffs contend that it was unreasonable for Commerce to include in the

numerator of the substantial dependence calculation the derived total of 71,814 tons of

Hojiblanca olives that were grown for mill but ultimately used for table because "'Dual Use'

varietals have broad cross-application in both table use and olive oil which militates a

conclusion in favor of lack of contingency."  *Plaintiffs' Comments* at 27.  This argument is

meritless both conceptually and mathematically.  Conceptually, based on the record evidence

that a mere 14% (71,814 / 509,304) of total olive tonnage produced from Hojiblanca olives

grown for mill was ultimately used for table, *see* Second Remand Final Calculations (2R.P.R

---

[3] If Plaintiffs' math were correct and the 45,420 tons of Cacerena and 29,870 tons of "other" were total raw olive consumption figures for all hectares of Cacerena and "other" dual use olives, then of the 90,404 tons of "Mill" olives used to produce table olives, 75,290 tons would be Cacerena and "other," leaving only 15,114 tons for Hojiblancas, the varietal all parties agree (and the AICA data confirm) is the dominant Spanish dual use olive used to produce table olives.

12), Step 3, it is not reasonable to conclude that the distinction between dual use olives grown for table and dual use olives grown for mill is not real. On the contrary, the reality and significance of this distinction is proven by multiple items of record evidence, including data maintained by the Government of Spain itself. *See Redetermination II* at 30-32, 51-52. The fact that a small percentage of dual-use varietal olives intended for one purpose winds up in a different one does not demonstrate that there is a "broad cross-application" of these olives such that there is no dependence between demand for the varietal and demand for the intended purpose.

Mathematically, there can be no justification for "{d}educting 71,814 tons {of Hojiblanca olives grown for mill but ultimately used for table} from Commerce's numerator and keeping all other things equal," *Plaintiffs' Comments* at 28, when 100% of the finished Hojiblanca olive tonnage (table olives and mill olives combined) is included in the denominator. *See* Second Remand Final Calculations (2R.P.R 12), Step 3. For the substantial dependence numerator and denominator to be on an apples to apples basis, if the denominator includes all tonnage (including mill tonnage) produced from the three table olive varietals and the principal dual use varietal, as it does, then the numerator must include all table olive tonnage of those same four varietals. The published figures for table olive tonnage include all table olives produced from the three table olive varietals, but only Hojiblanca table olives that were produced from Hojiblanca hectares grown for table olive use. Commerce therefore reasonably added to the published figure for table olive tonnage the additional Hojiblanca table olive tonnage that was made from Hojiblanca olives grown for mill.

Third, Plaintiffs claim that "{b}y excluding Cacerena, Commerce is substantially under-representing the relevant denominator, even under its own flawed analysis, inflating its

results." *Plaintiffs' Comments* at 28.  Plaintiffs, however, ignore the fact that Commerce also

excluded Cacerena olives from the numerator, thereby ensuring that the results are apples-to-

apples and not inflated.  As Commerce noted, moreover, whereas information on the record

allowed it to estimate volumes of Hojiblancas (the dominant dual use Spanish olive)

sufficiently to include these volumes in both the numerator and denominator of the

substantial evidence calculation, "the record does not contain sufficient information

regarding the total production volumes, mill production volumes, or the total hectares

dedicated to the production of cacerena that would allow us to include this varietal in the

substantial dependence calculation." *Redetermination II* at 32.  "Furthermore," Commerce

continued, "the evidence on the record suggests that the production volume of cacerena

comprises a small percentage of the total volume of olive varietals grown for table." *Id.*

Indeed, that this is true is borne out by Plaintiffs' own submitted data, which shows that

Cacerena olives comprised only 7.5% of total table olive production in 2016.  *See*

ASEMESA Feb. 21, 2020 submission, Exh. NFI-2 at page 3 (R.P.R. 15) (45,420 tons of

Cacerena table olives / 602,020 tons of total table olives).  Thus, it was reasonable for

Commerce to exclude this varietal in light of its scant significance and the absence of

relevant data.[4]

     Finally, Plaintiffs attempt to tweak Commerce's substantial dependence calculation

based on their interpretation of the AICA data they submitted, which they complain that

Commerce unreasonably declined to consider.  *See Plaintiffs' Comments* at 29-32.  This

contention is simply incorrect.  In fact, Commerce did rely on the AICA data, but interpreted

correctly both the AICA data submitted by Plaintiffs and the GOS data submitted by Musco.

---

[4] Indeed, based on Plaintiff's preferred data discussed *infra*, it appears that including Cacerena olives using Plaintiffs' preferred methodology would actually increase the substantial dependence percentage, from 48.71% to 49.3%.  *See Plaintiffs' Comments* at 30.

