Slip Op. 22-108

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **ASOCIACIÓN DE EXPORTADORES E INDUSTRIALES DE ACEITUNAS DE MESA, ACEITUNAS GUADALQUIVIR, S.L.U., AGRO SEVILLA ACEITUNAS S. COOP. AND., and ANGEL CAMACHO ALIMENTACIÓN, S.L.,** | |
| **Plaintiffs,** | |
| **v.** | **Before: Gary S. Katzmann, Judge** |
| **UNITED STATES,** | **Court No. 18-00195** |
| **Defendant,** | ***PUBLIC VERSION*** |
| **and** | |
| **COALITION FOR FAIR TRADE IN RIPE OLIVES,** | |
| **Defendant-Intervenor.** | |

## OPINION

[Commerce's Second Remand Results are sustained.]

Dated:  September 14, 2022

Matthew P. McCullough, Curtis Mallet-Prevost, Colt & Mosle LLP, of Washington, D.C., argued for Plaintiffs Asociación De Exportadores E Industriales De Aceitunas De Mesa, Aceitunas Guadalquivir, S.L.U., Agro Sevilla Aceitunas S. Coop. And.**,** and Angel Camacho Alimentación, S.L.

Tara K. Hogan, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendant United States. With her on the briefs were Brian M. Boynton, Acting Assistant Attorney General, Jeanne E. Davidson, Director, Sonia W. Murphy, Trial Attorney.  Of counsel on the briefs were Elio Gonzalez and Saad Y. Chalchal, Senior Attorneys, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

David J. Levine and Raymond Paretzky, McDermott Will & Emery LLP, of Washington, D.C.,

argued for Defendant-Intervenor Coalition for Fair Trade in Ripe Olives.

Katzmann, Judge:  The court again returns to an investigation by the United States Department of Commerce ("Commerce") into subsidies received by the Spanish olive industry. The U.S. domestic olive industry claims that the Government of Spain and European Union unfairly subsidized Spanish olives that were then imported into the United States to the detriment of the U.S. industry.  Before the court are Commerce's <u>Final Results of Remand Redetermination</u> (Dep't Commerce Nov. 3, 2021), Nov. 3, 2021, ECF No. 73-1 ("<u>Second Remand Results</u>"), which the court ordered in <u>Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States</u>, 45 CIT __, 523 F. Supp. 3d 1393 (2021) ("<u>Asemesa II</u>").  In <u>Asemesa II</u>, the court determined that Commerce's interpretations of 19 U.S.C. § 1677(5A)'s de jure specificity test and 19 U.S.C. § 1677-2's substantial-dependence requirement were unreasonable and not in accordance with law, and remanded Commerce's <u>Final Results of Remand Redetermination</u> (Dep't Commerce May 29, 2020), June 1, 2020, ECF No. 47-1 ("<u>First Remand Results</u>") for reconsideration.  523 F. Supp. 3d at 1407-08.  Commerce's <u>Second Remand Results</u> accordingly apply a revised interpretation of each statutory provision.

Plaintiffs Asociación de Exportadores e Industriales de Aceitunas de Mesa, Aceitunas Gudalquivir, S.L.U., Agro Sevilla Aceitunas S. Coop. And., and Angel Camacho Alementación, S.L. (collectively, "Plaintiffs" or "Asemesa") now challenge the <u>Second Remand Results</u>, arguing that the subsidy program at issue is not de facto specific under 19 U.S.C. § 1677(5A)(D)(iii), and that Commerce's determination that demand for certain raw olive varietals is substantially dependent on the demand for table olives pursuant to 19 U.S.C § 1677-2 is unsupported by substantial evidence and contrary to law.  Pls.' Cmts. on Commerce's Second Remand Redetermination at 3–4, 6, Dec. 3, 2021, ECF No. 76 ("Pls.' Br.").  Defendant United States ("the

Government") and Defendant-Intervenor Coalition for Fair Trade in Ripe Olives ("Coalition")

request that the court affirm Commerce's <u>Second Remand Results</u>.  Def.'s Reply to Cmts. on the

Second Remand Redetermination at 33, Jan. 12, 2022, ECF No. 79 ("Def.'s Br."); Reply Cmts. of

Def.-Inter. Addressing Second Remand Results at 24, Jan. 12, 2022, ECF. No. 81 ("Def.-Inter.'s

Br.").  The court concludes that Commerce's findings of de facto specificity and substantial

dependence are supported by substantial evidence and in accordance with law, and sustains the

<u>Second Remand Results</u>.

## BACKGROUND

The court set out the legal and factual background of the proceedings in further detail in its

previous opinions, <u>Asemesa I</u> and <u>Asemesa II</u>.  <u>Asociación de Exportadores e Industriales de</u>

<u>Aceitunas de Mesa v. United States</u>, 44 CIT __, __, 429 F. Supp. 3d 1325, 1330–38 (2020)

("Asemesa I"); <u>Asemesa II</u>, 523 F. Supp. 3d at 1397–1401.  Information relevant to the instant

opinion is set forth below.