As discussed above, Plaintiffs have fundamentally misrepresented the interplay between these data, interpreting net olive production figures as if they were olive consumption figures and assigning 100% of dual use production to a category that includes only dual use olives grown for mill. *See* discussion *supra*. The data that Plaintiffs submitted that Commerce rejected were not AICA production data but rather varietal hectare data, discussed *infra.*

Moreover, even using their own preferred data and methodologies, Plaintiffs still calculate a substantial dependence percentage of 49%. *See Plaintiffs' Comments* at 30. As discussed *supra* in Section III.D, the statute and legislative history do not support the establishment of a strict 50% requirement for substantial dependence. It could be that the percentage of the table olive and dual use varietals going to table olive production falls below 50% in a given year, due, perhaps, to temporary climate or market conditions (or the filing of an AD/CVD case). Even if acceptance of every unsupported (or mathematically insupportable) adjustment proposed by Plaintiffs reduced Commerce's well-reasoned 55% calculation to 49%, the record in this case would still show that demand for Spanish table and dual use olive varietals is substantially dependent on demand for table olives, the high-profit product that is the subject of this action.

### F. Commerce Reasonably Refused to Rely on the Varietal Hectare Data Submitted by Plaintiffs'

Plaintiffs' final argument is that Commerce arbitrarily refused to rely upon alternative data submitted by plaintiffs purporting to show that the total hectares reported in official data undercount total Spanish planted area of dual use olives. *Plaintiffs' Comments* at 32-34. Plaintiffs' argument is unavailing.

Commerce noted in the Second Remand Redetermination that it rejected the varietal hectare data relied upon by Plaintiffs for no fewer than five reasons: (i) it was unpublished,

(ii) it was extrapolated from different sources; (iii) it was from 2008 and 2018-19, before and after the POI; (iv) Plaintiffs did not provide the underlying source data; and (v) Plaintiffs did not provide supporting documentation.  *Redetermination II* at 66.  While it may be that no single one of these reasons would have been dispositive, taken in concert they certainly provide substantial evidence in support of Commerce's determination, especially in light of the presence on the record of direct, contemporaneous alternative evidence from official Spanish sources.  And as Commerce documented in the First Remand Redetermination, "ASEMESA acknowledged that the data {relied upon by Plaintiffs} were incomplete, had been extrapolated, and are not published."  *Redetermination*  at 97 (citations omitted).

Commerce found no evidence on the record, moreover, to support Plaintiffs' highly speculative extrapolations with regard to the number of hectares dedicated to production of varietals of Hojiblanca olives and the amount of production of table olives and olive oil attributable to that acreage:

> Both the GOS and Musco confirmed that the GOS does not publish information on mill olive varietals, which would include the portion of hojiblanca varietals that are identified as for the mill. Therefore, we had no manner in which to verify the area in hectares, by varietal, identified as for processing into olive oil. The GOS publishes production data, by varietal, only for table olive varietals identified as for table use.

*Redetermination* at 98-99 (citations omitted).  Commerce reasonably chose to rely upon GOS data rather than the self-serving data cited by Plaintiffs, finding that Plaintiffs' calculations were based on a highly attenuated analysis of extrapolated data concerning planted olive area in Spain that Plaintiffs had sliced and diced in order to minimize artificially the production volume of table olives processed from all table and dual use varieties.  Commerce carefully studied and rejected Plaintiffs' approach as both illogical and inconsistent with actual published GOS data.  Among the flaws cited by Commerce were the following:

DM_US 185635577-1.102498.0011

- The underlying data, which Plaintiffs did not provide, were extrapolated from two different sources, one concerning a 2018/2019 grower subsidy program and the other a 2008 internal report. *Redetermination* at 97-98.

- Plaintiffs based their calculation on an unsupported estimate that the surface area dedicated to the production of table and dual-use olive varietals was well over <u>twice as large</u> as the area published by the GOS. *Id.* at 31, 102-03.

- Plaintiffs wrongly included all production data for table and dual-use olive varieties in its estimation of total table olive production. *Id.* at 31-32.

On the basis of these serious data issues, Commerce justifiably concluded that Plaintiffs had vastly overestimated the production volume of the prior stage product in a way that was favorable to their argument but inconsistent with other, more reliable data, some of which they themselves had placed on the record and some of which had been published by the GOS.

Commerce thus fully considered all of the reliable information on the record in making its determination that demand for table olives is substantially dependent on demand for the varietals of olives that the GOS and the Spanish olive industry recognize as principally suitable for use in the production of table olives.

## IV.    CONCLUSION

For the reasons provided above, the we respectfully request that the Court affirm Commerce's Second Remand Redetermination and dismiss this action.

Respectfully submitted,

_____/s/ Raymond Paretzky_____.

David J. Levine
Raymond Paretzky
McDERMOTT WILL & EMERY LLP
500 N. Capitol Street, NW
Washington, DC  20001
(202) 756-8000
*rparetzky@mwe.com*
Counsel for Coalition for Fair Trade in Ripe Olives

*Dated:* January 12, 2022

25

## **Certificate of Compliance**

Pursuant to USCIT Chambers Procedure 2(B), I hereby certify that this submission complies with the Court's word limitation requirement.  The word count for this submission as computed by McDermott Will & Emery's word processing system is 7,247 words.

*/s/ Raymond Paretzky*

Raymond Paretzky
Counsel for Coalition for Fair Trade in Ripe Olives

DM_US 185635577-1.102498.0011