### I.    Legal and Regulatory Framework

To empower Commerce to offset economic distortions caused by countervailable subsidies

and dumping, Congress promulgated the Tariff Act of 1930.  <u>Sioux Honey Ass'n v. Hartford Fire</u>

<u>Ins.</u>, 672 F.3d 1041, 1046–47 (Fed. Cir. 2012); <u>ATC Tires Private Ltd. v. United States</u>, 42 CIT

__, __, 322 F. Supp. 3d 1365, 1366 (2018).  Under the Tariff Act, Commerce may -- upon petition

by a domestic producer or sua sponte -- initiate an investigation into potential countervailable

subsidies and, where such subsidies are identified, issue orders imposing duties on the subject

merchandise.  <u>Sioux Honey</u>, 672 F.3d at 1046–47; <u>ATC Tires</u>, 322 F. Supp. 3d at 1366–67;

19 U.S.C. §§ 1671, 1673.  A countervailable subsidy exists when (1) a government or public

authority has provided a financial contribution; (2) a benefit is thereby conferred upon the recipient

of the financial contribution; and (3) the subsidy is specific to a foreign enterprise or foreign industry, or a group of such enterprises or industries.  19 U.S.C. § 1677(5).

Where, as here, a domestic subsidy is at issue, such subsidy may be either de jure or de facto specific.  19 U.S.C. § 1677(5A)(D).  A domestic subsidy is de jure specific "[w]here the authority providing the subsidy, or the legislation pursuant to which the authority operates, expressly limits access to the subsidy to an enterprise or industry."  19 U.S.C. § 1677(5A)(D)(i). It is de facto specific if:

(I)    The actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number.
(II)   An enterprise or industry is a predominant user of the subsidy.
(III)  An enterprise or industry receives a disproportionately large amount of the subsidy.
(IV)   The manner in which the authority providing the subsidy has exercised discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored over others.

19 U.S.C. § 1677(5A)(D)(iii).  In assessing these factors, Commerce must "take into account the extent of diversification of economic activities within the jurisdiction of the authority providing the subsidy, and the length of time during which the subsidy program has been in operation."  Id.

If Commerce determines that the government of a country is providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export of a class or kind of merchandise imported, sold, or likely to be sold for import, into the United States, and the International Trade Commission ("ITC") determines that an industry in the United States is materially injured or threatened with material injury thereby, then Commerce imposes CVDs upon the merchandise equal to the amount of the net countervailable subsidy.  See 19 U.S.C. § 1671(a).  When the investigated merchandise involves a processed agricultural product, Commerce also considers subsidies received by producers or processors of the raw agricultural product, and imputes the benefit of those subsidies to the manufacture, production, or export of

the processed product where (1) the demand for the prior stage, or raw, product is substantially

dependent on the demand for the processed product, and (2) the processing operation adds only

limited value to the raw commodity.  19 U.S.C. § 1677-2.

### II.    *Procedural History*

On July 12, 2017, Commerce initiated a CVD investigation into ripe olives from Spain in

response to a petition from Coalition.  Ripe Olives from Spain: Initiation of Countervailing Duty

Investigation, 82 Fed. Reg. 33,050 (Dep't Commerce July 19, 2017), P.R. 126; Petition for

Imposition of AD and CVD Duties, Vol. I (June 21, 2017), P.R. 7 ("Pet. Vol. I").  Plaintiffs

Guadalquivir, Agro Sevilla, and Angel Camacho were selected as mandatory respondents.[1]  In its

petition, Coalition alleged that the European Union ("EU"), through the Government of Spain

---

[1] In CVD investigations or administrative reviews, Commerce may select mandatory respondents pursuant to 19 U.S.C. § 1677f-1(e)(2), which provides:

> If the administering authority determines that it is not practicable to determine individual countervailable subsidy rates under paragraph (1) because of the large number of exporters or producers involved in the investigation or review, the administering authority may—
>
> > (A) determine individual countervailable subsidy rates for a reasonable number of exporters or producers by limiting its examination to—
> >
> > > (i) a sample of exporters or producers that the administering authority determines is statistically valid based on the information available to the administering authority at the time of selection, or
> > >
> > > (ii) exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that the administering authority determines can be reasonably examined; or
> >
> > (B) determine a single country-wide subsidy rate to be applied to all exporters and producers.
>
> The individual countervailable subsidy rates determined under subparagraph (A) shall be used to determine the all-others rate under section 1671d(c)(5) of this title.

("GOS"), provided countervailable subsidies to raw olive growers that should properly be attributed to processors of ripe olives.    Petition for the Imposition of Antidumping and Countervailing Duties, Vol. III at 10 (June 21, 2017), P.R. 58 ("Pet. Vol. III").    Ripe olives -- the product at issue in this litigation -- are a type of edible table olive produced by curing, rinsing, and brining raw olives.    Asemesa I, 429 F. Supp. 3d at 1335.    Raw olives are a raw and unprocessed agricultural product which can be transformed into an edible consumer product through processing into table olives or olive oil.    Id.

        Through its investigation, Commerce determined that countervailable subsidies indeed existed with respect to ripe olive producers from Spain.    See id. at 1337–38; see also Issues and Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of Ripe Olives from Spain (Dep't Commerce June 11, 2018), P.R. 1300 ("IDM"); Ripe Olives From Spain: Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order, 83 Fed. Reg. 37,469 (Dep't Commerce August 1, 2018), P.R. 1417 ("Amended Final Determination").    Commerce further found that the subsidies provided to olive growers through the EU's Common Agricultural Policy ("CAP") were de jure specific domestic subsidies under 19 U.S.C. § 1677(5A) and could be attributed to the production of table olives (as a latter-stage product of raw olives) under 19 U.S.C. § 1677-2.    IDM at 33.

        As discussed in Asemesa I, the CAP subsidies at issue are provided to Spanish olive growers through the Basic Payment Scheme ("BPS"): the most recent iteration of EU agricultural subsidy programs.    429 F. Supp. 3d at 1333.    Because portions of the current BPS subsidy program are based on prior EU (and European Community) subsidy programs, Commerce "traced the history of these programs in making its determination that the current program is de jure specific." Id.    That history begins in 1997 with the Common Organization of Market in Oils and Fats ("the

Common Market Program"), which was an annual grant-to-farmer program applicable to Spanish olive growers.  Id.  In 2003, the Single Payment Scheme ("SPS") replaced the Common Market Program and remained in effect until 2014.  Id.  The SPS program was replaced in 2015 by the current BPS program, which provides subsidies to those Spanish olive growers both that meet the eligibility requirements and apply for subsidies.  Id.

While the BPS program provides subsidy payments based on geographical indicators of farmland productivity, those indicators are based on data collected by the GOS under the Common Market Program.  First Remand Results at 7.  This data reflects the hectares of farmland, quantity of crop produced per hectare, and type of crop produced in each hectare, for each qualifying farm.  Id.; Decision Memorandum for the Preliminary Determination in the Countervailing Duty Investigation of Ripe Olives from Spain at 19–22 (Dep't Commerce Nov. 20, 2017), P.R. 1075 ("PDM").  For olive growers, a value per hectare was calculated depending on whether the olives were grown for olive oil production or table olive production.  PDM at 22–23.  Under the SPS, this value was multiplied by a farm's area in hectares to determine the amount of aid that a particular farmer would receive.  Id. at 22; First Remand Results at 8.  The BPS then relied upon data collected under the SPS to allocate subsidy payments using regional rates based on the "productive potential and . . . productive orientation" of a particular region.  First Remand Results at 8.  The rates ultimately assigned to participating farmers do not expressly vary with the type and volume of crop produced but do reflect historic data regarding the agronomic practices carried out in the region, including whether a specific region historically produced permanent crops -- among them, olives.  IDM at 33–34.

Commerce concluded that because the SPS program relied upon Common Market Program data, and in turn provided the basis for the BPS program, "the annual grant amount provided under

BPS [is] based on annual grant amounts that were crop-specific," and the BPS subsidy payments are de jure specific to olive growers.  PDM at 24.  Commerce further determined that the relevant "prior stage product" for purposes of its investigation was raw olives, and that demand for raw olives is substantially dependent upon demand for table olives because table olives constitute 8 percent of the market for raw olives.  Id.; see 19 U.S.C. § 1677-2.  Upon determining that the BPS subsidies were both specific to olive growers and properly attributable to the production of table olives, Commerce imposed countervailing duties.  First Remand Results at 20–21.

Plaintiffs challenged Commerce's determination on September 28, 2018, arguing in relevant part that that the subsidies are not de jure specific (and therefore are not countervailable), and that the demand for raw olives is not substantially dependent upon the demand for table olives (such that subsidies to olive growers cannot be imputed to table olive production).  Asemesa I, 429 F. Supp. 3d at 1339.  The court concluded that Commerce's finding that the subsidies at issue were de jure specific and thus countervailable failed to include a reviewable interpretation of 19 U.S.C. § 1677(5A).  Id. at 1340–41.  The court also determined that Commerce applied an impermissible interpretation of the statutory term "substantially dependent," and that its interpretation of the term constituted an unexplained and arbitrary deviation from past practice, such that Commerce's interpretation of 19 U.S.C. § 1677-2 was arbitrary and not in accordance with law.  Id. at 1339, 1344.  Accordingly, the court remanded to Commerce for further proceedings consistent with its opinion.  Id. at 1352.

On June 1, 2020, Commerce submitted its First Remand Results to the court.  On remand, Commerce first reiterated and clarified its finding that the EU subsidy payments at issue are de jure specific to olive growers, and thus countervailable.  First Remand Results at 10.  Consistent with the Amended Final Determination, Commerce then determined that "the demand for the prior

stage product is substantially dependent on the demand for the latter stage product," but clarified that it interprets "'prior stage product' to be the raw agricultural product that the industry under examination considers principally suitable for use in the prior stage of production of the latter stage product" -- in this case, raw olives "principally suitable for . . . the production of table olives." First Remand Results at 27, 29.

The court remanded Commerce's First Remand Results, concluding that they were in accord with neither 19 U.S.C. § 1677(5A) nor 19 U.S.C. § 1677-2.  Reviewing Commerce's finding of de jure specificity, the court concluded that its interpretation of 19 U.S.C. § 1677(5A)'s de jure specificity inquiry "reduce[d] the de jure specificity test to a general finding of non-uniform treatment, without any determination that the subsidy in question be explicitly limited to a specific enterprise or industry by the administering authority or its implementing legislation," and thus diverged from the unambiguous text of the statute.  Asemesa II, 523 F. Supp. 3d at 1403.  The court likewise rejected Commerce's interpretation of 19 U.S.C. § 1677-2.  Id. at 1407.  In so doing, the court first affirmed Commerce's determination that "'prior stage product' and 'raw agricultural product' are not coextensive in the context of [19 U.S.C. § 1677-2]."  Id. at 1406–07.  However, the court explained that by defining "prior stage product" as "the raw agricultural product that the industry under examination considers principally suitable for use in the prior stage of production of the latter stage product," Commerce impermissibly rendered the substantial-dependence test self-fulfilling.  Id. at 1407.  Accordingly, the court remanded Commerce's determination for further proceedings consistent with its opinion.  Id. at 1408.

On November 3, 2021, Commerce submitted its Second Remand Results to the court.  In response to the court's instructions in Asemesa II, Commerce reconsidered both "its de jure specificity finding" and "its interpretation of 'raw agricultural product' and 'prior stage product.'"

Second Remand Results at 2.  On remand, Commerce first determined "that the subsidies provided by the GOS to olive growers are de facto specific pursuant to [19 U.S.C. § 1677(5A)(D)(iii)(III)]," given the disproportionately greater subsidy payments awarded to olive farmers.  Id. at 2, 19–22.  Consistent with its substantial-dependence findings in the Amended Final Determination and First Remand Results, Commerce then determined that the demand for "four table and dual-use raw olive varietals," namely "manzanilla, gordal, hojiblanca, and carrasquena," is "substantially dependent on [the demand for] processed table olives."  Id. at 32, 36.

Following the issuance of the Second Remand Results, Plaintiffs filed comments on December 3, 2021, opposing Commerce's finding that the at-issue subsidy program is de facto specific and reiterating their position that Commerce has failed to identify substantial dependence as required by law.  Pls.' Br.  The Government and Coalition each submitted replies to Plaintiffs' comments on January 12, 2022, requesting that the court sustain the Second Remand Results. Def.'s Br.; Def.-Inter.'s Br.  On January 6, 2021, the court issued questions prior to oral argument. Letter Concerning Qs. for Oral Arg., Apr. 26, 2022, ECF No. 89.  The parties filed their responses to the oral argument questions on May 6, 2022.  Pls.' Resps. to Ct.'s Written Qs. Before Oral Arg., ECF No. 92 ("Pls.' OAQ Resps."); Def.'s Resps. to Qs. in Adv. of Oral Arg, ECF 93 ("Def.'s OAQ Resps."); Resp. of Def.-Inter. to Apr. 26, 2022 Qs. for Oral Arg., ECF No. 94 ("Def-Inter.'s OAQ Resps.").  Oral argument was held on May 11, 2022.  Oral Arg., ECF No. 96.  On May 19, 2022, the parties filed supplemental briefs following oral argument.  Pls.' Final Cmts. After Oral Arg., ECF No. 97 ("Pls.' Post-Arg. Br."); Def.'s Post Oral Arg. Submission, ECF. No. 99 ("Def.'s Post-Arg. Br."); Post-Arg. Subm. of Def.-Inter., ECF No. 98 ("Def.-Inter.'s Post-Arg. Br.").

## JURISDICTION, STANDARD OF REVIEW, AND INTERPRETIVE FRAMEWORK

The court has jurisdiction over this action pursuant to 19 U.S.C. § 1516a and 28 U.S.C. § 1581(c).  The standard of review is set forth in 19 U.S.C. § 1516a(b)(1)(B)(i) which provides "[t]he court should hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  "A finding is supported by substantial evidence if a reasonable mind might accept the evidence as sufficient to support the finding."  Maverick Tube Corp. v. United States, 857 F.3d 1353, 1359 (Fed. Cir. 2017) (citing Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938)).  The court also reviews the determinations pursuant to remand "for compliance with the court's remand order."  Beijing Tianhai Indus. Co. v. United States, 39 CIT __, __, 106 F. Supp. 3d 1342, 1346 (2015) (citations omitted).

As laid out in Asemesa I, 429 F. Supp. 3d at 1338–39, and Asemesa II, 523 F. Supp. 3d at 1401, the court reviews Commerce's interpretation of a statute by application of the two-step Chevron test.  See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 843–45 (1984); see also Dupont Teijin Films USA, LP v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005).  Under Chevron, the court first determines "whether Congress has directly spoken to the precise question at issue."  467 U.S. at 842.  If so, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  Id. at 842–43.  However, "if the statute is silent or ambiguous with respect to the specific issue," the court must then determine "whether the agency's answer is based on a permissible construction of the statute."  Id. at 843.  If the agency's interpretation of the statute is reasonable, it must be upheld. Koyo Seiko Co. v. United States, 36 F.3d 1565, 1573 (Fed. Cir. 1994).

## DISCUSSION

Plaintiffs argue that Commerce's de facto specificity finding is unsupported by substantial evidence because it relies on data from "past programs" and because its attempt at corroboration fails to support its analysis. Pls.' Br. at 3–6. Plaintiffs also oppose Commerce's finding of substantial dependence, arguing that the consumption ratio used by Commerce is unsupported by substantial evidence and, even if it were not, fails to rise to the level of substantial dependence. Id. at 16–32. The Government and Coalition contend that Commerce's de facto specificity finding is adequately supported by the record, and that Commerce reasonably concluded from consumption data that the demand for certain varietals of raw olives is substantially dependent on the demand for table olives. Def.'s Br. at 7–15, 17–26; Def.-Inter.'s Br. at 4–7, 8–22. The court concludes that Commerce's findings of de facto specificity and substantial dependence are supported by substantial evidence and in accordance with law and accordingly sustains the Second Remand Results.

### I.     *De Facto Specificity Finding*

On remand, Commerce "examined whether the BPS program is de facto specific" and determined that it is. In reaching this conclusion, Commerce requested certain information from the GOS: namely, "the number of recipient companies and industries and the amount of assistance approved under [the BPS] program for the year in which any mandatory respondent was approved for assistance, as well as each of the preceding three years." Second Remand Results at 17. The GOS "replied with general information regarding the amount of total assistance" but declined to provide any per-industry data, noting instead that "the payments are decoupled" such that such specific data was unavailable. Id. at 17–18 (quoting Resp. of GOS to the Dept's Aug. 3, 2017 Initial Questionnaire at 16 (Sept. 18, 2017), P.R. 836 ("GOS IQR")). Commerce, finding that

information regarding "amounts of assistance provided to the agricultural sector . . . on an industry basis is necessary to determine whether the BPS [program] is de facto specific," resorted to facts otherwise available to support its analysis.  Id. at 18–19; see generally 19 U.S.C. § 1677e.

The information relied upon by Commerce as facts otherwise available is drawn from Coalition's petition and corroborated by the general information provided by the GOS.  See Second Remand Results at 19–22 (citing Pet. Vol. III at 9–17, Exs. III-13, III-15).  Commerce highlighted Coalition's estimate of BPS payments received by olive growers (€ 1.28 billion annually) in comparison to the approximate total BPS payments (€ 5 billion annually), and the resultant conclusion that "the olive industry in Spain received about one-fourth of all [BPS] payments" during the period of investigation.  Id. at 21.  In corroboration of this estimate, Commerce relied on the usage data provided by GOS, including "the total amount of assistance provided under the BPS program during the [period of investigation] and the total number of approved applications," in combination with Plaintiffs' reported subsidy usage during that same period.  Id. at 21–22.  Because Commerce calculated the approximate average BPS assistance per applicant to be [[            ]], while the average assistance reported by Plaintiffs Guadalquivir, Agro Sevilla, and Angel Camacho was between [[          ]] and [[              ]], Commerce determined that record information supported Coalition's allegations and concluded that the BPS program was "de facto specific within the meaning of [19 U.S.C. § 1677(5A)(D)(iii)(III)]."  Id. at 22.

Section 1677e of Chapter 19 of the U.S. Code provides, in relevant part, that if:

(1) necessary information is not available on the record, or

(2) an interested party or any other person –

>     (A) withholds information that has been requested by the administering authority or the Commission under this subtitle, [or]

      (B) fails to provide such information by the deadlines for submission of the
         information or in the form and manner requested,

     . . .

then Commerce "shall, subject to section 1677m(d) of this title, use the facts otherwise available

in reaching the applicable determination under this subtitle."  19 U.S.C. § 1677e(a).  Section

1677m(d) provides that, to the extent deficient information is provided, Commerce "shall promptly

inform the person submitting the response of the nature of the deficiency and shall, to the extent

practicable, provide that person with an opportunity to remedy or explain the deficiency."  19

U.S.C. § 1677m(d).  Where Commerce "relies on secondary information rather than information

obtained in the course of an investigation or review" in making its determination, it must also, "to

the extent practicable, corroborate that information from independent sources that are reasonably

at [its] disposal."  19 U.S.C § 1677e(c)(1).

     It is not contested that the GOS failed to provide the information requested by Commerce:

namely, data reflecting the amount of BPS assistance distributed on a per-recipient and per-

industry basis during the period of review.  Second Remand Results at 17–18, see also Pls.' OAQ

Resps. at 2 (summarizing the information provided by GOS).  It is also apparent that Commerce

provided an opportunity for GOS to explain or remedy its deficient submission.  See GOS Suppl.

Questionnaire (Dep't Commerce Oct. 25, 2017), P.R. 240.  Accordingly, Commerce was permitted

by 19 U.S.C § 1677e to rely upon facts otherwise available on the record to determine whether

BPS subsidy payments to olive growers were de facto specific.  Because "the only information on

the record regarding the distribution of assistance under the BPS on an industry basis" was

therefore Coalition's petition, Commerce reasonably relied upon the petition as facts otherwise

available.  Def.'s Br. at 10 (quoting Second Remand Results at 41); see also Pls.' OAQ Resps. at

2.

Commerce's analysis of the facts otherwise available is sufficient to support its finding of de facto specificity. Although the facts available consisted of secondary information -- namely, estimations by Coalition of the current industry-wide BPS subsidy payments -- Coalition supported its estimates with publicly available information, including statements by the European Commission that BPS funding would remain stable from 2014 (under the SPS program) to 2020. Second Remand Results at 20–21 (citing Pet. Vol. III at Ex. III-15). Commerce likewise confirmed Coalition's estimates "to the extent practicable" using the GOS's submissions, which suggested that the olive farmers under investigation -- together the three most-prolific producers of ripe olives during the period of investigation -- received many times the average BPS subsidy payments during that period. Id. at 22 (citing GOS IQR at 53–54); Asemesa I, 429 F. Supp. 3d at 1332. Accordingly, Commerce satisfied its statutory obligation to corroborate Coalition's petition. See 19 U.S.C. § 1677e(c)(1).

Nor is it the case that, as Plaintiffs argue, Commerce improperly relied upon data relating to "past programs." Pls.' Br. at 4. While Coalition's petition incorporates the publicly reported subsidy data regarding the SPS program and the Common Market Program, it expressly assesses, and Commerce expressly considered, that data as it informs the current BPS program. See Second Remand Results at 20–21 (citing Pet. Vol. III at Ex. III-15). Nor does Commerce's conclusion that Guadalquivir, Agro Sevilla, and Angel Camacho received "between double and 83 times the average amount of assistance" facially support a proportionate allocation of benefits on a per-hectare basis or undermine the assertions in the petition. Pls.' Br. at 5. Rather, as Commerce concludes, the markedly higher subsidies received by key players in the Spanish olive industry could just as easily indicate that the industry as a whole receives a disproportionate amount of the

total BPS subsidy payments.[2]  Second Remand Results at 21; see Def.'s Br. at 13–15 (explaining

in relevant part that the GOS data was used for purposes of corroboration, not an initial specificity

analysis).  As there is no basis to conclude that Commerce's analysis or corroboration of the

petition was in error, and as "a reasonable mind might accept" the petition as sufficient to support

Commerce's de facto specificity finding, that finding is supported by substantial evidence and

sustained.  Maverick Tube, 857 F.3d at 1359 (citing Consol. Edison Co., 305 U.S. at 229).

>    ## II.    *Substantial Dependence*

Applying 19 U.S.C. § 1677-2 on remand, Commerce again concluded that table olives

satisfied the statute's substantial-dependence analysis such that BPS subsidy payments to olive

growers can be attributed to producers of table olives.  Second Remand Results at 36.  However,

in light of the court's conclusion in Asemesa II that "prior stage product" cannot be defined as "the

raw agricultural product that the industry under examination considers principally suitable for use

in the prior stage of production of the latter stage product," Commerce revised its application of

the statute.  523 F. Supp. 3d at 1400.  Specifically, Commerce determined that the "prior stage

product" in this case is "table and dual-use raw olive varietals that are biologically distinct from

other raw olive varietals" -- namely, the manzanilla, gordal, hojiblanca, and carrasquena varietals

-- while the latter stage product is all table olives.  Second Remand Results at 30.  Commerce then

concluded that "[b]ecause 55.28 percent of the manzanilla, gordal, hojiblanca, and carrasquena

varietals, the prior stage product, were processed into table olives, the latter stage product, we find

that the demand for these varietals is substantially dependent on processed table olives."  Id. at 36.

---

[2] Indeed, as both the Government and Defendant-Intervenor note, the fact that olive production
constitutes only three percent of Spain's agricultural output further supports Commerce's
conclusion and is notably not addressed by the Plaintiffs in their comments on the Second Remand
Results.  See Second Remand Results at 19–20 n.86; Def.'s Br. at 11, Def.-Inter.'s Br. at 6–7.

Plaintiffs oppose Commerce's substantial-dependence determination, arguing that Commerce's consumption ratio (calculated by comparing the total amount of manzanilla, gordal, hojiblanca and carrasquena olive varietals processed into table olives with the total amount harvested) does not reflect substantial dependence, and in any case is not supported by substantial evidence.  Pls.' Br. at 6–7.  The Government and Defendant-Intervenor argue in favor of Commerce's determination, contending that Commerce reasonably identified specific olive varietals as the prior stage product, and reasonably assessed the dependence of those varietals on the production of table olives.  Def.'s Br. at 17–21; Def.-Inter.'s Br. at 13–22.

### A.       The Legal Standard is Satisfied

As a threshold matter, the court reiterates its conclusions in Asemesa I, where it determined that the plain meaning of 19 U.S.C. § 1677-2 requires a finding of substantial dependence where the demand for raw olives is "'largely, but not wholly,' 'contingent' on the demand for table olives."  See 429 F. Supp. 3d at 1341–42 (citations omitted).  The court further determined that Commerce's practice is to treat as substantially dependent any raw agricultural product for which at least half of the demand depends on the relevant latter stage product.  See id. at 1341–46 (noting that Commerce has developed a practice of finding substantial dependence where the latter-stage product comprises "almost exclusively, almost all, most, or substantially all the demand" for the prior-stage product); see also Final Affirmative Countervailing Duty Determination: Fresh, Chilled, and Frozen Pork from Canada, 54 Fed. Reg. 30,774 (Dep't Commerce July 24, 1989) ("Pork from Canada 1989"); Rice from Thailand; Final Results of Countervailing Duty Administrative Review, 59 Fed. Reg. 8,906 (Dep't Commerce Feb. 24, 1994) ("Rice from Thailand 1994").

In light of the plain meaning of the statute and Commerce's established past practice, Plaintiffs are not correct that Commerce's 55.28 percent consumption ratio cannot reflect substantial dependence.  Pls.' Br. at 21–22.  Where more than half of a prior stage product is dedicated to the production of a latter stage product, demand for the prior stage product is largely but not wholly dependent on the latter stage product.  Indeed, Commerce has expressly concluded that where "most" of a prior stage product is dedicated to the production of a latter stage product, demand for each is "inextricably linked" such that a finding of substantial dependence is appropriate.  Pork from Canada 1989 at 30,775.  Accordingly, Plaintiffs' argument that "[e]ven assuming" the accuracy of Commerce's consumption ratio, "its stated 55 percent figure does not meet the legal standard" is unavailing.[3]  Pls.' Br. at 20.

### B.        Commerce's Consumption Ratio is Supported by Substantial Evidence and in Accordance with Law

Having concluded that the legal standard would be satisfied by Commerce's 55.28 percent consumption ratio, the court next assesses whether the calculation of that ratio was supported by substantial evidence and in accordance with law.  In the Second Remand Results, Commerce first reassessed the appropriate prior stage product for its substantial-dependence analysis, concluding that "[b]ecause manzanilla, gordal, hojiblanca, and carrasquena account for 87 percent of olive production grown for table during the [period of investigation], we are relying on these four table and dual-use raw olive varietals as the 'prior stage product.'"  Second Remand Results at 32.  It rejected as potential prior stage products "strictly mill varietals," as "typically only 1 percent of

---

[3] The court likewise rejects Plaintiffs' argument that a "single continuous line of production" is required for a finding of substantial dependence.  Pls.' Br. at 32.  Plaintiffs identify no statutory basis for this alleged requirement, and like the threshold for substantial dependence, the court has already addressed the treatment of substantial dependence where there is no single continuous line of production in its prior opinion.  Asemesa I, 429 F. Supp. 3d at 1345; see also First Remand Results at 70; Second Remand Results at 58–59.

mill olives are sent to table" as well as dual-use cacerena olives, as "the production volume of cacarena comprises a small percentage of the total volume of olive varietals grown for table." Id. at 32–33.  Next, Commerce calculated a consumption ratio where the "492,244 tons of manzanilla, gordal, carrasquena, and hojiblanca grown for table, plus the 71,814 tons of hojiblanca grown for mill but used for table olive production" constituted the numerator (i.e., the amount of prior stage product used in the production of the latter stage product) and the "1,020,426 tons of manzanilla, gordal, carrasquena, and hojiblanca olive varietals" grown for any purpose (i.e., the total amount of prior stage product) constituted the denominator.  Id. at 33–36.  These numbers were drawn from Plaintiffs' responses and comments on the draft remand redetermination and adjusted (1) to exclude non-hojiblanca mill olives used for table olive production in the numerator, and (2) to include hojiblanca mill olives used for mill olive production in the denominator.  Id.  These adjustments were intended to accurately reflect the dual-use nature of hojiblanca olives and to avoid incorporating in Commerce's analysis any dual-use olive varietals for which there was inadequate evidence on the record.  Id. at 33–34.  Using the adjusted numerator and denominator, Commerce's consumption ratio indicated that 55.28 percent of the manzanilla, gordal, hojiblanca, and carrasquena varietals were processed into table olives.  Id. at 36.

The court first concludes that Commerce's reassessment of the appropriate prior stage product on remand is supported by substantial evidence and in accordance with law.  In Asemesa II, the court rejected Commerce's conclusion that the prior stage product, for purposes of a substantial-dependence analysis, was such raw olives "[as] the industry under examination considers principally suitable for use in" the production of table olives.  523 F. Supp. 3d at 1407. The court noted that such a definition would render 19 U.S.C. § 1677-2 "largely self-fulfilling" such that the section would have little remaining meaning.  Id.  On remand, Commerce identified

specific varietals as the appropriate prior stage product and explained that the excluded varietals

were biologically distinct.  Second Remand Results at 31.  Specifically, Commerce explained that

the "table olive varietals" it identified "have a lower oil content, are larger in size, are more

symmetrical in shape, and generally are characterized as having a higher pulp-to-bone ratio." Id.

This revised approach remedies the statutory inconsistency identified by the court in Asemesa II,

and is supported by record evidence, including by the submissions of the GOS.  Id.; see also

Musco's February 25 Resp. at Ex. 2A (Feb. 25, 2020), R.P.R. 4; GOS Suppl. Questionnaire (Dep't

Commerce Oct. 25, 2017), P.R. 240.

That there is a degree of fungibility between table and mill olives does not invalidate

Commerce's determination.  As Plaintiffs acknowledge, it is an undisputed fact that "almost all"

of certain varietals are used for either mill or table olive production.  Pls.' OAQ Resps. at 10–11.

Furthermore, Commerce directly addresses the risk that fungibility might muddy the waters of its

substantial-dependence analysis by adjusting the raw numbers of manzanilla, gordal, hojiblanca,

and carrasquena olives incorporated in the numerator and denominator of its consumption ratio to

avoid distorting that ratio by overestimating the dependence of dual-use olives (like hojiblanca)

on table olive production.  Second Remand Results at 33–36.  Accordingly, the court concludes

that Commerce's reevaluation of the appropriate prior stage product is supported by substantial

evidence and complies with the court's determination in Asemesa II.  See Beijing Tianhai Indus.,

106 F. Supp. 3d at 1346–47 (citations omitted) (setting out standard for compliance with court

remand).

Next, the court considers Commerce's reliance on a consumption ratio to determine

substantial dependence.  Plaintiffs argue that 19 U.S.C. § 1677-2 requires that "but for demand for

table olives, largely all of the raw olive varieties [Commerce] identifies as substantially dependent

would not exist," and that the use of a consumption ratio therefore erroneously fails to "emphasize[] the relationship between demand and dependence, not demand and use." Pls.' Br. at 16–17. This is incorrect. First, the statute requires that "demand for the prior stage product [be] substantially dependent on the demand for the latter stage product," not that a prior stage product could only ever be employed to produce the latter stage product at issue. 19 U.S.C. § 1677-2. As noted above, such requirement is satisfied where more than half of a prior stage product is dedicated to the production of a latter stage product. Second, where -- as here -- a prior stage product is used almost exclusively in the production of latter stage products, and not sold in its raw form, it is not apparent on what basis "demand" is distinct from "use" for purposes of a substantial dependence analysis. Finally, as Defendant-Intervenors note, "Commerce's use of consumption as a proxy for . . . demand is consistent with . . . its past practice." Def.-Inter.'s Br. at 13. For example, Commerce has found substantial dependence where "almost all . . . paddy or unmilled rice is dedicated to the production of milled rice," Rice from Thailand 1986 at 8,909, and where "most swine" is dedicated to slaughter, and "pork constitutes the primary product of the slaughtered pig," Pork from Canada 1989 at 30,775. Commerce's use of a consumption ratio to assess substantial dependence is thus in accordance with law.

Finally, the court considers the calculations underlying Commerce's consumption ratio. Addressing Commerce's adjustments to the consumption ratio, discussed supra, Plaintiffs argue "Commerce's analysis is built upon a series of mischaracterizations and unsupported assumptions that bias the results, all in reliance on data that do not permit a true varietal analysis." Pls.' Br. at 22. Plaintiffs specifically contest both Commerce's exclusion of certain non-hojiblanca dual-use varietals (namely cacerena) from the denominator of the ratio, and Commerce's inclusion of

hojiblanca olives grown for mill in the numerator.[4]  Id. at 27–32.  Plaintiffs further argue that

Commerce unreasonably decided not to rely on certain record data, including GOS's hectare data.

Id. at 32–34.

Again, Plaintiffs' arguments are unavailing.  First, as both the Government and Defendant-

Intervenor explain, Commerce excluded the cacerena olives from its analysis because, while it had

access to data conveying "the total tonnage of cacerena olives used to produce table olives," it

lacked any information regarding the amount of cacerena olives not used to produce table olives.

Def.'s Br. at 30; see Def.-Inter.'s Br. at 18; Second Remand Results at 66.  Thus, inclusion of the

cacerena data would have inflated the numerator of the consumption ratio (amount of table and

dual-use varietals used for table olive production) without similarly accurately increasing the

denominator (total amount of such varietals produced).  Second, Commerce adequately explained

its inclusion of the hojiblanca data and its adjustment of that data to include in the ratio

denominator hojiblanca grown for both table and mill.   Second Remand Results at 33–36.

Plaintiffs' argument that the hojiblanca grown for mill but used for table should nevertheless be

subtracted from the ratio numerator would render Commerce's inclusion of the hojiblanca olives

grown for mill in the ratio numerator unnecessary and inaccurate.  Id.; see also Def.-Inter.'s Br. at

20.  Finally, with respect to Plaintiffs' arguments that Commerce was obligated to rely upon

specific record data -- namely the GOS's hectare production data and the GOS agency (AICA)

consumption data -- Commerce reasonably declined to rely on both the GOS hectare data and

AICA data to adjust its consumption ratio.  The GOS hectare data was considered by Commerce,

---

[4] As the Government notes, Plaintiffs have waived their argument that Commerce should have
derived the total tonnage of cacerena olives used to produce olive oil using the hojiblanca ratio by
failing to raise such argument before Commerce.  Def.'s Br. at 31; Pls.' Br. at 28.  Accordingly,
the court need not address Plaintiffs' argument.

but ultimately rejected because it was unpublished, non-contemporaneous, and lacked any supporting documentation.  Second Remand Results at 66.  Similarly, the AICA data could not have been used (as Plaintiffs argue) to alter Commerce's consumption ratio because it represents olive production data only, and would therefore require Commerce to make the unsupported assumption that all olives grown for table are ultimately consumed in the production of table olives. Pls.' Br. at 25–26; Def.'s Br. at 32.  Commerce thus reasonably supported its calculation of the 55.28 percent consumption ratio with record evidence, and its substantial-dependence determination must be sustained.

## CONCLUSION

For the foregoing reasons, Commerce's Second Remand Results are sustained.  Judgment will enter accordingly in favor of the Government.

**SO ORDERED.**

/s/   Gary S. Katzmann
Gary S. Katzmann, Judge

Dated: September 14, 2022
        New York, New York